No. 25-10184 (consolidated with 25-10186, 25-10613, and 25-11163)

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

*Disability Rights Florida, et al.*
Plaintiffs-Appellees,
v.
*Florida Secretary of State*,
Defendant-Appellant.

*Florida Rising Together, et al.*
Plaintiffs-Appellees,
v.
*Florida Secretary of State*,
Defendant-Appellant.

*League of Women Voters of Florida, et al.*
Plaintiffs-Appellees,
v.
*Florida Secretary of State*,
Defendant-Appellant.

*Harriet Tubman Freedom Fighters Corp.*
Plaintiff-Appellee,
v.
*Florida Secretary of State*,
Defendant-Appellant.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA

## SUPPLEMENTAL APPENDIX OF APPELLEES DISABILITY RIGHTS FLORIDA, FLORIDA RISING TOGETHER, AND LEAGUE OF WOMEN VOTERS OF FLORIDA

## VOLUME I OF I

(counsel listed on next page)

Amia Trigg
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
700 14th Street NW, Ste. 600
Washington, DC 20005
Tel: 202-682-1300
atrigg@naacpldf.org

Morenike Fajana
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, NY 10006
Tel: 212-965-2200
mfajana@naacpldf.org

Ellen Y. Choi
COVINGTON & BURLING
LLP
415 Mission Street
San Francisco, CA 94105
Tel: 415-591-6000
echoi@cov.com

*Counsel for Disability Rights
Florida Appellees*

John A. Freedman
Elisabeth S. Theodore
Jeremy C. Karpatkin
Jillian M. Williams
ARNOLD PORTER KAYE
SCHOLER LLP
601 Massachusetts Ave, NW
Washington, DC 20001
Tel: 202-942-5000
John.freedman@arnoldporter.com
Elisabeth.theodore@arnoldporter.com
Jeremy.karpatkin@arnoldporter.com
Jillian.williams@arnoldporter.com

John Powers
Advancement Project
1220 L Street, NW, Ste. 850
Washington, DC 20005
Tel: 202-728-9557
jpowers@advancementproject.org

Jeffrey A. Miller
ARNOLD & PORTER KAYE
SCHOLER LLP
3000 El Camino Road
Five Paolo Alto Sq., Ste. 500
Palo Alto, CA 94306
Tel: 650-319-4500

Miranda Galino
LatinoJustice, PRLDEF
523 W. Colonial Dr.
Orlando, FL 32804
Tel: 321-418-6354
mgalindo@latinojustice.org

Jeffrey.miller@arnoldporter.com

Neda Khoshkhoo
Dēmos
368 9th Ave., 6th Floor, Ste. 11-105
New York, NY 10001
Tel: 202-864-2739
nkhoshkhoo@demos.org

*Counsel for Florida Rising Together Appellees*

Frederick S. Wermuth
KING, BLACKWELL, ZEHNDER & WERMUTH, P.A.
P.O. Box 1631
Orlando, FL 32802
Tel: 407-422-2472
fwermuth@kbzwlaw.com

David R. Fox
Christina Ford
ELIAS LAW GROUP LLP
250 Massachusetts Ave. NE, Ste. 400
Washington, DC 20001
Tel: 202-968-4490
dfox@elias.law
cford@elias.law

*Counsel for Appellees League of Women Voters of Florida, Inc., et al.*

# INDEX TO SUPPLEMENTAL APPENDIX

## No. 4:21-cv-186

### *League of Women Voters of Florida, Inc., et al. v. Byrd*
### (previously, *League of Women Voters of Florida, Inc., et al. v. Lee)*
### (Consolidated Docket)

| TAB | DATE | DOCUMENT |
|-----|------|----------|
| 114 | 07/07/2021 | Sixty-Six Supervisors of Elections' Unopposed Motion To Be Excused From Active Participation |
| 163 | 07/23/2021 | Secretary Lee's Response to the Court's Order to Show Cause |
| 665 | 03/31/2022 | Final Order Following Bench Trial |
| 758 | 11/15/2023 | Order Vacating Judgment and Directing Clerk to Enter Partial Judgment |

# TAB 114

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

LEAGUE OF WOMEN VOTERS OF
FLORIDA, INC., *et al*.,

      Plaintiffs,                   Case No. 4:21-cv-00186-MW-MAF
                                  Case No. 4:21-cv-00187-MW-MAF
v.                                 Case No. 4:21-cv-00242-MW-MAF

LAUREL M. LEE, in her official
capacity as Florida Secretary of State,
*et al*.,

      Defendants.
_____/

### SIXTY-SIX SUPERVISORS OF ELECTIONS' UNOPPOSED
### MOTION TO BE EXCUSED FROM ACTIVE PARTICIPATION

Sixty-six Supervisors of Elections respectfully move the Court to be excused

from active participation in Case Nos. 4:21-cv-00186-MW-MAF and 4:21-cv-

00187-MW-MAF, including any obligation to file responsive pleadings and to

attend hearings, conferences, and trial.[1]

1.     Plaintiffs challenge recent amendments to the Florida Election Code.

The Movants will not take positions on the merits of Plaintiffs' claims. The

_____

[1] The Supervisor of Elections for Miami-Dade County does not join in this
motion.

Movants do not intend, for example, to file dispositive motions or to offer exhibits or call witnesses at trial.

2.      The Movants were named as defendants to assure the efficacy of any injunctive relief the Court might grant. *See Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236 (11th Cir. 2020). The Secretary of State, the Republican National Committee, and the Republican National Senatorial Committee are actively defending the challenged provisions.

3.      The Movants will comply with all court orders and judgments applicable to them, though excused from active participation. But the expenditure of public resources by so many local officials in a matter that they do not intend to actively defend is unnecessary, and their mandatory participation only encumbers the efficient management of this litigation.

4.      For example, the complaints filed by the League Plaintiffs and the NAACP Plaintiffs together comprise nearly 400 paragraphs. *But see* Fed. R. Civ. P. 8(a)(2) (requiring a complaint's statement of the plaintiff's claim to be "short"). The preparation of answers by inactive defendants would alone consume significant resources to little purpose.

5.      The Movants therefore respectfully request the Court to excuse them from active participation in Case Nos. 4:21-cv-00186-MW-MAF and 4:21-cv-00187-MW-MAF, including any obligation to file responsive pleadings and to

attend hearings, conferences, and trial. The requested relief will neither cause prejudice to other parties nor deny the Court the benefit of a full, adversarial presentation of the merits of this dispute.

6.      The Movants do not seek to be excused from their discovery obligations. Though excused from active participation, the Movants will continue to respond or object to discovery requests as the Federal Rules of Civil Procedure require. Likewise, the Movants will provide deposition and trial testimony if compelled in accordance with the Rules.

7.      District courts "enjoy broad discretion in deciding how best to manage the cases before them." *Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1366 (11th Cir. 1997). Pursuant to this discretion, district courts have excused disinterested defendants from active participation in litigation. *See*, *e.g.*, *The Belt Ry. Co. of Chi. v. Weglarz Hotel III*, *LLC*, No. 1:18-cv-07361 (N.D. Ill. Mar. 12, 2019) (ECF No. 37); *Patch of Land Lending*, *LLC v. Realty Capital Ventures*, *LLC*, No. 9:17-cv-80450-KAM (S.D. Fla. Oct. 12, 2017) (ECF No. 49).

8.      Importantly, the Movants reserve the right to present facts and argument to the Court on the subject of remedies, including the timing and feasibility of specific remedies that the Court might order, and the impact of those remedies on the proper administration of elections.

**WHEREFORE**, Defendants, the Supervisors of Elections for Alachua, Baker, Bay, Bradford, Brevard, Broward, Calhoun, Charlotte, Citrus, Clay, Collier, Columbia, DeSoto, Dixie, Duval, Escambia, Flagler, Franklin, Gadsden, Gilchrist, Glades, Gulf, Hamilton, Hardee, Hendry, Hernando, Highlands, Hillsborough, Holmes, Indian River, Jackson, Jefferson, Lafayette, Lake, Lee, Leon, Levy, Liberty, Madison, Manatee, Marion, Martin, Monroe, Nassau, Okaloosa, Okeechobee, Orange, Osceola, Palm Beach, Pasco, Pinellas, Polk, Putnam, Santa Rosa, Sarasota, Seminole, St. Johns, St. Lucie, Sumter, Suwannee, Taylor, Union, Volusia, Wakulla, Walton, and Washington Counties, respectfully move the Court to be excused from active participation in Case Nos. 4:21-cv-00186-MW-MAF and 4:21-cv-00187-MW-MAF, including any obligation to file responsive pleadings and to attend hearings, conferences, and trial.

## <u>Local Rules Certifications</u>

Counsel for the Movants conferred with all adverse parties and thus complied with the attorney-conference requirement of Local Rule 7.1(B). None of the plaintiffs in Case Nos. 4:21-cv-00186-MW-MAF and 4:21-cv-00187-MW-MAF opposes this request.

This motion contains 615 words and therefore complies with the word-count requirement of Local Rule 7.1(F).

Respectfully submitted,

/s/ *John T. Lavia, III*

John T. LaVia, III
Florida Bar No.: 853666
Gardner, Bist, Bowden, Bust, Dee,
Lavia, Wright, Perry, & Harper, P.A.
1300 Thomaswood Drive
Tallahassee, Florida 32308
Telephone No.: (850) 385-0070
Facsimile No.: (850) 385-5416
Primary email: jlavia@gbwlegal.com
Secondary email: shari@gbwlegal.com
*Counsel for Supervisors of Elections*
*for Clay, Martin, Osceola, Polk, and*
*St. Lucie Counties*

/s/ *Andy Bardos*

Andy Bardos (FBN 822671)
GRAYROBINSON, P.A.
Post Office Box 11189
Tallahassee, Florida 32302-3189
Telephone: 850-577-9090
andy.bardos@gray-robinson.com
*Counsel for Supervisors of Elections*
*for Charlotte, Collier, Indian River,*
*Lake, Lee, Manatee, Marion, Monroe,*
*Pasco, and Seminole Counties*

/s/ *Ronald A. Labasky*

Ronald A. Labasky
Florida Bar No.: 206326
Brewton Plante, P.A.
215 S. Monroe St., Ste. 825
Tallahassee, FL 32301
Telephone: (850) 222-7718
Facsimile: (850) 222-8222
Primary email: rlabasky@blawfirm.net
Secondary email: fsase@bplawfirm.net
*Counsel for Supervisors of Elections*
*for Clay, Martin, Osceola, Polk, and*
*St. Lucie Counties*

/s/ *Frank M. Mari*

Frank M. Mari
Florida Bar No. 93243
Bell & Roper, P.A.
2707 E. Jefferson St.
Orlando, FL 32803
Telephone: 407-897-5150
Facsimile: 407-897-3332
fmari@bellroperlaw.com
ihaines@bellroperlaw.com
*Counsel for Supervisors of Elections*
*for Brevard, DeSoto, Flagler,*
*Gilchrist, Gulf, Highlands, Jefferson,*
*and Madison Counties*

/s/ Nicholas A. Shannin
Nicholas A. Shannin, Esquire
Florida Bar No. 0009570
Shannin Law Firm, P.A.
214 South Lucerne Circle East
Suite 200
Orlando, Florida 32801
Tel: (407) 985-2222
Email: nshannin@shanninlaw.com
service@shanninlaw.com
Counsel for Supervisor of Elections for
Orange County

/s/ Dale A. Scott
Michael J. Roper, Esq.
Fla. Bar No. 0473227
Dale A. Scott, Esq.
Fla. Bar No. 0568821
dscott@bellroperlaw.com
ehemphill@bellroperlaw.com
2707 East Jefferson Street
Orlando, FL 32803
Tel: 407-897-5150
Fax: 407-897-3332
Counsel for Supervisors of Elections
for Citrus County

Andrew J. Meyers
Broward County Attorney
115 South Andrews Avenue, Suite 423
Fort Lauderdale, Florida 33301
Telephone: (954) 357-7600

By: /s/ Benjamin Salzillo
Benjamin Salzillo
Fla. Bar No. 582751
bsalzillo@broward.org
Nathaniel A. Klitsberg
Fla. Bar No. 307520
nklitsberg@broward.org
Counsel for Supervisor of Elections for
Broward County

/s/ Ashley D. Houlihan
ASHLEY D. HOULIHAN
Florida Bar Number: 125852
General Counsel
SUPERVISOR OF ELECTIONS
PALM BEACH COUNTY
240 S. Military Trail
West Palm Beach, Florida 33401
Phone: (561) 656-6200
Fax: (561) 656-6220
E-mail:
ashleyhoulihan@pbcelections.org
Counsel for Supervisor of Elections for
Palm Beach County

6

/s/ *Mark Herron*
Mark Herron
MESSER CAPARELLO, P.A.
Florida Bar No. 199737
Primary Email: mherron@lawfla.com
Secondary Emails:
clowell@lawfla.com
statecourtpleadings@lawfla.com
S. Denay Brown
Florida Bar No. 88571
Primary Email: dbrown@lawfla.com
Secondary Emails: tweiss@lawfla.com
Patrick O'Bryant
Florida Bar No. 1011566
Primary Email: pobryant@lawfla.com
Secondary Email: clowell@lawfla.com
Post Office Box 15579
Tallahassee, FL 32317
Telephone (850) 222-0720
Facsimile: (850) 224-4359
*Counsel for Supervisor of Elections for Leon County*

MARKS GRAY, P.A.


/s/ *Susan S. Erdelyi*
Susan S. Erdelyi
Florida Bar No.: 0648965
E. Paul Cuffe
Florida Bar No. 1018521
1200 Riverplace Blvd., Suite 800
Jacksonville, Florida 32207
Telephone: (904) 398-0900
Facsimile: (904) 399-8440
serdelyi@marksgray.com
pcuffe@marksgray.com
jmcduffie@marksgray.com
*Counsel for Supervisors of Elections for Baker, Bay, Bradford, Calhoun, Columbia, Dixie, Franklin, Gadsden, Hamilton, Jackson, Lafayette, Liberty, Nassau, Putnam, Santa Rosa, St. Johns, Sumter, Suwannee, Taylor, Union, Wakulla, Walton, and Washington Counties*

HENDERSON, FRANKLIN,
 STARNES & HOLT
Post Office Box 280
Fort Myers, Florida 33902-0280
Telephone: 239.344.1346
Facsimile: 239.344.1501
Primary:
 Jerry.olivo@henlaw.com
 Robert.shearman@henlaw.com
Secondary:
 Courtney.ward@henlaw.com

/s/ *Robert C. Shearman*
Geraldo F. Olivo
Florida Bar No. 60905
Robert C. Shearman
Florida Bar No. 614025
*Counsel for Supervisors of Elections*
*for Glades, Hardee, Hendry, Holmes,*
*Levy, and Okeechobee Counties*

/s/ *Jon A. Jouben*
Jon A. Jouben, Esq.
Deputy County Attorney
Florida Bar No. 149561
Kyle Benda
Assistant County Attorney
Florida Bar No. 113525
Hernando County Attorney's Office
20 North Main Street, Suite 462
Brooksville, Florida 34601
(352) 754-4122
(352)754-4001 - Fax
jjouben@co.hernando.fl.us
kbenda@co.hernando.fl.us
cao@co.hernando.fl.us
phare@co.hernando.fl.us
*Counsel for Supervisors of Elections*
*for Hernando County*

/s/ *Kia M. Johnson*
KIA M. JOHNSON
Assistant County Attorney
Escambia County Attorney's Office
Florida Bar Number: 124746
221 Palafox Pl, Ste. 430
Pensacola, FL 32502
Phone: (850) 595-4970
Fax: (850) 595-4979
kmjohnson@myescambia.com
*Counsel for Supervisors of Elections*
*for Escambia County*

/s/ *Kelly L. Vicari*
KELLY L. VICARI
FBN 88794 / SOB 03325558
Senior Assistant County Attorney
Pinellas County Attorney's Office
315 Court Street, Sixth Floor
Clearwater, Florida 33756
Phone: (727) 464-3354
Fax: (727) 464-4147
kvicari@pinellascounty.org
eservice@pinellascounty.org
*Counsel for Supervisors of Elections*
*for Pinellas County*

/s/ *Gregory T. Stewart*
GREGORY T. STEWART
Florida Bar No. 203718
ELIZABETH DESLOGE ELLIS
Florida Bar No. 97873
KIRSTEN H. MOOD
Florida Bar No. 115595
Nabors, Giblin & Nickerson, P.A.
1500 Mahan Drive, Suite 200
Tallahassee, Florida 32308
(850) 224-4070
(850) 224-4073 (Facsimile)
gstewart@ngnlaw.com
eellis@ngnlaw.com
kmood@ngnlaw.com
legal-admin@ngnlaw.com
*Counsel for Supervisors of Elections*
*for Okaloosa County*

/s/ *Craig D. Feiser*
CRAIG D. FEISER
Assistant General Counsel
Florida Bar No. 164593
MARY MARGARET GIANNINI
Assistant General Counsel
Florida Bar No. 105572
117 West Duval Street, Suite 480
Jacksonville, Florida 32202
(904) 255-5100 (Telephone)
(904) 255-5120 (Facsimile)
CFeiser@coj.net; BOsburn@coj.net
MGiannini@coj.net;
ASeegobin@coj.net
*Counsel for Supervisor of Elections for*
*Duval County*

/s/ *Morgan R. Bentley*
MORGAN R. BENTLEY, ESQ.
Florida Bar No. 0962287
Bentley Law Firm, P.A.
mbentley@thebentleylawfirm.com
783 South Orange Ave., Suite 300
Sarasota, Florida 34236
Telephone: 941-556-9030
Facsimile: 941-312-5316
vengel@bentleyandbruning.com
*Counsel for Supervisors of Elections*
*for Sarasota County*

/s/ *Stephen M. Todd*
Stephen M. Todd, Esquire
Senior Assistant County Attorney
Florida Bar No. 0886203
Office of the County Attorney
Post Office Box 1110
Tampa, Florida 33601-1110
(813) 272-5670 – Fax: (813) 272-5758
ToddS@hillsboroughcounty.org
MatthewsL@hillsboroughcounty.org
ConnorsA@hillsboroughcounty.org
*Counsel for Supervisor of Elections for*
*Hillsborough County*

/s/ *Robert C. Swain*
Robert C. Swain
Senior Assistant County Attorney
Florida Bar No. 366961
/s/ *draft*
Diana Johnson
Senior Assistant County Attorney
Florida Bar No. 69160
12 Southeast 1st Street
Gainesville, Florida 32601
Phone: (352) 374-5218/Fax: 374-5216
bswain@alachuacounty.us
dmjohnson@alachuacounty.us
CAO@alachuacounty.us
*Counsel for Supervisor of Elections for*
*Alachua County*

/s/ *W. Kevin Bledsoe*
W. Kevin Bledsoe, Esq. (FBN 29769)
Deputy County Attorney
London L. Ott, Esq. (FBN 95058)
Assistant County Attorney
County of Volusia
Fla. Bar No. 029769
123 W. Indiana Avenue
Deland, Florida 32720
Phone: (386)736-5950
kbledsoe@volusia.org
mefird@volusia.org
adyer@volusia.org
*Counsel for Supervisor of Elections for*
*Volusia County*

## **CERTIFICATE OF SERVICE**

I certify that, on July 7, 2021, this document was served electronically upon all counsel of record.


/s/ *Andy Bardos*
Andy Bardos (FBN 822671)
GRAYROBINSON, P.A.

# TAB 163

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

LEAGUE OF WOMEN VOTERS OF
FLORIDA, INC., *et al.*,

      Plaintiffs,

v.

LAUREL M. LEE, in her official
capacity as Florida Secretary of State,
*et al.*,

      Defendants.

Case Nos.: 4:21-cv-186-MW/MAF
4:21-cv-187-MW/MAF
4:21-cv-201-MW/MAF
4:21-cv-242-MW/MAF

**SECRETARY LEE'S RESPONSE TO THE
COURT'S ORDER TO SHOW CAUSE**

## I.   <u>Introduction</u>

This Court's July 7, 2021 Order requires the "Plaintiffs and Secretary Lee" to

"show cause . . . as to whether Plaintiffs have standing against Secretary Lee for

each claim asserted in each case." Case No. 186 (ECF No. 115 at 4) (emphasis

omitted); Case No. 187 (ECF No. 138).[1]   At the pleading stage, the complaints

---

[1] While this Court's order applies only in *League of Women Voters, et al. v. Lee, et al.*, No. 21-cv-186 (N.D. Fla.) ("*LWV*"), and *NAACP, et al. v. Lee, et al.* No. 21-cv-187 (N.D. Fla.) ("*NAACP*"), the Secretary addresses Plaintiffs' claims in all four complaints for the sake of completeness. *See Florida Rising Together, et al. v. Lee, et al.*, No. 21-cv-201 (N.D. Fla.) ("*Florida Rising*") and *Harriet Tubman Freedom Fighters, Corp. et al. v. Lee, et al.,* No. 21-cv-242 (N.D. Fla.) ("*Harriet Tubman*"). The Secretary further asks that this response not be read as constituting a pleading in response to Amended Complaints; she intends to respond at a later time. *See* Case No. 201 (ECF No. 99) (granting extension); Case No. 242 (ECF No. 64) (same).

should speak for themselves but here it is unclear what the complaints actually say.[2]

Some are still shotgun pleadings that co-mingle allegations from count-to-count and all the now amended complaints still fail to adhere to the standards in *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) to one degree or another. But even temporarily suspending the pleading standards and then reading the complaints in the light most favorable to the Plaintiffs, the Plaintiffs allege that the five challenged sections of Chapter 2021-11, Laws of Florida ("2021 Law") operate *together* to harm them. By extension, the Plaintiffs attempt to establish standing through a theory that an order enjoining the Secretary would provide to them *some* (but not all) of the redress they seek. To the extent the Plaintiffs argue that the Court should consider the alleged harm inflicted by each of the five challenged provisions in *isolation*, then the Plaintiffs have no standing to sue the Secretary for alleged harm caused by three of those provisions: Section 24 (vote-by-mail request), Section 29 (the non-solicitation provision), and Section 32 (the limitation on ballot collection).[3]

---

[2] To be sure, "[i]t is the Plaintiffs' burden to plead and prove" standing. *Steele v. National Firearms Act Branch*, 755 1410, 1414 (11th Cir. 1985).

[3] The Secretary maintains that the Plaintiffs' ADA and Section 208 claims should be dismissed for the reasons set out in her motion to dismiss. *See,* Case No. 187 (ECF No. 92) (motion to dismiss in the *NAACP* matter, the ADA and Section 208 claims will also be a subject of the Secretary's forthcoming motions to dismiss in the *LWV*, *Harriet Tubman*, and *Florida Rising* matters).

The analysis becomes more peculiar still.  Sixty-six of the sixty-seven Supervisors of Elections have said that they "will not take positions on the merits of Plaintiffs' claims."  Case No. 186 (ECF No. 114 at 1).  As this Court notes, without the Supervisors, the Republican Intervenors might be the only ones in a position of asserting the State's interests in defense of all the claims rather than the elected State officials with whom the Secretary administers elections.  *See* Case No. 186 (ECF No. 115 at 2).  That should not be so.

Under these unusual circumstances, the Secretary asks this Court to allow her to present the State's good faith arguments in defense of the State's legislative enactments—to allow her to defend all five provisions of the 2021 Law from attack under the U.S. Constitution and the Voting Rights Act.  The Secretary's participation would be consistent with the Eleventh Circuit's "piggy-back" concept, which allows for cases to proceed before the trial court where some combination of parties can confer Article III standing as to each claim.  Here, assuming a well-pled and cognizable harm as to each claim in each complaint, the Plaintiffs satisfy the causation and redressability prongs against some combination of Defendants.

## II.    <u>Regulatory Overview</u>

As noted above, between the four complaints pending before this Court, the Plaintiffs challenge five separate provisions of the 2021 Law.  To assist this Court, the Secretary provides a brief overview of the challenged provisions.  Footnotes

follow each subheading, cataloging the counts in the now operative complaints where the provisions are seemingly at issue.

*Section 7 (Voter Registration Disclaimer and Delivery Window)*.[4]   The 2021 Law has amended section 97.0575 of the Florida Statutes to require all third-party voter registration organizations to "notify" a voter-applicant "at the time the application is collected": (1) that "the organization might not deliver the application to the division or the supervisor of elections in the county in which the applicant resides in less than 14 days or before registration closes for the next ensuing election"; (2) that "he or she may deliver the application in person or by mail"; (3) "how to register online with the division"; and (4) "how to determine whether the application has been delivered." **Exhibit A** at 8.  Section 7 also provides that an application returned by a third party voter registration organization "must . . . be promptly delivered to the division or the supervisor of elections in the county in which the applicant resides within 14 days after completed by the applicant . . . ." **Exhibit A** at 8. The Florida Division of Elections, within the Florida Department of State, oversees enforcement of Section 7.

---

[4] Section 7 is the subject of counts V and VI in the *LWV* amended complaint. Case No. 186 (ECF No. 160 at 70-75).  Section 7 is the subject of no counts in the *NAACP* amended complaint. Case No. 187 (ECF No. 45).  Section 7 is the subject of counts I, II, III, IV, VII, VIII in the *Florida Rising* amended complaint. Case No. 201 (ECF No. 59 at 92-100, 108-119).  Section 7 is the subject of counts I, II, and III in the *Harriet Tubman* amended complaint. Case No. 242 (ECF No. 44 at 46-60).

*Section 24 (Vote-by-mail Requests).*[5]   Section 24 modified Florida law to require voters to register for a vote-by-mail ballot every general election (every two years) rather than every other general election (every four years).  **Exhibit A** at 18. Section 24 also added the requirement that the elector for whom the ballot is requested provide one of a "Florida driver license number, . . . Florida identification card number, or the last four digits of the elector's social security number, whichever may be verified in the supervisor's records." **Exhibit A** at 19.  Neither the Secretary nor any component of the Department of State has enforcement authority over the vote-by-mail request provisions.

*Section 28 (Drop Box).*[6]   Changes to the drop box provision of state law seek to promote uniformity throughout the State after drop boxes were first used during the 2020 election cycle.  The changes focus on practical security considerations.  The Division of Elections has also been provided the specific authority to levy civil

---

[5] Section 24 is the subject of count I in the *LWV* amended complaint. Case No. 186 (ECF No. 160 at 55-60).  Section 24 is the subject of counts I, II, III, VI, VII, VIII in the *NAACP* amended complaint. Case No. 187 (ECF No. 45 at 56-67, 71-81). Section 24 is the subject of counts I, II, III, and IV in the *Florida Rising* amended complaint. Case No. 201 (ECF No. 59 at 92-100).  Section 24 is the subject of no counts in the *Harriet Tubman* amended complaint. Case No. 242 (ECF No. 44).

[6] Section 28 is the subject of count I in the *LWV* amended complaint. Case No. 186 (ECF No. 160 at 55-60).  Section 28 is the subject of count I, II, III, VI, VII, VIII in the *NAACP* amended complaint. Case No. 187 (ECF No. 45 at 56-67, 71-81). Section 28 is the subject of counts I, II, III, and IV in the *Florida Rising* amended complaint. Case No. 201 (ECF No. 59 at 92-100).  Section 28 is the subject of no counts in the *Harriet Tubman* amended complaint. Case No. 242 (ECF No. 44).

penalties upon any Supervisor of Elections for allowing access to a "drop box . . . for ballot receipt other than is authorized by this section." **Exhibit A** at 24.

*Section 29 (Non-solicitation Provisions).*[7]   Section 29 prohibits individuals and organizations from "engaging in any activity with the intent to influence or effect of influencing a voter" within 150 feet of, among other places, a drop box.   The Secretary has no role in enforcing Section 29's non-solicitation provisions.

*Section 32 (Third-party Ballot Collection).*[8] Section 32 limits the number of vote-by-mail ballots that a person may submit on behalf of others (with some exceptions).   This provision imposes criminal penalties for third-party ballot-collection violations.   The Secretary has no role in enforcing this provision or its criminal penalties.   **Exhibit A** at 27.

---

[7] Section 29 is the subject of counts I, III and IV in the *LWV* amended complaint. Case No. 186 (ECF No. 160 at 55-60, 64-69).   Section 29 is the subject of all counts in the *NAACP* amended complaint. Case No. 187 (ECF No. 45 at 56-81).   Section 29 is the subject of counts I, II, III, IV, V, and VI in the *Florida Rising* amended complaint. Case No. 201 (ECF No. 59 at 92-108).   Section 29 is the subject of no counts in the *Harriet Tubman* amended complaint. Case No. 242 (ECF No. 44).

[8] Section 32 is the subject of counts I and II in the *LWV* amended complaint. Case No. 186 (ECF No. 160 at 55-64).   Section 32 is the subject of counts I, II, III, VI, VII, VIII in the *NAACP* amended complaint. Case No. 187 (ECF No. 45 at 56-67, 71-81).   Section 32 is the subject of no counts in the *Florida Rising* amended complaint. Case No. 201 (ECF No. 59).   Section 32 is the subject of count IV in the *Harriet Tubman* amended complaint. Case No. 242 (ECF No. 44 at 60-63).

III.   **Argument**

  A.   **The *LWV*, *NAACP*, and *Florida Rising's* cumulative theory of harm for redressability.**[9]

Resolution of this Court's question turns on two-related standing concepts. The first cautions that "[s]tanding is not dispensed in gross." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008).   Article III thus requires "a plaintiff [to] demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Id.*   The second asks whether an order entered against the defendant would redress the plaintiff's injury.   Notably, the redressability inquiry under Article III requires that the federal courts have the ability to provide *some* relief—not *complete* relief—from the harms alleged; "relief which remedies at least some of the alleged injuries is sufficient to establish redressability." *I. L. v. Alabama*, 739 F.3d 1273, 1282 (11th Cir. 2014).   There is tension among the two concepts in this case.

Setting aside the pleading standards for the moment, in these cases, the Plaintiffs allege that the five provisions being challenged—taken both individually

---

[9] The *Harriet Tubman* Plaintiffs do not appear to allege that the provisions of Florida law that they challenge work together in some way to harm them. The Secretary also does not concede that allegations that bootstrap "individual" and "cumulative" harms together are proper under *Twombly*, *Iqbal*, and their progeny nor does the Secretary concede that "individual and cumulative" harm pleading is sufficient under Article III for standing purposes. However, this section assumes, *arguendo*, that such pleading is proper and sufficient to invoke this Court's jurisdiction.

and *together*—violate federal law.[10]   Because the Secretary has a role in implementing or enforcing some of the challenged provisions, an order entered against the Secretary would provide at least a partial remedy.  And because Article III requires no more than that, the Plaintiffs might satisfy the redressability prong for standing under their cumulative harm theory.  *See I. L.*, 739 F.3d at 1282.

But whether the cumulative harm theory adequately states (with particularity) a cognizable injury-in-fact for Article III purposes is a separate question.  This Court need not answer that question where, as here, the claims are poorly pled and do not, on their face, demonstrate standing for each claim and each form of relief sought. *See, e.g.*, *LaCroix v. Lee Cty.*, 819 Fed. Appx. 839, 843-44 (11th Cir. 2020); Order Dismissing Complaint Without Prejudice, ECF 17 at 2-7, *Gale Force Roofing & Restoration, LLC v. Brown*, Case No. 4:21-cv-246-MW (N.D. Fla. Jun. 29, 2021).

## B.   The Plaintiffs have standing to sue for certain claims.

Should this Court assess standing for each of the Plaintiffs' claims in isolation, the Plaintiffs have satisfied Article III's strictures for some, but not all, of the claims

---

[10] *See, e.g.*, Case No. 186 (ECF No. 160 at ¶ 156) ("No state interest justifies any of these restrictions, which individually *and cumulatively* burden the right to vote.") (emphasis added); Case No. 187 (ECF No. 45 at ¶ 76) ("Each Challenged Provision, alone *and in combination*, burdens the right to vote for all Florida voters, with disproportionate impacts on Black voters, Latino voters, and voters with disabilities.") (emphasis added); Case No. 201 (ECF No. 59 at ¶ 16) ("This Complaint challenges the following provisions of SB 90 that, individually *and cumulatively*, make voting more burdensome.") (emphasis added).

they have brought against the Secretary.[11]   Because the inquiry turns on the

Secretary's authority concerning the five challenged provisions of the 2021 Law, the

Secretary addresses each provision in turn.

1. Section 7 (Registration Disclaimer and Delivery Window)[12]

As noted above, the 2021 Law imposes a requirement on third-party voter

registration organizations to "notify" a voter-applicant that (1) "the organization

might not deliver the application to the division or the supervisor of elections in the

county in which the applicant resides in less than 14 days or before registration

closes for the next ensuing election"; (2) "he or she may deliver the application in

person or by mail"; (3) "how to register online with the division"; and (4) "how to

determine whether the application has been delivered."   Based on a variety of related

theories, the Plaintiffs allege that this section of the 2021 Law violates their First

---

[11] The *NAACP*, *Florida Rising*, and *Harriet Tubman* Plaintiffs have defined with
some specificity which claims are brought against which Defendants. *See, e.g.*, Case
No. 187 (ECF No. 45 at 56); Case No. 201 (ECF No. 59 at 92); Case No. 242 (ECF
No. 44 at 46).  The *LWV* Plaintiffs have not done the same. *See, e.g.*, Case No. 186
(ECF No. 160 at 55) (not clearly referencing in count I who exactly the allegations
are directed to, or from whom the relief is expected). For purposes of this response,
the Secretary will presume (without waiving her right to challenge at a later date)
that each of the challenges have been brought against her.

[12] The *LWV* Plaintiffs challenge this provision in counts V and VI. Case No. 186
(ECF No. 160 at 70-75).  The *NAACP* Plaintiffs do not challenge this provision of
Florida election law. Case No. 187 (ECF No. 45).  The *Florida Rising* Plaintiffs
challenge this provision in counts I, II, III, IV, VII, VIII. Case No. 201 (ECF No. 59
at 92-100, 108-119).  The *Harriet Tubman* Plaintiffs challenge this provision in
counts I, II, and III. Case No. 242 (ECF No. 44 at 46-60).

Amendment rights. Section 7 also mandates that an application collected by a third party voter registration organization "be delivered to the division or the supervisor of elections in the county in which the applicant resides within 14 days after completed by the applicant." **Exhibit A** at 8. The *Florida Rising* Plaintiffs separately allege that this provision violates their rights. *See* Case No. 201 (ECF No. 59 at 17). Because the Florida Division of Elections, which is a part of the Florida Department of State, must enforce the provisions of Section 7, the Plaintiffs have standing against the Secretary for these individual claims.

Indeed, the Division of Elections is the party tasked to enforce compliance with the statutory scheme for returning completed voter registration applications. **Exhibit A** at 8-9. The Division is also required to adopt "rules to ensure the integrity of the registration process." **Exhibit A** at 9. As the statute plainly contemplates, ensuring that third-party voter registration organizations give the required disclaimer necessitates the creation of a "rule to ensure" that those organizations comply with the law, a rule that the division shall promulgate in the normal course.

2.  <u>Section 24 (Vote-by-mail Requests)</u>[13]

As noted above, Section 24 modified Florida law to require voters to register for a vote-by-mail ballot every general election (every two years) rather than every other general election (every four years).  **Exhibit A** at 18.  Section 24 also added the requirement that the elector for whom the ballot is requested provide one of a "Florida driver license number, . . . Florida identification card number, or the last four digits of the elector's social security number, whichever may be verified in the supervisor's records."  **Exhibit A** at 19.  The statute grants the Secretary no role in implementing this specific section.  Even if the Plaintiffs can persuade this Court that Section 24 is a violation of law, the remedy to this hypothetical injury would not be through an injunction directed at the Secretary.

---

[13] The *LWV* Plaintiffs challenge this provision in count I. Case No. 186 (ECF No. 160 at 55-60). The *NAACP* Plaintiffs challenge it in Counts I, II, III, VI, VII, and VIII. Case No. 187 (ECF No. 45). The *Florida Rising* Plaintiffs challenge it in counts I, II, III, and IV. Case No. 201 (ECF No. 59 at 92-100). The *Harriet Tubman* Plaintiffs do not challenge this provision. Case No. 242 (ECF No. 44).

### 3.  Section 28 (Drop Box Rules)[14]

In contrast, an order entered against the Secretary with regard to Section 28 (the Drop-Box Rules) would redress some of the harm alleged by Plaintiffs in their challenge to this provision.  Because the Division of Elections has the authority to levy a civil penalty of $25,000 upon any supervisor for allowing access to a "drop box . . . for ballot receipt other than is authorized by this section," **Exhibit A** at 24, *complete* redress of the Plaintiffs alleged harm would necessarily include an injunction against the Secretary.  *See Lewis v. Governor of Alabama*, 944 F.3d 1287, 1301 (11th Cir. 2019) (explaining that redress of a direct or indirect injury is sufficient to meet the redressability prong of Article III).

### 4.  Section 29 (Non-solicitation Provisions)[15]

Some (but not all) of the Plaintiffs have included the Secretary as a defendant for their claim that Section 29's prohibition on "engaging in any activity with the

---

[14] The *LWV* Plaintiffs challenge this provision in count I. Case No. 186 (ECF No. 160 at 55-60). The *NAACP* Plaintiffs challenge this provision in counts I, II, III, VI, VII, and VIII. Case No. 187 (ECF No. 45 at 61-67, 71-80). The *Florida Rising* Plaintiffs challenge this provision in counts I, II, III, and IV. Case No. 201 (ECF No. 59 at 92-100). The *Harriet Tubman* Plaintiffs do not challenge this provision. Case No. 242 (ECF No. 44).

[15] The *LWV* Plaintiffs challenge this provision in counts I, III, and IV. Case No. 186 (ECF No. 160 at 55-60, 64-69). The *NAACP* Plaintiffs challenge this provision in Counts I, III, IV, V, VI, VII, VIII, and XIV. Case No. 187 (ECF No. 45 at 55-60, 64-75). The *Florida Rising* Plaintiffs challenge this provision in counts I, II, III, IV, and VI. Case No. 201 (ECF No. 59 at 92-100, 105-108) The *Harriet Tubman* Plaintiffs do not challenge this provision. Case No. 242 (ECF No. 44).

intent to influence or effect of influencing a voter" violates federal law. The Secretary, however, has no role in enforcing Section 29's non-solicitation provisions other than her duty to enforce the election law generally, which is insufficient on its own to convey Article III standing. *See Jacobson*, 974 F.3d at 1253-54. Because nothing contained within the statute grants any role to the Secretary with respect to this Section, no Plaintiff has standing to pursue a claim against the Secretary regarding this provision.

     5.  Section 32 (Third-party Ballot Collection)[16]

Similarly, the Secretary has no role in enforcing the provisions of Section 32, which limits the number of vote-by-mail ballots that a person may collect and return. Indeed, because Section 32 imposes criminal penalties, enforcement lies entirely outside Secretary's purview. For this reason, the Plaintiffs have no standing to maintain their Section-32-related claim against the Secretary. **Exhibit A** at 27.

     **C.**    **The Secretary should nevertheless be allowed to defend all five provisions of the 2021 Law.**

Finally, regardless of the approach this Court adopts in response to the Order to Show Cause, the Secretary may "piggy-back" on the other Defendants' ability to

---

[16] The *LWV* Plaintiffs challenge this provision in counts I and II. Case No. 186 (ECF No. 160 at 55-64). The *NAACP* Plaintiffs challenge this provision in counts I, II, III, VI, VII, VIII, and IX. Case No. 187 (ECF No. 45 at 61-67, 71-81). The *Florida Rising* Plaintiffs do not challenge this provision. Case No. 201 (ECF No. 59). The *Harriet Tubman* Plaintiffs challenge this provision in count IV. Case No. 242 (ECF No. 44).

defend the claims brought by the Plaintiffs. The Eleventh Circuit has long recognized the right of intervenors to be heard by riding "piggy-back" on parties who meet the requirements of Article III.[17] Specifically, the general rule is that "a party seeking to intervene need not demonstrate that he has standing . . . as long as there exists a justiciable case or controversy between the parties already in the lawsuit." *Chiles v. Thornburgh*, 865 F.2d 1197, 1213 (11th Cir. 1989). "So long as an original party on the intervenor's side remains party to the action . . . an intervenor need not make an independent showing that he or she meets the standing condition of Article III." *Dillard v. Chilton County Comm'n*, 495 F.3d 1324, 1330, 1336-40 (11th Cir. 2007). It follows that a similar concept can apply to the Secretary.

Here, the Plaintiffs' claims satisfy the causation and redressability prongs as to at least one of the Defendants now before this Court. *See Jacobson*, 974 F.3d at 1253-54. Insofar as Plaintiffs have Article III standing for their claims against the Supervisors (or even the Attorney General), the Secretary is a proper defendant to "defend that constitutionality of" the State's election laws given the peculiar posture of this case where, without the Secretary, only the Republican Intervenors would remain to assert the State's interests in the challenged provisions. *See generally Va.*

---

[17] To that end, and should this Court think it necessary, this Court should construe this section as a motion for the Secretary to intervene either as of right or permissively under Rule 24 as to all claims brought by Plaintiffs in all of the consolidated actions. *See* Fed. R. Civ. P. 24(a) and (b).

*House of Delegates v. Bethune-Hill*, 139 S. Ct. 1945, 1951 (2019) (quoting *Diamond v. Charles*, 476 U.S. 54, 62 (1986)).[18]

---

[18] The analysis to determine who may defend state law in federal court is a separate analysis from the well-trod injury-in-fact, traceability, and redressability requirements. *Compare Va. House of Delegates*, 139 S. Ct. at 1951-53 *with id*. at 1953-55 (distinguishing between the ability to defend state law and standing to appeal in the context of Article III).

Respectfully submitted by:

BRADLEY R. MCVAY (FBN 79034)
General Counsel
Brad.McVay@dos.myflorida.com
ASHLEY E. DAVIS (FBN 48302)
Deputy General Counsel
Ashley.Davis@dos.myflorida.com
Florida Department of State
R.A. Gray Building Suite 100
500 South Bronough Street
Tallahassee, Florida 32399-0250
Phone: (850) 245-6536
Fax: (850) 245-6127

*/s/ Mohammad Jazil*
MOHAMMAD O. JAZIL (FBN 72556)
mjazil@holtzmanvogel.com                    PHILLIP M. GORDON (VBN 95621)
GARY V. PERKO (FBN 855898)                  pgordon@holtzmanvogel.com
gperko@holtzmanvogel.com                    HOLTZMAN VOGEL BARAN
HOLTZMAN VOGEL BARAN TORCHINSKY             TORCHINSKY & JOSEFIAK, PLLC
& JOSEFIAK, PLLC                            15405 John Marshall Highway
119 South Monroe St., Suite 500            Phone: (540) 341-8808
Tallahassee, FL 32301                       Fax: (540) 341-8809
Phone: (202) 737-8808                       Admitted *pro hac vice*
Fax: (540) 341-8809

Dated:  July 23, 2021

## **LOCAL RULES CERTIFICATION**

I hereby certify that the foregoing motion contains 3,902 words, excluding the case style, conferral certification, and certificate of service.

*/s/ Mohammad Jazil*

*Counsel for Secretary of State Lee*

## **CERTIFICATE OF SERVICE**

I hereby certify that on July 23, 2021, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

*/s/ Mohammad Jazil*

*Counsel for Secretary of State Lee*

# TAB 665

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

**LEAGUE OF WOMEN VOTERS**
**OF FLORIDA, INC., et al.,**

   *Plaintiffs,*

**v.**                                          Case No.:  **4:21cv186-MW/MAF**
                                                          **4:21cv187-MW/MAF**
**LAUREL M. LEE, in her official**                       **4:21cv201-MW/MJF**
**capacity as Florida Secretary of**                     **4:21cv242-MW/MAF**
**State, et al.,**

   *Defendants,*

**and**

**NATIONAL REPUBLICAN**
**SENATORIAL COMMITTEE and**
**REPUBLICAN NATIONAL**
**COMMITTEE,**

   *Intervenor-Defendants.*
_____/

## **FINAL ORDER FOLLOWING BENCH TRIAL**

This case is about our sacred right to vote—won at great cost in blood and

treasure.[1] Courts have long recognized that, because "the right to exercise the

franchise in a free and unimpaired manner is preservative of other basic civil and

_____

[1] The current war in Ukraine, in which the Ukrainian people are fighting and dying to maintain the freedoms we take for granted—namely, the right to have a voice and not to be ruled by a despot—provides a poignant reminder of both the value and fragility of democracy.

political rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized." *Reynolds v. Sims*, 377 U.S. 533, 561–62 (1964). Applying that maxim, this Court must rule on the legality of Florida Senate Bill 90—a sweeping package of amendments to the Florida Election Code—that Plaintiffs challenge under the First, Fourteenth, and Fifteenth Amendments, the Americans with Disabilities Act (ADA), and the Voting Rights Act (VRA).

Defendants argue that SB 90 makes minor prophylactic changes to the election code. Plaintiffs[2], on the other hand, allege that SB 90 runs roughshod over the right to vote, unnecessarily making voting harder for all eligible Floridians, unduly burdening disabled voters, and intentionally targeting minority voters—all to improve the electoral prospects of the party in power. This Court has received thousands of pages of evidence—plus thousands more pages of briefing—and has heard two weeks' worth of testimony from 42 witnesses, ranging from state senators to statisticians.[3] Having reviewed all the evidence, this Court finds that, for the most

---

[2] This case is really four consolidated cases. When the distinction is material, this Court refers to the Plaintiffs from Case No. 4:21cv186 as the *League* Plaintiffs, the Plaintiffs from Case No. 4:21cv187 as the *NAACP* Plaintiffs, the Plaintiffs from Case No. 4:21cv201 as the *Florida Rising* Plaintiffs, and the Plaintiffs from 4:21cv242 as the *HTFF* Plaintiffs.

[3] This Court has worked to issue this Order as expeditiously as possible. Altogether, setting the thousands of pages of exhibits aside, this Court has considered 3,632 pages of transcripts and 1,224 pages of post-trial briefing and attachments. At the same time, this Court has presided over a criminal trial and a major multi-week products liability trial. All this to say that this Court recognizes the urgency of this case and has done its best to issue this Order on an expedited basis.

part, Plaintiffs are right. Thus, as explained in detail below, this Court enjoins Defendants from enforcing most of SB 90's challenged provisions.

In so ruling, this Court recognizes that the right to vote, and the VRA particularly, are under siege. *See, e.g.*, *Ark. State Conf. NAACP v. Ark. Bd. of Apportionment*, No. 4:21-cv-01239-LPR, 2022 WL 496908, at *2 (E.D. Ark. Feb. 17, 2022) (dismissing a "strong merits case" that Arkansas had, to the detriment of Black voters, racially gerrymandered seats in the Arkansas House of Representatives under the theory that no private right of action is available under section 2 of the VRA); *Merrill v. Milligan*, 142 S. Ct. 879 (2022) (staying, without explanation, order enjoining racially gerrymandered congressional maps); *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2351 (2021) (Kagan, J., dissenting) ("Today, the Court undermines Section 2 [of the VRA] and the right it provides."); *Shelby Cnty., Ala. v. Holder*, 570 U.S. 529 (2013) (gutting the VRA's preclearance regime).

Federal courts must not lose sight of the spirit that spurred the VRA's passage. In June 1965, Martin Luther King Jr. wrote a letter to the *New York Amsterdam News* urging Congress to pass the VRA. In it, he wrote that "to deny a person the right to exercise his political freedom at the polls is no less a dastardly act as to deny a Christian the right to petition God in prayer." Martin Luther King Jr., *Let My People Vote*, The Atlantic, https://tinyurl.com/2sfx63u4 (last visited Mar. 22, 2022). Federal

courts would not countenance a law denying Christians their sacred right to prayer, and they should not countenance a law denying Floridians their sacred right to vote.

I

At the outset, this Court notes that the parties have vastly different views on how this Court should approach this case. To hear Plaintiffs tell it, Florida wears a constitutional straitjacket any time it revises its election code. To hear Defendants tell it, Florida holds a constitutional blank check. Neither is true.

States enjoy considerable discretion in regulating their elections. Article I of the Constitution tasks states with enacting laws governing "[t]he Times, Places and Manner of holding Elections for Senators and Representatives." U.S. Const. art. I, § 4, cl. 1. But the states' discretion is not limitless. The states must comply with acts of Congress, such as the VRA. *See id.* ("[B]ut the Congress may at any time by Law make or alter such Regulations."). They must also comply with the Constitution. For example, election regulations cannot "deny to any person . . . the equal protection of the laws." U.S. Const. amend. XIV. And states cannot deny the right to vote based on race, sex, or failure to pay a tax. U.S. Const. amend. XV, § 1; U.S. Const. amend. XIX; U.S. Const. amend. XXIV. Nor, for citizens older than 18, can states deny the right to vote based on age. U.S. Const. amend. XXVI.

The bottom line is that, when called to examine the Florida Election Code's fidelity to federal law, this Court must use a gentle touch, recognizing the State's

prerogative to make such laws while also safeguarding the Constitution's guarantees to the people of Florida.

Recognizing this truth, this Court has long deferred to the State when evaluating its election regulations. *See, e.g.*, *Democratic Senatorial Campaign Comm. v. Detzner*, 347 F. Supp. 3d 1033, 1036 (N.D. Fla. 2018) (declining to enjoin enforcement of Florida's standards for determining "voter intent when the voter has not properly filled out their ballot"); *Votevets Action Fund v. Detzner*, No. 4:18cv524-MW/MJF, 2018 WL 11254567, at *1 (N.D. Fla. Nov. 16, 2018) (declining to enjoin enforcement of Florida law distinguishing between domestic and overseas absentee voters); *Democratic Senatorial Campaign Comm. v. Detzner*, No. 4:18cv528-MW/CAS, slip op. at 1–6 (N.D. Fla. Nov. 15, 2018) (declining to enjoin enforcement of laws permitting extension of the election returns reporting deadline only in an "emergency"); *Namphy v. DeSantis*, 493 F. Supp. 3d 1130, 1145 (N.D. Fla. 2020) (recognizing "Florida's interest in preventing chaos" in its elections and declining to extend voter registration deadline after Florida had taken some steps to remedy the issue in that case).

Sometimes, however, Florida goes too far. *See, e.g.*, *Fla. Democratic Party v. Scott*, 215 F. Supp. 3d 1250, 1254 (N.D. Fla. 2016) (granting temporary injunction extending voter registration deadline in the wake of Hurricane Matthew); *Madera v. Detzner*, 325 F. Supp. 3d 1269, 1273 (N.D. Fla. 2018) (ordering Florida officials to

provide language assistance to Puerto Rican voters); *League of Women Voters of Fla., Inc., v. Detzner*, 314 F. Supp. 3d 1205, 1210 (N.D. Fla. 2018) (enjoining categorical bar on early voting on any university or college campus).

But even then, Florida has often accepted this Court's ruling and endeavored to fix the deficiency. *See, e.g.*, *Fla. Democratic Party v. Scott*, No. 4:16cv626-MW/CAS, 2016 WL 6080225, at *1 (N.D. Fla. Oct. 12, 2016) (noting that "Defendants took no position" on the entry of a preliminary injunction further extending voter registration deadline). *Compare also Fla. Democratic Party v. Detzner*, No. 4:16cv607-MW/CAS, 2016 WL 6090943, at *1 (N.D. Fla. Oct. 16, 2016) (enjoining enforcement of § 101.68, Fla. Stat. (2016), which allowed voters who did not sign an absentee ballot an opportunity to cure but denied that opportunity to voters whose signature did not match signature on file), *with* Ch. 2017-45, § 1, at 1–5 (amending § 101.68, Fla. Stat. (2016) to fix the problems identified by this Court); *compare Democratic Exec. Comm. of Fla. v. Detzner*, 347 F. Supp. 3d 1017, 1022 (N.D. Fla. 2018) (again holding unconstitutional § 101.68, Fla. Stat. (2017) as to mismatched signatures on vote-by-mail and provisional ballots), *with* Ch. 2019-162, § 8, at 6–10, Laws of Fla. (again amending § 101.68, Fla. Stat. to fix the problems identified by this Court); *compare Namphy*, 493 F. Supp. 3d at 1146 (criticizing Florida's failure to maintain its online voter registration system after the system crashed on the last day of registration), *with* Ch. 2021-11,

§ 9, at 5, Law of Fla. (requiring "[l]oad testing and stress testing to ensure that the online voter registration system has sufficient capacity to accommodate foreseeable use, including [during] . . . the week immediately preceding the book-closing deadline for an election").[4]

In sum, this Court must scrutinize the challenged laws. But it must also stay mindful—as it always has—that the question is *not* whether this Court thinks those laws are good policy; the question is whether they violate federal law.

## II

At trial, following the close of Plaintiffs' evidence, Defendants moved for judgment on partial findings pursuant to Federal Rule of Civil Procedure 52(c), arguing that Plaintiffs had failed to set forth sufficient evidence to support their

---

[4] All told, I have heard 17 cases related to voting in Florida. I ruled against Florida in six of those 17 cases. *Fla. Democratic Party v. Scott*, 2016 WL 6080225, at *1; *Fla. Democratic Party v. Scott*, 215 F. Supp. 3d at 1254; *Madera*, 325 F. Supp. 3d at 1273; *League of Women Voters*, 314 F. Supp. 3d at 1210; *Democratic Exec. Comm. of Fla.*, 347 F. Supp. 3d at 1022; *Jacobson v. Lee*, 411 F. Supp. 3d 1249, 1255 (N.D. Fla. 2019). Of those six, Florida appealed two. For one, a motions panel denied a motion to stay this Court's order, *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1315 (11th Cir. 2019), and a superseding change in the law then rendered the case moot, *Democratic Exec. Comm. of Fla. v. Nat'l Republican Senatorial Comm.*, 950 F.3d 790, 792 (11th Cir. 2020). On the other, the Eleventh Circuit reversed. *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1241 (11th Cir. 2020). As for the other four, Florida did not appeal and changed the law to conform with this Court's orders: Florida gave Puerto Rican voters Spanish-language ballots, *see* Fla. Admin. Code R. 1S-2.032, allowed students to vote on campus, did not object to an emergency extension of the registration deadline after Hurricane Matthew—during which more than 108,000 people registered to vote, Steven Bousquet, *Surge of post-Hurricane Matthew Voters Breaks 100,000 Mark*, Tampa Bay Times (Oct. 24, 2016), https://tinyurl.com/2p8efhd5—and amended its signature match statute. Of the remaining 11 cases in which this Court ruled for the state, only one was appealed, and eventually affirmed. *Indep. Party of Fla. v. Sec'y, State of Fla.*, 967 F.3d 1277, 1279 (11th Cir. 2020).

claims. After a party has been fully heard on an issue during a bench trial, Rule 52(c)

permits a court to enter judgment on a claim or defense that "can be maintained or

defeated only with a favorable finding on that issue." Fed. R. Civ. P. 52(c); *see also*

*JDI Holdings, LLC v. Jet Mgmt., Inc.*, 732 F. Supp. 2d 1205, 1209 (N.D. Fla. 2010).

When facing a Rule 52(c) motion, "the court does not view the evidence in the light

most favorable to the nonmoving party, as it would in passing on a Rule 56 motion

for summary judgment or a Rule 50(a) motion for judgment as a matter of law;

instead, it exercises its role as factfinder." *United States v. $242,484.00*, 389 F.3d

1149, 1172 (11th Cir. 2004); *see also Chris Berg, Inc. v. Acme Mining Co.*, 893 F.2d

1235, 1238 n.2 (11th Cir. 1990) ("[T]he court must weigh the evidence and may

consider the witnesses' credibility."). Any "judgment on partial findings must be

supported by findings of fact and conclusions of law as required by Rule 52(a), but

the court may "decline to render any judgment until the close of the evidence." Fed.

R. Civ. P. 52(c). Here, this Court declined to render judgment on the Rule 52(c)

motions until the close of evidence.

This Court now considers the claims against Defendants. In rendering

judgment following a nonjury trial, Rule 52(a) requires a court to "find the facts

specially and state its conclusions of law separately." Fed. R. Civ. P. 52(a). "Findings

of fact must be sufficient to allow the reviewing court 'an opportunity to engage in

meaningful appellate review.' " *FTC v. On Point Cap. Partners, LLC*, 17 F.4th 1066,

1080 (11th Cir. 2021) (quoting *Danley v. Allen*, 480 F.3d 1090, 1091 (11th Cir. 2007)). Although Rule 52(a) "requires specific findings of fact, it does not require a finding on every contention raised by the parties." *Feazell v. Tropicana Prods., Inc.*, 819 F.2d 1036, 1042 (11th Cir. 1987). "A 'judge need only make brief, definite, pertinent findings and conclusions upon the contested matters; there is no necessity for overelaboration of detail or particularization of facts.' " *On Point Cap. Partners*, 17 F.4th at 1081 (quoting *Stock Equip. Co. v. Tenn. Valley Auth.*, 906 F.2d 583, 592 (11th Cir. 1990)). "So long as there is 'sufficient record evidence to support the findings, [district courts] need not state the evidence or any of the reasoning upon the evidence.' " *Id.* (alteration in original) (quoting *Stock Equip. Co.*, 906 F.2d at 592).[5] Thus, having heard and considered all the testimony, evidence, and arguments

---

[5] In conclusory fashion, Supervisor White asserts this Court cannot rely on Plaintiffs' evidence in their rebuttal case for purposes of making this Court's findings of fact and conclusions of law with respect to ruling on the Rule 52 motion. *See* ECF No. 651 at 12 n.5. Supervisor White provides no authority to support such a limitation on this Court's consideration of the trial record in ruling on the deferred Rule 52 motion, nor does this Court rely on Plaintiffs' rebuttal evidence in making its findings and conclusions. Indeed, had this Court considered only the evidence introduced in Plaintiffs' case in chief, this Court would have ruled the same. Moreover, this Court is permitted to defer ruling on the Rule 52 motion and consider the entire trial record in distilling its findings of fact and conclusions of law. *See, e.g.*, *In re Oberdick*, 490 B.R. 687, 697 (Bankr. W.D. Pa. 2013) (deciding Rule 52 motions based on state of the record at close of all evidence and not on the state of the record as it existed when the motion was originally made); *cf. Duval v. Midwest Auto City, Inc.*, 578 F.2d 721, 724 (8th Cir. 1978) ("If a defendant, after moving for involuntary dismissal at the close of the plaintiff's case, introduces evidence in his own behalf, his right to a judgment of dismissal is thereby waived.").

presented at trial, this Court now enters the following findings of fact and

conclusions of law pursuant to Rule 52(a).[6]

## III

First, this Court turns to Plaintiffs' intentional discrimination claims. The

*Florida Rising* and *NAACP* Plaintiffs challenge the vote-by-mail (VBM) request

provision,[7] the VBM request identification provision, the drop-box provisions, the

---

[6] In so doing, it bears mentioning that this Court's conclusions of law are subject to *de novo* review, but its "findings of fact—including determinations of the credibility of witnesses and weight of the evidence—will not be set aside unless they are clearly erroneous." *Sidman v. Travelers Cas. & Sur.*, 841 F.3d 1197, 1201 (11th Cir. 2016) (quoting *Fischer v. S/Y Neraida*, 508 F.3d 586, 592 (11th Cir. 2007)). "In a case in which the evidence is largely testimonial, like this one, the district court has the advantage of observing the witnesses and evaluating their credibility firsthand . . . ." *Id.* (quoting *Fischer*, 508 F.3d at 592). Thus, when "fact findings are based on credibility determinations [the reviewing court] must give 'even greater deference to the trial court's findings; for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said.' " *Jemison v. Simmons*, 518 F. App'x 882, 888 (11th Cir. 2013) (quoting *Anderson v. City of Bessemer*, 470 U.S. 564, 575 (1985)). Accordingly, as the Eleventh Circuit has recognized, "[i]n a bench trial, the district court judge . . . is itself the finder of fact, and we owe to it the same deference in assessing the credibility of . . . testimony that we would owe to a jury." *Bellitto v. Snipes*, 935 F.3d 1192, 1209 (11th Cir. 2019).

[7] SB 90's provisions have gone by many names during this litigation. For example, the *NAACP* Plaintiffs refer to section 101.62(1)(a), Florida Statutes, which halves the lifespan of standing VBM requests, as the vote-by-mail application restrictions. ECF No. 45 ¶ 75c, *in* Case No. 4:21cv187. But the *Florida Rising* Plaintiffs refer to section 101.62(1)(b), Florida Statutes, which requires identification to request a VBM ballot, as the vote-by-mail application restrictions. ECF No. 59 ¶ 16, *in* Case No. 4:21cv201. Accordingly, to avoid confusion, this Court adopts the terminology used by the parties in the joint pretrial stipulation, ECF No. 402.

Inexplicably, the State-Level Defendants and Intervenor-Defendants have started calling the solicitation definition the "safe-space provision" in their post-trial brief, notwithstanding the parties' stipulation regarding terminology. This shift in language is not lost on this Court, but this Court will only note that this sort of gamesmanship is unhelpful. Likewise, Plaintiffs in Case Nos. 4:21cv187 and 4:21cv201 refer to the provision as the "Line Relief Provision" throughout their joint post-trial brief. Again, for the sake of consistency, this Court refers to the provision according to the parties' stipulation.

registration delivery provision, and the solicitation definition, alleging that the Legislature enacted them with the intent to discriminate against Black and Latino[8] voters. *See* ECF No. 45 ¶¶ 186–223, *in* Case No. 4:21cv187; ECF No. 59 ¶¶ 165–82, *in* Case No. 4:21cv201.

Taking the challenged provisions in the order set out above, the VBM request provision reduces the duration of a voter's VBM ballot request from two election cycles to one general election cycle—or put another way, from four years to two years. § 101.62(1)(a), Fla. Stat. (2021).

The VBM request identification provision requires any voter seeking to vote by mail to provide their Florida driver's license number, Florida identification card number, or the last four digits of their social security number with their VBM request. It also requires the Supervisors to verify that the identification number the voter provides matches the identification number in the county's voter registration records. § 101.62(1)(b), Fla. Stat. (2021).

The drop-box provisions require an employee of each Supervisor of Elections' office to continuously monitor any secure drop box at the Supervisor's office when

---

[8] This Court uses the terms Hispanic and Latino interchangeably because that is how they have been used throughout this case. *See also* Mark Hugo Lopez, Jens Manuel Krogstad, & Jeffrey S. Passel, *Who is Hispanic?*, Pew Research Center (Sept. 23, 2021) https://tinyurl.com/55j4prd6 ("The terms 'Hispanic' and 'Latino' are pan-ethnic terms meant to describe—and summarize—the population of people living in the U.S. of that ethnic background. In practice, the Census Bureau most often uses the term 'Hispanic,' while Pew Research Center uses the terms 'Hispanic' and 'Latino' interchangeably when describing this population.").

the drop box is accessible for deposit of ballots. They also reduce the availability of drop boxes outside of early voting hours and impose a $25,000 civil penalty on the Supervisor if any drop box is left accessible for ballot receipt other than as authorized. § 101.69, Fla. Stat. (2021).

The registration delivery provision requires third-party voter registration organizations (3PVROs) to deliver voter registration applications to the Division of Elections or the Supervisor of Elections in the county in which the applicant resides within 14 days after the applicant completes the application, but not after registration closes for the next election (previously 3PVROs could return applications to any Supervisor no matter where in Florida the applicant lived). § 97.0575(3)(a), Fla. Stat. (2021).

The solicitation definition prohibits anyone from "engaging in any activity with the intent to influence or effect of influencing a voter" inside a polling place or within 150 feet of a drop box or the entrance to any polling place. § 102.031(4)(a)–(b), Fla. Stat. (2021). The solicitation definition can be read to prohibit "line warming" activities. Line warming refers generally to the non-partisan provision of aid to voters waiting in line to vote, such as giving out water, fans, snacks, chairs, ponchos, and umbrellas. Tr. at 1954–55.

Other provisions—though not challenged as discriminatorily motivated—are also relevant to Plaintiffs' claims. For example, the registration disclaimer provision

works alongside the registration delivery provision by requiring 3PVROs to deliver a set of state-mandated warnings every time they collect a registration application. § 97.0575(3)(a), Fla. Stat. (2021). Thus, this Court considers this provision below as well.[9]

## A

Before this Court addresses Plaintiffs' claims, it must ensure that Plaintiffs have standing to challenge each of the provisions. *See CAMP Legal Def. Fund, Inc. v. City of Atlanta*, 451 F.3d 1257, 1273 (11th Cir. 2006) (emphasizing that courts have an "independent obligation . . . to ensure a case or controversy exists as to each challenged provision").[10]  The standing requirement is satisfied as long as a single plaintiff has standing. *Rumsfeld v. FAIR*, 547 U.S. 47, 53 (2006) ("[T]he presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement."). But in applying that principle, this Court must evaluate each

---

[9] This Court recognizes that, at the time of this writing, new legislation amending Florida's Election Code to remove this compelled speech requirement awaits Governor DeSantis's signature.

[10] This Court imposed no page limit on the parties' post-trial briefing. Yet Defendants devote only about six and a half pages to applying the law of standing to the facts of this case. *See* ECF No. 648 at 47–53. Worse still, Defendants do not specifically discuss any Plaintiff, asserting broadly that Plaintiffs have not carried their burden to establish standing and offering only generalized reasons why that is so. *Id.* Based on past experience, this Court harbors little doubt that Defendants will crystalize their standing arguments before the Eleventh Circuit—likely into a form never addressed by this Court. And it is no answer to say that this Court has repeatedly rejected Defendants' standing arguments; this Court has proven itself more than willing to dismiss claims and parties for lack of standing, as evidenced by this Court's rulings on the motions to dismiss. *See, e.g.*, ECF No. 274 at 24.

consolidated case separately. *See Hall v. Hall*, 138 S. Ct. 1118, 1127–29 (2018) ("[C]onsolidation is permitted as a matter of convenience and economy in administration, but does not merge the suits into a single cause, or change the rights of the parties, or make those who are parties in one suit parties in another." (quoting *Johnson v. Manhattan Ry. Co.*, 289 U.S. 479, 496–97 (1933))).

It is useful to start with the standing doctrine's purpose. The Constitution limits federal judicial power to "Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 1. Standing doctrine—"rooted in the traditional understanding of a case or controversy"—ensures that courts stay true to that limitation. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). Standing doctrine thus ensures that federal courts do not "intrude upon the powers given to the other branches" by offering an advisory opinion. *Id.* at 337.

The Supreme Court has long held that an actual controversy exists when the parties have "such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues." *Baker v. Carr*, 369 U.S. 186, 204 (1962); *see also Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 472 (1982) (explaining that standing doctrine "tends to assure that the legal questions presented to the court will be resolved, not in the rarified atmosphere of a debating society, but in a concrete factual context conducive to a realistic appreciation of the consequences of judicial

action"). "This is the gist of the question of standing." *Carr*, 369 U.S. at 204. So when it comes to standing, the ultimate question is whether "concrete adverseness" exists between the parties.

Over time, the Supreme Court has developed a three-part test for determining when such adverseness exists. Under that test, a plaintiff must show (1) that they have suffered an injury-in-fact that is (2) traceable to the defendant and that (3) can likely be redressed by a favorable ruling. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).

For the individual Plaintiffs, this inquiry is straightforward. But for the organizational Plaintiffs, the issue is more complex. The organizational Plaintiffs proceed under two theories; namely, organizational standing and associational standing.

Organizational standing allows an organization to assert claims based on injuries to the organization itself. *See Fla. Democratic Party v. Hood*, 342 F. Supp. 2d 1073, 1079 (N.D. Fla. 2004) ("An organization has standing to challenge conduct that impedes its ability to attract members, to raise revenues, or to fulfill its purposes." (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982))). Here, Plaintiffs proceed under a diversion-of-resources theory. "Under the diversion-of-resources theory, an organization has standing to sue when a defendant's illegal acts impair the organization's ability to engage in its own projects by forcing the

organization to divert resources in response." *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1341 (11th Cir. 2014). "[T]he fact that the added cost [to the organization] has not been estimated and may be slight does not affect standing . . . ." *Fla. State Conf. of NAACP v. Browning*, 522 F.3d 1153, 1165 (11th Cir. 2008) (quoting *Crawford v. Marion Cnty. Election Bd.*, 472 F.3d 949, 951 (7th Cir. 2007)).

On the other hand, associational standing allows an organization to sue on its members' behalf "when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Greater Birmingham Ministries v. Sec'y of State of Ala.*, 992 F.3d 1299, 1316 (11th Cir. 2021) (*GBM*). To establish associational standing, Plaintiffs must "make specific allegations establishing that at least one identified member has suffered or will suffer harm." *Ga. Republican Party v. Sec. & Exch. Comm'n*, 888 F.3d 1198, 1203 (11th Cir. 2018) (cleaned up).

With these principles in mind, this Court first considers whether at least one Plaintiff from each of the relevant consolidated cases has standing to challenge the above-listed provisions.

16

1

a

Taking the provisions in the order set out above, this Court begins with the *NAACP* Plaintiffs, and finds that the Florida NAACP has associational standing to challenge the VBM request provision.

First, Florida NAACP members have standing to sue in their own right. Ms. Scoon is a member of the Bay County branch of the NAACP. Tr. at 33. When SB 90 took effect, she had a standing VBM request. *Id.* at 87. She testified that requesting a VBM ballot every election cycle burdens her because it doubles the number of VBM ballot requests she must submit—thus doubling the amount of effort it takes to vote by mail—and increases the chance that she will forget to request her ballot. *Id.* at 89. This Court credits Ms. Scoon's testimony on these points.

On cross, Defendants responded to this testimony by asking Ms. Scoon why she "couldn't . . . just . . . put a reminder in [her] calendar" to request a VBM ballot "every time it needs to be done?" *Id.* at 136. Defendants' blithe suggestion misses the point. "For purposes of standing, a denial of equal treatment is an actual injury even when the complainant is able to overcome the challenged barrier." *Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1351 (11th Cir. 2009). Plus, "[t]he slightness of the[] burden . . . is not dispositive." *Id.* Just as a law that merely requires a voter to present identification before voting inflicts an Article III injury, the VBM request

provision injures Ms. Scoon by forcing her to request a VBM ballot every election instead of every other election. *See id.* at 1351–52. And that injury is traceable to Supervisor Andersen. Florida law tasks the Supervisors with implementing the law governing VBM requests. *See* § 101.62(1)(a), Fla. Stat. (2021). And finally, an injunction ordering Supervisor Andersen to accept requests for VBM ballots for two general election cycles, as he had previously done, would redress Ms. Scoon's injury. *See* § 101.6(1)(2), Fla. Stat. (2019). Ms. Scoon therefore has standing to challenge the VBM request provision.

The interests the Florida NAACP seeks to protect are also germane to the organization's purpose. As Mr. Brown—president of the Indian River County branch of the NAACP—testified, the Florida NAACP promotes civic participation. Tr. at 510. It does so through many outlets, such as voter registration, training, and education. *Id.* The Florida NAACP also engages in get out the vote activities, encouraging voters to "exercise their most precious and priceless right." *Id.* at 513. Plus, it would strain credulity to suggest that fighting race-based barriers to the franchise is not germane to the Florida NAACP's mission. To the contrary, this Court could almost take judicial notice that this suit is germane to the Florida NAACP's purpose. Plainly, the second associational standing factor is satisfied.

Finally, neither the claim asserted nor the relief requested require the Florida NAACP's individual members to participate. As this Court has already noted,

"prospective relief weigh[s] in favor of finding that associational standing exists." *GBM*, 992 F.3d at 1317 n.29. So Plaintiffs' claims fit neatly within associational standing's parameters. Thus, at least one *NAACP* Plaintiff has standing to challenge the VBM request provision.

b

Turning to the *Florida Rising* Plaintiffs, this Court finds that they too have standing to challenge the VBM request provision. For example, this Court heard from Plaintiff Equal Ground Education Fund's founder, Jasmine Burney-Clark. Tr. at 380. She testified that Equal Ground distributes voter-education materials. *Id.* at 404. These materials include information about the deadline for VBM requests and submissions. *Id.* During the 2020 election cycle, Equal Ground spent roughly $1,000,000 on such materials. *Id.* But due to the changes SB 90 has wrought, Equal Ground anticipates spending $2,000,000 in 2022. *Id.* at 405. This is because Equal Ground has determined the voters are largely unaware of SB 90 and the changes it has made to the election code. *Id.* at 407. To conduct this added education, Equal Ground will have to reach into its reserves. *Id.*

Equal Ground has also decided to hire a political director in response to SB 90. *Id.* at 391, 409. This will cost Equal Ground over $55,000 a year. *Id.* at 409. To fund this position, Equal Ground must take funds from its Souls to the Polls and voter registration program. *Id.* It has also been forced to forgo hiring an internal

19

communications manager, digital organizer, and internal graphic designer. *Id.* at 409–10. Equal Ground prioritized hiring a political director because the director has the skills to interpret SB 90—including the VBM request provision—and "translate" it to the community. *Id.* at 410. This Court credits Ms. Burney-Clark's testimony on these points.

Ms. Burney-Clark's testimony establishes a diversion-of-resources injury. Tellingly, on cross Defendants asked whether, even if SB 90 had not passed, Equal Ground would educate voters about the locations of drop boxes and the hours of polling places. *Id.* at 418. But Defendants did not ask the same question about the VBM request provision. Equal Ground would not have to educate voters about the VBM request provision absent SB 90 because it was not an issue before SB 90. In short, Equal Ground has diverted resources from hiring for various positions and from its Souls to the Polls and voter registration programs to educate voters about SB 90—including the VBM request provision. Equal Ground conducts this work in its "core counties"—Orange, Pinellas, Seminole, and Volusia. Tr. at 384. That is enough to establish standing against Defendant Supervisors for Orange, Pinellas, Seminole, and Volusia Counties.

The same is true for Hispanic Federation. For Hispanic Federation, this Court heard from its national director of civic engagement, Mr. Vélez Burgos. *Id.* at 716. Mr. Vélez Burgos testified that Hispanic Federation's get out the vote efforts center

on VBM and drop boxes. *Id.* at 735–36. This work reaches all 67 counties in Florida. *Id*. at 722–23. Now, because of SB 90, Hispanic Federation must "start following up with voters that might think that they're still on the rolls [until] 2024 or 2026." *Id.* at 757. It also plans to spend more money on "TV and radio" to explain the VBM request provision. *Id.* The VBM request provision also forces Hispanic Federation to conduct more outreach to "SuperVoters"—someone who has voted in each of the past four election cycles—to alert them to the need to renew their VBM requests. *Id.* at 759. Each text message Hispanic Federation sends to a voter to convey this information costs 6 cents. *Id.* at 760. And each phone call costs staff time and payroll for canvassers. *Id.* These added costs have prevented Hispanic Federation from hiring more administrative staff and opening satellite offices. *Id.* at 761–62. Hispanic Federation has also been forced to reduce its communication budget. *Id.* This Court credits Mr. Vélez Burgos's testimony.

In sum, Hispanic Federation must spend time and resources countering the VBM request provision's effects throughout the state. This impacts Hispanic Federation by forcing it to forgo opening satellite offices or consolidate existing ones, and by forcing it to hire fewer staff. Thus, Hispanic Federation has standing to challenge the VBM request provision against all 67 Supervisors of Elections.

Having determined that at least one Plaintiff from each consolidated case has standing to challenge the VBM request provision, this Court turns to the VBM request identification provision.

2

Next, this Court considers whether Plaintiffs have established standing to challenge the VBM request identification provision.

a

First, this Court again finds that the Florida NAACP has associational standing through Ms. Scoon. Ms. Scoon testified that she registered to vote over 40 years ago and cannot remember if she used her driver's license or social security number to do so. *Id.* at 87. But whether she knows which form of identification she used or not is immaterial. Just as a law requiring voters to present identification before voting injures all voters subject to that requirement, a law requiring Ms. Scoon to present identification to request a VBM ballot injures Ms. Scoon. *See Billups*, 554 F.3d at 1351–52. Plus, the Supervisors enforce the VBM request identification provision. § 101.62(b), Fla. Stat. (2021). And an injunction ordering Supervisor Andersen to accept VBM requests without accompanying identification would redress Ms. Scoon's injury. So Ms. Scoon has standing to challenge the VBM request identification provision herself. And, as explained above, the other associational standing requirements are met. Accordingly, the Florida NAACP has

22

associational standing to challenge the VBM request identification provision with respect to Supervisor Andersen.

Because the Florida NAACP has standing to challenge the VBM request identification provision, this Court need not consider whether the other *NAACP* Plaintiffs have standing to challenge the provision.

b

As for the *Florida Rising* Plaintiffs, this Court also finds that at least one Plaintiff has standing to challenge the VBM request identification provision.

Mr. Vélez Burgos testified that Hispanic Federation will "have to create new signs, new postings, new voter education materials and resources to alert voters to the fact that they will have . . . to provide" identification to register to vote by mail. Tr. at 757. Plus, part of Hispanic Federation's canvassing work includes signing people up to vote by mail. *Id.* at 757. Explaining to registrants that Hispanic Federation needs their identification information to request VBM ballots on their behalf will both lengthen the average interaction per voter—thus reducing overall production—and deter voters from signing up to vote by mail. *Id.* at 758. As a result, Hispanic Federation must hire more canvassers. *Id.* at 761. It also has to pay all canvassers for more hours spent canvassing. *Id.* Just as with the VBM request identification provision, these added costs have prevented Hispanic Federation from hiring more administrative staff and opening satellite offices. *Id.* at 761–62. It has

also reduced Hispanic Federation's communication budget. *Id.* Again, this Court credits Mr. Vélez Burgos's testimony.

The VBM request identification provision imposes additional costs on Hispanic Federation by forcing it to spend resources educating voters about the new requirements. It also makes canvassing more expensive. As a result, Hispanic Federation must hire fewer administrative staff and maintain fewer offices. Hispanic Federation therefore has standing to challenge the VBM request identification provision.

3

Next this Court addresses the drop-box provisions. This Court finds that both sets of Plaintiffs have standing to challenge the drop-box provisions.

a

As to the *NAACP* Plaintiffs, this Court finds that the Florida NAACP has associational standing to challenge the drop-box provisions. First, Ms. Scoon has standing to challenge the drop-box provisions. As she testified, she had used an unmanned drop box outside the Bay County Supervisor of Election's office "for many years" and "for many reasons." *Id.* at 78. Now, however, the Bay County Supervisor has removed the drop box. *Id.* at 82. Indeed, in a press release, Supervisor Andersen announced that "[t]he Vote By Mail Drop Box outside the Supervisor of Elections office has been removed . . . [d]ue to Florida Senate Bill 90." ECF No.

24

608-84 at 2. Ms. Scoon testified that she will now have to alter the way she votes, to her great inconvenience. Tr. at 86–87. This is enough to confer standing on Ms. Scoon. Without minimizing the harm Ms. Scoon has testified to suffering, this Court notes that even "an identifiable trifle is enough" to satisfy Article III's injury requirement. *United States v. Students Challenging Regul. Agency Procs.*, 412 U.S. 669, 689 n.14 (1973).

Ms. Scoon's injury is also traceable to Defendant Lee and redressable by an injunction against her. Defendant Lee's Division of Elections has the authority to impose a $25,000 civil penalty against any Supervisor of Elections who leaves a drop box "accessible for ballot receipt other than as authorized by this section." § 101.69(3), Fla. Stat. (2021). This deters Supervisors who would otherwise offer drop box options beyond the statutorily required drop boxes at the Supervisors' main office, permanent branch office, and early voting sites. *See* § 101.69(2)(a), Fla. Stat. (2021) ("Secure drop boxes *shall* be placed at the main office of the supervisor, and at each permanent branch office of the supervisor, and at each early voting site. Secure drop boxes may also be placed at any other site that would otherwise qualify as an early voting site under s. 101.657(1)." (emphasis added)). Indeed, this is exactly what happened with the drop box Ms. Scoon has historically used, which had been outside the SOE office, unmanned, and available 24/7. ECF No. 608-84 at 2. An injunction precluding Defendant Lee from imposing a $25,000 penalty on the

Supervisors would provide Ms. Scoon meaningful relief from the challenged drop box provision because it would allow Supervisor Andersen to replace the drop box that Ms. Scoon wishes to use without fear of incurring a $25,000 penalty. And he would likely do so, given that the drop box was in place for many years. Tr. at 78. Recall that Article III requires only that redressability be "likely." *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 287 (2008). This Court credits Plaintiffs' evidence on these points. Ms. Scoon has standing to challenge the drop-box provisions.

Further, just as above, challenging an allegedly racially motivated restriction on a form of voting is obviously germane to the Florida NAACP's organizational purpose and this action does not require participation by individual NAACP members. So the Florida NAACP has associational standing to challenge the drop-box provisions. Because the Florida NAACP has standing, this Court need not consider whether the remaining *NAACP* Plaintiffs also have standing.

b

This Court also finds that at least one *Florida Rising* Plaintiff has standing to challenge the drop-box provisions under a diversion-of-resources theory. For Plaintiff Poder Latinx, this Court heard from Mr. Garces, its coexecutive director and cofounder. Tr. at 186. Poder Latinx's mission is "to empower [the] Latinx community via the electoral process." *Id.* at 187.

26

Mr. Garces testified that drop boxes are very convenient for those in the Latino community *Id.* at 216. Because SB 90 reduced drop boxes' availability, there will be longer lines on election day in Latino neighborhoods. *Id.* at 217. Poder Latinx cannot change that, but it can help transport voters who would have otherwise used drop boxes to the polls to vote. *Id.* Poder Latinx has so far set aside $15,000 for its transportation program. *Id.* at 217–18. Plus, now that drop boxes are no longer available 24/7, Poder Latinx will have to research the particular hours each Supervisor will make drop boxes available and then train canvassers to convey that information. *Id.* at 217. Poder Latinx's voter turnout and voter education programs operate in Orange, Osceola, Seminole, Lake, Polk, Lee, Palm Beach, and Volusia Counties. *Id.* at 193. If Poder Latinx was not forced to spend additional time and resources combating SB 90—including the drop-box provisions—it would hire additional staff. And its inability to do so will hamper its ability to register voters, educate voters, and encourage voter turnout. *Id.* at 224. This Court credits Mr. Garces's testimony on these points.

In short, Poder Latinx will have to spend additional time and money countering the drop-box provisions in Orange, Osceola, Seminole, Lake, Polk, Lee, Palm Beach, and Volusia Counties. It would otherwise use those resources to hire additional staff. And finally, the lack of additional staff hampers Poder Latinx's mission. Thus, Poder Latinx has standing to challenge the drop-box provisions.

4

Turning to the registration delivery provision, only the *Florida Rising* Plaintiffs challenge this provision, and thus this Court need not discuss the *NAACP* Plaintiffs. Further, this Court finds that the *Florida Rising* Plaintiffs have standing to challenge the provision.

Returning to Poder Latinx, Mr. Garces testified that the registration delivery provision has placed many additional burdens on Poder Latinx. Now, Poder Latinx's quality control workers must google each street address on each registration to ensure that the street address matches the county the voter specified on the form. *Id.* at 208. Further, Poder Latinx must now sort all registration applications by county to ensure that they are submitted to the correct supervisor. *Id.* Poder Latinx did not implement these added measures based on abstract fears; one Supervisor has already threatened to fine Poder Latinx for submitting forms from another county. *Id.* at 209.

Plus, besides the quality control costs, Poder Latinx must now spend extra time or money driving registrations to the correct Supervisor or, if the Supervisor is too far away, mailing the registrations by certified mail. *Id.* at 208. And though, as suggested by Defendants' questions on cross-examination, Poder Latinx could deliver unsorted registrations to the Division of Elections, *see id.* at 241, that would also entail added costs in postage or time and gas for hand delivery.

28

In 2021, it cost Poder Latinx over $4,500 to comply with SB 90's delivery restriction—$476 in mail costs and $4,100 in staff time. *Id.* at 210. Poder Latinx further predicts that it will cost between $40,000 and $50,000 to comply in 2022. *Id.* at 210–11. These added costs contribute to Poder Latinx's inability to hire additional staff as discussed above. Thus, Poder Latinx has standing to challenge the registration delivery provision under a diversion-of-resources theory.

5

Finally, this Court addresses the solicitation definition. This Court finds that both sets of Plaintiffs have standing to challenge the solicitation definition.

a

As to the Florida NAACP, this Court heard testimony from Ms. Cynthia Slater, the president of the Volusia County-Daytona Beach Branch of the NAACP, Tr. at 1948, as well as Mr. Anthony Brown, the president of the Indian River County branch of the NAACP and third vice president for the Florida State Conference of the NAACP, *id.* at 506–07. With respect to both witnesses, I find their testimony credible.

*First,* the Florida NAACP has proved it is injured in Volusia County with respect to the solicitation definition. At trial, Ms. Slater testified at length regarding her branch's "line warming" activities before SB 90 was enacted. Tr. at 1956–60. Specifically, the Volusia County branch of the NAACP has engaged in "line

29

warming" activities within the 150-foot buffer zone as recently as 2020 and as early as 2004. *Id*.[11] Moreover, Ms. Slater testified that she has personally worked to provide such support to voters at polling places in every election since 2004 through 2020. *Id*. at 1956.  However, because of the solicitation definition, her branch no longer "plans to provide any relief or support to volunteers[.]" *Id*. at 1963. She testified that after SB 90 was enacted, her local Supervisor of Elections, Defendant Lisa Lewis, met with her branch of the NAACP to explain the changes in the law, including the expanded solicitation definition. *Id*. at 1962. Ms. Lewis apparently warned the Florida NAACP members that they could no longer conduct their "line warming" activities because "there could be fines and penalties if [they] are doing that[.]" *Id*. Accordingly, Ms. Slater and the Volusia County branch of the NAACP are self-censoring for fear of such penalties because of the challenged provision and are thus suffering an injury in fact.

*Second*, Ms. Slater and the Volusia County branch of the NAACP can trace their injury to Defendant Lewis. Here, there is no dispute that Florida law grants

---

[11] Ms. Slater also testified that while serving in the statewide position as civic engagement chair for the Florida State Conference of the NAACP from 2003 to 2018, she oversaw the "line warming" activities of up to 55 local branches of the NAACP throughout Florida. Tr. at 1949–50, 1960. According to Ms. Slater, all of these local "units" of the NAACP provided relief to voters who were waiting in lines at the polls between 2003 to 2018. *Id*. However, Ms. Slater did not testify that every county in Florida was home to one of these 55 branches or that the line relief that the branch members provided included assistance provided within the 100- or 150-foot buffer zone. Nor did Ms. Slater identify in which counties these 55 local "units" of the NAACP operated. Accordingly, Ms. Slater's testimony is insufficient to establish an injury with respect to any county aside from Volusia County.

Defendant Lewis authority to maintain good order at the polls, including defining the area in which solicitation is unlawful and directing law enforcement to remove people within the 150-foot zone, in which Ms. Slater's and the Florida NAACP's line warming activities are arguably now banned. §§ 102.031(1), (2), (4)(a)–(c), Fla. Stat. (2021). Moreover, this Court heard uncontradicted testimony from Ms. Slater that Defendant Lewis has already interpreted the challenged provision to include the "line warming" activities that were previously conducted in Volusia County since at least 2004 and warned the Florida NAACP that their conduct may now be subject to fines and penalties. Accordingly, given that Supervisor Lewis has authority to interpret and enforce the challenged solicitation ban—and, apparently, has already done so to prohibit the Florida NAACP's "line warming" activities that were permitted before SB 90—Ms. Slater's and the Florida NAACP's injury is traceable to Defendant Lewis.

*Third*, Ms. Slater's and the Florida NAACP's injury is redressable by an order prohibiting Defendant Lewis from enforcing the solicitation definition to prohibit their "line warming" activities in Volusia County.

As to Defendants' arguments to the contrary, it is no answer that the Florida NAACP's asserted injury is not redressable because another provision of Florida law makes it a crime to solicit voters who need assistance in casting their ballots by reason of blindness, disability, or inability to read or write. *See* § 101.051(2), Fla.

Stat. (2021) (outlawing voter-assistance solicitation within 150-foot buffer zone pursuant to provision that permits blind, disabled, or illiterate voters to have the person of their choice assist them in reading and casting their ballot); *see also* ECF No. 648 at 52–53. Section 101.051(2) is part of a separate statutory scheme that allows certain voters to receive assistance in casting their ballots. This provision creates a first-degree misdemeanor to engage in a more specific form of "solicitation"—namely, approaching voters to offer to help them cast their ballots if they are blind, disabled, or illiterate. *See* §§ 101.051(1)–(2), Fla. Stat. Such specific conduct would remain illegal in the event Supervisor Lewis is enjoined from enforcing the broader definition of "solicitation" under a separate provision of Florida's Election Code, but members of the Florida NAACP would no longer fear prosecution for providing other kinds of direct assistance to voters waiting in long lines at polling places and drop boxes in Volusia County.[12]

It is also no answer that the Florida NAACP's injury is not redressable because some Supervisors of Elections imposed stricter policies for their 150-foot buffer zones before SB 90 was enacted. First, this Court heard no evidence that Supervisor

---

[12] Moreover, section 101.051(2) only applies to ban voter-assistance solicitation of blind, disabled, or illiterate voters. To the extent a reviewing court concludes this section overlaps with sections 102.031(4)(a)–(b), an injunction prohibiting Supervisor Lewis from enforcing the expanded solicitation definition under section 102.031(4)(b) would still provide partial redress to the Florida NAACP's injury because, without running afoul of section 101.051(2), its members could continue offering sighted, able, and literate voters direct assistance while they wait in line at the polls in Volusia County.

Lewis imposed a strict no-contact policy within her no-solicitation zones prior to SB 90's passage. Indeed, the undisputed evidence points to the contrary—namely, that Ms. Slater, who testified to having a direct line of communication and cooperation with Supervisor Lewis, and the Florida NAACP, regularly provided direct assistance to voters within the 150-foot zone prior to SB 90.

Moreover, the undisputed fact that Supervisor Lewis already had statutory authority to command law enforcement to remove disruptive or unruly persons from the 150-foot zone before SB 90 was enacted does not change this Court's findings or conclusion as to the Florida NAACP's standing. *See* §§ 102.031(1), (2), (4)(c), Fla. Stat. The Eleventh Circuit has held that when a requested injunction does nothing to remove the same penalty imposed by other, unchallenged statutes, then the requested relief does not satisfy the redressability requirement for Article III standing. *See Fla. Fam. Pol'y Council v. Freeman*, 561 F.3d 1246, 1257–58 (11th Cir. 2009); *see also KH Outdoor, L.L.C. v. Clay Cnty., Fla.*, 482 F.3d 1299, 1304 (11th Cir. 2007). But here, the unchallenged provisions authorizing Supervisor Lewis to maintain order at the polls do not carry the same penalty as the expanded solicitation ban, which makes it a first-degree misdemeanor to "engag[e] in any activity with the intent to influence or effect of influencing a voter," within the 150-foot buffer zone. In short, the unchallenged provisions under section 102.031 do not

arguably criminalize "line warming"—instead, they simply authorize government actors, including the Supervisors of Elections, to maintain order at the polls.

For example, prior to SB 90, a person did not commit a crime for handing out food or water to voters within the 150-foot buffer zone, and thus, they were not subject to arrest if the Supervisor of Elections or sheriff's deputy assigned to that polling place saw them do it. Instead, the Supervisor of Elections could command the deputy to tell that person to leave the 150-foot zone and only then, if the person refused, would they potentially be subject to arrest for committing a *different* crime—i.e., trespass or resisting without violence. Now, however, section 104.41 designates a violation of the solicitation ban to be a first-degree misdemeanor, so if a Supervisor of Elections or sheriff's deputy sees someone handing out water in the 150-foot zone and interprets such conduct as solicitation under section 102.031(4)(b), that person is subject to immediate arrest for committing a first-degree misdemeanor in the presence of a law enforcement officer. *See* § 901.15(1), Fla. Stat. ("A law enforcement officer may arrest a person without a warrant when [t]he person has committed a felony or misdemeanor . . . in the presence of the officer. An arrest for the commission of a misdemeanor . . . shall be made immediately or in fresh pursuit."). Accordingly, an injunction prohibiting enforcement of the solicitation definition—which expands the potential for criminal liability to include "engaging in any activity with the intent to influence or effect of

influencing a voter" within the 150-foot buffer zone—would redress the Florida NAACP's self-censorship injury.

Finally, it is no answer to say the Florida NAACP lacks standing because its injury is not redressable by an injunction against all 67 Supervisors of Elections. Specifically, Defendants Lee, Moody, and Defendant-Intervenors assert, without citation, that "to demonstrate standing, Plaintiffs needed to show that their challenge to the [solicitation definition] is redressable in each of the sixty-seven counties of Florida." ECF No. 648 at 51. With respect to the Florida NAACP, this is true with respect to its vagueness and overbreadth claims, discussed in more detail below, only to the extent that it seeks an injunction against all 67 Supervisors. The Florida NAACP would have to show that it is injured in each county in Florida, that its injury is traceable to the relevant county Supervisor of Elections, and that such injury would be redressed by an injunction prohibiting the relevant county Supervisor of Elections from enforcing the challenged statute. But here, for purposes of its intentional discrimination claims, the Florida NAACP has proved that it has standing to sue the Volusia County Supervisor of Elections. Accordingly, the Florida NAACP has standing to challenge the solicitation definition provision.

b

Finally, this Court turns to the *Florida Rising* Plaintiffs. Florida Rising Together, Poder Latinx, Equal Ground Education Fund, and Hispanic Federation

each assert standing to challenge the solicitation definition under theories of associational and organizational standing. This Court finds that at least one *Florida Rising* Plaintiff has standing to challenge the solicitation definition under a diversion-of-resources theory.

Specifically, this Court heard from Ms. Andrea Mercado, the executive director of Florida Rising Together, who testified that Florida Rising Together's predecessor organization provided "line warming" to voters waiting in line at polling places in Miami-Dade, Broward, Palm Beach, Duval, Orange, Osceola, Hillsborough, and Pinellas counties during the 2020 election. Tr. at 2045–47. Specifically, though, Ms. Mercado testified that such "line warming" was conducted within the 150-foot buffer zone only in Broward, Palm Beach, and Duval counties. *Id*. at 2046. Now, however, Ms. Mercado testified that Florida Rising Together will not provide such relief within the 150-foot buffer zone and instead will use its resources to invest in larger and more visible tents and signage that are outside of the buffer zone. *Id*. at 2047. Ms. Mercado further testified that the resources Florida Rising Together is diverting to address the challenged portions of SB 90 would otherwise have been used to fund the organization's vaccine education canvass, support families facing eviction, fund the organization's climate emergency programming, and fund other civic engagement work in Florida. *Id*. at 2051–52. Accordingly, based on Ms. Mercado's testimony, which I find credible, Florida

Rising Together has demonstrated an injury in fact for the same reasons as the Florida NAACP. Namely, because of the expanded solicitation definition, Florida Rising Together is self-censoring in Broward, Palm Beach, and Duval counties and diverting resources from identifiable programs to continue providing some relief outside of the 150-foot buffer zone.

As discussed at length above, Florida Rising Together's injury is traceable to the Defendant Supervisors of Elections in Broward, Palm Beach, and Duval counties due to their enforcement authority with respect to the challenged statute. In addition, an injunction prohibiting these Supervisors of Elections from enforcing the expanded definition is likely to redress Florida Rising Together's injuries by eliminating the potential for criminal liability for violating the expanded solicitation ban. Accordingly, Florida Rising Together has standing to challenge the solicitation definition with respect to Defendant Supervisors of Elections for Broward, Palm Beach, and Duval counties.

B

Having determined that Plaintiffs have standing to challenge each provision, this Court turns to the merits of Plaintiffs' intentional discrimination claims. The Fourteenth Amendment, the Fifteenth Amendment, and section 2 of the VRA all prohibit intentional race discrimination in voting. And although SB 90 is racially neutral on its face, Plaintiffs assert that the Legislature passed it with the intent to

discriminate against Black and Latino voters. If Plaintiffs are right, SB 90 is "just as abhorrent, and [unlawful], as laws that expressly discriminate on the basis of race." *N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 220 (4th Cir. 2016).

As explained below, this Court finds that the Legislature enacted some of SB 90's provisions with the intent to discriminate against Black voters, but that Plaintiffs have not met their burden to show that the Legislature intended to discriminate against Latino voters.

1

One point before this Court delves into the evidence. While reading this Order, a lay reader may find themselves asking why such a wide-reaching analysis is necessary. For two reasons, it is. First, there is no jury in this case; this Court acts as the jury, finding facts based on the evidence before it. But unlike a jury, this Court must explain the evidence it considered and the conclusions it drew from that evidence. *See* Fed. R. Civ. P. 52(a)(1).

Second, in this day and age, few would be so foolish as to openly admit their racial motivations—knowing that any such statement would provide fodder for a law's opponents. Instead, this Court must rely on circumstantial evidence. In other words, this Court must infer the Legislature's intent from all of the circumstances surrounding SB 90's passage.

Think of it like viewing a pointillist painting, such as Georges Seurat's *A Sunday Afternoon on the Island of La Grande Jatte*. One dot of paint on the canvas is meaningless, but when thousands of dots are viewed together, they create something recognizable.[13] So too here, one piece of evidence says little, but when all of the evidence is viewed together, a coherent picture emerges.

2

This Court begins with the applicable standard. Both Plaintiffs' constitutional claims and their statutory claim require this Court to apply the multifactor test set out in *Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977). In this Circuit, however, there are a few important differences between Plaintiffs' constitutional claims and their statutory claim.

*First*, under the Fourteenth and Fifteenth Amendments, Plaintiffs must show that SB 90 has *both* a discriminatory impact and that the Legislature passed it with discriminatory intent. *GBM*, 992 F.3d at 1321. To make out a section 2 claim, Plaintiffs need only show a "discriminatory purpose." *Askew v. City of Rome*, 127 F.3d 1355, 1373 (11th Cir. 1997). Thus, Plaintiffs can succeed under section 2 of the

---

[13] *See* Emma Taggert, *How the Pioneers of Pointillism Continue to Influence Artists Today*, My Modern Met (Jan. 18, 2018), https://tinyurl.com/ybux3r5s; *see also Ferris Bueller's Day Off – Art Institute of Chicago scene*, YouTube (Nov. 21, 2011), https://tinyurl.com/2ce925m9,

VRA by showing only that the Legislature passed the challenged provisions with a discriminatory intent.

*Second*, under the Fourteenth and Fifteenth Amendments, if Plaintiffs show that SB 90 has a discriminatory impact, and that racial discrimination was a "substantial" or "motivating" factor in its passage, the burden shifts to Defendants to show that the Legislature would have passed the law anyway. *Hunter v. Underwood*, 471 U.S. 222, 228 (1985). But under section 2, "[o]nce intent is shown, it is not a defense . . . that the same action would have been taken regardless of the racial motive." *Askew*, 127 F.3d at 1373; *see also McCrory*, 831 F.3d at 233 n.10 ("We note that at least one of our sister circuits has rejected the second step of this inquiry as inappropriate for intent claims under § 2.").

Either way, the starting point for each of these claims is the test set out in *Arlington Heights*. The *Arlington Heights* factors are (1) the challenged law's impact; (2) the law's historical background; (3) "the specific sequence of events leading up" to the law's passage, which includes "(4) procedural and substantive departure; and (5) the contemporary statements and actions of key legislators." *GBM*, 992 F.3d at 1322. This "list has been supplemented" with another three factors: "(6) the foreseeability of the disparate impact; (7) knowledge of that impact, and (8) the availability of less discriminatory alternatives." *Id.*

While these factors inform the discriminatory purpose inquiry, they are "non-exhaustive." *Cooper v. Harris*, 137 S. Ct. 1455, 1479 (2017). And thus this Court cannot ignore other relevant evidence of intent just because it does not fit neatly under a particular factor. This Court must also remember that "an invidious discriminatory purpose may often be inferred from the *totality* of the relevant facts," *Washington v. Davis*, 426 U.S. 229, 242 (1976) (emphasis added), and thus this Court must be careful not to focus on each fact in isolation, thereby "miss[ing] the forest in carefully surveying the many trees," *McCrory*, 831 F.3d at 214; *see also Perkins v. West Helena*, 675 F.2d 201, 209 (8th Cir. 1982) ("In determining whether a discriminatory purpose existed, no set of factors, including those suggested in . . . *Arlington Heights*, is dispositive of the question of intent."). In short, "[t]he *Arlington Heights* factors require a fact intensive examination of the record"—there is no easy substitute. *GBM*, 992 F.3d at 1322 n.33.

Finally, this Court emphasizes an important point that it fears has been lost in the chaos of this consolidated action. "Under *Arlington Heights*, . . . the issue is not just whether there was racial animus in any legislator's heart, nor whether there were other reasons, in addition to race, for a legislature's action. To establish a prima facie case, a plaintiff need only show that race was a motivating factor in adoption of a challenged provision." *Jones v. DeSantis*, 462 F. Supp. 3d 1196, 1235 (N.D. Fla. 2020). Put another way, the question before this Court is *not* whether the Florida

Legislature is racist. Nor is the question whether SB 90's sponsors are racists. Rather, the question is whether race was a motivating factor in SB 90's adoption. Thus, if the Legislature's motive "was to favor Republicans over Democrats, and the only reason the legislators thought [SB 90] would accomplish that result was that a disproportionate share of affected [voters] were African American [or Latino], prohibited racial motivation has been shown." *Id.* at 1237; *see also Cooper*, 137 S. Ct. at 1473 ("[T]he sorting of voters on the grounds of their race remains suspect even if race is meant to function as a proxy for other (including political) characteristics.").

With the appropriate standard in mind, this Court turns to the *Arlington Heights* factors. And while discriminatory impact—being a prerequisite to any constitutional claim—is sequentially the first *Arlington Heights* factor, this Court finds the historical background a more appropriate starting point, and thus begins there.

3

a

Florida has a grotesque history of racial discrimination. For example, Professor Austin, whom this Court accepted as an expert on Florida elections and Black and Latino political participation, Tr. at 838, testified that Florida's first post-Civil War constitution never took effect because it extended the franchise to White

42

males only, *id.* at 852.[14] And even when Congress forced Florida to extend the franchise to Black men, Florida did everything it could to prevent those citizens from voting. As Dr. Kousser—an expert in American politics, southern politics, and minority voting rights testified—during the post-Reconstruction period, Florida took incremental steps to limit the franchise. *Id.* at 1694–96. First, Florida altered its constitution to allow the governor to appoint all statewide officeholders, ensuring White domination of the executive branch. *Id.* at 1696. In 1887, the Florida Legislature enacted a proto-identification requirement, under which registration certificates were required to vote. *Id.* at 1697. In 1888, the Legislature passed the "Eight Box Law"—which "worked as a de facto literacy test"—and a poll tax. *Id.* at 1699. These measures—all facially neutral—had their desired effect; "Black voting dropped from 62 percent in 1888 to 11 percent in 1892." *Id.* at 855, 1699.

---

[14] This Court has made plain where it accepts experts' testimony and where it rejects it. For example, as explained below, this Court accepts some of Dr. Smith's opinions and rejects others. And as one could guess, anywhere this Court relies on an expert's report or testimony, this Court accepts that opinion.

A brief word is also in order about Defendants' expert, Dr. Kidd. Although Plaintiffs' motion presented a close call, this Court did not strike Dr. Kidd's testimony. But nobody should confuse this Court's attempts to be polite with an inability to separate wheat from the chaff. Excepting Dr. Kidd's opinion that different states have different laws governing their elections, this Court rejects Dr. Kidd's testimony. While the methodology Dr. Kidd used is accepted in theory, the way he applied it is not. And thus, his conclusions are not reliable. This should surprise no one. Indeed, Defendants do not bother citing Dr. Kidd's testimony *at all* in their post-trial brief. In short, Dr. Kidd's suggestion that Florida is on the forefront of ballot accessibility in the United States is not supported by his haphazard approach.

Florida's White majority also used terrorism to suppress the Black vote, as Dr. Burch, an expert in—among other things—discriminatory barriers to voting, testified. In 1920 in Ocoee, Florida, "a man was lynched and 30 to 60 people were killed and nearly all of the Black homes and churches were burned after a Black man tried to vote in an election that day." *Id.* at 935.

Restrictive voting laws and racial violence made a brutally effective pair. As late as 1960, only seven Black voters were registered in Gadsden County, even though Gadsden County had a voting-age Black population of over 12,000. *Id.* at 861–62. And there were no Black congressional representatives from Florida between 1877 and 1992. *Id.* at 869, 1705.

Similarly, Latinos seeking to vote in Florida have long faced discrimination. While there were some Latino legislators in the Florida Legislature as early as the late 1960s, there was only one Latino representative in 1980. *Id.* at 856. Further, Latinos have historically been disadvantaged by language discrimination. *Id.* at 859. Municipalities have also exploited racially polarized voting environments, using at-large elections to prevent Latinos from winning office. *Id.*

What is this Court to make of this history? To be sure, there are those who suggest that we live in a post-racial society. *See Shelby Cnty.*, 570 U.S. at 557. But that is simply not so. Still, this Court is mindful of the Eleventh Circuit's admonition that Florida's racist history cannot ban "its legislature from ever enacting otherwise

constitutional laws about voting." *GBM*, 992 F.3d at 1299. Of course, today's legislators did not draft the 1865 constitution or the Eight Box Law. And, at times, the Legislature has acknowledged Florida's deeply disturbing racial history and alluded to systemic racism's lingering effects. *See* Ch. 2020-88, §§ 1–4, at 1–2, Laws of Fla. (requiring the Board of Education "to examine ways in which the history of the 1920 Ocoee Election Day Riots will be included in instruction on African-American history," directing the Secretary of State to "determine how the Museum of Florida History . . . will promote the history of the 1920 Ocoee Election Day Riots," and directing investigation into naming state parks and schools after victims of the massacre).[15] But Florida's painful history remains relevant; it echoes into the present and sets the stage for SB 90.

b

One way in which Florida's past remains relevant is through the socioeconomic disparities that it has created between racial groups. On this point, Plaintiffs presented Mr. Cooper, an expert in demographics and socioeconomic data. Tr. at 588. Mr. Cooper testified that non-Hispanic White Floridians "outpace

---

[15] The undersigned was born and raised in Winter Garden, Florida, Ocoee's neighboring town. The Ocoee Massacre was an ugly secret that everyone knew about, but nobody discussed.

African-Americans and Latinos in Florida across almost all key variables of socioeconomic status." *Id.* at 598.[16]

Take voter registration. Over 90% of Florida's White voting age citizens are registered to vote. *Id.* at 607; ECF No. 467-10 at 7. But only 83% of its Black and 77% of its Latino voting age citizenry are registered. ECF No. 467-10 at 7. And the vast majority (about 80%) of Black and Latino voters are also concentrated in 12 highly populated counties. ECF No. 467-10 at 7; Tr. at 609.

In terms of economic well-being, 5.4% of White family households are below the poverty line, but 15.8% of Black and 17.7% of Latino family households are below the poverty line. Tr. at 613. Further, the White population has a poverty rate of 9.2%, but the Black population has an overall poverty rate of 19.5%, and the Latino population has a poverty rate of 15.7%. *Id.* at 614. This pattern largely holds true for working age Floridians and for Floridians over 65. *Id.* at 615; ECF No. 467-10 at 10. It also bears noting that the median White household income ($65,149) is 46.7% higher than the Black median household income ($44,412) and about a quarter higher than the Latino median household income ($52,497). Tr. at 616–17; ECF No. 467-10 at 10. And when it comes to per capita income, the White per capita income ($40,938) is almost twice the Black per capita income ($20,989) and almost

---

[16] The data Plaintiffs have introduced—for example, socioeconomic data, registration data, and statistical data showing patterns of use by race for different modalities of voting—is largely undisputed; however, the parties vigorously dispute the import of the data.

three quarters higher than the Latino per capita income ($23,905). Tr. at 618; ECF No. 467-10 at 10. Black and Latino Floridians also rely on food stamps in vastly higher numbers than White Floridians. Tr. at 618; ECF No. 467-10 at 10.

These patterns repeat themselves in the realm of education. For example, 6.9% of the White population have not finished high school, but 15.3% of the Black population and 20.4% of the Latino population lack a high school degree. Tr. at 619. And 31.5% of the White population have a bachelor's degree or higher, compared to 19.6% of the Black population and 25.7% of the Latino population. *Id.* at 620. Plus, only 1.7% of the White population does not speak English well. *Id.* at 10. But 5.9% of Black Floridians and over a third (35.6%) of Latino Floridians do not speak English well. ECF No. 467-10 at 10–11; Tr. at 611.

Turning to other metrics, the unemployment rate is more mixed, Black Floridians have a slightly higher unemployment rate (7.2%), while White and Latino Floridians are close to even (4.1% and 3.8% respectively). And when Floridians do find jobs, White Floridians are comparatively more likely to work in the professional sector or in management positions. Tr. at 622. On the other hand, Black and Latino Floridians are overrepresented in the service sector. *Id.*

Beyond the workforce, the disparities are just as stark. While 80.1% of Black households and 84.7% of Latino households have access to broadband internet, 88.8% of White households have such access. *Id.* at 623. Further, while 4.8% of

47

White households lack access to a vehicle, 7.3% of Latino households and 10.4% of Black households lack such access. *Id.* at 629. Unsurprisingly then, Black and Latino Floridians use public transportation at higher rates than White Floridians—4% and 1.8% versus 0.7% respectively. *Id.* at 630. Black and Latino Floridians also face longer commutes, with 4.9% of Black Floridians, 6.6% of Latino Floridians, and 4% of White Floridians traveling two or more hours to get to and from work. *Id.* at 631.

These are not small disparities. And they are far too consistent to be coincidental. Rather, these disparities are the stark results of a political system that, for well over a century, has overrepresented White Floridians and underrepresented Black and Latino Floridians. This Court will return to these disparities when it addresses SB 90's impact on Black and Latino voters.

c

The present effects of Florida's past are also relevant in other ways. As the Supreme Court has recognized, "racial identification is highly correlated with political affiliation." *Cooper*, 137 S. Ct. at 1473 (quoting *Easley v. Cromartie*, 532 U.S. 234, 243 (2001)). That has long been true in Florida.

As Dr. Kousser testified, "race and partisanship are inextricably intertwined; and that has been so in Florida throughout its history one way or another." Tr. at 1688. For example, Dr. Kousser described that in Reconstruction Florida, Republicans were commonly called "Black Republicans," both because of a

negative connotation associated with the color black and because the Florida Republican Party's core constituency was Black.Tr. at 1688.

Today, Black voters are a key constituency for the Florida Democratic Party. Between 2004 and 2020, Black voters favored Democratic presidential and gubernatorial candidates at rates between 86% and 96%, or an average of roughly 89.7%. *See id.* at 1788. Latino voters have generally favored Democratic candidates, but the correlation is much less pronounced. For Latinos, the range of support for Democratic candidates in the same period is between 44% and 62%, with an average of roughly 54%. *See id.* at 1788–89. By contrast, White voters heavily favor Republican candidates, giving Democrats between 42% and 32% of their vote between 2004 and 2020, with an average of roughly 38.6%. *See id.*

Defendant Lee's records, of which this Court took judicial notice, ECF No. 569, paint a similar picture. First, 78.75% of Black voters are registered Democrats. *See* ECF No. 568-1. On the other hand, only 3.53% of Black voters are registered Republicans. *Id.* Similarly, 47.46% of White voters are registered Republicans (and almost 82% of Republicans are White), and only 27.4% of White voters are registered Democrats. *Id.* Finally, Latino voters are roughly split, with 37.92% registering as Democrats and 25.60% registering as Republicans. *Id.* As for Non-Party Affiliates, 16.38% of Black voters are not affiliated with a party, 35.20% of

Latino voters are not affiliated with a party, and 23.46% of White voters are not affiliated with a party. *Id.*

For Latino voters, Defendants' expert Dr. Moreno largely corroborated the information set out above, testifying that "the best way to understand Hispanics is as swing voters." Tr. at 3330. In other words, between 1980 and 2004, Latino voters favored Republican candidates, between 2008 and 2018 they largely favored Democratic candidates, and now they may be swinging back toward Republicans. *Id.* at 3331. This Court credits Dr. Moreno's testimony on this point.[17]

Based on the evidence above, this Court finds that White Floridians are likely to vote for the Republican Party, Black Floridians are extremely likely to vote for the Democratic Party, and Latino Floridians are not particularly affiliated with either party. Put another way, for White and Black voters in Florida, separating race from politics only works in science fiction.

That's a dangerous mix; one racial group is so affiliated with the minority party that roughly nine in ten members of that group typically support that party.

---

[17] This Court does not rule out the possibility that different ethnic groups that make up what this Court refers to as "Latino" voters may, in fact, favor a certain party. Indeed, as Dr. Moreno testified, Latino voters are not a monolith. For example, "Cuban-Americans in Miami-Dade have high registration and voting rates compared to other Hispanic voters in Florida." Tr. at 3349. This Court also recognizes the possibility that the Legislature enacted SB 90 with the intent to discriminate against a subset of Latinos—such as Puerto Ricans. But that was not the claim presented to this Court, and so this Court offers no opinion on whether the Legislature enacted SB 90 with the intent to discriminate against any subgroup that falls within the broader "Latino" category (and, in fairness to Plaintiffs, such a claim would be very hard to prove, as the Division of Elections does not keep records on such subgroups).

Indeed, one witness testified that Black voters are so closely associated with the Democratic Party that Supervisors' employees have told persons engaged in line warming that they cannot wear shirts bearing the words "Black Voters Matter" because that is a "partisan" statement. Tr. at 1987–88. As "[t]he Supreme Court has explained," such "polarization renders minority voters uniquely vulnerable to the inevitable tendency of elected officials to entrench themselves by targeting groups unlikely to vote for them." *McCrory*, 831 F.3d at 214 (citing *Thornburg v. Gingles*, 478 U.S. 30 (1986)). Indeed, as Defendants' expert conceded, "it would provide a political advantage to the Republican Party in Florida if voting were to decrease among African-Americans." Tr. at 3362.

Making it even more tempting for Florida's Legislature to give in to that "inevitable tendency," Florida's elections are very close. For example, in the last decade, the margin of victory in gubernatorial and presidential races in Florida has hovered between roughly 3% and 0.5%. *See* Fla. Dep't of State, Div. of Elections, *Election Results*, https://tinyurl.com/mr4ffu88 (last visited Mar. 23, 2022). Suppressing even a few thousand votes could swing an election. Indeed, in 2018, the margin of victory in Florida's gubernatorial race was only 32,463 votes. *See id.* As of the date of this Order, there are 1,938,191 Black registered voters in Florida. Suppressing just 1% of Black voters—or 19,381 voters—would, on average, suppress 17,443 Democratic votes, and thus could easily swing an election. So it is

easy to see how Republican legislators who harbor no racial animus could be tempted to secure their own position by enacting laws targeting Black voters.

Sadly, the record before this Court suggests that, in the past 20 years, Florida's legislators and cabinet officials have given into that temptation several times—targeting Black voters because of their affiliation with the Democratic party. It is to that history that this Court now turns.

d

To start, Florida has a history of maintaining its voter rolls in a discriminatory manner. Since 2000, Florida has repeatedly purged or sought to purge its voter rolls. These purges and attempted purges have consistently and disproportionately affected, or threatened to affect, Black voters.

Multiple experts testified that "[i]t's well known nationally that" Florida conducted "a large [voting-roll] purge in 2000." Tr. at 1712. The purge used an algorithm so obviously flawed that 20 Supervisors refused to implement it. ECF No. 467-13 ¶ 44.[18] But the remaining 47 did, to tragic effect. In a later report, the U.S. Commission on Civil Rights found that the purge's effects fell overwhelmingly on minority voters. Tr. at 1712. Indeed, "Black voters were ten times as likely to have their ballots rejected as White voters." *Id.* at 1713. In Miami-Dade County, Black

---

[18] In their joint pretrial stipulation, the parties stipulated to the admission of "the disclosed expert reports (and figures and tables therein) of experts who appear to testify at trial." ECF No. 402 at 19 n.11.

voters made up only 20% of the population, but 65% of those purged from the voter rolls were Black. *Id.* at 870. Unsurprisingly, then, the Commission found "strong and credible evidence of violations of Section 2 of the Voting Rights Act and disenfranchisement of people of color" during Florida's 2000 election. ECF No. 518-7 at 1.

In response to the chaotic 2000 election, the Legislature passed the Florida Election Reform Act of 2001. ECF No. 467-12 ¶ 54. Among other things, the Act included "[a] voter list maintenance section that had a standardless ex-felon identification procedure, was more likely to erroneously identify minorities as ex-felons," and put the onus on the voter to prove they belonged on the rolls. *Id.* ¶ 56. Voters quickly challenged several of the Act's provisions in the Southern District of Florida. *Id.* ¶ 59. And the Legislature, recognizing the inevitable, soon repealed the challenged provisions. *Id.*

But by 2004 Florida was back at it, questioning the "eligibility of more than 40,000 registered voters based on felon status." Gilda R. Daniels, *A Vote Delayed is a Vote Denied: A Preemptive Approach to Eliminating Election Administration Legislation That Disenfranchises Unwanted Voters*, 47 U. Louisville L. Rev. 57, 88 (2008); Tr. at 1713.[19]

---

[19] This Court has considered some secondary sources which broadly confirm Plaintiffs' experts' testimony on these points. Namely, for ease of reference, this Court looked to law review

In spring 2004, CNN made a public records request for copies of "the list of registered Florida voters who are suspected felons." *CNN v. Fla. Dep't of State*, 2004-CA-001259, 2004 WL 5138312 (Fla. Cir. Ct. July 1, 2004). Citing section 98.0979(1)(a), Florida Statutes, which allowed only a limited group of persons to make copies of "voter registration information," the Florida Department of State offered to allow CNN to view the list, but not to copy it. *Id.* CNN sued, and the Circuit Court for Second Judicial Circuit held that section 98.0979 violated the Florida Constitution. *Id.* Accordingly, the court ordered the Division of Elections "to immediately open the suspected felons list for public inspection" and to allow CNN "to copy and photograph the list." *Id.*

In the wake of that ruling, "advocacy groups and the media revealed that the list included persons who were eligible to vote—a disproportionate number of whom were African-Americans (22,000)—while exempting a large number of Hispanics." Daniels *supra*, at 88–89. "State officials [then] admitted that the list was racially discriminatory," but disclaimed any partisan motive. *Id.* at 89 n.154; Ford Fessenden, *Florida List for Purge Proves Flawed*, New York Times (July 10, 2004), https://tinyurl.com/mrrbkxbw. Chastened, Florida abandoned the purge.

---

articles for numbers contained in Defendant Lee's records, and a news article for statements made by Defendant Lee's office. Surely, no party could contest the accuracy of either.

Undeterred by a decade of debacles, Florida again moved to purge its voter rolls in late 2011 to early 2012. Tr. at 1714. In May 2012, then Florida Secretary of State Ken Detzner "sent a list of 2,700 possible non-citizen voters to county election officials for eligibility verification." Michael Ellement, *Blocking the Ballot: Why Florida's New Voting Restrictions Demonstrate a Need for Continued Enforcement of the Voting Rights Act Preclearance Requirement*, 62 Cath. U. L. Rev. 541, 560 (2013); Tr. at 1714 (explaining that Florida began with a list of 180,000 names that eventually dropped to 2,700). Yet again, "[t]he names on the potential non-citizen list included a disproportionately high number of minority voters." Ellement *supra*, at 560.

Florida's newest proposed purge provoked a wave of lawsuits. Claiming that Florida's purge "erroneously targeted lawfully-registered voters, including a disproportionate share of racial and language minorities," some organizations sued seeking to force Florida to preclear its purge plans under section 5 of the VRA. *Mi Familia Vota Educ. Fund. v. Detzner*, 891 F. Supp. 2d 1326, 1330 (M.D. Fla. 2012). Ultimately, however, this suit was dismissed after the Supreme Court decided *Shelby County*.

The Department of Justice also sued Florida under the National Voter Registration Act (NVRA). Accordingly, a brief word about that statute is in order here. Congress enacted the NVRA because it recognized that, while the VRA

"eliminated the more obvious impediments to registration," it "left a complicated maze of local laws and procedures . . . through which eligible citizens had to navigate in order to exercise their right to vote." H.R. Rep. 103-9, at 3 (1993). Congress also recognized that "discriminatory and unfair registration laws and procedures can . . . disproportionately harm voter participation by . . . racial minorities." *Id.* And Congress was particularly concerned about discriminatory voter roll purges. So it enacted section 8 of the NVRA, which it designed "to prohibit selective or discriminatory purge programs." *Id.* at 15.

Returning to Florida's 2012 voter purge, this Court found that the purge probably violated some of section 8's provisions. *United States v. Florida*, 870 F. Supp. 2d 1346, 1350 (N.D. Fla. 2012). This was so because "[t]he Secretary's methodology made it likely that the properly registered citizens who would be required to respond and provide documentation would be primarily newly naturalized citizens" and thus "[t]he program was likely to have a discriminatory impact on these new citizens." *Id.* But because, by that time, Florida had abandoned its purge, this Court declined to grant injunctive relief. *Id.* at 1351.

Around the same time, a district court in South Florida was also considering whether to enjoin Florida's voter roll purge under another of section 8's provisions—its 90-day provision. *See Arcia v. Detzner*, 908 F. Supp. 2d 1276, 1279–80 (S.D. Fla. 2012). That provision requires states to "complete, not later than 90 days prior to the

date of a[n] . . . election for Federal office, any program the purpose of which is to systematically remove names of ineligible voters from the official list of eligible voters." *Id.* Relying, in part, on the canon of constitutional avoidance, the district court held that the voter roll purge was "not subject to the 90-day provision." *Id.* at 1284.

Amid this legal firestorm, and as alluded to above, Florida ultimately abandoned its purge—although "without sending notice to county Supervisors of Elections." ECF No. 467-13 ¶ 45. But the Eleventh Circuit had the final word. Concluding that the issue was capable of repetition yet evading review, it reversed the Southern District of Florida, holding that the 90-day provision applied to Florida's voter roll purge and that the purge therefore violated the NVRA. *Arcia*, 772 F.3d at 1343–48.

More recently, as Dr. Burch reported, "[t]he evidence suggests that canceled voter registrations still disproportionately affect African Americans, including the thousands purged between 2018 and 2019." ECF No. 467-6 at 16–17.

In sum, Florida has a history of purging or seeking to purge its voter rolls. Because Florida often uses flawed methodologies to identify felons, noncitizens, or others who are ineligible to vote, Florida's purges affect many qualified voters. And

for the past 20 years, those voters have disproportionately been Black.[20] This "series of purges, one after another, . . . is an indication of continued problems with voting discrimination differentially affecting minority groups in Florida." Tr. at 1714.

Florida also has a tortured relationship with early voting. In 2004, Florida expanded early in-person voting. *Id.* at 1727–28. And in the 2004 election, Black usage of early in-person voting "substantially exceeded White usage." *Florida v. United States*, 885 F. Supp. 2d 299, 322 (D.D.C. 2012). In 2005, the Legislature quickly walked back that expansion, over the opposition of Florida's Black Caucus, restricting early voting to government buildings and eight hours per day on weekdays and eight hours total on weekends. Tr. at 1728.

Still, in 2008, the Obama campaign stressed early voting. *Id.* As a result, 52% of early voting ballots were cast by Democrats and over "half of the Black votes in Florida were cast early in person." *Id.* at 1729. In total, Black voters used early voting at twice the rate of White voters. *Florida*, 885 F. Supp. 2d at 322.

In 2010, the Black "usage rate" for early voting "still exceeded the white rate by a factor of about one-third." *Id.* at 323. The Legislature was quick to act. In 2011, then-Representative Dennis Baxley introduced HB 1355, which decreased the number of early in-person voting days. As a federal court later explained, the

---

[20] As explained below, besides making it harder for Black voters to stay on the rolls, Florida also has a history of making it tougher for them to get on to the rolls in the first place.

Legislature enacted HB 1355 "without clearly identifying why the law needed to be changed, without creating much of a legislative record to document its reasons for the change, and against the advice of the Florida State Association of Supervisors of Elections." *Brown v. Detzner*, 895 F. Supp. 2d 1236, 1239 (M.D. Fla. 2012).

Before HB 1355, early voting in Florida began on "the 15th day before an election" and ended "on the 2nd day before the election." *Florida*, 885 F. Supp. 2d at 308 (quoting § 101.657(d), Fla. Stat. (2010)). HB 1355 altered that scheme by mandating that the early voting period begin "on the 10th day before an election and end on the 3rd day before an election." *Id.* at 309 (quoting § 101.657(d), Fla. Stat. (2011)) (alteration deleted).

By changing the end of the early voting period from the second day before an election to the third day before an election, HB 1355 effectively banned early voting on the Sunday before election day. Previously, Black churches had widely encouraged their congregants to vote on the Sunday before election day in so-called "Souls to the Polls" events. Tr. at 1730; *see also Florida*, 885 F. Supp. 2d at 335 ("[M]any African-American churches organize 'souls to the polls' drives to transport their congregants to early voting sites on that Sunday."). But even setting the Sunday before the election aside, Black voters "disproportionately used the first five days of the benchmark early voting period." *Florida*, 885 F. Supp. 2d at 323. Indeed, Black voters "used the repealed days of early voting at rates nearly *double* those of White

voters in 2008." *Id.* at 324. In other words, HB 1355 surgically removed only those early voting days used disproportionately by Black voters.

Ultimately, a three-judge panel in the District Court for the District of Columbia declined to preclear HB 1355's changes to the early voting period under section 5 of the VRA because Florida did not meet "its burden" to establish "that its statewide early voting changes will have a nonretrogressive effect" on minority voter participation. *Id.* at 337. Because Florida could not show that its changes would have a nonretrogressive effect, the court did not reach whether the Legislature enacted HB 1355's early voting provisions with the intent to discriminate based on race. *Id.* at 351. A month later, the Middle District of Florida ruled on a similar issue and found that HB 1355 did not violate the Constitution or the VRA. *Brown*, F. Supp. 2d at 1239.

First, the court in *Brown* found that the Legislature did not enact HB 1355 with the intent to discriminate based on race. In doing so, the court acknowledged that HB 1355's amendments to early voting would "have a disproportionate effect on minority voters." *Id.* at 1246. It also acknowledged testimony that the Legislature made amendments to HB 1355 in an "unusual" manner, that the Legislature limited public testimony to three minutes, and that legislators used a "strike-all" amendment to alter the law the day before the Senate Rules Committee considered it. *Id.* at 1247. Next, the court noted that a senator had made racially charged statements on the

senate floor that "could be considered evidence of discriminatory purpose." *Id.* (quoting *Florida*, 885 F. Supp. 2d at 354). And the court conceded that the former chairman of the Florida Republican Party had, in an unrelated case, testified to participating in meetings "in which 'not letting blacks vote' and 'suppressing black voters in Florida' was discussed." *Id.* at 1248. Even so, the court determined that the plaintiffs were unlikely to succeed on their intentional discrimination claim. Finally, the court also rejected the plaintiffs' discriminatory results claim, concluding that HB 1355 would not "result in a denial or abridgement of the right to vote on account of race." *Id.* at 1255.

Besides changing Florida's early voting rules, HB 1355 also altered Florida's scheme regulating 3PVROs—which, as explained below, overwhelmingly serve minority communities. Before HB 1355, "Florida law required an organization, upon receipt of a voter-registration application, to 'promptly' deliver it to a voter-registration office." *League of Women Voters of Fla. v. Browning*, 863 F. Supp. 2d 1155, 1159 (N.D. Fla. 2012). HB 1355 changed that by requiring "voter-registration organization[s] to deliver a voter-registration application to the Division of Elections or the local supervisor of elections 'within 48 hours after the applicant completes it or the next business day if the appropriate office is closed for that 48-hour period.' " *Id.* at 1160 (quoting § 97.0575(3)(a), Fla. Stat. (2011)).

HB 1355 also required 3PVROs to disclose to the Division of Elections the name of every volunteer who helps the organization register voters. *Id.* at 1163. It also required the 3PVRO to report any change in this information within 10 days. *Id.* Even more, the law required "registration agents"—anyone who helped register voters—to file a sworn statement that the agent "will obey all state laws and rules regarding the registration of voters." *Id.* at 1164 (quoting § 97.0575(1)(d), Fla. Stat. (2011)). And "[t]he statement 'must be on a form containing notice of applicable penalties for false registration.' " *Id.* (quoting § 97.0575(1)(d), Fla. Stat. (2011)). Plus, as this Court noted, the Secretary of State had promulgated a form that falsely suggested "that a registration agent commits a felony and could be imprisoned for five years for sending in a voter-registration application that includes false information, even if the registration agent does not know or have reason to believe the information is false." *Id.*

HB 1355 also imposed various other onerous restrictions on 3PVROs that, for the sake of brevity, this Court will not discuss here. Unsurprisingly, this Court enjoined much of HB 1355's restrictions on 3PVROs as violative of the First Amendment and the NVRA. *Id.* at 1168. Accordingly, when other courts ruled on HB 1355's racial effects, they did not address its 3PVRO restrictions. *See Florida*, 885 F. Supp. 2d at 307.

In the next election cycle, HB 1355 had a predictable effect on Florida elections: "voters stood in line for as long as six to eight hours for [early in-person voting] or election day voting in Florida during the 2012 election." Tr. at 1739. These "long lines helped to reduce [early in-person] voting by 225,000" and "election day voting by 250,000 between 2008 and 2012." *Id.* at 1740. After a public uproar, the Legislature restored the pre-2011 early voting hours. *Id.*

Finally, a more recent piece of Florida legislation also merits discussion. In 2018, Florida voters overwhelmingly approved "Amendment 4, which restored voting rights to former felons who had served their time." *Id.* at 899. In response to Amendment 4, the Legislature passed SB 7066, which required felons to pay all fees they owed to the state before their voting rights could be restored. *Id.* As Dr. Austin testified, SB 7066 "had more of an impact on African-Americans," while 6% of the non-Black population was disenfranchised by Florida's prior regime, 15% of the Black voting-age population was affected. *Id.*

In *Jones v. DeSantis*, 462 F. Supp. 3d 1196 (2020), this Court considered whether the Legislature enacted SB 7066 with the intent to discriminate based on race. Summarizing the plaintiffs' evidence, this Court explained that "the plaintiffs' race claim draws substantial support from the inference—in line with the testimony of the State's own expert—that a motive was to support Republicans over Democrats, coupled with the legislators' knowledge that SB7066 would have a

63

disparate impact on African Americans, who vote for Democrats more often than for Republicans." *Id.* at 1238. But given "other explanations for these SB7066 provisions, as well as evidence inconsistent with the inference of racial motivation" this Court found that, "[o]n balance, . . . SB7066 was not motivated by race." *Id.* Still, this Court noted that "the issue is close and could reasonably be decided either way." *Id.* at 1235.

Once is an accident, twice is a coincidence, three times is a pattern. Skilled and well-respected judges from multiple courts examined the provisions discussed above, and they all found that the Florida Legislature did not enact them with the intent to discriminate based on race. But in all cases, the court acknowledged that the law had discriminatory effects. This case is different because this Court now has 20 years of legislation before it. At some point, when the Florida Legislature passes law after law disproportionately burdening Black voters, this Court can no longer accept that the effect is incidental. Based on the indisputable pattern set out above, this Court finds that, in the past 20 years, Florida has repeatedly sought to make voting tougher for Black voters because of their propensity to favor Democratic candidates.

In summation, Florida has a horrendous history of racial discrimination in voting. As a result, Florida has long had a government that is not responsive to the needs of racial minorities. Because Florida's government has historically been

unresponsive to minorities, White Floridians outpace minorities by almost every socioeconomic metric. Further, because of Florida's racially charged past, race is closely correlated with politics in modern-day Florida. Over two-thirds of registered Republicans are White; roughly two-thirds of all Black voters are Democrats. And Latino voters are split. Plus, almost all Florida elections are decided by razor-thin margins. The toxic mixture of racially polarized voting and close elections amplifies the risk that Florida's elected officials will target voters based on their race. In the past 20 years, that is what has happened. Florida has purged its voter rolls, the effects of which fell disproportionately on Black voters. And when Black voters tended to favor a form of voting, or when a change in the law opened more opportunities for Black Floridians to vote, the Legislature has acted to restrict those opportunities. This factor weighs in Plaintiffs' favor.

With this background in mind, this Court turns to the 2020 election, which immediately preceded SB 90's passage.

4

a

This Court next looks at the specific sequence of events leading to SB 90's passage. SB 90 has its genesis in the 2020 election, which was unique for many reasons. In Florida, the 2020 election differed from past elections in two important ways.

*First*, SB 90 saw a major shift in VBM usage, both in how many voters voted by mail and in *who* voted by mail. Since 2014, voters have cast about 19.6 million VBM ballots in Florida. Tr. at 2179. Put another way, VBM ballots make up about 39% of all ballots cast in Florida since 2014. *Id.* Across elections, VBM ballot use has hovered around 30%. *Id.* at 2181. Historically, VBM use has not been distributed evenly across racial groups.

Looking at general elections, White and Latino voters have generally used vote by mail in greater percentages than Black voters. *Id.* at 2184; ECF No. 467-5 at 36–37. For example, between 2014 and 2020, Black VBM use hovered around 20%. Tr. at 2184. By contrast, during the same period, White VBM use hovered around 31% to 32%. *Id.* at 2185. In 2020, however, Black VBM use doubled to around 40%. *Id.* at 2185; *see also id.* at 2580 (explaining that the 2020 election saw "100 percent increase in [Black] usage" of VBM). On the other hand, White VBM use jumped to 45%. *Id.* at 2185. So while White VBM use remained greater, the gap between White and Black VBM use shrunk from roughly 11% to 5%. *Id.*

Turning to party affiliation, between 2014 and 2020, Democrats used VBM at a rate of roughly 35.5%. *See* ECF No. 467-5 at 38. Republicans used VBM during the same period at a rate of roughly 40%. *See id.* In 2020, however, Democrats used VBM at a rate nearly 20% greater than Republicans (roughly 61% to 42%). *See id.*

As one of Plaintiffs' experts testified, the ongoing pandemic contributed to this surge in VBM usage. *Id.* at 2414. But that does not mean that the increase in VBM use among Black voters and Democrats is a transient change. Instead, once voters become habituated to using more convenient forms of voting—such as VBM—we should expect many voters to continue using that form of voting. Tr. at 2413–18; *see also id.* at 2605 (testimony by Supervisor Earley that, in 2020, "people that hadn't been introduced to vote-by-mail saw that it was easy and secure and something they felt comfortable doing"); *id.* at 1169 (testimony by Supervisor Scott that people "plan to continue voting by mail in the future because they've discovered how convenient it is").

*Second*, besides seeing a surge in VBM, the 2020 election saw a surge in turnout generally. In 2016, Florida had a turnout rate of 74.5%; in 2020 the rate was 77.2%. To put this in perspective, 1,565,612 *more* voters voted in 2020 than in 2016.[21] That's more than the entire population of Maine (1,372,247 people). *U.S. Census Bureau Quickfacts: Maine*, United States Census Bureau (July 1, 2021), https://tinyurl.com/2p8yzsfe.

---

[21] Using Defendant Lee's book closing reports, we know that there were 12,863,773 registered voters in Florida in 2016. So roughly 9,583,510 Floridians voted in 2016. In 2020, there were 14,441,869 registered voters. So roughly 11,149,122 Floridians voted in 2020.

Despite the pandemic, the resulting shifts in VBM ballot use, and the massive increase in turnout, Florida's 2020 election went relatively well, as the Stanford-MIT Healthy Elections Project explained:

> Overall, the 2020 general election went smoothly in Florida, and administrators successfully overcame the hurdles the pandemic erected. Canvassing boards counted absentee ballots earlier than in previous years, ensuring that election results were promptly available on election night. Both absentee voting and in-person voting went well with comparatively low absentee ballot rejection rates, few lines at polling places, except at the start of early voting, sufficient poll workers, and high compliance with mask-wearing requirements for in-person voting. The state experienced challenges as well, including a last-minute crash of the voter registration website, confusion surrounding a state law that permits former felons to vote after paying court fines and fees, ambiguity regarding the interpretation of rules pertaining to absentee ballot box drop boxes, instances of voter intimidation and polling place durations, and misinformation regarding voting processes.

Tr. at 1748. Unsurprisingly, Florida officials praised Florida's election performance. This included praise from Governor DeSantis, the Florida Supervisors of Elections, Senator Baxley[22] (SB 90's Senate sponsor), Representative Ingoglia (SB 90's House sponsor), and Defendant Lee. *Id.* at 1752–53, 60; *id.* at 965.

While Florida's election went smoothly, this Court cannot ignore reality. The 2020 election and its aftermath, on a national scale, was chaotic, though scant evidence was presented on this issue. Between the 2020 election and SB 90's introduction, then-President Trump refused to acknowledge that he had lost the

---

[22] Recall that Senator Baxley also sponsored HB 1355.

election, causing an escalating crisis that culminated in a mob storming the United States Capitol on January 6, 2021.[23] This is not determinative, but this Court cannot evaluate the Legislature's actions without at least acknowledging these events. Indeed, the Supervisors' lobbyist, David Ramba, testified that considering "all of the things that were on the national news and who stole what and everything else, we knew that somebody was going to come up with a piece of legislation." Tr. at 3101.

As Mr. Ramba expected, in the first legislative session after the 2020 election, the Legislature, through SB 90, made a sweeping set of changes to Florida's election code, with a specific focus on VBM.[24] For context, between 2013 and 2020 the Legislature made no changes to VBM. *Id.* at 1722. And the exact justification for SB 90 as a whole, and for its constituent parts, is difficult to pin down, with sponsors and supporters offering conflicting or nonsensical rationales. Indeed, as Senator Farmer testified, the rationale for SB 90 "was perhaps the most [elusive] answer we faced." *Id.* at 1517.

---

[23] *See Timeline: 2020 Election and Aftermath*, Voice of America (Jan. 5, 2022), https://tinyurl.com/yc4kcbyw. Indeed, some in the Legislature saw the connection. Representative Hardy remarked that "[w]e're not here because we have a problem with our elections. We are here because the Republican former president lost his reelection in November. Rather than admitting his defeat, he spun a web of lies." ECF No. 462-29 at 19.

[24] While Mr. Ramba testified that election bills often follow statewide elections, he conceded that they are usually "less comprehensive" than SB 90. Tr. at 3101.

Upon an exhaustive review of relevant legislative materials, Plaintiffs' expert, Dr. Burch, testified that "in general" SB 90's stated purpose was to proactively "instill . . . voter confidence by ensuring election integrity and security." *Id.* at 970. This rationale is suspect for two reasons. First, in 2020, there was "high confidence in the election outcome among Floridians." *Id.* at 980. Indeed, Floridians were "among the highest in the nation in terms of . . . voter confidence." *Id.* at 981. To be fair, however, these surveys came *before* some of the most troubling events of late 2020 and early 2021. That brings this Court to the second reason the voter confidence rationale is suspect. In 2018, then-Governor Scott and then-President Trump alleged election fraud in Florida. *Id.* 986–89, 1007. While those statements demonstrably harmed voter confidence, the Legislature did not make any changes to the election code in response. *Id.*

Nor was there any evidence before the Legislature that fraud is even a marginal issue in Florida elections.[25] Defendant Lee testified before the Legislature that she was not personally aware of any instance in which a person received another person's VBM ballot and used it. *Id.* at 1762–63. And Senator Baxley explained that

---

[25] This Court notes that there have been new allegations of voter fraud *since* the Legislature considered SB 90, *see* ECF No. 454, and that the Legislature has voted to create a new "Office of Election Crimes and Security," *see* Fla. CS for SB 524, § 3 (2022) (creating § 97.022, Fla. Stat.). But *post hoc* justifications say nothing about the Legislature's intent at the time it passed SB 90. Similarly, the creation of a voter fraud office cannot create a safe harbor for otherwise discriminatory laws. To rule otherwise is akin to claiming the creation of a ghost hunting team proves the existence of ghosts.

he did not have any evidence of fraud involving drop boxes or any evidence of widespread fraud involving VBM ballots. *Id.* at 1763–64. That concession was borne out by the evidence in this case. Representative Thompson testified that, with one exception discussed below, when the Legislature considered SB 90, "there was no evidence of voter fraud" before it. *Id.* at 1456; *see also id.* at 1518 ("There was no evidence whatsoever presented of any voter fraud problems in the 2020 election.").

Adding to the confusion, Senator Baxley sometimes denied that he intended SB 90 to address election fraud at all. For example, Senator Baxley responded to a question about VBM fraud by stating "[t]hat's not the purpose of our bill." *Id.* at 1765. Senator Baxley also responded to a similar question by stating that he was not "trying to build a case on" election fraud. *Id.* at 1766.

Similarly, Representative Ingoglia explained in response to a question about the solicitation definition, "we've never said that any non-profit organization is trying to influence votes." ECF No. 462-31 at 30. In sum, upon evaluating the legislative record, Dr. Kousser explained that "[w]hen specifically challenged about whether there was fraud that SB 90 responded to, the authors of the bill repeatedly said there was not; that's not the purpose of the bill." Tr. at 1767.

Further undercutting the fraud rationale, when asked about fraud that actually occurred during the 2020 election—"sham candidates" bribed by a former Republican member of the Florida Senate to run in close South Florida elections and

syphon votes from other, legitimate candidates—Representative Ingoglia candidly admitted that "[t]here is nothing currently in this bill addressing that." ECF No. 462-9 at 52; *see also* Tr. at 976. Eventually, a provision was included that prohibited a candidate from changing their party affiliation just before registering to run, which aimed to address this issue. Tr. at 1545; *see* Ch. 2021-11, § 12, at 12, Laws of Fla. (requiring that any person seeking to qualify as a candidate with no party affiliation must swear in writing that "he or she is registered without any party affiliation and that he or she has not been a registered member of any political party for 365 days before the beginning of qualifying preceding the general election for which the person seeks to qualify"). But other amendments that would have criminalized such activity were rejected. Tr. at 1871–74.

Finally, to the extent that legislators claimed that SB 90 prophylactically prevents fraud that has yet to occur, Senator Farmer testified that the Legislature was never presented with an example of any type of VBM fraud that SB 90 *might* prevent. *See id*. at 1557.

Beyond prophylactically responding to fraud or concerns of fraud, Legislators offered alternative rationales for the legislation. Representative Ingoglia, for example, explained that he saw no issues with election integrity, and that SB 90 was really about consistency in election administration. ECF No. 462-9 at 43. *But see* ECF No. 461-34 at 24 (testimony by Supervisor Hays to the Legislature that he had

"yet to see anybody who can give us concrete evidence that that rule [requiring that drop boxes be continuously monitored] was violated"). Generally, SB 90's sponsors struggled to identify a specific problem they were seeking to address. Tr. at 972.

That said, specific provisions did have proffered justifications, although many were just as questionable as SB 90's overarching justifications. The VBM request provision had two apparent justifications: (1) that it would make the voter file more accurate by forcing people to update their address with the Supervisors by forcing them to request VBM ballots more often, *id.* at 1009, and (2) "that people needed [the ability] to choose . . . whether they would vote by mail or in person every year." *Id.* at 1009; *see also* ECF No. 461-37 at 16–17.

While the first explanation is perhaps plausible, the second is not. Elaborating on his reasoning, Senator Baxley stated that he wanted to give voters "the opportunity to vote however they want to." ECF No. 461-37 at 110–11. This rationale is nonsensical. The Florida Election Code already addresses this issue by permitting voters to vote in person even if they have also requested a VBM ballot. § 101.69(1), Fla. Stat. ("The provisions of this code shall not be construed to prohibit any elector from voting in person at the elector's precinct on the day of an election or at an early voting site, notwithstanding that the elector has requested a vote-by-mail ballot for that election."). Senators raised this discrepancy on the Senate floor. Tr. at 1013.

73

As for the VBM request identification provision, Senator Hutson explained that "what we want to make sure is nobody can just get online or call the supervisor with the irrelevant information and just change people's vote-by-mail ballots." ECF No. 461-98 at 93. This rationale is also questionable, as Senator Jones recognized, a voter can change their registration without any of the forms of identification the VBM request identification provision requires. *Id.* at 94. Overall, though, this justification is at least plausible.

As for the drop-box provisions, the given justifications were threefold: (1) without more restrictions, people may tamper with drop boxes, Tr. at 1015, (2) the Supervisors were not using drop boxes properly, *id.*, and (3) "the provision was necessary to ensure the chain of custody of the ballot," *id.*

On the first point, Senator Baxley said that drop box tampering "is a regular phenomenon that happens." *Id.* at 1017. But at other times, Senator Baxley said he had "never made the case against box tampering." *Id.* at 1020. No evidence was presented to the Legislature that drop box tampering actually occurs. *Id.* at 1021.

The second justification has more merit. Mr. Ramba testified that the Supervisors would have liked to see "some smaller clarifications" related to the rules surrounding drop boxes. *Id.* at 3105.

The third point, however, is nonsensical. Most VBM ballots are still deposited through mailboxes, and for those ballots there will be no "chain of custody." This

74

issue was discussed repeatedly before the Legislature. For example, Supervisor Hays asked legislators, "Who's going to monitor the U.S. Postal Service boxes? You know, I'm sorry, but there's a dichotomy here that I personally cannot deal with. They're— you're not going to pay for a cop to stand at the post office box, are you?" ECF No. 461-34 at 24. Similarly, Mr. Ramba described this discrepancy as "ridiculous." Tr. at 3105.

For the solicitation provision, the justification appeared to be respect for privacy. Tr. at 1025. Or perhaps to prohibit political solicitation. But as other senators pointed out, Florida law already bans solicitation. *Id.* at 1026. Moreover, as Dr. Kousser explained, voting is "very often a communitarian act"—especially in the Black community. *Id.* at 1812–13.

Finally, for the restrictions on 3PVROs, Senator Baxley falsely claimed that a federal court order required SB 90's changes. *Id.* at 1567. Senator Baxley was not the only one to make this claim. In the House, Representative Gregory claimed that "[t]his is a good commonsense regulation which, by the way, is absolutely required by court ruling. It isn't even as if we have a choice to do it." ECF No. 462-29 at 45– 46. These claims, simply put, are false. As explained above, the last court ruling in Florida addressing restrictions on 3PVROs, *League of Women Voters of Florida v. Browning*, struck down a set of restrictions proposed by Senator Baxley. *See* 863 F. Supp. 2d at 1159.

75

This Court knows that Senator Baxley and Representative Gregory were alluding to *Browning* because the senate bill analysis for SB 90 refers to this Court's order entering a permanent injunction in 2012 following its decision in *Browning*, and notes that the Department of State had already revised its rules to comply with the injunction. *See* Fla. S. Comm. on Rules, SB 90 (2021) Post-Meeting Analysis (April 20, 2021), https://tinyurl.com/mtuzzcx2; *see also League of Women Voters v. Detzner*, Case No. 4:11cv628-RH/WCS, 2012 WL 12810507 (Aug. 30, 2012) (permanent injunction and order for entry of judgment). To reiterate, nothing in the injunction compelled the Legislature to require 3PVROs to return voter registration applications in the county where the applicant resided. To the extent the legislators suggested that this Court ordered this change in the permanent injunction following *Browning*, that is simply not true.

As with HB 1355, the Supervisors opposed SB 90. Indeed, Senator Farmer remarked that, before SB 90, he had "never seen 67 different counties' elected officials agree on anything," but, he remarked, the Supervisors were united in their opposition to SB 90—a least until the very end when one Supervisor stated that they did not "oppose" SB 90. Tr. at 1521. As Supervisor Hays told the Senate Governmental Oversight and Accountability Committee, "nothing in this bill is on our list of suggestions, with the exception of that one section giving us the authorization to begin canvassing the vote-by-mail ballots after the logic and

accuracy testing is completed. That's the only thing that we are in favor of in this bill." *Id.* at 1028. Supervisor Earley likewise testified that "on balance we are against this bill vehemently." *Id.* at 1028. And Senator Brandes—a Republican—stated that "to my knowledge, not one Republican supervisor has stood up and . . . said they support this piece of legislation." ECF No. 461-39 at 9. Even Representative Ingoglia conceded that the Supervisors had not requested SB 90 and had reported no issues related to election integrity or election fraud. *See* ECF No. 462-9 at 42–43.

That said, it does appear the Legislature was somewhat receptive to the Supervisors' input. Mr. Ramba testified that 75% to 80% of the alterations to SB 90 during its trip through the Florida Legislature were based on his recommendations. Tr. at 3101–02. As Mr. Ramba testified, the Supervisors were against many proposed provisions that did not become law. These provisions would have cancelled all requests for 2022 VBM ballots, banned drop boxes, and added signature match provisions. *Id.* at 3117–19. On the other hand, some of the Supervisors' priorities made it into the final bill. For example, the Supervisors supported the registration delivery provision and matching the 150-foot non-solicitation zone to the 150-foot non-harassment zone provided for in a different section of the election code. *Id.* at

3121.[26] But on the whole, the Supervisors would have preferred a much more limited law. *Id.* at 3105.

Despite the Legislature accepting some input, the Florida Supervisors never issued a statement supporting SB 90. *Id.* at 3129. Supervisor Corley was blunter: "I have so much I want to say about the motives, intent and content of this election bill but, to be honest, beyond disillusioned, so I'll keep my pie hole shut." *Id.* Tellingly, the Supervisors' legislative priorities moving forward largely involve repealing some of SB 90's provisions. *Id.* at 3130–31. In summation, the Supervisors did not ask for SB 90, did not want SB 90, and did not like SB 90. They were, however, able to persuade the Legislature to back down on some points. But this hardly makes SB 90 a triumph for the Supervisors. Put another way, convincing someone to smash your windows in place of burning down your house is a victory, but it doesn't mean you wanted your windows smashed.

b

As part of this Court's consideration of the sequence of events running up to SB 90's passage, this Court also considers whether SB 90's consideration in the Legislature was marked by any procedural or substantive departures.

---

[26] To be clear, however, the Supervisors did not seek a change to the definition of solicitation. *Id.* at 3131–32.

Representative Geraldine Thompson serves on the House Public Integrity and Elections Committee (PIE). Tr. at 1446. As one would expect, the Committee deals with, among other things, election administration. *Id.* In line with the testimony set out above, Representative Thompson testified that HB 7041[27] was different from other election bills because "there was very little regard for the Supervisors' opinions and positions, and [HB 7041] was primarily a function of the Legislature." *Id.* at 1447. Indeed, multiple Supervisors told Representative Thompson that they had not requested HB 7041 and that they opposed its passage. *Id.* at 1448–49. Representative Thompson testified that HB 7041's journey through the House was unusual because it was only presented to the PIE once. *Id.* at 1450. Representative Thompson also testified that Representative Ingoglia's use of a strike-all amendment was unusual— not that strike-all amendments are unusual, but that the way it was used for HB 7041 was unusual. *Id.* at 1451. As Representative Thompson explained, "[r]arely is there a strike-all offered once a bill is on the floor to be taken up for a vote." *Id.* Rather, strike-all amendments are typically offered "during committee." *Id.* Representative Thompson could not recall another time during the last session when a strike-all amendment was used this way. *Id.* at 1453. Representative Thompson also explained that the strike-all's timing—it was offered around 1:30 a.m.—was "very unusual." *Id.*

---

[27] SB 90's equivalent in the Florida House of Representatives.

Further, Representative Thompson explained that even though—for lack of better terminology—priorities of the Governor are sometimes "steamrolled" through the Legislature, HB 7041 was still unusual. *Id.* at 1454. HB 1, she noted, was another hugely partisan bill from the same session. And yet, legislators had "an opportunity; we did have time to discuss it, to debate it, to offer amendments, unlike" HB 7041. *Id.* Representative Thompson also testified that she was surprised Representative Ingoglia "waived close" on his strike-all amendment. *Id.* at 1458. In other words, Representative Ingoglia declined to speak in favor of his amendment before the Legislature voted on it. This, Representative Thompson said, "was highly unusual." *Id.*

This Court also heard from Representative Carlos Guillermo Smith. *Id.* at 1867. Representative Smith has been involved in the Legislature in some form for 11 consecutive sessions. *Id.* at 1869. Representative Smith reiterated many things Representative Thompson said; namely, that while strike-all amendments are not unusual, proposing one after legislation makes it to the floor is, that the timing of the strike-all was strange, and the bill's consideration overall was rushed. *Id.* at 1876, 1884.

Finally, this Court heard from Representative Anna V. Eskamani. *Id.* at 1893. She testified that "it tends to be the most controversial bills that are only given two committee stops"—as she testified HB 7041 was—"in such a quick fashion where

the opportunity for public testimony is very limited." *Id.* at 1898; *see also id.* at 1929

("I will say that when it comes to priority bills . . . , it might not be necessarily

unusual."). Like the other Representatives, Representative Eskamani testified that

HB 7041 moved quickly through the House with little input from Democratic

Representatives. *Id.* at 1899. And, like the other Representatives, Representative

Eskamani testified that the use of a strike-all amendment outside of committee was

unusual—something she had never seen before. *Id.* at 1902–03.[28]

On the Senate side, this Court heard from Senator Gary Farmer, Jr. *Id.* at 1510.

Senator Farmer serves on the Senate Rules Committee, which considers most major

pieces of legislation before they go to the Senate floor. *Id.* at 1512–13. Senator

Farmer testified that he had concerns about the process under which the Legislature

considered SB 90. *Id.* at 1518. Many of these concerns related to COVID protocols,

which reduced public access to Senate proceedings. *Id.* at 1518–19.

That said, even the pre-agreed COVID procedures were not necessarily

followed. For example, senators had agreed that elected officials and subject matter

experts would be permitted to testify in person. *Id.* at 1519. And for other bills, this

procedure was followed. *Id.* at 1520. Yet, despite requests from Senate Democrats,

---

[28] On the strike-all issue, Dr. Burch testified that of the 227 bills that came before the Senate in 2021, only seven were amended by strike-all within 24-hours before the bill was to be debated. *Id.* at 1035. So it is not necessarily true that strike-all amendments are *never* used this way—at least in the Florida Senate.

the Supervisors were not permitted to give testimony about SB 90 in person. *Id.*

Senator Farmer testified that public comment was limited to one minute each—but

this was in part because of the high level of public interest. *Id.* at 1522. As for the

pace of consideration, analogizing to a court, Senator Farmer called it a "rocket

docket." *Id.* at 1523. Senator Farmer testified that the constrained way in which SB

90 moved through the Legislature made it harder to make an informed decision on

the bill and to prepare and submit amendments. *Id.* at 1525–26.

Senator Farmer did concede, however, that partisan priorities often move

quickly and forcefully through both chambers of the Legislature. *Id.* at 1536. Senator

Farmer also explained that, as compared to the past, the Florida Senate has become

more partisan and that senators have become less willing to work with those across

the aisle. *Id.* at 1536–37.

For Defendants, this Court heard from Mr. Ramba. He testified that both the

House and Senate imposed COVID protocols. *Id.* at 3092. For the Senate, people

testified via two-way camera, at the House they testified in person. *Id.* Mr. Ramba,

testified that, other than the COVID protocols, the public comment for SB 90 was

no different than that for any other bill with similar interest in any other session. *Id.*

at 3095–97.

Further, Mr. Ramba testified that it was not necessarily unusual for people to

get only a few minutes to address a legislative committee where many people are

lined up to speak. *Id.* at 3097. He also testified that the House and Senate both had workshops before SB 90 was filed. *Id.* at 3103. Plus, Mr. Ramba testified that two committee stops for a bill is not unusual for a bill that "a presiding officer . . . really likes." *Id.* at 3103. Mr. Ramba was also asked whether there was anything unusual about the way the strike-all amendment was used with SB 90. *Id.* at 3114. Mr. Ramba explained that "[t]here weren't any new issues in the April 27th strike-all. It was kind of making the bill smaller and clarifying different sections of it." *Id.* at 3115. Thus, using a strike-all in this context was sensible. Mr. Ramba, however, did not say that using a strike-all in this way was normal.

Considering the above testimony, this Court concludes that the procedure used to pass SB 90 was unusual writ large, but not necessarily so for a hyper-partisan bill such as SB 90. Put another way, this sort of procedure is what one would expect to see if the Legislature was in fact motivated by race, but it is also what this Court would expect to see if the Legislature had some other nefarious motivation—such as partisanship. Accordingly, this Court concludes that this factor does not strongly weigh one way or the other.

c

Finally, for the events leading to SB 90's passage, case law also instructs this Court to consider the contemporary statements and actions of key legislators. On top of the actions and statements set out above, this Court highlights a few particularly relevant statements. This Court begins with a telling text message exchange between Representative Ingoglia and Senator Gruters (the Chairman of the Florida Republican Party). The exchange is reproduced below (Senator Gruters's messages are gray and Representative Ingoglia's are blue).



ECF No. 468-2 at 1.

Yes, we cannot make up that ground

Putting at Risk all Republican non partisan

Candidates

We had a race in sarasota this year and got killed

Our school board member got killed

Last year

Because they have 20,000 more absentee voters

We spent 100,000 by ourselves to try to cut down the difference as a county

We cannot make up ground

Trump campaign spent 10 million

Could not cut down lead

ECF No. 468-2 at 2.

While these communications do not show a *racially* discriminatory intent, they do suggest that the Legislature passed SB 90 with partisan purpose. As several Supervisors testified, before SB 90, although VBM requests were limited to four years, many Supervisors offered an option to simply renew VBM requests by checking a box. In effect then, a VBM request *could* be permanent before SB 90.

Democrats overtook Republicans in VBM use in dramatic fashion in 2020. As Senator Gruters complains, it will be difficult for the Republican Party to make up that ground. Further, voters who request VBM ballots automatically get those ballots for municipal elections. *See* Tr. at 1210. And as Supervisor Scott explained, "we've seen directly that there was an increase in voter participation in those municipal elections as a result of more people requesting vote-by-mail ballots for the 2020 cycle." *Id.* at 1211. When asked whether SB 90's "change to the validity period of vote-by-mail ballots will reduce turnout in municipal elections," Supervisor Scott replied, "without a doubt." *Id.* Similarly, Supervisor White testified that she believed that standing VBM requests increased turnout in midterm, municipal, and local elections. *Id.* at 1349.

If Democratic voters continue to receive VBM ballots—which effectively doubles as a reminder that a local election is coming up—Democratic turnout will be much higher in local elections moving forward. That would, as Senator Gruters stated, put "at [r]isk all Republican non partisan" candidates. ECF No. 468-2 at 2. So something needed to be done about the Democratic lead in VBM requests. Frankly, this is just about the only justification for the VBM request provision this Court has heard that makes any sense.

Switching gears, at trial, Plaintiffs also highlighted problematic statements that some of SB 90's supporters made on the Senate floor. In one instance, Senator

86

Powell spoke about his grandmother and how "[f]or 54 years of her life she was not allowed to vote and for the last 40 it may have still been questionable." ECF No. 462-8 at 22. In response, Senator Boyd said, "elections don't sneak up on us" and while "[i]t's our right to vote, it's also our responsibility to prepare to vote." *Id.* at 26–27. And at one point, Senator Huston remarked, "the only excuse that you have" if you do not vote "is that you're lazy." *Id.* at 29. That Senators Boyd and Hutson trotted out one of the oldest racial tropes known to man[29] in response to concerns about minority disenfranchisement probably says something about them, but it does not tell this Court much about the Legislature's motivations as a whole.

In a similar vein, this Court heard testimony that, throughout his career, Senator Baxley has "stopped a bill from being further considered which would have established a slavery memorial" because he did not want to "celebrate defeat,"[30] fought to keep the racial epithet, "darkie," in the state song, "opposed a bill that would ban the display of Confederate flags on state and local government property," and "opposed a bill to replace a . . . statue of [Confederate] General Edmund Kirby Smith with one of Mary McLeod Bethune, Black educator and civil rights worker."

---

[29] *See, e.g.*, Gary M. Segura & Ali A. Valenzuela, *Hope, Tropes, and Dopes: Hispanic and White Racial Animus in the 2008 Election*, 40 Presidential Stud. Q. 497, 501 (2010) ("Stereotypes that African Americans are lazy or unintelligent form the basis for old-fashioned prejudice and the belief that African Americans are inferior to Whites.").

[30] *See* Kristen M. Clark, *A Senator Said a Florida Slavery Memorial would "Celebrate Defeat." Lawmakers are Furious*, Miami Herald (Apr. 28, 2017, 10:47 PM), https://tinyurl.com/2p939s8s.

Tr. at 1805.[31] Because Senator Baxley sponsored SB 90, this evidence has some marginal relevance. But Senator Baxley is one of 40 senators. And just as with Senators Boyd and Hutson's statements, Senator Baxley's deeply troubling statements and actions cannot tell this Court much about *the Legislature*'s motivations.

That said, the most important statement for this Court's purposes did come from Senator Baxley. In an exchange, Senator Berman asked Senator Baxley, "[a]re you aware that the restrictions in this legislation including those related to drop box and access to voter assistance will have a disparate impact on black voters?" To which Senator Baxley responded, after denying SB 90 would disenfranchise anyone, "[n]ow to look at patterns of use and say, well, you may have to go about it a little different way. There's a learning curve." ECF No. 461-98 at 100. This statement is particularly relevant to this Court's analysis of whether SB 90's impacts—which, for some provisions, this Court finds are racially disparate—were foreseeable and whether the Legislature knew of those impacts. As Senator Baxley acknowledges, (a) he has looked at data showing that Black voters use drop boxes in ways SB 90 restricts, and (b) he knows that this data shows Black voters will be impacted by SB

---

[31] One would have hoped that, as a funeral director, Senator Baxley would have recognized that it's time to put the Confederacy to rest.

90. This Court will return to this statement when it considers whether SB 90's disparate impacts were foreseeable.

To recap, the 2020 election in Florida was unprecedented in several ways. It saw record turnout, it saw record VBM use among Black voters and Democrats, and it was quite successful. Despite this success, in the first legislative session after the 2020 election, the Legislature moved to overhaul Florida's election code. But legislators struggled to articulate why they were doing so—offering conflicting and nonsensical rationales. The Supervisors, experts in their field, widely panned SB 90 and refused to support it. And even though the Supervisors persuaded the Legislature to back down on some of its most restrictive proposals, the Supervisors' association ultimately did not endorse SB 90.

In backroom discussions, however, legislators were more cogent. Indeed, the only rationale for SB 90 that makes any sense—benefitting the Republican Party— was offered in a private text message chain. Finally, although legislators struggled to publicly explain why SB 90 was needed, its sponsor candidly admitted that it would harm Black voters. For these reasons, the sequence of events leading to the passage of the challenged law supports Plaintiffs' claims.

With this particular sequence of events, and the broader historical context set out above, in mind, this Court now looks to SB 90's effects.

5

a

Next, this Court considers SB 90's effects. But first, a conceptual point. Plaintiffs' two experts on SB 90's effects—Dr. Smith and Dr. Herron—both used a framework called the calculus of voting. Many political scientists use this framework. Tr. at 2225. Put simply, the calculus of voting "describes [each] voter['s] decision to turnout [as] a comparison of costs and benefits." *Id.* When costs exceed benefits, the voter doesn't vote; when the benefits exceed costs, the voter votes. *Id.* Accordingly, the higher the cost to vote, the lower the turnout; the lower the cost, the higher the turnout. *Id.* at 2226–27.

The calculus-of-voting framework recognizes two benefits to voting: (1) instrumental and (2) expressive. *Id.* at 2227. Instrumental benefits refer to what a voter gains by possibly being the decisive voter in an election. *Id.* Expressive benefits inure from the value that a voter places on the act of voting itself. *Id.*

There are also costs to voting: transportation costs (i.e., taking the bus, driving, or walking to the polls, etc.), information costs (i.e., learning how to vote, where to vote, etc.), and time costs (i.e., waiting in line, time spent traveling to the polls, etc.). Further, because registration is a prerequisite to voting, any cost to register is also a cost to vote. *Id.* at 2228–29.

Voting's costs are not borne equally across the electorate. *See id.* at 2231. For example, voters without cars face a greater burden from transportation costs. *Id.* Similarly, voters with inflexible work schedules will face a greater burden from time costs, *id.*, and information costs fall more heavily on voters without internet access. *Id.* at 2232. Thus, while SB 90 imposes burdens on all Floridians, it does not do so equally. Having clarified this concept, this Court turns to the challenged provisions.

b

Start with drop boxes. Drop boxes first appeared in Florida in the early 2000s. *Id.* at 2396. For the next 10 to 15 years, drop boxes slowly grew in popularity. And until 2019, drop boxes were unregulated at the state level. *Id.* at 2396–97. That year, the Florida Legislature first sought to regulate drop boxes as part of SB 7066.[32] The new drop-box provisions permitted the use of secure drop boxes from the time VBM ballots went out until election day. *Id.* at 2398; *see also* § 101.69(2), Fla. Stat. (2019). It also required the Supervisors to place drop boxes at their main offices, branch offices, and early voting sites. § 101.69(2), Fla. Stat. (2019). SB 7066 also permitted—or rather, did not prohibit—the use of 24/7 drop boxes. Tr. at 2398.

SB 90 changed this landscape by requiring a Supervisor's employee to continuously monitor each drop box in person while the drop box is in use. § 101.69(2)(a), Fla. Stat. (2021). It also drastically constrains when drop boxes can

---

[32] Recall that SB 7066 also restricted the reach of Amendment 4.

be used by limiting drop-box use—except for drop boxes at the Supervisor's offices—to "the county's early voting hours of operation." *Id.* As mentioned above, SB 90 also imposes a $25,000 sanction on the Supervisors for non-compliance. *Id.* § 101.69(3). Multiple Supervisors testified to the effect SB 90 will have on their drop box operations.

Before SB 90, Miami-Dade County offered drop boxes in 33 locations during early voting hours, and in four locations on the Monday before election day and election day. Tr. at 1365–66. Because Miami-Dade County already manned drop boxes, SB 90 will have a limited effect on drop-box availability. *See id.* at 1395. Still, as a result of SB 90, Miami-Dade County will offer two fewer drop boxes on the day before the election and on election day. *Id.* at 1367.

In Broward County, Supervisor Scott plans to offer eight drop boxes during the last 2 days of voting—but absent SB 90, he would have offered at least 40. *Id.* at 1205. Supervisor Scott explained that this gap in election day drop boxes will have a major effect on Broward County voters. *See id.* at 1199.

In Leon County, Supervisor Earley testified that he would have to move drop boxes inside if he does not have enough staff to supervise them. *Id.* at 2662. That said, he expects to have enough funding to staff each drop box. *Id.* Supervisor Earley is also considering removing a small mail slot at his office that allowed voters to

deposit VBM ballots, but his decision hinges on the outcome of this case. *Id.* at 2663–64.

As for Pasco County, Supervisor Corley testified that he will not offer as many drop boxes in 2022 as he did in 2020. *Id.* at 1291. This is because he is offering 12 early voting sites in 2022, while in 2020 he offered 14. *Id.* Because it is not unusual to have fewer early voting sites during a midterm year than a presidential election year, it is unclear from Supervisor Corley's testimony whether SB 90 caused Pasco County to offer fewer drop boxes.

For Lake County, Supervisor Hays testified that, in 2020, he made drop boxes available long before an election—the same day he mailed out VBM ballots—and all the way through election night. ECF No. 549-2 at 66.[33] Lake County had 12 early voting sites, and thus 12 corresponding drop boxes, that were available from 10:00 a.m. to 6:00 p.m., *id.* at 64, a drop box at the Supervisor's office that was open from 8:00 a.m. to 6:00 p.m., *id.*, and finally, a drop box outside the Supervisor's office that was available 24/7, *id.* Supervisor Hays added that his 24/7 drop box was extraordinarily popular—especially outside business hours and on weekends. *Id.* at

---

[33] As stated above, Supervisor Hays testified that he made drop boxes available at the same time he sent out VBM ballots, which he believed to be 35 days before any election. ECF No. 549-2 at 66. Supervisor Hays, no doubt, was right that he sends out ballots 35 days before an election. The law, however, provides that the Supervisors must send out VBM ballots between 40 and 33 days before an election. § 101.62(4)(b), Fla. Stat. Accordingly, before SB 90, Supervisors could offer drop boxes up to 40 days before an election.

213. Because of SB 90, Lake County will no longer offer the 24/7 drop box. *Id.* at 79.

In 2020, Hillsborough County offered 26 early voting sites—and thus 26 corresponding drop boxes. ECF No. 549-3 at 37. Plus, at the Supervisor's four offices, drop boxes were available outside of early voting hours—one of which was available 24/7. *Id.* Supervisor Latimer testified that the 24/7 drop box was especially helpful to voters who work, for example, 12-hour shifts, and thus could not use the drop boxes available during regular business hours. *Id.* at 163. Overall, drop boxes were popular in Hillsborough County, accounting for 45% of the 337,800 VBM ballots returned, or about 152,000 ballots. *See id.* at 106. Supervisor Latimer testified that he would have two fewer drop box locations in 2022, but that this was unrelated to SB 90. *Id.* at 45. He also testified that he will no longer offer a 24/7 drop box. *Id.* at 120.

Finally, while Lee County Supervisor Tommy Doyle testified that SB 90 "was quite a change when it came to drop boxes," it will not impose any changes on Lee County. This is because Lee County did not offer drop boxes other than at the Supervisor's office outside of early voting hours and because Lee County stopped offering 24/7 drop boxes before SB 90. Tr. at 3196, 3199.

Besides hearing from Supervisors, this Court also heard expert testimony about SB 90's effect on drop-box availability. Dr. Smith testified that, in 2020, 485

drop boxes were offered across Florida. Tr. at 2454.[34] Dr. Smith also concluded that 122 of those drop boxes would become unavailable because of SB 90. *Id.* at 2455. These drop boxes fall into two groups. First, Dr. Smith identified 65 24/7 drop boxes that were not continuously monitored. *Id.*; *see also id.* at 2291 (testimony by Dr. Herron to the same effect). Second, Dr. Smith identified 57 drop boxes that were not at a Supervisor's office but were available outside of early voting hours. *Id.* As explained above, SB 90 prohibits both types of drop box.

Further, Dr. Smith testified that SB 90 will affect 53 of Florida's 67 counties. *Id.* at 2458. For example, before SB 90, 48 counties offered 24/7 drop boxes. *Id.* at 2460. In SB 90's wake, 29 of them—or 60%—have said that they will no longer offer 24/7 drop boxes. *Id.* And only 4 counties have affirmatively committed to maintaining 24/7 drop boxes (15 counties remain undecided). *Id.*

Dr. Smith also testified that drop boxes were extremely popular on the days outside the early voting period. For example, in Columbia County, 50.3% of all ballots cast by drop box were cast outside early voting hours. *Id.* at 2468; ECF No. 467-7 ¶ 146. In Indian River County, 72% of all drop box ballots were cast outside of early voting hours. ECF No. 467-7 ¶ 160. Similarly, the number was 57% in St. Lucie County, *id.* ¶ 167, 66.6% in Franklin County, *id.* ¶ 189, 54.3% in Polk County, *id.* ¶ 198, and 52.2% in Okeechobee County, *id.* ¶ 195. And in Pinellas County,

---

[34] Similarly, Dr. Herron concludes that roughly 488 drop boxes were available. Tr. at 2290.

76,987 ballots (almost 40% of all drop box ballots) were cast using drop boxes that SB 90 prohibits. Tr. at 2470.

Even in counties where most drop box voters submitted their ballots during early voting hours, drop boxes remained popular outside of early voting hours. For example, 36% of the drop box ballots submitted in Hernando County—10,200 ballots—were submitted outside the early voting period. ECF No. 467-7 ¶ 164. In Madison County, 49.7% of drop box ballots were cast outside the early voting period. *Id.* ¶ 172. In Lee County, 40.5% of all drop box ballots cast (38,530 ballots) were cast *before* the early voting period. *Id.* ¶ 178. Similarly, 66.6% of all drop box ballots cast in Franklin County were cast before the early voting period. *Id.* ¶ 189. Again, SB 90 drastically restricts drop-box usage at the times these ballots were cast.

Finally, Dr. Smith also looked at three counties that provided hour-by-hour data on 24/7 drop-box usage—Manatee, Okeechobee, and Indian River. Tr. at 2474–75. In Okeechobee, 27.3% of drop box ballots were deposited after hours, 21% in Indian River County, and 11.6% in Manatee County.[35] Further, in Putnam County, 40% of all drop box ballots were submitted through a 24/7 drive-through drop box. ECF No. 467-7 ¶ 176. In short, 24/7 drop boxes were popular during the 2020 election.

---

[35] The actual number in Manatee County was likely higher, but Dr. Smith only had data for the 24/7 drop box ballots cast during early voting. Tr. at 2475.

At bottom, SB 90 does not eliminate drop boxes, and voters will continue to use them. But SB 90 will make drop boxes less accessible before early voting begins, on the day before election day, and on election day—days when many voters (possibly most voters) use drop boxes. SB 90 will also reduce the number of drop boxes available outside of regular business hours—another popular period for drop boxes. Another way to think about SB 90, then, is that it largely eliminates the features that made drop boxes more convenient than early-in-person or election-day voting. Thus, this Court concludes that SB 90 will burden voters who use drop boxes. And the evidence before this Court suggests that these voters are disproportionately likely to be Black.

Black voters favor drop boxes more than other racial groups. This Court draws this conclusion relying on Plaintiffs' expert, Dr. Herron, who looked at drop-box usage in three ways. *First*, he looked at data that various Supervisors produced on drop-box use in their counties. *Id.* at 2251. Dr. Herron used county data because the Department of State does not maintain data on drop-box use. *Id.* Taking aggregated data from the 46 counties that produced drop box information, Dr. Herron sought to identify any relationships between race and drop-box usage. *Id.* at 2255. Ultimately, Dr. Herron found "suggestive evidence that counties with more . . . Black vote by mail voters are also counties that . . . had greater drop-box usage rates." *Id.* at 2256. This correlation, however, was not statistically significant. *Id.* Thus, this evidence is

merely suggestive of a correlation between race and drop-box usage. But a more granular analysis also suggests that Black voters use drop boxes at greater rates than White and Latino voters.

*Second*, Dr. Herron looked to what he termed "drop box logs"—"lists of individuals who cast drop box ballots"—from five counties. *Id.* at 2257. By merging this data with state-level election data, Dr. Herron could determine "if any individual drop box voter is," for example, "young or old, or White or Black." *Id.* The five counties Dr. Herron looked to—Sarasota, Santa Rosa, Columbia, Madison, and Franklin—are not necessarily representative of the entire state, and Franklin and Madison Counties provided data for only the primary and general elections. *Id.* at 2259. Still, this is the best available data. With this data, Dr. Herron used a logistic regression—a type of statistical model—to analyze the relationship between drop-box usage and race in Columbia, Santa Rosa, and Sarasota Counties. *Id.* at 2260. Without digressing into the minutiae of statistical modeling, a positive and statistically significant coefficient estimate for a particular racial group signifies a positive correlation between being a member of that group and using a drop box. *Id.* at 2265.

Ultimately, Dr. Herron concluded that "being a Black vote-by-mail voter means you are more likely to use a drop box than being a White vote-by-mail voter." *Id.* at 2268. Indeed, in the general election, a Black VBM voter in Columbia, Santa

Rosa, and Sarasota Counties had, on average, 14% greater odds than a White VBM voter of voting by drop box in the general election. *See* ECF No. 567-1.[36] And in the presidential preference primary and the primary elections, the relationship was even more pronounced—Black VBM voters had, on average, 48% and 25% greater odds, respectively, of voting via drop box than White VBM voters. For other racial groups, Dr. Herron did not find statistically significant or consistent relationships between race and drop-box usage. *Id.* at 2270–71.[37]

That said, race's effect on drop-box use appears less pronounced than the effect of party on drop-box usage—for example, Republican VBM voters had on average roughly 18% lesser odds of using a drop box than Democratic VBM voters in the general election. Still, whether a voter is White or Black appears to have a meaningful and remarkably consistent connection with drop-box usage.

How persuasive is this evidence? As noted above, Columbia, Santa Rosa, and Sarasota Counties are all "very White counties" and thus not representative of Florida as a whole. *Id.* at 2274. When asked how this affected his analysis, Dr.

---

[36] These odds are calculated by taking a coefficient from table 14 of Dr. Herron's report—for example, 0.131—and subtracting 1 from $e$ ($e$ is roughly equivalent to 2.71828) to the $n^{th}$ power (with $n$ being the coefficient) and then multiplying the result by 100. *See* David W. Hosmer & Stanley Lemeshow, *Applied Logistic Regression* 49–50 (2d ed. 2000). Here $e$ to the 0.131 power equals roughly 1.14. Then *1.14 - 1 = 0.14.* And *0.14 × 100 = 14.* So, there is on average 14% greater odds that a Black VBM voter would use a drop box than a White VBM voter in Columbia, Santa Rosa, and Sarasota Counties during the 2020 general election.

[37] It bears noting, however, that the Latino populations of the counties for which Dr. Herron had data is small, and not at all reflective of the rest of the state.

Herron explained: "I would say it make[s] me more confident that there is truly a relationship between race and drop-box usage." *Id.* at 2277. This is so, Dr. Herron explained, because he detected a correlation between being Black and using a drop box despite the unrepresentatively small Black populations in the counties for which he had data.

*Third*, and finally, Dr. Herron looked at how SB 90 limited the placement of drop boxes. Looking at where a Supervisor could place drop boxes in each county, and the number of registered voters in the county, Dr. Herron calculated the potential number of voters per drop box in each county. *Id.* at 2289. As Dr. Herron explained, "the most racially heterogenous counties . . . are places where the ratio of voters to potential drop box location is high, and so . . . those counties are . . . particularly burdened by SB 90's restrictions on locations." *Id.* at 2290. Dr. Herron based this analysis on the number of early voting sites and Supervisors' offices. *Id.* at 2289.

But SB 90 permits drop boxes at "any . . . site that would otherwise qualify as an early voting site." § 101.69(2)(a), Fla. Stat. (2021). So it is unclear that Dr. Herron has truly accounted for the universe of possible drop box locations. Still, this Court finds that Dr. Herron's reasoning would hold true for drop boxes outside of early voting hours, where the universe of possible drop boxes is more limited. During that period, the ratio of voters to drop boxes will be much higher in large, racially heterogenous counties. This is important because, as explained below, other

evidence suggests that Black voters use drop boxes more heavily outside early voting hours than other voters.

On the whole, Dr. Herron's analysis suggests that Black voters are more likely to use drop boxes, with the caveat that Dr. Herron drew on limited data to reach his conclusion. Dr. Herron also concluded that SB 90 would place a greater burden on counties with large minority populations. This Court finds Dr. Herron's testimony and analysis on this point credible. Taken together, this evidence suggests, and this Court finds, that Black voters are more likely to use drop boxes than White or Latino voters.[38]

Not only do Black voters disproportionately use drop boxes, but they also use them in precisely the ways SB 90 prohibits. To reach this conclusion, this Court relies on another Plaintiffs' expert, Dr. Smith. Like Dr. Herron, Dr. Smith concluded that the drop-box provisions would "have a disparate impact, negative impact, on Black and Hispanic voters." *Id.* at 2393. For the same reason Dr. Herron did so, in evaluating the drop-box provisions, Dr. Smith looked at data from a limited number of counties; namely, Columbia and Manatee counties. *Id.* at 2478.

---

[38] Though discussed in much less detail, this conclusion is buttressed by Dr. Burch's testimony that other studies have found that, in Florida, Black voters were slightly more likely than White voters, 29.6% versus 28.3%, to use drop boxes and much more likely than Latino voters to use drop boxes. Tr. at 961.

As explained in part above, the Columbia County Supervisor provided drop box data on the individual level, including voter ID numbers and the day each ballot was dropped off. *Id.* at 2478. Dr. Smith matched this information to individual voter files, thus determining the demographic characteristics of the voters using Columbia County's drop boxes. *Id.* at 2479. Using this method, Dr. Smith concluded that—of all the VBM ballots deposited in drop boxes by Black voters in Columbia County—52.4% of them were deposited outside of early voting hours. *Id.* at 2479. For White voters the number was 50.2%, and for Latino voters the number was 41.3%. *Id.* Dr. Smith added that one in five Black VBM voters in Columbia County used a drop box and that one in ten Black VBM voters used a drop box outside early voting hours. ECF No. 467-7 ¶ 148. Reverse engineering Dr. Smith's numbers, this Court can conclude that—by comparison—roughly 3 in 25 White VBM voters used a drop box outside of early voting hours in Columbia County.[39]

Manatee County, on the other hand, *only* provided information for drop-box usage during early voting hours, so Dr. Smith could not draw conclusions about drop boxes' popularity outside of early voting hours in Manatee County. *Id.* Still, because

---

[39] Roughly 27,000 White voters voted in Columbia County. ECF No. 467-7 ¶ 148. And 27.8% of them voted by mail—i.e., roughly 7,506 White voters voted by mail. Of those 7,506 voters, 902 voted by drop box outside early voting hours, roughly 12% of all White VBM voters. Then covert 12% to a decimal, here 0.12. Then, covert the decimal to a fraction, $\frac{3}{25}$. Finally, we can convert that fraction to a ratio, here 3 : 25. Thus, 3 in 25 White voters who voted by mail used a drop box outside of early voting hours.

Manatee County provided timestamps, Dr. Smith could determine which drop box ballots were deposited outside of normal business hours. Tr. at 2480–81. Dr. Smith found that 13.5% of Black voters and 13.4% of Latino voters deposited their VBM ballots outside of normal business hours, compared to 11.4% of White voters. *Id.* at 2482. This Court finds Dr. Smith's report and testimony on these points credible.

Taking all the above evidence, this Court concludes that the drop-box provision will have a disparate impact on Black voters. On the other hand, this Court does not conclude that the drop-box provisions will have a disparate impact on Latino voters.[40]

First, Black voters use drop boxes at a greater rate than other racial groups. Indeed, while the data from which to draw conclusions is limited, the results are remarkably consistent. Across counties and across elections, Black voters use drop boxes more than White voters. More importantly, Black voters tend to use drop boxes in just the way that SB 90 targets. That is, Black voters disproportionately use drop boxes outside of early voting and outside of typical business hours. When viewed alongside Mr. Cooper's demographic testimony, these conclusions make sense, and bolster this Court's confidence in its conclusion.

---

[40] It may well be that Latino voters *do* disproportionately favor drop boxes. Ultimately, however, this Court is limited to expert testimony based on data from counties with very small Latino populations, and thus this Court has very little information to go on.

Black voters are overrepresented in the service sector, and they are underrepresented in management positions. So Black voters will typically work less flexible hours. They also have less access to transportation and travel farther to and from work. Thus, it is reasonable to conclude that it is harder for Black voters to get to a polling location during regular business hours. Finally, because Black voters have less access to broadband internet, they will have a harder time figuring out when drop boxes will be open, and thus they will be disproportionately harmed by laws complicating drop box procedures. *See, e.g.*, *id.* at 1199 (testimony by Supervisor Scott that, at just one polling location on election day, hundreds of people would attempt to turn in VBM ballots only to learn "that they needed to go to the Lauderhill Mall," and that "most of the people could not make that trip for various reasons and were not able to go and drop off their ballots"). Put another way, SB 90's drop-box provisions increase the time, transportation, and information costs of voting by drop box. Because of the lingering effects of past discrimination, these costs will fall more heavily on Black voters. Accordingly, this Court concludes that the drop-box provisions have a disparate impact on Black voters. This disparate impact weighs in Plaintiffs' favor with respect to their challenge to the drop-box provisions.

c

Next, this Court considers the VBM request provision. To reiterate, this provision reduces the lifespan of standing VBM requests from two general election cycles to one (i.e., from four years to two years). *Compare* § 101.63(1)(a), Fla. Stat. (2021), *with* § 101.62(1)(a), Fla. Stat. (2019). As to this provision, Dr. Smith testified that "Black voters . . . were more likely to have [a] standing [VBM] request than White voters." Tr. at 2494. As Dr. Smith noted in his report, he could try to determine the racial characteristics of voters with standing VBM requests by looking at the counties' daily VBM reports released ahead of the 2020 general election. ECF No. 467-7 ¶ 102. Dr. Smith looked to the first VBM activity report from the 2020 general election—which was released on September 4, 2020. *Id.* ¶ 103. In that report, those voters with a status code of "R" had requested a VBM ballot in the 2020 election. *Id.* ¶ 104. Those with a status code of "S" had a standing request. *Id.* But the picture is muddled because the Supervisors change "S" codes to "R" codes once the request has been processed. *Id.* Nonetheless, 1.89% of Black voters had an "S" code in the September report, compared to 0.48% for Latino voters, 1.19% for those of "other" races, and 1.30% for White voters. *Id.* ¶ 104. Thus, according to this limited data, in 2020, Black voters were most likely to have a standing VBM request.

This Court accepts Dr. Smith's report and testimony for what it is— indeterminate at best. Thus, this Court finds that the VBM request provision's racial

impact is unclear. Thus, for the VBM request provision, this factor does not weigh strongly one way or the other.

d

Now, this Court turns to the VBM request identification provision. To recap, this provision requires voters requesting a VBM ballot to provide their Florida driver's license number, Florida ID number, or the last four digits of their social security number.[41] It also requires the Supervisor to accept the request only if the identification provided matches that "in the supervisor's records."

During discovery, the Division of Elections produced a data file of 587,207 individual voters entitled "LitigationRR_NoDL-SSN_20210722_.txt." Tr. at 2517–18; ECF No. 467-7 ¶ 78. As Dr. Smith explained in his report, he has "yet to find documentation about how, or why, o[r] for whom this file was created, or the source and date when the data were derived." ECF No. 467-7 ¶ 55. Looking at the file, Dr. Smith noted that it appeared to have "the same structure as the FVRS"[42] and "could be a subset of the FVRS." *Id.* ¶ 80. The file also "appear[ed] to be in the range of the missing 585,006 voters the Division of Elections flagged as having 'no Dl or ssn' or" as having "an 'incomplete DL or ssn' on record." *Id.* ¶ 79. Dr. Smith used this

---

[41] This is in addition to the name, address, date of birth, driver's license number, ID number, SSN, or appropriate affirmation, and signature necessary to register to vote. *See* § 97.052(5)(a), Fla. Stat.

[42] " 'FVRS' refers to the Florida Voter Registration System that contains the official list of registered voters in the state." Fla. Admin. Code R. 1S-2.039(2)(c).

106

file to evaluate the VBM request identification provision's racial effects, Tr. at 2518,

even though, in his report, he candidly acknowledged that "[t]here is no way for me

to verify . . . what form of IDs the 587,207 registered voters identified by the

Division of Elections [in the data file] may or may not have on file," ECF No. 467-

7 ¶ 80. In turn, this Court cannot assess the veracity of Dr. Smith's analysis based on

this data. And further undercutting Dr. Smith's analysis, Director Matthews testified

that, since SB 90 passed, the number of voters without the requisite identification

has dropped "from 600-plus thousand to 400,000." Tr. at 3408, 2785. Thus, even if

the file Dr. Smith analyzed did actually reflect those voters without identification at

the time it was created, it is not clear his conclusions would hold true today, as we

do not know the demographic makeup of the roughly 100,000 voters who now have

identification on file. Still, this Court briefly address Dr. Smith's analysis below.

Using the data from the NoDL-SSN file, Dr. Smith sought to analyze the racial

breakdown of those without any of the forms of identification that SB 90 requires.

Tr. at 2518. Ultimately, Dr. Smith determined that, of the individuals with no

requisite form of identification, 80.18% were White, 12.70% were Black, 3.92%

were Latino, and 3.20% were "other." *Id.* at 2519; ECF No. 467-7 ¶ 81. Thus, White

voters are overrepresented among those with no requisite form of identification.

Dr. Smith then noted that 97.7% of the voters in the NoDL-SSN file had

registered before 2006, the year Florida implemented the Help America Vote Act

(HAVA). Tr. at 2522; ECF No. 467-7 ¶ 84. Dr. Smith then looked to the 2.3% of voters from the NoDL-SSN file who registered post-2006. He found that 30.21% were Black, 21.53% were Latino, 34.62% were "other," and 13.65% were White. Tr. at 2525; ECF No. 467-7 ¶ 88. Accordingly, Dr. Smith determined that the VBM request identification provision would have a disparate impact on Black and Hispanic voters. Tr. at 2533. When asked why he relied on post-HAVA trends to reach this conclusion, Dr. Smith explained he did so, and that it made sense to do so, "because that is the regime that is in place post-HAVA." *Id.* at 2530. This Court finds Dr. Smith's circular explanation unconvincing.

In sum, there is some evidence based on Dr. Smith's testimony and report that (a) White voters will be most impacted in the short term by the VBM request identification provision, and that (b), in the future, the VBM request identification provision could have a disparate impact on minority voters. That said, because Dr. Smith is not sure what the numbers he relied on show, even these conclusions are suspect. This Court thus does not accept Dr. Smith's testimony on this point and finds that the racial impact of the VBM request identification provision is unclear. Accordingly, the evidence of impact does not strongly weigh one way or the other with respect to the VBM request identification provision.

e

Leaving VBM, this Court turns next to the solicitation definition. To refresh, the solicitation definition prohibits anyone from "engaging in any activity with the intent to influence or effect of influencing a voter" inside a polling place or within 150 feet of a drop box or the entrance to any polling place. § 102.031(4)(a)–(b), Fla. Stat. (2021). As this Court has explained elsewhere, in practical terms, the solicitation definition discourages groups who give food, water, and other forms of encouragement to voters waiting in long lines from continuing to do so. One way, then, to measure whether this provision will have a disparate impact on Black or Latino voters is to determine whether Black and Latino voters are disproportionately likely to wait in line to vote. Tr. at 2535.

Dr. Smith testified on this issue. First, he testified that a large body of peer-reviewed literature concludes that Florida has, on average, longer lines than much of the country, and that minority voters are more likely to be affected by those lines. *Id.* at 2541–45. For example, in part because of HB 1355—the last sweeping change to Florida's election code—"[m]inority voters in Florida" during the 2012 election "faced disproportionately long lines, thus disproportionately high cost of voting, and then in some cases a small downstream effect in 2014 and 2016 of decreased propensity to vote." *Id.* at 2547. In fact, in 2012, Florida had the longest lines in the country. *Id.* at 2585.

Dr. Smith also evaluated wait times in Miami-Dade County during early voting in the 2020 election. *Id.* at 2556. As Dr. Smith testified, he took data from various sources and merged them with the "voter file"—data provided by the Division of Elections—to determine wait time by ethnicity:

> Going through that process that I discussed earlier in terms of taking the estimated wait times that the Supervisor of Elections provided on these five days, and combining it with the check-in information to determine what days individuals voted, and combining it with the voter file, all using unique IDs, I'm able to determine across the 33 polling locations on these five days the raw count of Black, Hispanic, White and Other voters of racial and ethnic characteristics of when they voted and what time the wait time was estimated to be by the Supervisor of Elections and Miami-Dade staff.

*Id.* at 2556.

What Dr. Smith found was that, across the five days he measured, 24.8% of Black voters had wait times of 30 minutes or longer, 21.2% of Latino voters had wait times of 30 minutes or longer, and 15.2% of White voters had wait times of 30 minutes or longer. *Id.* at 2557–58. Put another way, roughly 1 in 4 Black voters and 1 in 5 Latino voters waited 30 minutes or more compared to roughly 3 in 20 White voters. *See id.* at 2558.[43]

Dr. Smith also analyzed Orange County and Lee County using a similar methodology. *Id.* at 2560. Dr. Smith's Orange County analysis, however, is of

---

[43] Dr. Smith focused on 30 minutes or longer because, "30 minutes is a standard that is pretty much accepted not only by academics but by practitioners as an upper limit on how long we can expect voters to be able to withstand waiting in line." Tr. at 2597.

somewhat limited utility because (a) it looks at data for only one day, and (b) Dr. Smith provides his conclusions in a different form. *See* ECF No. 467-7 at 157. Dr. Smith reports the early voting wait time by race, which shows that White voters disproportionately waited longer to vote on the day for which Dr. Smith had data. *Id.* at 158. But, as Dr. Smith testified, this data was likely skewed by a problem at the Winter Park Library. Tr. at 2561. For that reason, White voters were more likely to wait more than three hours—at the library—but "Black and Hispanic voters were more likely than White voters to experience wait time of times of 15 or 30 minutes." ECF No. 467-7 ¶ 256. Due to the limited nature of Dr. Smith's Orange County analysis, this Court gives these conclusions little weight.

Dr. Smith's Lee County analysis is just as limited. This is because "the wait time documents produced in discovery by the Lee County SOE are not complete." *Id.* ¶ 261. Some polling locations are missing, as is data for some of the busiest early voting days. *Id.* ¶¶ 261–62. Accordingly, this Court gives little weight to Dr. Smith's conclusions as they relate to Lee County.[44]

In sum, the most complete picture this Court has of the correlation between race and time spent waiting to vote comes from Miami-Dade County. Even that data,

---

[44] Overall, Dr. Smith concluded that Black voters were slightly more likely to wait longer than 30 minutes than other voters, although the data for less than 30 minutes but more than 15 minutes was largely mixed, with White voters falling into this category slightly more than other groups. ECF No. 467-7 at 169.

though, is limited to early voting hours. Still, it roughly confirms what countless scholars have already concluded; namely, that minority voters spend more time waiting in line to vote than White voters.

Finally, Dr. Burch testified that survey data shows that Black and Latino voters were more likely to report waiting in long lines during the 2020 election. Tr. at 961. 5.3% of Black voters and 6.2% of Latino voters reported waiting in long lines, compared to 4% of White voters. *Id.*

Based on all the evidence before it, this Court likewise concludes that minority voters in Florida are, on average, more likely to wait in long lines to vote. That conclusion impacts this Court's analysis in two ways. First, this Court concludes that the solicitation definition will have a disparate impact on minority voters because minority voters are disproportionately likely to wait in line to vote, and because the provision discourages third parties from helping those waiting to vote.

Second, although this Court already found that the record is unclear as to whether the various VBM provisions have a *direct* racially discriminatory effect, it finds that they will have an *indirect* racially discriminatory effect. This is so because, by making voting by mail tougher, SB 90 will force some voters to either vote early or in person on election day. The same is true for the drop-box provisions. Because more voters will vote in person, wait times at polling places will be longer. As explained above, this will disproportionately impact minority voters, who already

wait longer on average to vote. Tr. at 2544–45; *id.* at 2598; ECF No. 467-7 ¶ 231. This Court thus concludes that the evidence of impact weighs in Plaintiffs' favor with respect to the solicitation definition.

f

Finally, this Court addresses the registration delivery provision. Under that provision 3PVROs can no longer return registration applications to any Supervisor, rather they must now deliver registration applications to the Division of Elections or the Supervisor of Elections in the county in which the applicant resides. *Compare* § 97.0575(3)(a), Fla. Stat. (2021), *with* § 97.0575(3)(a), Fla. Stat. (2011). As this Court has already determined, this provision will harm 3PVROs by imposing additional costs on them, thus limiting the number of voters each 3PVRO can reach. And although not challenged in Plaintiffs' intentional race discrimination counts, this Court also finds that the registration disclaimer provision is relevant here. Like the delivery provision, it will increase the cost of registering voters, and thus limit 3PVROs' reach. Thus, in determining whether a particular racial group is harmed by these provisions, this Court must determine whether any racial group relies more heavily on 3PVROs.

Dr. Herron addressed this exact question. Tr. at 2294. Dr. Herron focused on post-2012 registrations—which provide more reliable information due to changes in the way Florida collected registration information. *Id.* at 2297. While the information

113

Dr. Herron used is not perfect—for example, if a voter registered with a 3PVRO and then changed that information online, the data would show the voter as having registered online—it still provides a useful snapshot. *See id.* at 2302; *see also id.* at 2569 ("I certainly suspect, and some of the Supervisors have confirmed, that it's much more likely for individuals who registered with a 3PVRO to subsequently update their registration through a different modality."). This data shows that minority voters use 3PVROs in rates much higher than White voters. For example, roughly 15.37% of Black voters registered using 3PVROs. *Id.* at 2303. For White voters, the number is 2.79%. *Id.* Further, just over 11% of Latino voters and 13% "other" race voters—for example, Native Americans and Asian Americans—used 3PVROs to register. *Id.* at 2304. And when broken out across counties, "almost every place has Black 3PVRO rates greater than White 3PVRO rates." *Id.* at 2305. This conclusion is also borne out in county-specific data. *Id.* at 2310.

Similarly, 10.48% of Democrats registered using 3PVROs and only 3.9% of Republicans registered using 3PVROs. *Id.* at 2306. This result was also consistent across the state. *Id.* at 2307. As above, when using county-specific data, Democrats remain overrepresented in 3PVRO registrations and Republicans remain underrepresented. *Id.* at 2312.

Dr. Smith also addressed SB 90's provisions regulating 3PVROs. *Id.* at 2566; ECF No. 467-7 at 24. Dr. Smith estimates that 10.86% of Black voters registered

using 3PVROs. Tr. at 2570. He also estimates that 9.57% of Latinos, 9.63% of "others," and 1.87% of White voters registered using 3PVROs. *Id.* at 2570–71; ECF No. 467-7 at 32. In other words, about one in every ten Black and Latino voters registered through a 3PVRO, but only about one out of every 50 White voters registered through a 3PVRO. Tr. at 2571. Like Dr. Herron, Dr. Smith found that this disparity is consistent across Florida. *Id.* at 2574. This Court credits both Dr. Herron and Dr. Smith's testimony on this point.

Plainly, 3PVROs overwhelmingly serve minority communities. Thus, by restricting their reach, the registration delivery provision disproportionately harms Black and Latino voters. Accordingly, this Court concludes that the evidence of impact weighs in Plaintiffs' favor with respect to the registration delivery provision.

g

What's the takeaway? Every single challenged provision has a disparate impact on Black voters in some way. Black voters are more likely to use drop boxes, SB 90 limits drop boxes. Not only that, but Black voters are more likely to use drop boxes in the exact way that SB 90 restricts. On the other hand, there is little evidence before this Court that the VBM provisions have a *direct* disparate impact on Black voters. Still, these provisions will have downstream effects; namely, they make voting by mail harder, and thus will push voters towards in-person voting. This, in turn, will exacerbate lines at polling places. And a wealth of scholarly studies show

that Black and Latino Floridians are already more likely to wait in line to vote—a conclusion buttressed by Dr. Smith's Miami-Dade analysis. Accordingly, by increasing the number of voters voting in person, SB 90 will exacerbate the lines that Black and Latino voters are already more likely to wait in. Further, because Black and Latino voters, on average, are more likely to wait longer to vote, the solicitation definition will disparately impact them by restricting third parties' ability to provide them aid while they wait in line. This is even more so given that the VBM provisions will exacerbate line lengths. Finally, both Black and Latino voters rely on 3PVROs in vastly greater numbers than White voters. So hindering 3PVROs—as SB 90 does—will have a disparate impact on Black and Latino voters.

In sum, then, this Court finds that the challenged provisions as a whole will have a disparate impact on both Black and Latino voters and will especially burden Black voters. The evidence of impact thus weighs in favor of establishing Plaintiffs' claims with respect to each of the challenged provisions.

6

Having determined that SB 90 disparately impacts Black and Latino voters, this Court next considers both (1) whether SB 90's disparate impacts were foreseeable and (2) whether the Legislature knew of those impacts.[45] The evidence

---

[45] This Court recognizes that these are really two factors, but it makes sense to discuss them together here.

before this Court not only suggests that the Legislature had such knowledge, but also that it specifically sought it out.

First, the Legislature had the raw data showing SB 90's disparate impacts before it. Director Matthews testified that, by statute, the Division of Elections provides the Legislature with an election recap report "after every election" that includes two data sets. Tr. at 3408. These data sets are "voter registration and voting history." *Id.* This recap report contains the same information that Plaintiffs' experts used to reach their conclusions in this case. *See id.* at 2179, 2363, 2483.

Perhaps the raw data itself is not enough, but supporting both foreseeability and knowledge, Director Matthews also testified that, along with the general recap report, the Legislature asked several specific questions while it was considering SB 90. *Id.* at 3406–07. For example, Director Matthews testified that the Legislature specifically asked about, and the Division "provided information about[,] voter registrations . . . the number of voter registrations that had DL and SSN, that only had DL, that only had SSN, or that had no DL, no SSN, or had an invalid DL or SSN." *Id.* at 3408. Indeed, "[t]hat was what" the Legislature was "most keenly interested in." *Id.* at 3409.

Plus, Director Matthews testified that the Legislature wanted to know "who uses drop boxes." *Id.* at 3409. When specifically asked by this Court whether "who uses drop boxes meant demographic data, Director Matthews said she thought "they

117

just wanted to know how many people were using the drop boxes." *Id.* at 3412–13.

But Director Matthews's face and body language told a different story, as she apparently recognized her slip in testifying truthfully that the Legislature had asked her for information about what kind of voters—i.e., Black, White, old, young—use drop boxes. This Court finds, based on Director Matthews's reaction to its questions—for example, that she offered the information without prompting, then quickly tried to backtrack—that the Legislature asked for demographic information about drop-box users. At any rate, the Division does not keep information on drop boxes, and thus presumably did not provide any information to the Legislature. But while the Division does not keep information about drop boxes, we know that some Supervisors do. And "[t]he Legislature also asked individual supervisors of elections for information." *Id.* at 3459. This Court finds, based on Director Matthews's testimony and Senator Baxley's statements that he had looked at "the patterns of use," that the Legislature likely had the same drop box data before it that is now before this Court. ECF No. 461-98 at 100.

Director Matthews also testified that the Legislature asked for specific information about "MARG" voters—i.e., first time VBM users. Tr. at 3410, 3456. Put another way, the Legislature asked for, and received, detailed demographic information about exactly who was using VBM ballots for the first time in 2020.

118

Finally, Director Matthews testified that the Legislature "wanted to know about third-party voter registration organizations." *Id.* at 3409. Not only that, but this Court knows exactly what the Legislature wanted to know. Senator Farmer testified that "[w]e were in possession of statistical evidence that showed that voter registration groups registered about 10 percent of Black voters; a very close number, I think it was 8 or 9 percent, of Hispanic voters; but only 1 percent of White voters." *Id.* at 1566. The Legislature could only have obtained this information from the Division of Elections. *See id.* at 2566 (testimony by Dr. Smith that "[t]he Division of Elections was very helpful by providing a voter file that included the method of voter registration statewide. . . . That is information -- the method of voter registration that is contained within the FVRS is actually something that's not publicly available to groups, parties, scholars"). This shows (a) that the Legislature asked for and received demographic information about 3PVRO use while it considered SB 90 and (b) that the Legislature knew that the registration return provision would have a disparate impact on minority voters. Finally, that the Legislature received and considered demographic information when considering the 3PVRO provisions bolsters this Court's conclusion that, when the Legislature asked for data about "who" uses drop boxes, it was in fact requesting demographic data.

In short, the Legislature had before it exactly the same demographic information that this Court now has before it now—possibly even more information.

And as explained above, that information shows that SB 90 would have a disparate impact on Black voters.

Plaintiffs also presented other evidence that, while perhaps less reliable, reinforces the evidence set out above. Senator Farmer testified that he was "presented with evidence and statistics and studies that showed that people of color and minorities were going to be impacted by these provisions more than White voters." *Id.* at 1528. These studies were provided to the Legislature by outside groups, such as the Legal Defense Fund, NAACP, and League of Women Voters. *Id.* at 1529. It is unclear, however, whether these letters were ever considered, as Senator Farmer testified that "they don't allow the LDF letter or the NAACP letter or any of that into the committee." *Id.* at 1553. Rather, these letters are significant because Senator Farmer testified that he relayed his concerns—based in part on these letters—to his Senate colleagues.

Plainly, the Legislature knew about SB 90's disparate impacts. Senator Farmer testified that he repeatedly conveyed has concerns about SB 90's disparate impacts to Senate President Wilton Simpson and to Senate Rules Chair Kathleen Passidomo. *Id.* at 1531. Indeed, Senator Farmer testified that he specifically discussed the disparate impact the drop-box provisions would have on minority voters—to no avail. *Id.* at 1548. He did the same with each of the individual challenged provisions. *See id.* at 1558, 1564, 1567–68. Senator Farmer added that, in these discussions, his

Republican colleagues never denied that SB 90 would have a disparate impact on minority voters. *Id.* at 1552–53.

In addition, several Legislators spoke about SB 90's impacts. Representative Thompson, for example, told legislators that reducing the times drop boxes were available would "impact[] the ability of African-Americans in particular to participate in democracy and to cast their vote." *Id.* at 1458. Another Representative compared SB 90 to the 1875 Mississippi Plan—a white supremist coup in Reconstruction-era Mississippi. ECF No. 462-29 at 37–38.

In sum, the Legislature had the same data before it that Plaintiffs' experts have used to show disparate impact. Further, the Legislature affirmatively sought out information about whom each of the challenged provisions would impact. Reenforcing this data, outside groups submitted studies to the Legislature that also showed that SB 90's provisions would have a disparate racial impact. And both privately and on the floor of the House and Senate, legislators told their colleagues that SB 90 would have a disparate racial impact. Finally, if there were any lingering doubt, SB 90's sponsor acknowledged that he had looked at the "patterns of use" and that there would be "a learning curve" for Black voters after SB 90. ECF No. 461-98 at 100. SB 90's expected disparate impacts were foreseeable and were known to the Legislature. So both of these factors weigh in Plaintiffs' favor as to each of the challenged provisions.

7

Finally, this Court considers whether less discriminatory alternatives were available to the Legislature. This factor is difficult to apply because it is not entirely clear what, exactly, SB 90's provisions were supposed to do. With that said, this Court takes the proffered justifications set out above, and then considers whether less restrictive alternatives to those goals were presented to the Legislature.

Recall that the VBM request provision had two apparent justifications: (1) that it would make the voter file more accurate by forcing people to update their voter file more often by forcing them to request VBM ballots more often, Tr. at 1009, and (2) "that people needed to [be able to] choose the option of whether they would vote by mail or in person every year," *id.* at 1009; *see also* ECF No. 461-37 at 16–17.

On the first point, several less restrictive alternatives were presented. For example, Senator Torres—a Democrat—offered an amendment that would have prevented any retroactive cancellations of VBM requests. ECF No. 467-16 at 12; ECF No. 461-64. That amendment was rejected. ECF No. 467-16 at 12. Further, Senator Brandes—a Republican—twice offered an amendment providing that, if a voter updates her address at DHSMV, her voter registration is updated. *Id.* at 13; ECF No. 461-85; ECF No. 461-103. That amendment was also twice rejected. ECF No. 467-16 at 13.

The second rationale, giving voters "the opportunity to vote however they want to," ECF No. 461-37 at 110–11, also had a less discriminatory alternative—doing nothing, because Florida's Election Code already allows voters to vote in-person when they have requested and received a VBM ballot. *See* § 101.69(1), Fla. Stat. Opposing senators made this point during the legislative debate.

SB 90's sponsors claimed that the VBM request identification provision makes sure that "nobody can just get online or call the supervisor with the irrelevant information and just change people's vote-by-mail ballots." ECF No. 461-98 at 93. This provision also has less restrictive alternatives. But although this Court can think of some less discriminatory alternatives—such as allowing an applicant without a requisite form of identification to affirm as much, as those registering to vote may do, *see* § 97.053(5)(a)(5)(b), Fla. Stat.—it is unclear that such alternatives were before the Legislature.

The drop-box provisions had three justifications: (1) without more restrictions, people may tamper with drop boxes, Tr. at 1015, (2) the Supervisors were not using drop boxes properly, *id.*, and (3) "the provision was necessary to ensure the chain of custody of the ballot," *id.*

The Legislature considered several amendments to the drop-box provisions that would have allowed it to pursue these goals without restricting drop-box availability. Senator Brandes offered an amendment permitting 24/7 drop boxes at

Supervisors' offices with video surveillance and Representative Joseph—a Democrat—offered an amendment permitting 24/7 drop boxes with video surveillance, as did Senator Powell—also a Democrat. ECF No. 467-16 at 14–16; ECF No. 462-4; ECF No. 462-19; ECF No. 462-43; *see also* Tr. at 1548, 1550. Senator Jones also offered an amendment that would have allowed drop boxes outside of early voting hours. ECF No. 467-16 at 14; ECF No. 462-5. As did Senator Powell. Tr. at 1549. The amendments allowing video surveillance would have allowed Supervisors to continue offering 24/7 drop boxes while also maintaining ballot security. *See id.* at 1204 (testimony by Supervisor Scott that video surveillance worked "very, very well"). And the Legislature's uniformity rationale was based on the monitoring of drop boxes—not when they were available. *See* ECF No. 462-9 (statement by Representative Ingoglia that the drop-box provisions were in part motivated by Supervisors "thumbing their nose" at Defendant Lee's request— Defendant Lee lacks the power to compel the Supervisors—that drop boxes be supervised). So cutting the use of drop boxes outside of early voting hours serves no purpose, and the amendments permitting drop boxes outside of early voting hours— or just changing nothing—presented less discriminatory alternatives.

The solicitation definition's justification appeared to be a respect for privacy. Tr. at 1025. Or perhaps to prohibit political solicitation. But as other senators pointed out, the law already banned solicitation. *Id.* at 1026. Thus, doing nothing was a less

discriminatory alternative. And even then, some legislators offered amendments that would have allowed civic organizations to hand out food and water. *Id.* at 1468–67; *id.* at 1565; *id.* at 1924; ECF No. 467-16 at 13–15; ECF No. 461-83; ECF No. 462-37. The Legislature rejected these amendments even though Representative Ingoglia had stated that "we've never said that any non-profit organization is trying to influence voters." Tr. at 1922. Several less discriminatory alternatives to the solicitation definition were thus available to the Legislature.

Finally, SB 90's restrictions on 3PVROs rested on the false claim that a court order required the Legislature to enact the provisions. Because this was not true, doing nothing was, again, a less discriminatory alternative.

In sum, with perhaps the exception of the VBM request identification provision, less discriminatory alternatives to each challenged provision not only were available but were presented to and rejected by the Legislature. Thus, this Court concludes that the availability of less discriminatory alternatives weighs in Plaintiffs' favor—except on the VBM request identification provision.

8

So was race a motivating factor in the adoption of any of the challenged provisions? Throughout trial, this Court heard about several possible motivations. Maybe SB 90 was genuinely motivated by a desire to prevent voter fraud and ensure voter confidence; maybe the Legislature was motivated by the political zeitgeist—

among a storm of election fraud claims, it had to do *something*; maybe SB 90 was enacted purely to secure a political advantage for the Republican Party, without regard to whether it harmed minority voters; or maybe, as Plaintiffs say, SB 90 was enacted to target Democrats and, in furtherance of that goal, to target Black and Latino voters.

Before considering these alternatives, this Court summarizes the evidence before it. Recall the relevant factors: (1) the challenged law's impact; (2) the law's historical background; (3) "the specific sequence of events leading up" to the law's passage, which includes "(4) procedural and substantive departure; and (5) the contemporary statements and actions of key legislators"; "(6) the foreseeability of the disparate impact; (7) knowledge of that impact; and (8) the availability of less discriminatory alternatives." *GBM*, 992 F.3d at 1322. This Court took these factors in a slightly different order, first considering SB 90's historical background before considering the sequence of events preceding SB 90's passage, SB 90's impact, foreseeability and knowledge of SB 90's impact, and finally concluding with less discriminatory alternatives.

Beginning with SB 90's historical background, Florida has a long history of racial discrimination against Black and Latino Floridians. But that historical discrimination cannot, on its own, prove that any law that harms racial minorities was passed with discriminatory intent. That said, Florida's history informs its

present. Because of past discrimination, White Floridians outpace Black and Latino Floridians by every socioeconomic metric. And politics in Florida are racially polarized, at least for Black and White voters. In every statewide election for the past 20 years, about nine in every ten Black voters has voted for the Democratic party. On the other hand, White voters heavily favor the Republican Party, and make up about 80% of its constituency. Latino voters, on the other hand, are best understood as swing voters. Plus, Florida's elections are decided by razor thin margins, depressing just a few thousand of your opponent's supporters can easily swing an election. The temptation is therefore great for the party in the majority to target the particular racial groups that support the minority party.

The evidence before this Court also shows that, for the past 20 years, the Legislature has given into that temptation by repeatedly targeting Black voters because of their propensity to favor Democratic candidates. On this point, HB 1355 is most relevant. After an election in which Black voters relied heavily on early in-person voting, then-Representative Baxley proposed HB 1355, which reduced early voting.

But the story is more complex than that: HB 1355 targeted the *specific* early voting days most used by Black voters. It also attacked—there's just no other way to describe it—3PVROs, on which Black voters disproportionately rely. As a result, multiple courts acknowledged that HB 1355 would disproportionately impact Black

voters. *See Florida*, 885 F. Supp. 2d at 337; *Brown*, 895 F. Supp. 2d at 1246. Plus, the Legislature enacted HB 1355 "without clearly identifying why the law needed to be changed, without creating much of a legislative record to document its reasons for the change, and against the advice of the Florida State Association of Supervisors of Elections." *Brown*, 895 F. Supp. 2d at 1239.

In these respects, HB 1355 and SB 90 are clones. In the 2020 election, Black VBM use almost matched White VBM use—put another way, Black VBM use doubled. Plus, the evidence before this Court shows that Black drop-box use exceeded White drop-box use. Just as HB 1355 targeted early voting after Black voters disproportionately relied on it, SB 90 targets drop boxes after Black voters disproportionately relied on them. And just as HB 1355 did not eliminate all early in-person voting, SB 90 does not eliminate all drop boxes. HB 1355 targeted the specific early voting days most used by Black voters; SB 90 targets the specific times and days Black voters most use drop boxes.

Plus, just as with HB 1355, the Legislature enacted SB 90 without clearly identifying why the law needed to be changed, without creating much of a legislative record to document its reasons for the change, and against the advice of the Florida State Association of Supervisors of Elections. In other words, SB 90 fits neatly within a historical pattern of discrimination against Black voters. On the other hand, SB 90 does not fit into a recent pattern of discrimination against Latino voters.

Next, as alluded to above, the sequence of events preceding SB 90's passage is also suspect. The 2020 election in Florida was a success. Yet the Legislature, in the face of massive turnout and a surge in VBM usage by Black and Democratic voters, moved quickly to revamp Florida's election laws. In doing so, the Legislature struggled to articulate why its changes were needed. In some cases, Legislators offered contradictory or nonsensical justifications. And as this Court found, some procedural and substantive departures marked SB 90's passage. But these departures show only that SB 90 was highly partisan.

This Court also looked at contemporaneous statements and actions by key legislators. Senator Gruters, the chair of the Florida Republican Party, revealed the real purpose behind SB 90 in a text to Representative Ingoglia: to favor the Republican Party over the Democratic Party. In addition, some Republican Senators made statements on the Senate floor that could be considered evidence of racial animus. But the views of individual senators, even lead sponsors, are of marginal relevance to the Legislature's motivations as a whole. Finally, SB 90's sponsor, Senator Baxley, acknowledged on the Senate floor that SB 90—particularly its drop-box provisions—would have a disparate impact on Black voters.

The evidence before this Court proves him right. The drop-box provisions will disparately impact Black voters. One reason for this is that SB 90 reduces the number of available drop boxes, and Black voters are, on average, more likely to use drop

boxes.[46] But the drop-box provisions also disparately harm Black voters because they eliminate most drop boxes offered before early voting, a time when Black voters are more likely to use drop boxes, and 24/7 drop boxes, which Black voters are also more likely to use.

On the other hand, there is little evidence that the two VBM provisions will have a disparate impact on Black or Latino voters. But the line warming and 3PVRO provisions will. Black and Latino voters are more likely to wait in long lines, and SB 90's other provisions will exacerbate those lines. Yet SB 90 chills non-partisan groups from helping voters waiting in line to vote. Finally, minority voters disproportionately rely on 3PVROs to register to vote, but SB 90 will make it tougher for these groups to operate.

The Legislature had data before it showing that SB 90's provisions would have the above-described effects. First, the Legislature had the same data before it that Plaintiffs' experts used here. More to the point, the Legislature *specifically asked* for demographic data that showed the disparate impact that SB 90 would have. Indeed, Senator Farmer testified that he remembered seeing data showing that minorities would be disproportionally impacted by SB 90's restrictions on 3PVROs, data that was only available from the Division of Elections.

---

[46] On the other hand, this Court has heard no evidence that Latino voters disproportionately favor drop boxes.

And if there was any doubt the Legislature realized that SB 90 would harm minorities based on the data before it, Senators Farmer and Baxley cleared that up. Senator Farmer repeatedly told leading Republican Senators in private meetings that each of SB 90's challenged provisions would have a disparate impact, something those senators never denied; Senator Baxley openly acknowledged on the Senate floor that SB 90 would have a disparate impact on Black voters.

Finally, rendering any conclusion that the Legislature had a pure motivation all the more improbable, the Legislature rejected less discriminatory ways to reach almost all of its stated goals. Indeed, a *Republican* senator offered many of these alternatives as amendments, but the Legislature repeatedly voted those amendments down.

With this evidence in mind, this Court returns to the possible motivations laid out above. First, the evidence shows that SB 90 was not motivated by a desire to prevent voter fraud and ensure voter confidence. Not only is voter fraud extremely rare in Florida, but SB 90's proponents could not even explain how SB 90 would reduce voter fraud prophylactically. While requiring drop boxes to be monitored in person makes some sense, the Legislature never offered *any* justification for cutting drop boxes' availability outside of early voting hours. And at any rate, further undercutting the Legislature's proffered rationale, the Legislature rejected over and over amendments that would achieve its stated goals in a less discriminatory manner.

Second, the Legislature did not enact SB 90 in response to the political mood. As Dr. Kousser convincingly testified, if the Legislature were merely reacting to the political mood, we would expect to see the Legislature carpet-bomb the election code. In other words, this Court cannot blithely declare, "well SB 90 must be partisan because Legislature wanted to react to the national mood" while ignoring the specifics. Here, the Legislature made surgical changes to the election code that targeted specific groups:

> I think that the difference -- the difficulty is this: There were -- this is a quite specific law. It, for example, changes the vote-by-mail to require certain numbers associated with it; it intervenes -- it makes it harder for third-party voter registration organizations to operate; it limits drop box; it limits line-warming activities. These are quite specific things.
> . . .
> There is a difference between this sort of a response and a response to very general agitation. If the very general agitation, clearly politically involved and having partisan overtones to it, is a justification for a law, then it can justify anything at all that regulates elections.

Tr. at 1755. This Court finds that the Legislature enacted SB 90 to improve the Republican Party's electoral prospects, not to respond to the general political mood.

The main question, then, is whether the Legislature enacted SB 90 purely to secure an electoral advantage for the Republican Party without regard to whether it harmed minority voters, or whether SB 90 was enacted, at least in part, to target minority voters *in order to* secure an electoral advantage for the Republican Party.

As a subset of this question, this Court finds that the Legislature did not pass SB 90 with the intent to discriminate against Latino voters. For one, Latino voters

are not so associated with any party. In fact, Defendants' expert testified that Latino voters are now swinging *toward* the Republican Party. Because Latino voters are generally swing voters, this Court finds that it would make little sense for the Legislature to target Latino voters as a whole. This is borne out by the evidence before this Court. Contrasted with SB 90's impact on Black voters, SB 90's provisions have a much less consistent negative effect on Latino voters. And so, this Court finds that Plaintiffs have failed to show that the Legislature enacted SB 90 at least in part to discriminate against Latino voters.

Thus, the question boils down to whether the Legislature was targeting Democrats generally, or Black voters because they vote for Democrats. Some provisions seem to target Democrats as a whole, and not Black voters specifically. For example, Dr. Kousser testified that "the increase in the proportion of people who were White who voted by mail, from the increase from 2016 to 2020, was almost entirely among White Democrats." Tr. at 1725. So it appears to this Court that the motivation behind the VBM request provision was to cancel Democratic VBM requests generally, and not to specifically target Black VBM requests. This conclusion finds support in Senator Gruters's text messages to Representative Ingoglia. For these reasons, this Court finds that Plaintiffs have not shown that the Legislature enacted the VBM request provision with the intent to discriminate against Black voters.

As for the VBM request identification provision, it may well be that the Legislature passed this provision with the intent to discriminate based on race. For example, there is a fair amount of scholarship that shows that minorities in the United States are less likely to possess photo ID. As one 2012 study showed, 95% of White voters have a photo ID versus 87% of Black voters and 90% of Latino voters. *See* Vanessa M. Perez, Project Vote, *Americans with Photo ID: A Breakdown of Demographic Characteristics* 3 (2015). But because this Court does not have evidence before it establishing that either (a) the VBM request identification provision has a disparate impact on Black voters or (b) the Legislature *believed* that the VBM request identification provision would have a disparate impact on Black voters, this Court finds that Plaintiffs have not proved that the Legislature enacted the VBM request identification provision with the intent to discriminate against Black voters.

That said, this Court finds that the remaining challenged provisions—the drop box provision, the solicitation definition, and the registration return provision—specifically target Black voters. Take drop boxes, for example. The evidence before this Court shows that party is highly correlated with drop-box use—Democrats are more likely to use drop boxes. If the Legislature had targeted Democrats writ large, it would have simply banned drop boxes, as some of SB 90's earlier versions proposed to do. But that is not what the Legislature did; SB 90 effectively bans drop-

box use at the specific times and the specific days that Black voters, not all Democratic voters, are most likely to use them. The same is true for the solicitation definition and the registration return provision. White Democrats do not wait in long lines, nor do they use 3PVROs to register. These provisions are not aimed at Democrats as a whole.

In sum, this Court concludes that to the extent promoting voter confidence or preventing voter fraud may have motivated the Legislature in part, this Court finds that the Legislature passed SB 90 with the intent to restructure Florida's election system in ways that favor the Republican Party over the Democratic Party. This Court further finds that, to advance the Legislature's main goal of favoring Republicans over Democrats, the Legislature enacted some of SB 90's provisions with the intent to target Black voters because of their propensity to favor Democratic candidates.

Because the Legislature passed the drop-box provisions, the solicitation definition, and the registration return provision with the intent to discriminate against Black voters, those provisions violate the VRA. *See Askew*, 127 F.3d at 1373 (explaining that, under section 2, "[o]nce intent is shown, it is not a defense . . . that the same action would have been taken regardless of the racial motive"). But under the Fourteenth and Fifteenth Amendments, the burden now shifts to Defendants to show that the Legislature would have passed the drop-box provisions, the solicitation

definition, and the registration return provision regardless of its racial motivations. *Underwood*, 471 U.S. at 228.

Not only have Defendants failed to carry their burden, they do not even try. *See* ECF No. 648 at 60–64. And this Court finds, upon reviewing all the evidence set out above, that the Legislature would not have passed the drop-box provisions, the solicitation definition, or the registration return provision absent an intent to discriminate against Black voters. Accordingly, these provisions violate the VRA, the Fourteenth Amendment, and the Fifteenth Amendment. Defendants are therefore enjoined from enforcing them.

## IV

The *League* Plaintiffs, *NAACP* Plaintiffs, and *Florida Rising* Plaintiffs also challenge the solicitation definition under the Due Process Clause of the Fourteenth Amendment and the First Amendment. *See* ECF No. 402 at 5, 15.

To recap, the challenged provision defines "solicitation" as follows:

> [T]he terms "solicit" or "solicitation" shall include, but not be limited to, seeking or attempting to seek any vote, fact, opinion, or contribution; distributing or attempting to distribute any political or campaign material, leaflet, or handout; conducting a poll except as specified in this paragraph; seeking or attempting to seek a signature on any petition; selling or attempting to sell any item; and engaging in any activity with the intent to influence or effect of influencing a voter.

§102.031(4)(b), Fla. Stat. (2021). The final example of "solicitation"—"engaging in any activity with the intent to influence or effect of influencing a voter"—is the target of Plaintiffs' claims in these consolidated cases.

Plaintiffs bring facial and as-applied challenges to the solicitation definition, alleging this provision is unconstitutionally vague in violation of the Fourteenth Amendment and overbroad in violation of the First Amendment. ECF No. 160 ¶¶ 178–86; ECF No. 45 ¶¶ 177–85; ECF No. 59 ¶¶ 191–210. The provision defines "solicitation" in relation to section 102.031(4)(a)'s ban on solicitation inside of polling places or within 150 feet of polling-place entrances, Supervisors' offices, or drop boxes. As noted above, "solicitation" now includes the catch-all activity of "engaging in any activity with the intent to influence or effect of influencing a voter." § 102.031(4)(b), Fla. Stat. (2021). A violation of the prohibition on solicitation, as defined by section 102.031(4)(b), constitutes a violation of Florida's Election Code, which amounts to a first-degree misdemeanor under Florida law. *See* § 104.41, Fla. Stat. ("Any violation of this code not otherwise provided for is a misdemeanor of the first degree, [punishable by up to a year in jail and $1,000 fine].").

Plaintiffs[47] seek an injunction prohibiting all 67 Defendant Supervisors of Elections from enforcing this ban on "engaging in any activity with the intent to

---

[47] The *HTFF* Plaintiffs do not challenge the solicitation definition as unconstitutionally vague in violation of the Fourteenth Amendment.

influence or effect of influencing a voter" within 150 feet of polling locations and drop boxes. But before this Court can reach the merits of Plaintiffs' vagueness and overbreadth claims, this Court must first determine whether Plaintiffs have standing to challenge the solicitation definition.

A

1

This Court begins its analysis with the *League* Plaintiffs and concludes that they have standing. Plaintiff Cecile Scoon, president of the League of Women Voters of Florida and member of both the League of Women Voters of Florida, Inc., and the League of Women Voters of Florida Education Fund, Inc., testified about several "Party at the Polls" events and tabling at the polls that the League of Women Voters has conducted in Bay County, Florida, in addition to her own "line warming" activities. Tr. at 54–60. She testified that while the League often sets up tables outside of the 150-foot buffer zone around the polls, League volunteers cross into the 150-foot zone to assist voters who are having difficulty waiting in line. *Id.* at 59 ("Yes, we do if we see someone is having any difficulty getting up the steps, opening the door, if they're sweating, or just, you know—if it's a small community, you might actually know the person going in."). Volunteers sometimes take food to voters waiting in line within the 150-foot buffer zone. *Id.* ("So then you would say, Can I get you a cookie or a candy? You know, it would be wrapped, and you would bring

138

it to them. They'd say yes, and you might bring it to them."). Ms. Scoon has also personally assisted an elderly voter walk to the door of a polling place. *Id*. at 60 ("And we just proceeded—you know, I was kind of stabilizing her. We went to the door, and I opened the door, and she went in."). But because of SB 90, Ms. Scoon testified that the League does not intend to allow members to provide any more direct assistance to voters waiting in line to vote. *Id*. at 63–64 ("So rather than go down that negative trail and to expose our members, to expose the potential voter who was trying to vote, and to also not cause distress to the Supervisor of Elections' office trying to discern, What are you doing? Are you interfering in some illegal way? We're just not going to do it."). Based on Ms. Scoon's testimony, which I find credible, Ms. Scoon has standing to challenge the solicitation definition.

*First*, she has suffered an injury in fact. The injury in fact requirement "serves to distinguish a person with a direct stake in the outcome of a litigation—even though small—from a person with a mere interest in the problem." *Students*, 412 U.S. at 689 n.14. Even "an identifiable trifle is enough." *Id.* Here, Ms. Scoon's injury is far more than a trifle. Indeed, like being compelled to say something she would not otherwise say, she must now remain silent when she otherwise would speak to voters within 150 feet of polling places or drop boxes for fear of criminal penalties in the event her activities amount to "solicitation" under the challenged provision. Courts have long found such self-censorship to constitute an injury for standing

purposes. *See ACLU v. Fla. Bar*, 999 F.2d 1486, 1493 (11th Cir. 1993) ("[T]he alleged danger of this statute is, in large measure one of self-censorship; a harm that can be realized without an actual prosecution." (quoting *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988))). Thus, Ms. Scoon meets the injury prong.

*Second,* Ms. Scoon's injury is traceable to Defendant Mark Andersen—her local Supervisor of Elections. Here, there is no dispute that Florida law grants Supervisors of Elections authority to maintain good order at the polls, including defining the area in which solicitation is unlawful and directing law enforcement to remove people within the 150-foot zone that now arguably bans Ms. Scoon's line warming activities. §§ 102.031(1), (2), (4)(a)–(c), Fla. Stat. (2021). In addition, Ms. Scoon testified that she has frequently worked with Supervisor Andersen in Bay County, whom she characterized as someone who is "focused on following the rules." Tr. at 114. Indeed, she noted that Supervisor Andersen's "interpretation sometimes of following the rules . . . can be a little more restrictive than maybe the way [she] would do it[.]" *Id*. Accordingly, given that Supervisor Andersen has authority to interpret and enforce the solicitation ban, including the challenged solicitation definition, Ms. Scoon's injury is traceable to him.

*Third*, and finally, an injunction against Supervisor Andersen prohibiting him from enforcing the expanded ban on solicitation within the 150-foot buffer zone would redress Ms. Scoon's injury. For example, an order enjoining Supervisor

Andersen from enforcing the expanded solicitation ban removes the threat that Ms. Scoon—or the League—will be punished in Bay County for speaking with voters, helping elderly voters walk to the door of a polling place, or offering food, water, or other comfort to them while they wait in line at the polls. Supervisor Andersen does not dispute this—indeed, he presented no evidence whatsoever at trial.

Because Ms. Scoon has standing, the League entities also have associational standing to sue Supervisor Andersen. Ms. Scoon is a member of both organizations and would have standing in her own right, this suit is germane to the League entities' purpose, and neither the claim asserted, nor the relief requested requires the participation of individual members. *See GBM*, 992 F.3d at 1317 n.29 ("[P]rospective relief weigh[s] in favor of finding that associational standing exists."). But because Ms. Scoon lacks standing to sue the remaining 66 Supervisors of Elections, the League entities must establish standing through their diversion-of-resources theory as to each remaining Supervisor of Elections to prove they have standing to sue all of them.

This Court finds that the League entities[48] have had to divert resources from other identifiable programs to address the challenged provisions under SB 90,

---

[48] The League entities share membership, staff, and leaders. Accordingly, when SB 90 draws staff time away from other projects, it harms both entities. For example, as explained below, the League has been forced to divert time and money to retraining volunteers to conduct voter registration—harming the registration side. And that same diversion of time and resources has also harmed the lobbying side, taking time away from redistricting, for example. Accordingly, the

including the solicitation definition. Ms. Scoon, as League president, has spent "many hours . . . researching the law, writing up information, guidelines, writing PowerPoints, [and] having talks [during] lunch-and-learn" meetings. Tr. at 92. Further, Leah Nash—the League's executive director—has spent hundreds of hours—outside of this lawsuit—working to make sure League members know how to comply with SB 90. *Id.* at 1135.

Absent SB 90, Ms. Nash would have spent more time on fundraising and grant writing. *Id.* at 1136; *see id.* at 1137 (explaining that Ms. Nash had planned to spend about 50% of her time grant writing and ended up spending 25% of her time on grant writing). As a result, the League did not get as many grants this year as it has in the past, *id.* at 1136–37, and is not meeting its "budget and projections for 2022," *id.* at 1138.[49] SB 90 has also drained time away from the League's redistricting efforts. *Id.* at 1138. The League's Amendment 4-related work has likewise suffered. *Id.* at 1139. And the time the League has spent on SB 90 is not time the League would have spent educating voters about election law anyway. *Id.* at 1141. This Court finds Ms. Scoon and Ms. Nash's testimony on these points credible.

---

difference between the two organizations is not meaningful for diversion-of-resources purposes. Tr. at 1121.

[49] The League of Women Voters of Florida Education is the entity farthest from making its projected budget, and although the League of Women Voters of Florida, Inc. is close, it is not yet on budget either. Tr. at 1149–50.

However, the testimony at trial did not specify that this diversion injury occurs in each of the 67 counties and is thus traceable to each of the Defendant Supervisors of Elections or likely redressable by an injunction against each of them. This Court may infer that a diversion of resources to address the solicitation definition affects the League entities' operations statewide; however, this Court cannot speculate that an injunction prohibiting any given Supervisor of Elections from enforcing this provision would redress that injury—particularly when this Court heard only limited testimony about "line warming" activities that League members conduct in Bay County. Accordingly, the League entities have standing to challenge the solicitation definition based on their diversion of resources with respect to the Bay County Supervisor of Elections' enforcement of that provision. However, the League entities have not met their burden to prove they have standing to seek relief against the remaining 66 Supervisors of Elections.

With respect to *League* Plaintiff Black Voters Matter Fund, this Court heard from Mr. Clifford Albright, who testified that the organization engages in "line warming" activities within the 150-foot buffer zone. Tr. at 1979–89. However, critically, Mr. Albright provided no specifics regarding where and when this activity within the 150-foot zone has taken place. The only detail about where Black Voter Matters Fund has conducted "line warming" was Mr. Albright's anecdote regarding an event in Tallahassee, Florida, where his group provided food, music, and

143

encouragement to voters at the polls. *Id*. at 1984. But Mr. Albright did not testify that anyone at this event went within the 150-foot buffer zone. Accordingly, Black Voters Matter Fund's asserted injury remains purely speculative after the close of evidence at trial. Moreover, this Court has no way of knowing if Black Voters Matter Fund's asserted self-censorship injury is traceable to one, or some, or all 67 Supervisors of Elections. This Court can reasonably infer that its injury is traceable to perhaps one Supervisor of Elections. But this Court is left guessing as to which Supervisor of Elections that may be. And given Mr. Albright's testimony that Black Voters Matter Fund picks and chooses only certain polling places to conduct such "line warming" activities, it is wholly inappropriate for this Court to infer that such activity occurs in all 67 counties in Florida. *See* Tr. at 1982–83.  Accordingly, Black Voters Matter Fund has failed to prove standing based on its own, or its members', First Amendment injuries with respect to the solicitation definition.

In addition, though Black Voters Matter Fund also put on evidence of a diversion of resources because of the solicitation definition, as with the League entities, Black Voters Matter Fund has failed to prove that this diversion injury occurs in each of the 67 counties and is thus traceable to each of the Defendant Supervisors of Elections or likely redressable by an injunction against each of them. This Court may infer that a diversion of resources to address the solicitation definition affects Black Voters Matter Fund's operations statewide; however, this

144

Court cannot speculate that enjoining any given Supervisor of Elections would redress that injury—particularly when this Court heard only limited testimony about "line warming" activities that the organization conducts in unidentified counties in Florida.

The last *League* Plaintiff to challenge the solicitation definition at trial is the Florida Alliance of Retired Americans (FLARA). To establish standing, Plaintiffs elicited testimony from Mr. William Sauers, the state president of FLARA. Tr. at 1616. Mr. Sauers testified generally that FLARA has thirteen chapters covering the state of Florida and just over 200,000 members who live throughout the state, including himself. *Id*. at 1608. He noted that FLARA members "almost exclusively" use vote-by-mail ballots to vote. *Id*. at 1621; *see also id*. at 1623 ("Yes, we've been utilizing vote-by-mail for a long time."). And Mr. Sauers testified that though he has previously voted in person and once had to stand in line for over an hour, he cannot stand in line for any length of time to vote in person. *Id*. at 1628 ("So I would have a problem personally if I had to stand in line for any length of time. I can't do it."). Instead, Mr. Sauers used a drop box to deposit his vote-by-mail ballot in the November 2020 general election and has apparently been voting by mail since at least 2010. *Id*. at 1635–36. Finally, Mr. Sauers testified that if the solicitation definition remains in place, FLARA will encourage its members to vote by mail to avoid waiting in lines at the polls. *Id*. at 1629.

145

Although I find Mr. Sauers to be credible, his testimony falls short of proving FLARA's associational or organizational theories of standing to sue all 67 Supervisors of Elections to challenge the solicitation definition. As to associational standing, any injury to Mr. Sauers or any other individual FLARA member is purely speculative. Mr. Sauers testified that FLARA members almost exclusively vote by mail—thus, it's unclear to this Court if any member has any intention to vote in person and would otherwise benefit from "line warming." In addition, Mr. Sauers has been voting by mail since 2010 and has expressed no intention to vote in person given his physical limitations. Accordingly, Mr. Sauers is only injured by the solicitation definition if (1) he is unable to vote by mail, (2) he attempts to vote in person, and (3) the line at his polling place requires him to stand for any length of time, such that some assistance from a civic engagement group would otherwise provide him comfort that keeps him in line until he is able to cast his ballot. Such a speculative injury is insufficient to prove standing at trial. And FLARA's diversion-of-resources theory of standing also falls short for the same reasons the other *League* Plaintiffs failed to meet their burden as to organizational standing. Accordingly, with respect to the *League* Plaintiffs, I conclude that only Ms. Scoon and the League entities have standing to challenge Bay County Supervisor of Elections Andersen's enforcement of the solicitation definition.

2

As discussed above in the section on Plaintiffs' intentional race discrimination claims, the Florida NAACP has standing against Defendant Lewis, Supervisor of Elections for Volusia County. But to establish standing to proceed with its vagueness and overbreadth claims against the other 66 Supervisors of Elections, the Florida NAACP must proceed with other evidence to meet its burden. But, as with the other organizational Plaintiffs, the Florida NAACP has not proved standing to challenge the solicitation definition as to all remaining Supervisors of Elections.[50]

---

[50] Plaintiffs have proved standing to sue some, but not all, of the Supervisors of Elections with respect to the solicitation definition. The Plaintiffs who challenge the solicitation definition have not demonstrated that they are all injured in each of the 67 counties, nor that their injuries are traceable to or redressable by an injunction against each of the 67 Supervisors of Elections. For example, this Court did not hear any evidence at trial that proves any Plaintiff conducts "line warming" activities in each of the 67 counties and is thus subject to each Defendant Supervisor of Elections' independent enforcement authority. Instead, this Court heard testimony concerning various activities conducted in only a hodgepodge of counties, including Bay, Miami-Dade, Broward, Duval, Palm Beach, Osceola, Orange, Pinellas, Volusia, etc. While this Court heard testimony that several Plaintiff organizations have chapters, branches, or members throughout the state, Plaintiffs did *not* present testimony that each of those sub-groups engages in the same activities in every county in Florida. Moreover, it's a fair inference that not every branch or chapter of an organization does the exact same thing with respect to "line warming" in each of the 67 counties. This Court *did* hear testimony that each county differs in size, voting population, voting patterns, demographics, etc. And this Court would not be surprised if an organizational Plaintiff that routinely conducts "line warming" activities in larger and more diverse counties would not do the same in much smaller counties that experience little to no wait times at polling places. But this Court must not speculate that each Plaintiff does the same thing in every county to find that Plaintiffs have standing for an injunction against each of the 67 Supervisors of Elections. This Court ordered Plaintiffs to file a response as to this issue following the trial. ECF No. 657. Plaintiffs, given the opportunity to file, without any page limits, written closing arguments and supplemental briefing directly addressing this Court's concern, cited no legal support for the proposition that because a Plaintiff has standing to seek an injunction against one Defendant Supervisor of Elections, they are entitled to an injunction with respect to another Defendant Supervisor of Elections who is not the cause of their injury. Accordingly, as explained at length in this section of the Order, Plaintiffs have standing to challenge the solicitation definition only with

147

Specifically, this Court heard from Mr. Brown, the third vice president for the Florida State Conference of the NAACP, who testified that although some counties have as many as three branches, not all counties in Florida have a local branch of the NAACP. Tr. at 508. Mr. Brown also testified that some, but not all, branches of the NAACP in Florida conduct "line warming" activities within the no-solicitation zone. *Id*. at 516. For instance, Mr. Brown was unaware of any "line warming" activities conducted within the 100-foot zone in 2018 or the 150-foot zone in 2020 in Miami-Dade County. *Id*. at 536. Mr. Brown also testified regarding the resources the Florida NAACP has diverted to address SB 90, including the solicitation definition. *Id*. at 531–33. But assuming *arguendo* that Mr. Brown's testimony is sufficient to establish an organizational injury, the Florida NAACP has failed to prove that such injury is traceable to or redressable by an injunction against the remaining 66 Supervisors of Elections. Accordingly, the Florida NAACP has not proved its asserted injuries are traceable to each Defendant Supervisor, aside from Defendant Lewis, and thus it lacks standing to challenge the solicitation definition for vagueness and overbreadth, except as to its claims against Defendant Lewis.

---

respect to some, but not all, of the 67 Supervisors of Elections as to their vagueness and overbreadth claims.

With respect to Disability Rights Florida, Plaintiffs assert it has associational standing to pursue its vagueness claim against all 67 Supervisors of Elections but cite only a slim portion of the record in support. *See* ECF No. 652-1 at 5; ECF No. 652 at 288. In addition, Disability Rights Florida abandons a diversion-of-resources theory of standing with respect to this challenge, *see* ECF No. 652-1 at 5, accordingly this Court will focus its discussion on whether Disability Rights Florida has associational standing.

To start, this Court heard testimony from several of Disability Rights Florida's constituents regarding the burdens that SB 90 imposes upon them. Based on their testimony, these constituents either cannot or do not intend to vote in person. Instead, based on their disabilities, these witnesses vote by mail, and their testimony—which this Court finds credible—was directed at other challenged provisions regarding the vote-by-mail process and not the solicitation definition. For example, Ms. Slaughter testified that she cannot leave her home because of her disability. Tr. at 2085. Thus, any asserted injury based on the solicitation definition is purely speculative with respect to Ms. Slaughter, as well as the other constituents who testified at trial.[51]

---

[51] For example, there is no evidence before this Court that Ms. Rogers—who is legally blind—intends to vote in person in any upcoming election. *See* Tr. at 1088–1110. Instead, her testimony established that, even before SB 90 was enacted, it was too difficult for her to vote in person and that the new vote-by-mail restrictions make it harder for her to vote by mail. *Id*. Accordingly, any injury based on the solicitation definition is purely speculative with respect to Ms. Rogers.

Moreover, generalized references to disabled Floridians who are injured by the solicitation definition are not enough to prove standing with respect to Disability Rights Florida. *See, e.g.*, Tr. at 2744–45 (Ms. Babis's testimony regarding disabled voters who benefit from "line warming" assistance, without specifying where the assistance was provided). Instead, the right to sue on behalf of its constituents does not relieve Disability Rights Florida of its requirement to prove that one of its constituents has standing to sue to support the requested relief. *See Doe v. Stincer*, 175 F.3d 879, 887–88 (11th Cir. 1999) (holding that insufficient evidence supported standing to sue on behalf of constituents based on affidavit asserting only

---

Likewise, Ms. Zukeran testified that her disability causes her to feel severe anxiety around others and that her last experience voting in person at the polls made her "feel really crowded at the polls, and [she] fe[lt] like [she was] not in a good place because [she was] surrounded by strangers." Tr. at 2095. Accordingly, Ms. Zukeran is not harmed by the solicitation definition.

Next, Ms. Teti testified that she would vote in person, if necessary, but that it would be very difficult for her because of her mobility issues. *See* Tr. at 1591–92. Ms. Teti is a registered voter in Hillsborough County, *id*. at 1587, where Supervisor of Elections Latimer is responsible for enforcing the solicitation definition provision. This Court heard from Supervisor Latimer, who testified that he has a policy to provide seats for voters with disabilities in the event they have trouble standing in line. ECF No. 549-3 at 49. I find Mr. Latimer's testimony credible on this point. Accordingly, any asserted injury to Ms. Teti based on the solicitation definition depends upon (1) her failing to apply to vote by mail in time, (2) her attempting to vote in person, (3) the presence of a line at her polling place when she arrives, and (4) the polling place failing to provide her with a seat at the door, consistent with Supervisor Latimer's policy. Thus, Ms. Teti's asserted injury based on the solicitation definition is also purely speculative.

Finally, Dr. Brigham's testimony was largely concerned with the burdens that challenged drop box and vote-by-mail restrictions have on his ability to vote. Dr. Brigham, a cancer survivor, now lives with the disability of an uncontrollable bowel and would rather not vote in person if he has other methods available to him. Indeed, at trial, Dr. Brigham was not asked any question about the need for relief or assistance while waiting in line to vote in person. Tr. at 1596–1614. So, again, any injury to Dr. Brigham based on the solicitation definition is purely speculative given the record before this Court.

generalized reference to harms suffered by Florida constituents). But this Court heard zero testimony establishing any individual constituent's standing to challenge the solicitation definition with respect to their local Supervisor of Elections—let alone, the other 66 Supervisors of Elections. In short, Disability Rights Florida has failed to prove associational standing to challenge the solicitation definition provision. Likewise, Plaintiff Common Cause appears to have abandoned any claim with respect to the solicitation definition, *see* ECF No. 652-1 at 5–6.

3

As to the *Florida Rising* Plaintiffs, and as discussed above in the section on Plaintiffs' intentional race discrimination claims, Florida Rising Together has standing against Defendant Supervisors of Elections for Broward, Palm Beach, and Duval counties.

As to Poder Latinx, Plaintiffs assert a theory of organizational standing to challenge the solicitation definition. ECF No. 652-2 at 4. They rely entirely on the testimony of Mr. Esteban Garces, Poder Latinx's coexecutive director and cofounder. Tr. at 186. Mr. Garces testified that Poder Latinx set up within 50 feet of polling sites in Orange and Osceola counties during the 2020 election to provide language assistance to voters waiting in lines in those counties. *Id*. at 221–22. He also testified that Poder Latinx understands the challenged solicitation definition now potentially bans its assistance within 150 feet of the polls, and so it chooses not

151

to engage with voters within that buffer zone going forward. *Id*. at 222–23. In addition, Mr. Garces testified that Poder Latinx is working on alternative plans, such as making larger signs or shifting toward more social media or television engagement to reach voters who need language assistance at the polls. *Id*. at 223. Mr. Garces noted that a one-hour television segment on Univision would cost the organization about $20,000. *Id*. But for SB 90, Poder Latinx would use this money toward "growth" for the organization, including investing in infrastructure and additional staff. *Id*. at 224.

I find Mr. Garces's testimony credible and sufficient to establish Poder Latinx's standing with respect to its challenge of the solicitation definition as to Defendant Supervisors of Elections in Orange and Osceola counties. But again, as with the other Plaintiffs, this testimony does not prove that Poder Latinx has standing as to the remaining Supervisors of Elections for the same reasons explained at length above.

As to Plaintiff Equal Ground Education Fund (Equal Ground), Plaintiffs again only assert a theory of organizational standing to challenge the solicitation definition. ECF No. 652-2 at 6. They rely entirely on the testimony of Ms. Jasmine Burney-Clark, Equal Ground's founder and consulting director. Tr. at 380. Ms. Burney-Clark testified that Equal Ground conducted "line warming" activities within 150 feet of polling places and drop boxes during the 2020 election in Volusia,

Pinellas, Seminole, and Orange counties. *Id.* at 384, 393, 395, 400, 402. Specifically, about 80% of Equal Ground's Souls to the Polls programming was held within 150 feet of drop boxes or polling places in Volusia, Pinellas, Seminole, and Orange counties in 2020. *Id.* at 421–22. But now, because of the challenged solicitation definition, Equal Ground will no longer provide such services within 150 feet of drop boxes or polling places going forward. *Id.* at 397–98, 402. Moreover, Equal Ground is working on diverting resources to educate voters on these changes with respect to voter assistance at the polls. *Id.* at 403. Specifically, Equal Ground is creating educational materials to deliver to voters in its core counties, hiring more staff, and paying the additional fees for attending more community events to educate the public about SB 90, including the solicitation definition. *Id.*; *see also id.* at 409. To pay for Equal Ground's new political director, the organization has had to divert funds from its Souls to the Polls and voter registration programming, in addition to tapping into the organization's limited reserves. *Id.* at 409. In addition, Equal Ground was unable to fill several internal staff positions or county staff due to this diversion of its limited resources. *Id.* at 409–10.

I find Ms. Burney-Clark's testimony credible and sufficient to establish Equal Ground's standing with respect to its challenge of the solicitation definition as to Defendant Supervisors of Elections in Orange, Pinellas, Volusia, and Seminole counties. But again, as with the other Plaintiffs, this testimony does not prove that

Equal Ground has standing as to the remaining Supervisors of Elections for the same reasons explained at length above.

Lastly, as to Hispanic Federation, Plaintiffs assert a theory of organizational standing and associational standing to challenge the solicitation definition. ECF No. 652-2 at 8–9. They rely entirely on the testimony of Mr. Frederick Vélez Burgos, Hispanic Federation's national director of civic engagement. Tr. at 716. Mr. Vélez Burgos testified that Hispanic Federation has only conducted "line warming" activities in Orange, Osceola, Miami-Dade, and Broward counties and has helped other organizations do the same in Polk County. *Id.* at 723. Mr. Vélez Burgos testified that although Hispanic Federation tries to set up its tables at the polls outside of the 150-foot zone, Hispanic Federation volunteers have nonetheless provided language assistance to voters within the buffer zone. *Id.* at 742. In addition, Mr. Vélez Burgos testified that while the organization offers food, water, and phone chargers to voters outside of the 150-foot zone, he is sure that volunteers have incidentally crossed into the 150-foot zone. *Id.* at 743. In addition, some polling places make it impossible for Hispanic Federation to set up in a safe place that is close enough to the voters but still outside the 150-foot buffer zone. *Id.* At such locations, Mr. Vélez Burgos testified that Hispanic Federation is "probably" setting up its "line warming" stations inside of the 150-foot buffer zone. *Id.* Lastly, Mr. Vélez Burgos testified that his organization provides rides to the polls for voters in

154

these counties, and sometimes the drivers enter the 150-foot buffer zone to drop the voter off. *Id.* at 744. Moreover, volunteers, including Mr. Vélez Burgos, assist disabled voters on foot up to the doors of their polling places. *Id.* at 744–45.

Because of SB 90, however, Mr. Vélez Burgos testified that Hispanic Federation is unable to determine whether its "line warming" activities violate the solicitation ban as defined by the challenged solicitation definition. Tr. at 746. The organization plans to resume its "line warming" activities in February or March of 2022. *Id.* at 819–20. But veteran canvassers, including green card holders who wish to become citizens in the future, have now told Hispanic Federation that they do not want to continue their "line warming" activities for fear of getting involved with law enforcement at the polls. *Id.* at 774–75. In addition, due to the confusion the law has caused Hispanic Federation, the organization has had to divert resources to pay outside legal counsel for advice on how the solicitation definition could be interpreted. *Id.* at 746. This diversion of limited resources has required Hispanic Federation to decrease its budget for communications and satellite offices. *Id.* at 817.

I find Mr. Vélez Burgos's testimony credible as it relates to Hispanic Federation's "line warming" activities in Orange, Osceola, Miami-Dade, and Broward counties and sufficient to establish Hispanic Federation's injury as to the challenged provision. Like Ms. Scoon, Mr. Vélez Burgos has personally assisted disabled voters to the doors of polling places. Moreover, his organization has

provided "line warming" to voters at the polls in each of these counties, and its activities have taken place within the 150-foot zone for several different reasons— for instance, providing Spanish language assistance to voters within the 150-foot zone or dropping voters off at the polls within the buffer zone. Now, however, veteran canvassers no longer wish to engage in "line warming" activities for fear of running afoul of the law. Moreover, the organization has had to divert resources to respond to the solicitation definition and its potential impact on Hispanic Federation's "line warming" activities in Orange, Osceola, Miami-Dade, and Broward counties.

For these reasons, and those discussed at great length above with respect to the other organizational Plaintiffs, Hispanic Federation has standing to challenge the solicitation definition in Miami-Dade, Broward, Orange, and Osceola counties. However, Hispanic Federation has not proved standing to challenge the solicitation definition with respect to the balance of the Defendant Supervisors of Elections.

4

To recap, as for Plaintiffs' vagueness and overbreadth claims, Plaintiffs Cecile Scoon and the League entities have standing to sue to enjoin only the Bay County Supervisor of Elections from enforcing the solicitation definition; Plaintiff Florida NAACP has standing to sue to enjoin only the Volusia County Supervisor of Elections from enforcing the solicitation definition; Plaintiff Florida Rising Together

has standing to sue to enjoin only the Broward, Palm Beach, and Duval County Supervisors of Elections from enforcing the solicitation definition; Plaintiff Poder Latinx has standing to sue to enjoin only the Orange and Osceola County Supervisors of Elections from enforcing the solicitation definition; Plaintiff Equal Ground has standing to sue to enjoin only the Orange, Pinellas, Volusia, and Seminole County Supervisors of Elections from enforcing the solicitation definition; and Plaintiff Hispanic Federation has standing to sue to enjoin only the Miami-Dade, Broward, Orange, and Osceola County Supervisors of Elections from enforcing the solicitation definition. Having resolved all threshold standing issues, this Court turns to the merits of Plaintiffs' vagueness and overbreadth claims challenging the solicitation definition.

## B

### 1

Turning to the merits, Plaintiffs argue the solicitation definition is impermissibly vague and overbroad in violation of the Due Process Clause of the Fourteenth Amendment and the First Amendment. *See* ECF No. 649 at 83 and ECF No. 652 at 383; *see also* ECF No. 160 ¶¶ 178–86; ECF No. 45 ¶¶ 177–85; ECF No. 59 ¶¶ 191–210. They assert both facial and as-applied claims with respect to vagueness and overbreadth. *See* ECF No. 402 at 7–13 (pretrial stipulation); *see also* ECF No. 380 at 12 n.5 (order clarifying that this Court did *not* grant summary

judgment on Plaintiffs' overbreadth or vagueness claims). To review, the challenged

definition provides:

> [T]he terms "solicit" or "solicitation" shall include, but not be limited to, seeking or attempting to seek any vote, fact, opinion, or contribution; distributing or attempting to distribute any political or campaign material, leaflet, or handout; conducting a poll except as specified in this paragraph; seeking or attempting to seek a signature on any petition; selling or attempting to sell any item; *and engaging in any activity with the intent to influence or effect of influencing a voter*.

§ 102.031(4)(b), Fla. Stat. (2021) (emphasis added).

This definition informs Florida's ban on "solicitation" within 150 feet of

polling places and drop boxes, which provides that

> [n]o person, political committee, or other group or organization may solicit voters inside the polling place or within 150 feet of a drop box or the entrance to any polling place, a polling room where the polling place is also a polling room, an early voting site, or an office of the supervisor where vote-by-mail ballots are requested and printed on demand for the convenience of electors who appear in person to request them. Before the opening of a drop box location, a polling place, or an early voting site, the clerk or supervisor shall designate the no-solicitation zone and mark the boundaries.

§ 102.031(4)(a), Fla. Stat. (2021). This Court begins with a discussion of the law

governing these claims.

Vague laws violate the Due Process Clause because they fail to give notice of

what they prohibit. A law can be impermissibly vague in two distinct ways. "First,

if it fails to provide people of ordinary intelligence a reasonable opportunity to

understand what conduct it prohibits. Second, if it authorizes or even encourages

arbitrary and discriminatory enforcement." *Wollschlaeger v. Governor, Fla.*, 848 F.3d 1293, 1319–20 (11th Cir. 2017); *see also Papachristou v. City of Jacksonville*, 405 U.S. 156, 162 (1972). Overbroad laws, on the other hand, violate the First Amendment because they punish "a substantial amount of protected free speech, judged in relation to the statute's plainly legitimate sweep." *Virginia v. Hicks*, 539 U.S. 113, 118–19 (2003) (cleaned up).

Vagueness and overbreadth are interrelated but discrete concepts. *Am. Booksellers v. Webb*, 919 F.2d 1493, 1505 (11th Cir. 1990). For example, a law that prohibits any person from engaging "in First Amendment activities" in a set area is overbroad but not vague. Erwin Chemerinsky, *Constitutional Law* 1032 (6th ed. 2019) (quoting *Bd. of Airport Comm'rs of L.A. v. Jews for Jesus, Inc.*, 482 U.S. 569, 571 (1987)). And a law that bans all activity not protected by the First Amendment is vague but not overbroad. *Id.* But often a law is both overbroad and vague—a concept the Eleventh Circuit has called "[o]verbreadth from indeterminacy." *Webb*, 919 F.2d at 1505. This is so because an indefinite law may give the government leeway to punish protected conduct. So, in addressing overbreadth, this Court must "evaluate the ambiguous as well as the unambiguous scope of the enactment." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 495 n.6 (1982).

Before reaching the question of whether the solicitation definition is unconstitutionally vague and/or overbroad, this Court considers whether Plaintiffs' "line warming" activities are protected under the First Amendment.

2

First, the State-level Defendants and Defendant-Intervenors argue that Florida's solicitation definition does not implicate the First Amendment because, as applied to Plaintiffs' "line warming" activities, it regulates only conduct that "facilitates voting" and not conduct expressing a message. ECF No. 648 at 70–73.[52] These Defendants make only a passing reference to this proposition and cite a single Ninth Circuit case for support. *See id*. at 72 n.19 (quoting *Feldman v. Ariz. Sec'y of State's Off*., 840 F.3d 1057, 1084 (9th Cir. 2016)). Of course, the portion of the Ninth Circuit case that these Defendants cite has nothing to do with "line warming" activities or solicitation bans in buffer zones around polling places, but instead addressed whether "ballot collection is expressive conduct protected under the First Amendment." *Feldman*, 840 F.3d at 1084. Defendants' reliance on this case is, at best, misplaced.

---

[52] "Argue" is a generous term. Without engaging in any analysis, the State-level Defendants and Defendant-Intervenors offer the conclusory statement that Plaintiffs did not demonstrate that their "line warming" activities are understood to communicate any identifiable message by those viewing them. ECF No. 648 at 72.

This Court must decide whether Plaintiffs have proved their "line warming" activities qualify as expressive conduct protected under the First Amendment. "Constitutional protection for freedom of speech 'does not end at the spoken or written word.' " *Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 901 F.3d 1235, 1240 (11th Cir. 2018) (quoting *Texas v. Johnson*, 491 U.S. 397, 404 (1989)). Rather, the First Amendment also encompasses a right to engage in "expressive conduct." *Id.* (quoting *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1270 (11th Cir. 2004)).

To determine whether Plaintiffs' "line warming" activities are expressive— and thus entitled to First Amendment protection—this Court must ask two questions. *See Spence v. Washington*, 418 U.S. 405, 410–11 (1974). These are "(1) whether an intent to convey a particularized message was present, and (2) whether the likelihood was great that the message would be understood by those who viewed it." *Burns v. Town of Palm Beach*, 999 F.3d 1317, 1336 (11th Cir. 2021) (cleaned up) (quoting *Johnson*, 491 U.S. at 404). While the first question is self-explanatory, the second is more nuanced. It requires this Court to ask "whether the reasonable person would interpret" the conduct as conveying "*some* sort of message, not whether an observer would necessarily infer a *specific* message." *Food Not Bombs*, 901 F.3d at 1240 (emphasis in original) (quoting *Holloman*, 370 F.3d at 1270) (cleaned up).

In *Burns*, the Eleventh Circuit distilled *Food Not Bombs* into the following factors to determine whether a reasonable person would interpret the conduct as conveying some sort of message: (1) whether the plaintiff intends to distribute literature or hang banners in connection with the expressive activity; (2) whether the activity will be open to all; (3) whether the activity takes place in a traditional public forum; (4) whether the activity addresses an issue of public concern; and (5) whether the activity "has been understood to convey a message over the millenia." *Burns*, 999 F.3d at 1344–45. There, the Eleventh Circuit considered "the weight of the factors" and concluded that Mr. Burns's mansion was not expressive conduct. *Id*. at 1345. But the court also noted that the *Food Not Bombs* factors are not "exclusive"— "[t]here may be other factors that are relevant to whether Burns's new mansion is expressive conduct protected by the First Amendment." *Id*. at 1346.

Here, the crux of Defendants' argument is that "Plaintiffs did not demonstrate a 'great likelihood' that their line-warming activities are understood by those viewing them to communicate any identifiable message in any of Florida's sixty-seven counties[.]" ECF No. 648 at 72 (quoting *Burns*, 999 F.3d at 1336).[53] Not so. Turning to the evidence introduced at trial, Plaintiffs have proved the likelihood is

---

[53] Defendants apparently concede that Plaintiffs have established their intent to convey a particularized message. But even if they do not, the overwhelming evidence at trial establishes this first prong under *Spence* and its progeny.

great that a reasonable person would interpret their "line warming" activities to communicate an identifiable message.

Starting with Ms. Scoon and the League entities, this Court heard uncontradicted testimony that their activities in Bay County are accompanied by a banner and educational materials—though League volunteers do not take educational materials with them inside of the buffer zone. *See* Tr. at 57. Their assistance is open to all voters on site and takes place in public areas outside of polling places. *Id*. at 58–61. And their assistance addresses a matter of public concern—voting and democracy. Indeed, Ms. Scoon testified that voters who receive assistance have expressed an understanding of and gratitude for the emotional support that the League volunteers offer to voters waiting in lines outside of the polls. *Id*. at 61–62.

Likewise, as to the Florida NAACP, Ms. Slater also testified that the Florida NAACP's "line warming" activities in Volusia County are open to all voters waiting in lines outside of their polling places. Tr. at 1956–57, 1959–60; *see also id.* at 516 (Mr. Brown's testimony that local NAACP "line warming" activities "do not discriminate . . . if there's a person in line that need[s] our assistance, we provide it"). In Volusia County, the Florida NAACP has historically provided such assistance to voters outside of polling places at three specific precincts in Daytona—the John H. Dickerson Center on Martin Luther King Boulevard, the Allen Chapel AME

Church, and the public library at City Island. *Id*. at 1957–58. And, historically, the Volusia County NAACP's "line warming" work has been well-received by voters at those sites. *Id*. at 1960–61 ("[T]hey are relieved. We get – we always get compliments, positive compliments. Voters are glad to see us. They know that we are there to give them relief and support when needed, that we get – we have nothing but compliments . . . regarding our – them knowing that we're there to give them support and relief.").

As to Florida Rising Together, Ms. Mercado testified that its volunteers have previously provided food, water, or umbrellas to any voters in need who were in line outside of their polling places in Broward, Palm Beach, and Duval counties, and that it plans to invest in larger signs to tell voters that assistance is available. Tr. at 2046–47. The provision of such relief serves as "encouragement . . . to stick it out and stay in line until they cast their vote." *Id*. at 2046. As to Poder Latinx, Mr. Garces testified that volunteers have previously set up about 50 feet from polling locations with signage and t-shirts to provide nonpartisan support and assistance to voters waiting in lines outside of their polling place. *Id*. at 218–19. Mr. Garces testified that the decision to set up 50 feet from the polling location allows volunteers to be "close enough to be able to approach voters in parking lots or sidewalks" but far enough away so as "not to cause any issues." *Id*. at 222. But due to SB 90, Poder Latinx will now have to invest in larger signs to communicate its message of support and

assistance to voters from outside of the 150-foot buffer zone or take to the airwaves or social media to communicate that message. *Id*. at 222–23.

As for Equal Ground, Ms. Burney-Clark testified that its "line warming" activities are an extension of its Souls to the Polls programming, and that it "go[es] to the polls, provide[s] folks with food, water, fans, and seating and sometimes even entertainment," to "ensure voters stay in line and commit to voting as opposed to choosing between some of their bodily needs . . . while they are standing in those long lines." *Id*. at 400–01. Similarly, Mr. Vélez Burgos testified that in handing out water to voters waiting in line outside of their polling places, voters respond with thanks while volunteers ask those voters to "[p]lease stay in line until you exercise your right to vote." *Id*. at 744.

A common thread runs through each witness's testimony—namely, that although their "line warming" activity varies from organization to organization, all Plaintiffs not only seek to have voters actually stay in line and cast their ballots, they also communicate to those voters that their determination to exercise the franchise is important and celebrated. As to the *Burns* factors, Plaintiffs' "line warming"— specifically, that of Ms. Scoon, the League entities, and Poder Latinx—is accompanied with signs and t-shirts. Likewise, this assistance has accompanied an even larger event or celebration, like the Volusia County NAACP's Souls to the Polls programming. Plaintiffs have provided this assistance within the buffer zone outside

of polling places—an area the U.S. Supreme Court and Eleventh Circuit have both considered to be a traditional public forum. *See Burson v. Freeman*, 504 U.S. 191, 196–97 (1992) (plurality opinion) ("These forums include those places which by long tradition or by government fiat have been devoted to assembly and debate, such as parks, streets, and sidewalks. Such use of the streets and public places has, from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens." (cleaned up)); *see also Citizens for Police Accountability Pol. Comm. v. Browning*, 572 F.3d 1213, 1217 n.9, 1218 (11th Cir. 2009) (applying *Marks* rule and extending *Burson* plurality's reasoning to appeal of challenge to Florida's ban on exit polling regarding non-ballot issues within no-solicitation zone);[54] *cf. Minn. Voters All. v. Mansky*, 138 S. Ct. 1876, 1886 (2018) (noting that the four-Justice plurality in *Burson* parted ways with Justice Scalia's concurrence over whether the public sidewalks and streets surrounding a polling place qualified as a nonpublic forum, but holding that *interior* of polling place is a nonpublic forum). Moreover, it

---

[54] *See also CBS Inc. v. Smith*, 681 F. Supp. 794 (S.D. Fla. 1988) (Marcus, J.) (granting preliminary injunction against enforcement of earlier iteration of § 102.031, Fla. Stat., and noting that the statute's "150-foot zone as measured from the building entrance housing a polling place does not exempt public streets, sidewalks, and parks. These traditional, quintessential public forums—places which by long tradition or by government fiat have been devoted to assembly and debate, are entitled to the protection of the First Amendment" (internal citation and quotation marks omitted)); *CBS Broad., Inc. v. Cobb*, 470 F. Supp. 2d 1365, 1369 (S.D. Fla. 2006) ("As a facially content-based restriction on political speech *in a public forum*, Section 102.031 must be subjected to exacting scrutiny: the State must show that the regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." (emphasis added and cleaned up)).

is undisputed that Plaintiffs' assistance is open to all, and the message accompanying their "line warming" activities addresses an issue of public concern—voting and democracy.

Although the testimony did not establish that *every* Plaintiff intends to distribute literature or hang banners in connection with their "line warming" activities or that such "line warming" activities have been understood to convey a message over the millennia, the balance of the *Burns* factors and the specific factual context of this case establish that Plaintiffs' "line warming" activities are expressive activities that a reasonable person would understand to convey a specific message of support, solidarity, and celebration in exercising "their most precious and priceless right, and that's their right to vote." Tr. at 512. Accordingly, I conclude that Plaintiffs' "line warming" activities are expressive activities protected by the First Amendment.

3

Having determined that Plaintiffs' "line warming" activities are covered by the First Amendment, this Court turns to whether the solicitation definition is impermissibly vague such that it chills Plaintiffs' speech or overbroad in violation of the First Amendment. "It is by now, a 'basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined.' " *Burns*, 999 F.3d at 1349 (quoting *Wollschlaeger*, 848 F.3d at 1319). And when speech is

167

involved, "rigorous adherence" to the twin concerns of fair notice of what's prohibited and precise guidance to prevent arbitrary or discriminatory enforcement "is necessary to ensure that ambiguity does not chill protected speech." *Wollschlaeger*, 848 F.3d at 1320. Indeed, "[w]hile perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity, government may regulate in the area of First Amendment freedoms only with narrow specificity." *Id*. (internal citations and quotation marks omitted).

For both the vagueness and overbreadth challenges, this Court begins by construing the statute at issue. This Court starts here because it is mindful that it has a duty to construe the statute as constitutional if it can.[55] *See Boos v. Barry*, 485 U.S. 312, 330 (1988).

The nature of this Court's duty to narrowly construe a challenged statute varies depending on whether this Court is construing a state or federal enactment. When a federal law is at issue, this Court has a "duty to avoid constitutional difficulties by [adopting a limiting construction] if such a construction is *fairly possible*." *Boos*, 485 U.S. at 331 (emphasis added). If, on the other hand, a state law is at issue, this Court cannot "adopt a narrowing construction . . . unless such a construction is

---

[55] This Court recognizes that there are really two doctrines at play here. One "holds that courts should, if possible, interpret ambiguous statutes to avoid rendering them unconstitutional." *United States v. Davis*, 139 S. Ct. 2319, 2332 n.6 (2019). The other "suggests courts should construe ambiguous statutes to avoid the need to address serious questions about their constitutionality." *Id.* Given their obvious overlap, both are addressed together here.

*reasonable and readily apparent.*" *Id.* at 330 (emphasis added); *accord Stenberg v. Carhart*, 530 U.S. 914, 944 (2000); *see also Gooding v. Wilson*, 405 U.S. 518, 520 (1972) (noting that "[o]nly the [state] courts can supply the requisite construction" to save an otherwise vague and overbroad statute).

"The distinction is an important one" because "[w]hen a state statute has unconstitutional applications and has not been given a narrowing construction by the state court that saves it from those applications, federal courts 'must be careful not to encroach upon the domain of a state legislature by rewriting a law to conform it to constitutional requirements.'" *Toghill v. Clarke*, 877 F.3d 547, 556 (4th Cir. 2017) (quoting *Legend Night Club v. Miller*, 637 F.3d 291, 301 (4th Cir. 2011)); *see also Dimmitt v. City of Clearwater*, 985 F.2d 1565, 1572 (11th Cir. 1993) ("[A]s a federal court, we must be particularly reluctant to rewrite the terms of a *state* statute." (emphasis in original)); *Wis. Right to Life, Inc. v. Barland*, 751 F.3d 804, 833 (7th Cir. 2014) (explaining that "the 'unless' clause" in "unless such construction is reasonable and readily apparent" is an "important federalism principle [that] should be invoked sparingly and with caution").

So, the question before this Court is not whether there is *any* reading that would render the statute constitutional. Nor is it whether there is a possible, plausible, or simply reasonable reading that would render the statute constitutional. Instead, the question is whether there is a constitutional reading of the statute that is

both *reasonable* and *readily apparent* and, thus, does not require this Court to rewrite the statute to conform it to constitutional requirements. *See Citizens for Responsible Gov. State Pol. Action Comm. v. Davidson*, 236 F.3d 1174, 1194–95 (10th Cir. 2000) (declining state's invitation to give statute at issue "a construction more restrictive than that provided by [its] plain language" (quoting *Wilson v. Stocker*, 819 F.2d 943, 948 (10th Cir. 1987))).

With that in mind, this Court starts with the text. Section 102.031(4)(a) bans solicitation within 150 feet of certain locations, including polling places and drop boxes. In turn, the challenged provision, section 102.031(4)(b), provides that

> the terms "solicit" or "solicitation" shall include, but not be limited to, seeking or attempting to seek any vote, fact, opinion, or contribution; distributing or attempting to distribute any political or campaign material, leaflet, or handout; conducting a poll except as specified in this paragraph; seeking or attempting to seek a signature on any petition; selling or attempting to sell any item; and engaging in any activity with the intent to influence or effect of influencing a voter.

§ 102.031(4)(b), Fla. Stat. (2021).

As noted above, the challenge here is concerned with the amended language, "and engaging in any activity with the intent to influence or effect of influencing a voter." Plaintiffs assert this language is vague because it criminalizes conduct based on a third party's subjective reaction to it, fails to provide notice of what is prohibited, fails to define "influencing a voter," and invites arbitrary enforcement. ECF No. 649 at 84–86; ECF No. 652 at 383–86. In short, Plaintiffs assert the

expanded language now potentially criminalizes anything that "has the effect of influencing a voter," whether or not one intends any influence, *and* the statute fails to define what "influencing a voter" means in this context.[56]

In defense of the statute, the State-level Defendants and Defendant-Intervenors assert the challenged provision "clarifies existing election laws and creates a 'floor' that prohibits significantly less speech than what many supervisors of elections already prohibit under Florida Statutes section 102.031." ECF No. 648 at 74; *see also id.* at 33 ("It was much amended during the legislative process, but the final version enacted as part of Senate Bill 90 simply clarified existing law."). How does the amended statute "clarify" existing law? Defendants do not say. It is apparently self-evident—meriting no further discussion or engagement with the text. Once again, Florida's lawmakers have planted an aspen in the Florida Statutes—you know it's an aspen because of the way it is.[57]

To start, this Court must make clear the question before it. The question is not how the statute *actually applies*. That is to say, this Court is not construing the statute to apply it in a particular, well-defined context. Rather, the question is whether a person of ordinary intelligence can understand what the statute prohibits. Thus, the

---

[56] To reiterate, a violation of section 102.031's ban on solicitation, as defined by section 102.031(4)(b), is a first-degree misdemeanor, punishable by up to a year in jail and a $1,000 fine. *See* § 104.41, Fla. Stat.

[57] *See This is an Aspen*, YouTube (Oct. 19, 2019), https://www.youtube.com/watch?v=wKiXdqaY180.

canons of construction, while still relevant, take on less significance. And while this is a court of law—not grammar—the "ordinary principles of English prose" are not "irrelevant" to the definition's construction. *See Flora v. United States*, 362 U.S. 145, 150 (1960). This is especially true here, where the question is how a person of ordinary intelligence would read the statute. Relatedly, this Court will not enjoin the statute's enforcement merely because it can imagine some "close cases." *United States v. Williams*, 553 U.S. 285, 305 (2008).

This Court also acknowledges the obvious up front; some conduct clearly falls within the definition's scope. Bribing someone to vote for your preferred candidate clearly falls within the scope of "solicitation," and is an activity with the intent to influence a voter. The same goes for asking every voter in line to vote for or against a certain candidate moments before they enter the polling place. But the Supreme Court has squarely rejected the argument that "a vague provision is constitutional merely because there is some conduct that clearly falls within the provision's grasp." *Johnson v. United States*, 576 U.S. 591, 602 (2015).

Likewise, although it is well within the Florida Legislature's purview to outlaw solicitation of voters waiting in line near the polls, overbreadth is an exception to the rule that a plaintiff who brings a facial attack on a statute must show that the statute can never be constitutionally applied. *Doe v. Valencia Coll.*, 903 F.3d 1220, 1232 (11th Cir. 2018). All of this is to say that the mere fact that the statute

has some constitutional applications does not decide the ultimate issue before this Court.

With those caveats, this Court turns back to the statute's language. Plaintiffs take no issue with the bulk of the solicitation definition—indeed, their challenge is only directed at the language that Senate Bill 90 added—namely, "engaging in any activity with the intent to influence or effect of influencing a voter." Starting with the statutory text, this Court is instructed to "proceed from the understanding that unless otherwise defined, statutory terms are generally interpreted in accordance with their ordinary meaning." *Regions Bank v. Legal Outsource PA*, 936 F.3d 1184, 1190 (11th Cir. 2019) (citations and internal quotation marks omitted). Here, the challenged statute "otherwise define[s]" the terms "solicit" and "solicitation" to include the challenged language. Accordingly, this Court need not resort to determining the plain or ordinary meaning of the terms "solicit" or "solicitation."

Moving to the challenged language, the statutory text is clear that "any activity" is illegal if one either (1) engages in it within the 150-foot buffer zone with the specific "intent to influence" a voter, or (2) such activity occurs within the 150-foot buffer zone and has the "effect of influencing a voter," regardless of one's intent. This language, on its face, does not provide anyone fair notice of what's prohibited, nor does it provide precise guidance to the law's enforcers to prevent arbitrary or discriminatory enforcement. Instead, it outlaws "any activity" within a 150-foot zone

if you intend that it influences a voter or it has the unintended effect of influencing a voter.

"Activity" remains undefined. But the ordinary meaning of the term offers no window into what's prohibited under Florida's expanded solicitation ban. Webster's has defined "activity" to mean several things, including (1) "the quality or state of being active: behavior or actions of a particular kind," (2) "vigorous or energetic action," (3) "natural or normal function," (4) "an active force," (5) "a pursuit in which a person is active," (6) "a form of organized, supervised, often extracurricular recreation," and (7) "an organizational unit for performing a specific function." *Merriam-Webster.com Dictionary*, Merriam-Webster, https://www.merriam-webster.com/dictionary/actvity (last visited March 15, 2022). Other forms of conduct already prohibited under the solicitation definition amount to different kinds of "activities" in the sense that they are all "pursuit[s] in which a person is active"— for example, "seeking or attempting to seek any vote, fact, opinion, or contribution," "distributing or attempting to distribute any political or campaign material, leaflet, or handout," "conducting a poll except as specified in this paragraph," "seeking or attempting to seek a signature on any petition," and "selling or attempting to sell any item." *See* § 102.031(4)(b), Fla. Stat. (2021).

But here, the definition goes beyond these specified "activities" to include "engaging in *any* activity" that has a specific intent or result. And the Eleventh

Circuit has held that when " 'any' [is used] without 'language limiting the breadth of that word, 'any' means all.' " *Regions Bank*, 936 F.3d at 1194 (quoting *CBS Inc. v. PrimeTime 24 Joint Venture*, 245 F.3d 1217, 1223 (11th Cir. 2001)). Here, the Florida Legislature provides that this list of prohibited "activities" "includes, but is not limited to," the list provided above, and the expanded language that Plaintiffs challenge. Accordingly, without any limitation on the word "any," Florida has outlawed *all* activities within the 150-foot zone if they are conducted with or without a specific intent, so long as they have the effect of influencing a voter.

Looking to the words around the challenged language also offers no clarification or limitation as to what's prohibited under the expanded definition. *See Nehme v. Smithkline Beecham Clinical Labs., Inc.*, 863 So. 2d 201, 205 (Fla. 2003) ("Under the doctrine of *noscitur a sociis* (a word is known by the company it keeps), one examines the other words used within a string of concepts to derive the legislature's overall intent."). Specifically, the other verbs defining "solicit" under section 102.031(4)(b) include "seeking," "selling," "distributing" and "conducting." "To seek" can mean "to resort to," "to go in search of," "to ask for," or "to try to acquire or gain." *See Merriam-Webster.com Dictionary*, Merriam-Webster, https://www.merriam-webster.com/dictionary/seek (last visited March 15, 2022). Thus, "to seek" a vote, fact, opinion, contribution, or signature on a petition ordinarily means one is approaching a voter "to ask for" or "to try to acquire or gain"

their vote, fact, opinion, contribution, or signature. "To sell" ordinarily means "to offer for sale." "To distribute" ordinarily means "to divide among several or many: apportion," or "to give out or deliver especially to members of a group." *See Merriam-Webster.com Dictionary,* Merriam-Webster, https://www.merriam-webster.com/dictionary/distribute (last visited March 15, 2022). Thus, handing out free political leaflets or campaign materials to voters in line is prohibited under the ordinary meaning of this term. And finally, "to conduct" a poll unless otherwise allowed for under the Election Code ordinarily means one "direct[s] or take[s] part in the operation or management of," that poll. *See Merriam-Webster.com Dictionary*, Merriam-Webster, https://www.merriam-webster.com/dictionary/conduct (last visited March 15, 2022).

In prohibiting the asking of voters to vote for a specific candidate, sign a specific petition, or offer a fact or opinion, the distribution of political or campaign materials or leaflets, and the offering of items for sale to voters near polling places and drop boxes, the Florida Legislature's intent appears to be focused on shielding voters from both the common annoyances attendant to such activities and the taint of fraud or intimidation at the polls. But as Plaintiffs point out, the fact that the expanded prohibition criminalizes "any activity" based upon whether a voter feels they've been "influenced" by such activity is akin to other statutes that the Supreme Court has struck down for tying criminal culpability to whether the defendant's

conduct was unacceptable based on "wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings." *United States v. Williams*, 553 U.S. 285, 306 (2008) (citing *Coates v. Cincinnati*, 402 U.S. 611, 614 (1971) (holding that ordinance criminalizing "annoying" assemblies of three or more persons on sidewalks was unconstitutionally vague on its face) and *Reno v. ACLU*, 521 U.S. 844, 870–71, 871 n.35 (1997)).

And while the Eleventh Circuit has previously credited the State's interest in protecting voters from "undue influence" at the polls, *see Citizens for Police Accountability Political Committee*, 572 F.3d at 1219, the challenged language does not couch its prohibition within the scope of a particular sort of influence—undue or otherwise. Nor does the statute provide notice of what that "influence" must concern. Must the influence be limited to convincing voters to vote for or against certain candidates or ballot measures? Or is it directed at discouraging a voter to stay in line? What about activities that are intended to influence a voter to feel a sense of pride or patriotism for voting? Does a person distributing religious or artistic literature to individuals in that 150-foot zone commit a misdemeanor if they intend to influence folks to try out their church or to go see their art show? What about a person who helps an unsteady voter to the door with the intent to influence that voter to make it to the polls safely?

And what of those activities that have only the unintended "effect" of influencing a voter? Has the jogger wearing a "MAGA" t-shirt and sharing the sidewalk with voters within 150 feet of the polls committed a misdemeanor? What about the immunocompromised teenager wearing a "Black Lives Matter" mask who waits just outside the polling place for their parent who's voting inside? The sensitivities and proclivities of any given voter could dictate who gets arrested for "solicitation." And until that voter alerts you to the "influence" that they've subjectively experienced, it is impossible to know what activity violates this statute. At best, section 102.031(4)(b)'s new language—if it is susceptible to any reasonable reading—puts a person of ordinary intelligence on notice that if they say or do anything within 150 feet of the polls that "influences" a voter in some way, they've committed a crime.

This Court also heard testimony from some Supervisors of Elections regarding their interpretation of this new language. There did not appear to be any clear consensus as to what this new definition means or how it should apply. For example, Supervisor of Elections for Leon County, Mark Earley, testified that he agreed with a staff member's opinion that the new language is "vague," Tr. at 3513, but he doesn't allow anyone to talk to voters in line anyway unless they fall under some exception. *Id*. Supervisor of Elections for Hillsborough County, Craig Latimer, testified that he understands "solicitation" to mean "[t]rying to encourage somebody

to vote for a person or for or against a referendum." ECF No. 549-3 at 170. But he agreed that "[i]t would depend on the situation," to determine whether someone who has contact with a voter in the 150-foot buffer zone is "soliciting" a voter. *Id*. Accordingly, he testified that there's "absolutely" an aspect of judgment involved in enforcing the solicitation ban. *Id*. at 171. And in his judgment, Supervisor Latimer has decided "not [to] put up with" anyone handing water bottles to voters in line, "because [he] do[es]n't have any idea what that person is talking to the voter about." *Id*. This Court also heard from Supervisor of Elections for Broward County, Joe Scott, who testified that his office isn't doing anything different with respect to solicitation as compared to 2020. Tr. at 1234. However, neither side in this case offered any evidence of what was permitted in Broward County in 2020. Instead, Supervisor Scott testified that he thinks this provision is "intimidating to people and there could be issues where, you know, volunteers who would otherwise be helpful to the public are not going to because they're confused about what the law is and will be nervous about doing anything wrong." *Id*. at 1235.

This Court also heard from Director Matthews, who, after parroting Secretary Lee's counsel's argument that the new language "clarifies" the law, testified that it's really up to the "facts and circumstances" of a specific case to determine whether a nonpartisan organization is prohibited from handing out bottled water to voters under this definition. *Id*. at 2813–14. In addition, Ms. Matthews testified that her office has

not provided an advisory opinion on how to interpret the statute or issued any directive on the topic. *Id.* at 2815.

Based on the evidence before this Court, some Supervisors of Elections have essentially decided that rather than interpret and enforce the law as written, they will just rely on their own understanding of what "solicitation" means. Others have determined that the expanded language now prohibits "line warming" activities that they used to allow in their counties. *See, e.g.*, *id.* at 1962. Other Supervisors aren't doing anything different now than before the expanded language was added to section 102.031—but it's unclear as to what was allowed before the definition was expanded. Accordingly, this expanded solicitation definition both fails to put Floridians of ordinary intelligence on notice of what acts it criminalizes and encourages arbitrary and discriminatory enforcement, making this provision vague to the point of unconstitutionality. It requires individuals to "speculate as to the meaning of penal statutes," at the risk of their liberty. *Lanzetta v. State of New Jersey*, 306 U.S. 451, 453 (1939).

"When Congress passes a vague law, the role of courts under our Constitution is not to fashion a new, clearer law to take its place, but to treat the law as a nullity and invite Congress to try again." *Davis*, 139 S. Ct. at 2323. While it is not Congress that authored this statute, the same principle applies; this Court's role is not to remedy the Florida Legislature's mistake, but to give the Legislature the opportunity

to do so itself. Accordingly, I conclude that the solicitation definition's ban on "engaging in any activity with the intent to influence or effect of influencing a voter" is unconstitutionally vague under the Due Process Clause of the Fourteenth Amendment.

4

This Court turns next to Plaintiffs' overbreadth argument. As explained above, the overbreadth doctrine loosens the rules typically governing facial attacks on the constitutionality of a statute. *Valencia Coll.*, 903 F.3d at 1232. The exception exists because "the threat of enforcement of an overbroad law may deter or 'chill' constitutionally protected speech—especially when the overbroad statute imposes criminal sanctions." *Hicks*, 539 U.S. at 119.

To prevail on their overbreadth claim, Plaintiffs must show that section 102.031(4)(b) "punishes a 'substantial' amount of protected free speech, 'judged in relation to the statute's plainly legitimate sweep.' " *Id.* at 118–19. "Substantial overbreadth" is not "readily reduced to an exact definition." *Members of City Council of City of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 800 (1984). But the Supreme Court has recognized that "the mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge." *Id.* So the question is not whether this Court can conceive of *any* hypothetical situation in which section 102.031(4)(b) would violate the

Constitution. Instead, this Court must ask whether section102.031(4)(b) prohibits a substantial amount of activity protected by the First Amendment relative to the amount of unprotected activity it prohibits.

The first step, then, is to figure out what the statute prohibits. *Williams*, 553 U.S. at 293. At this step, this Court "should, of course, construe the statute to avoid constitutional problems, if the statute is subject to such a limiting construction." *New York v. Ferber*, 458 U.S. 747, 769 n.24 (1982). But this Court cannot twist itself into a pretzel to save an otherwise invalid statute. *See Boos*, 485 U.S. at 330 ("[F]ederal courts are without power to adopt a narrowing construction of a state statute unless such a construction is reasonable and readily apparent."). Assuming the statute is not subject to a limiting construction, the next question is whether the statute "criminalizes a substantial amount of protected expressive activity." *Williams*, 553 U.S. at 297. "In making that determination, a court should evaluate the ambiguous as well as the unambiguous scope of the enactment." *Flipside*, 455 U.S. at 495 n.6. If the statute is overbroad, this Court must ask whether it can sever the problematic provision from the rest of the statute. *Ferber*, 458 U.S. at 769 n.24.

First, as explained above, the challenged provision is vague because it is fails to provide notice of what's prohibited, allows for arbitrary or discriminatory enforcement, and is not subject to a limiting construction. Second, considering the statute's ambiguous scope, it is overbroad. To be sure, the statute criminalizes a large

amount of unprotected activity. But, in its ambiguity, it also consumes vast swaths of core First Amendment speech.

In reviewing other polling place restrictions on speech, the Supreme Court has recognized that states must be allowed to strike a balance between "the accommodation of the right to engage in political discourse with the right to vote." *Minnesota Voters Alliance*, 138 S. Ct. at 1892 (quoting *Burson*, 504 U.S. at 198). Accordingly, the Supreme Court has upheld a 100-foot restriction around polling places in Tennessee that banned "the display of campaign posters, signs, or other campaign materials, distribution of campaign materials, and solicitation of votes for or against any person or political party or position on a question." *Burson*, 504 U.S. at 193 (quoting Tenn. Code. Ann. § 2-7-111(b) (Supp. 1991)). Likewise, the Eleventh Circuit rejected a challenge to Florida's ban on signature solicitation targeting voters exiting polling places. *See Citizens for Police Accountability Political Committee*, 572 F.3d at 1215. In so doing, the Eleventh Circuit found the challenged ban on soliciting signatures from voters exiting the polls "mirror[ed] in many respects—including the size of the restricted zone—the Tennessee statute upheld in *Burson*." *Id*. at 1221.

More recently, however, in 2018, the Supreme Court reviewed a restriction on speech within a more restricted forum—inside polling places—in *Minnesota Voters Alliance*. 138 S. Ct. 1876. In that case, the Supreme Court held that Minnesota's ban

on voters wearing political badges, political buttons, or anything bearing political insignia inside polling places on Election Day violated the First Amendment. *Id*. at 1882, 1892. To reach this conclusion, the Supreme Court noted that the *inside* of polling places is a nonpublic forum subject to greater restrictions on speech—but because Minnesota's ban was not "capable of reasoned application," it did not pass constitutional muster. *Id*. at 1886, 1892; *see also id*. at 1891 ("But the State's difficulties with its restrictions go beyond close calls on borderline or fanciful cases. And that is a serious matter when the whole point of the exercise is to prohibit the expression of political views.").

The same infirmities apply to Florida's ban on "engaging in any activity with the intent to influence or effect of influencing a voter." Rather than attempting to strike any balance to allow for *any* discourse, Florida has outlawed "any activity"— including *any* speech—within 150 feet of the polls if it is intended to "influence" or has the unintended effect of "influencing" a voter. Instead of tailoring the ban on solicitation to activities that pose a risk of confusing or intimidating voters around the polls, Florida has outlawed all activities that "influence" voters in some unidentified way.

That said, there can be no doubt, overbreadth is "strong medicine" that must be employed sparingly. *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973). But here we are not dealing with marginal cases. Section 102.031(4)(b)'s expanded language

banning "engaging in any activity with the intent to influence or effect of influencing a voter" is overbroad in violation of the First Amendment.

The next question is whether this provision is severable from the remainder of section 102.031, Florida Statutes. Severability of state legislative provisions is "a matter of state law." *Leavitt v. Jane L.*, 518 U.S. 137, 139 (1996). "Florida law clearly favors (where possible) severance of the invalid portions of a law from the valid ones." *Solantic, LLC v. City of Neptune Beach*, 410 F.3d 1250, 1269 n.16 (11th Cir. 2005). "Florida's severance doctrine is designed to show great deference to the legislative prerogative to enact laws by recognizing the obligation of the judiciary to uphold the constitutionality of legislative enactments where it is possible to strike only the unconstitutional portions." *Jones v. Governor of Fla.*, 950 F.3d 795, 831 (11th Cir. 2020) (citations and quotations omitted). "Florida law thus adopts a strong presumption of severability, and squarely places the burden on the party challenging severability." *Id.* (citation omitted).

"Under Florida law, 'the remainder of the act [may] stand' where 'a part of a statute [has been] declared unconstitutional' so long as four requirements are met:

> (1) the unconstitutional provisions can be separated from the remaining valid provisions, (2) the legislative purposes expressed in the valid provisions can be accomplished independently of those which are void, (3) the good and the bad features are not so inseparable in substance that it can be said that the Legislature would have passed the one without the other and, (4) an act complete in itself remains after the invalid provisions are stricken.

*Id.* (citing *Smith v. Dep't of Ins.*, 507 So. 2d 1080, 1089–90 (Fla. 1987)).

"In brief, '[t]he question is whether the taint of an illegal provision has infected the entire enactment, requiring the whole unit to fail.' " *Emerson v. Hillsborough Cnty.*, 312 So. 3d 451, 460 (Fla. 2021) (citation omitted). In applying these factors, Florida courts "have recognized the cardinal principle of severability analysis: 'The severability of a statutory provision is determined by its relation to the *overall legislative intent* of the statute of which it is a part, and whether, the statute, less the invalid provision, can still accomplish this intent.' " *Id.* (citation omitted).

Here, the problematic provision, "engaging in any activity with the intent to influence or effect of influencing a voter," is severable from the rest of section 102.031(4)(b) and leaves the remainder of that definition provision and the overall statute governing order at the polls intact. The legislative purpose of authorizing the maintenance of good order at the polls and outlawing solicitation of voters can be accomplished independent of the new, expanded language. Indeed, the problematic provision was added thirteen years after the last substantive change to the provision defining "solicitation." *See* Ch. 2008-95, § 25, Laws of Fla. (amending definition of solicitation with respect to exit polling). Moreover, no Defendant in this action has attempted to show that the challenged provision is not severable from the unchallenged portion of section 102.031. The Defendant Supervisors of Elections

still maintain authority to define the no-solicitation zone, enforce its prohibitions, and remove "disruptive and unruly persons" from the zone. Accordingly, the problematic language is severable, and this Court enjoins its enforcement by Defendant Supervisors of Elections for Volusia, Bay, Broward, Palm Beach, Duval, Miami-Dade, Seminole, Pinellas, Orange, and Osceola Counties.

V

A

Plaintiffs in Case Nos. 4:21cv187 and 4:21cv201 also challenge the solicitation definition on preemption grounds. They claim that the solicitation definition, on its face and in its application, conflicts with section 208 of the VRA, 52 U.S.C. § 10508. ECF No. 45 ¶¶ 224–28; ECF No. 59 ¶¶ 211–18.

Of course, "federal preemption of a state or local law is premised on the Supremacy Clause of the United States Constitution," and thus implicates constitutional questions. *BellSouth Telecomms., Inc. v. Town of Palm Beach*, 252 F.3d 1169, 1176 (11th Cir. 2001). "A fundamental and longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them." *Williamson v. Brevard Cnty.*, 928 F.3d 1296, 1316–17 (11th Cir. 2019) (quoting *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 445 (1988)). Accordingly, because this Court has already found the solicitation definition unconstitutional under the First, Fourteenth, and Fifteenth

187

Amendments, there is no need to address the preemption question. *See, e.g.*, *Green Party of Tenn. v. Hargett*, 791 F.3d 684, 695 (6th Cir. 2015) ("Because we find that the ballot retention statute is facially unconstitutional under the Equal Protection Clause, we need not decide whether it also violates the First Amendment."); *Cates v. Zeltiq Aesthetics, Inc.*, 535 F. Supp. 3d 1222, 1231 (M.D. Fla. 2021) ("The Court need not address the preemption question because Defendant is already entitled to summary judgment on alternative grounds.").

B

Likewise, Plaintiffs in three of these consolidated cases also allege that the solicitation definition, as applied to their "line warming" activities, infringes on their right to engage in free speech in violation of the First Amendment. *See* ECF No. 160 ¶¶ 173-77, *in* Case No. 4:21cv186; ECF No. 45 ¶¶ 167-76, *in* Case No. 4:21; ECF No. 59 ¶¶ 191-97, *in* Case No. 4:21cv201. But, again, given the myriad constitutional infirmities discussed at length above with respect to the solicitation definition, this Court need not reach the constitutional question of whether this provision also violates the First Amendment as applied to Plaintiffs' "line warming" activities. *See, e.g.*, *Williamson*, 928 F.3d at 1316–17; *Green Party of Tenn.*, 791 F.3d at 695; *Cates*, 535 F. Supp. 3d at 1231.

VI

Next, this Court considers Plaintiffs' compelled speech challenge to the registration disclaimer provision, section 97.0575(3)(a), Florida Statutes (2021). That provision requires third-party voter registration organizations (3PVROs)

a. to notify voter registration applicants at the time the organization collects their application that the organization might not deliver the application to the Division of Elections or the supervisor of elections in the county in which the applicant resides in less than 14 days or before registration closes for the next ensuing election;

b. to advise the applicant that the applicant can deliver their application in person or by mail; and

c. to inform the applicant how to register online with the division and how to determine whether their application has been delivered.

"If the Secretary of State reasonably believes that a person has committed a violation of this section, the secretary may refer the matter to the Attorney General for enforcement." § 97.0575(4), Fla. Stat. (2021). In turn, the Attorney General may initiate civil actions to redress violations of—or to prevent violations of—section 97.0575. *Id.* (permitting the Attorney General to seek "a permanent or temporary injunction, a restraining order, or any other appropriate order"). Finally, section

97.0575 requires the Secretary of State to "adopt rules to ensure the integrity of the registration process." *Id.* § 97.0575(5).

Plaintiffs[58] argue that the registration disclaimer violates the First Amendment by compelling them to speak, ECF No. 160 ¶¶ 187–93; ECF No. 59 ¶¶ 237–52; ECF No. 44 ¶¶ 121–43, and by restricting their political speech and associational rights, ECF No. 160 ¶¶194–202; ECF No. 59 ¶¶ 237–52.

A

1

This Court recognizes that SB 524, which is now awaiting Governor DeSantis's signature, repeals the registration disclaimer. *See* Fla. CS for SB 524, § 6 (2022) (proposed amendment to § 97.057(3)(a), Fla. Stat.). All agree that SB 524 moots Plaintiffs' claims challenging the registration disclaimer. *See* ECF No. 661 at 7; ECF No. 662 at 1. And this Court has waited, based on federalism concerns and cognizant of its duty to avoid addressing constitutional issues unnecessarily, to issue this Order. But this Court can wait no longer. While this issue will likely become moot soon, it is not moot yet. Thus, this Court turns to Plaintiffs' claims challenging the registration disclaimer.

---

[58] The *NAACP* Plaintiffs do not challenge the registration disclaimer.

2

Before this Court addresses Plaintiffs' claims, it must ensure that Plaintiffs have standing to challenge the registration disclaimer.

a

This Court begins its analysis with the *League* Plaintiffs and concludes that they have standing. Plaintiff Cecile Scoon is the president of the League of Women Voters of Florida (the League). Tr. at 32. She testified that she has long been a member of the League and has been personally registering voters for about 36 years. *Id.* at 36. Plus, SB 90 has already forced—and will continue to force—her to deliver the disclaimer. *See id.* at 50–51. Ms. Scoon does not believe that the disclaimer is "accurate or fair." *Id.* at 51. Based on Ms. Scoon's testimony, which I find credible, Ms. Scoon has standing to challenge the registration disclaimer.

*First*, she has suffered an injury in fact. The injury in fact requirement "serves to distinguish a person with a direct stake in the outcome of a litigation—even though small—from a person with a mere interest in the problem." *Students*, 412 U.S. at 689 n.14. Even "an identifiable trifle is enough." *Id.* And Ms. Scoon's injury is far more than a trifle. Although most First Amendment cases address restrictions on speech, "measures compelling speech are at least as threatening." *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2464 (2018). Unsurprisingly then, courts have found that the "deprivation of [a plaintiff's] First

Amendment right[] . . . to be free from compelled speech" is an "injury in fact." *Jacobs v. Clark Cnty. Sch. Dist.*, 526 F.3d 419, 426 (9th Cir. 2008). Thus, Ms. Scoon meets the injury prong.

*Second*, Ms. Scoon's injury is traceable to Defendants Lee and Moody. Traceability is not an exacting standard; "[p]roximate causation is not a requirement of Article III standing." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 134 (2014). And thus "[a] plaintiff . . . need not show . . . that 'the defendant's actions are the very last step in the chain of causation.' " *Wilding v. DNC Servs. Corp.*, 941 F.3d 1116, 1126 (11th Cir. 2019) (quoting *Bennett v. Spear*, 520 U.S. 154, 168–69 (1997)). "[E]ven harms that flow indirectly from the action in question can be said to be 'fairly traceable' to that action for standing purposes." *Focus on the Fam. v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1273 (11th Cir. 2003).

Throughout this litigation, both Defendants Lee and Moody have acknowledged that they directly enforce the registration disclaimer. *See, e.g.*, ECF No. 163 at 4 ("The Florida Division of Elections, within the Florida Department of State, oversees enforcement of Section 7."); *id.* at 10 ("[T]he Division of Elections is the party tasked to enforce compliance with the statutory scheme for returning completed voter registration applications."); *see also* ECF No. 176 at 4 n.1 ("The Attorney General recognizes that she has civil enforcement authority over

§ 97.0575(3)(a), Fla. Stat. (2021) . . . .". Defendants did not change their position at trial and nothing the parties presented to this Court suggests otherwise. Ms. Scoon's injury is traceable to Defendants Lee and Moody.

*Third*, and finally, an injunction against Defendants Lee and Moody would redress Ms. Scoon's injury. The redressability prong "focuses . . . on whether the injury that a plaintiff alleges is likely to be redressed through the litigation." *Sprint Commc'ns*, 554 U.S. at 287 (emphasis removed). Further, "Article III . . . does not demand that the redress sought by a plaintiff be complete," *Moody v. Holman*, 887 F.3d 1281, 1287 (11th Cir. 2018), and a "substantial likelihood" of redressability will do. *Duke Power Co. v. Env't Study Grp.*, 438 U.S. 59, 79 (1978). Enjoining Defendants Lee and Moody from using their powers to investigate and prosecute civil enforcement proceedings for suspected failures to deliver the registration disclaimer will redress Ms. Scoon's injuries. For example, an order enjoining Defendants Lee and Moody from enforcing the registration disclaimer removes the threat that Ms. Scoon—or the League—will be punished for failing to deliver the disclaimer. Defendants Lee and Moody do not dispute this. Ms. Scoon has standing.[59]

---

[59] Because Ms. Scoon has standing, the League also has associational standing. Ms. Scoon is a member who would have standing in her own right, this suit is germane to the League's purpose—the League's "primary goal is to help people register to vote," Tr. at 34—and neither the claim asserted, nor the relief requested requires the participation of individual members. *See GBM*, 992 F.3d at 1317 n.29 ("[P]rospective relief weigh[s] in favor of finding that associational standing exists.").

And even if Ms. Scoon did not have standing, the League itself could also have standing, either because SB 90 violates its First Amendment rights or through a diversion-of-resources theory. This Court finds that the League has standing under a diversion-of-resources theory, but that it has not shown a First Amendment injury.

Starting with the League's First Amendment rights, the First Amendment extends the same protections to the "political speech of corporations or other associations" as it does to the political speech of natural persons. *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 343 (2010). And just as the registration disclaimer compels Ms. Scoon to speak, it compels the League itself to speak. Thus, the League, it would seem, suffers the same compelled speech injury. For the League, however, this theory does not work. The problem is that, as explained above, the League is really two entities, and it remains unclear which League entity is a 3PVRO. Tr. at 1144 ("I would have to check in and see which one it is."). So this Court does not know which entity is compelled to speak. Defendant Moody explored this issue on cross, *see id*. at 1142–44, so Plaintiffs cannot claim that they were not on notice. Yet Plaintiffs did nothing to clarify the point. Ultimately, Plaintiffs bear the burden to prove standing. And this Court finds that saying that SB 90 compels one of two Plaintiffs to speak—we're not sure which one—does not cut it. Thus, Plaintiffs have failed to establish that the League itself has standing under a compelled speech theory.

194

But the League does have standing under a diversion-of-resources theory, as explained at length above. Defendants Lee and Moody raise several general arguments attacking organizational standing—although it is impossible to discern which Plaintiffs their arguments are directed at. This Court addresses each briefly.

First, Defendants complain that many Plaintiffs have not specifically identified the costs SB 90 has imposed on them. ECF No. 648 at 92. Tellingly, the League is not among the Plaintiffs mentioned in this section of Defendants' brief. Based on the testimony described above, this Court rejects this argument as to the League.

Next, Defendants argue that "self-inflicted" harms are not Article III injuries. ECF No. 648 at 48. Specifically, Defendants target "disclaimer-acknowledgement forms" used by Florida Rising and Poder Latinx. *Id.* So this argument—apparently— is not directed toward the League. Even so, this Court addresses it here. The Eleventh Circuit rejected the same argument when Defendant Lee's predecessor made it. In *Florida State Conference of NAACP v. Browning*, the then-Florida Secretary of State tried "to draw a distinction between an act or law negating the efforts of an organization, which is admittedly an injury under *Havens*, and an act or law merely causing the organization to voluntarily divert resources in response to the law," which the Secretary claimed was "an entirely self-inflicted injury." 522 F.3d at 1165– 66. Responding to the Secretary's argument, the Eleventh Circuit drew a line

between litigation costs and costs incurred in blunting an unconstitutional law's effects: "[c]osts unrelated to the legal challenge are different and do qualify as an injury, whether they are voluntarily incurred or not." *Id.* at 1166.

Diverting resources to comply with SB 90, to reduce SB 90's impacts, and to ensure that the Plaintiff organizations are not sanctioned for violating SB 90 draws resources away from other projects and thus is a cognizable injury under Article III.

In short, the League would have spent time applying for grants, pursuing Amendment 4-related projects, and focusing on redistricting. But SB 90 has forced the League to divert resources away from those projects to educate its members about the changes SB 90 has wrought. "[B]ecause [the League] cannot bring to bear limitless resources, [its] noneconomic goals will suffer. Therefore, [the League] presently ha[s] standing on [its] own behalf to seek relief." *Id.* at 1166.[60]

Having determined that both Ms. Scoon and the League have standing to challenge the disclaimer requirement, this Court need not consider whether the other *League* Plaintiffs have standing too. *FAIR*, 547 U.S. at 53.[61]

---

[60] For the reasons set out above, the League's injury is traceable to Defendants Lee and Moody and redressable by an order against them.

[61] That said, this Court also finds that Plaintiff Alan Madison has individual standing to challenge the registration disclaimer provision. *See* Tr. at 703–05.

b

Next, this Court turns to the *Florida Rising* Plaintiffs. They too have established standing. First, unlike the League, the *Florida Rising* organizational Plaintiffs—Poder Latinx, Equal Ground, Hispanic Federation, UnidosUS, and Florida Rising Together—have all established that they are 3PVROs. Tr. at 191, 383, 719, 1405, 2034. They therefore have standing because SB 90 compels their speech. *See Citizens United*, 558 U.S. at 343. But even if this were not so, the *Florida Rising* Plaintiffs also have standing because at least one Plaintiff has standing under a diversion-of-resources theory.

On that point, this Court heard testimony from Jared Nordlund, the state advocacy director for Plaintiff UnidosUS (Unidos). Tr. at 1403. Mr. Nordlund testified that Unidos works "to create an America where Hispanic contributions are respected and where they are able to pursue their version of the American dream." *Id.* at 1404. Relevant here, Unidos engages in voter registration. *Id.* at 1405. Unidos's voter registration campaign has three prongs: (1) community-based canvassing—physically going into high-traffic Hispanic neighborhoods and registering people to vote—(2) digital programing—buying online ads that direct people to Unidos's become-a-voter website—and (3) virtual programing—calling people and encouraging them to register through the become-a-voter website. *Id.* at 1407.

Unidos also provides support to affiliate organizations that want to register voters. *Id.*

Through in-person canvassing, Unidos has registered roughly 300,000 voters since 2012. *Id.* at 1409. Unidos has registered voters for the 2012, 2014, 2016, 2018, and 2020 election cycles. *Id.* In 2020, Unidos registered 72,000 people to vote in Florida. *Id.* at 1413. That year, Unidos budgeted $3–3.5 million for voter registration. *Id.* at 1413. The registration team consisted of Mr. Nordlund, an Orlando civic engagement specialist, a Miami civic engagement specialist, an operations manager, temporary field organizers, team captains, 50 canvassers, and three quality control managers. *Id.* at 1413–14.

Unidos plans to resume in-person voter registration in the spring of 2022. *Id.* at 1422. With SB 90 in place, Unidos expects that it will take more time to register voters. *Id.* at 1423. This is because Unidos will now have to deliver the disclaimer and then explain the disclaimer while registering voters. *Id.* Unidos will also have to train staff on how to deliver the disclaimer. *Id.* at 1424. Plus, Unidos will spend resources developing a receipt for registrants to prove it delivered the disclaimer. *Id.* at 1425.

Because of the disclaimer requirement, Unidos anticipates "paying for additional staff time to train people and retrain people on the disclaimer and making sure that they complete the acknowledgment form." *Id.* at 1437. And in part because

of the disclaimer requirement, Unidos believes that its per-voter registration costs will rise from $30–35 to $35–40. *Id.* at 1438–39. Overall, Unidos will be forced to budget around $100,000 more for voter registration than it had in the past. *Id.* at 1439.

To pay for these added costs, Unidos will have to do additional fundraising. *Id.* at 1439. But, of course, fundraising has costs too. Here, additional fundraising will take time away from voter education and get-out-the-vote efforts. *Id.* It will also draw Mr. Nordlund away from Unidos's issue advocacy work. For example, Mr. Nordlund will have less time to advocate for bills that "would allow English-learner students in K through 12 to take their year-end FSAs in their native language," and "would allow any nonprofit in Florida to be reimbursed for their time to enroll a person who is eligible [for] SNAP." *Id.* at 1440. Additional time spent fundraising would also strain Unidos's effort to advocate for more affordable housing. *Id.*

And if fundraising cannot cover the added cost, Unidos will have to "take money away from [its] canvassing shifts," which would mean "less time in the field" and "less production." *Id.* at 1441. This Court finds Mr. Nordlund's testimony credible.

Based on the above, Unidos has established organizational standing to challenge the registration disclaimer. Whether Unidos has yet diverted its resources or finalized its budget is irrelevant. As long as it "reasonably anticipate[s] that [it]will

have to divert personnel and time" to offset the registration disclaimer's effects, Unidos has standing. *Browning*, 522 F.3d at 1165–66; *see also id.* at 1166 ("Even though the injuries are anticipated rather than completed events, they satisfy the immediacy and likelihood requirements . . . .").

In sum, the disclaimer requirement will impose additional costs on Unidos's registration program by forcing Unidos to spend more money training staff and by forcing it to hire more staff. To pay for these added costs, Unidos will have to raise more money. But the time and effort spend fundraising will draw resources away from other projects such as get-out-the-vote efforts, voter education, lobbying the Legislature, and campaigning for more affordable housing. Thus, in addition to their First Amendment injuries, the *Florida Rising* Plaintiffs have standing because at least one Plaintiff has standing under a diversion-of-resources theory.

c

Finally, this Court turns to Plaintiff HTFF and concludes that it too has standing to challenge the registration disclaimer. Like the *Florida Rising* organizational Plaintiffs, HTFF has standing because the disclaimer provision compels its speech. HTFF also has standing because the disclaimer provision forces HTFF to divert resources.

As to diversion of resources, this Court heard from HTFF's founder, Rosemary McCoy. Tr. at 255–56. She testified that HTFF is a nonpartisan

organization that focuses on civic engagement and education. *Id.* at 256. Its "goal is to increase [political] participation among those that are underserved." *Id.* at 260. To that end, HTFF engages in voter registration, organization, and education. *Id.*

Relevant here, HTFF works to register voters in underserved low-income communities—typically canvassing, for example, at laundromats, bus stations, courthouses, and convenience stores. *Id.*

SB 90 will also force HTFF to spend more time with each potential registrant explaining the disclaimer. *Id.* at 268. This reduces the number of voters HTFF can register. HTFF now uses a registration acknowledgment form to document its compliance with SB 90. *Id.* at 278, 282. Plus, HTFF distributes receipts to persons it registers. *Id.* at 283. On top of these measures, HTFF has produced training materials to help train its staff to work through questions that the registration disclaimer may raise from potential registrants. *Id.* at 284.

If the registration disclaimer were not in place, HTFF could spend more time training canvassers on how to convince potential registrants of the importance of voting. *Id.* at 286. Plus, because canvassers are paid for training time, HTFF must pay more money to train them to deliver the disclaimer. *Id.* And if HTFF did not have to print materials related to the registration disclaimer, it would print materials educating the public about primary elections. *Id.* at 287. This Court finds Ms. McCoy's testimony credible on these points.

In sum, then, SB 90 forces HTFF to spend time and money training canvassers to deliver the registration disclaimer. Absent SB 90, HTFF would use those resources to train its canvassers to better handle other aspects of the registration process. And if HTFF did not have to print materials documenting its compliance with SB 90, it could print materials educating voters about other parts of the electoral process—such as primary elections. Accordingly, HTFF has standing under a diversion-of-resources theory.

Having concluded that at least one Plaintiff from each consolidated case has standing to challenge the registration disclaimer, this Court proceeds to the merits of Plaintiffs' claims.

B

Turning to the merits, this Court must first decide what test applies to Plaintiffs' claims. This Court begins with Defendants' argument that Plaintiffs' speech is commercial speech entitled to lesser protection under the First Amendment.

1

In passing, Defendants try to cast Plaintiffs' speech as commercial, and thus subject to the more lenient standard of review set out in *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626, 629 (1985). This Court has already rejected this argument. And although it pains this Court to retread

202

this ground, because Defendants advance new arguments as to why Plaintiffs' speech is commercial, this Court will reiterate, Plaintiffs' speech is not commercial.[62]

Defendants advance two arguments supporting their position. First, Defendants say Plaintiffs' speech is commercial "because 3PVROs have professional employees who profit from their participation in voter registration activities." ECF No. 648 at 81 n.22. Second, Defendants point to "the unique fiduciary responsibilities Florida law imposes upon [3PVROs] in relation to prospective registrants, and the significant overlap between this obligation and common law fiduciary responsibilities imposed in the commercial context." *Id.* This Court takes each argument in turn.

The most obvious issue with Defendants' first argument is that some Plaintiffs *do not* employ paid canvassers. For example, the League registers voters using volunteers. *See, e.g.*, Tr. at 64 ("We are volunteers."). More to the point, it makes little difference whether Plaintiffs pay their canvassers. Commercial speech is a "narrow category," encompassing only speech that is "related solely to the economic interests of the speaker and its audience, or" that "does no more than propose a commercial transaction." *Dana's R.R. Supply v. Att'y Gen., Fla.*, 807 F.3d 1235, 1246 (11th Cir. 2015) (cleaned up). Plaintiffs' speech—encouraging Floridians to register

---

[62] This Court also incorporates by reference its previous analysis on this issue in its orders addressing Defendants' motions for summary judgment. *See, e.g.*, ECF No. 245, *in* Case No. 4:21cv214, at 10–16.

to vote—is neither. Under Defendants' theory, artists, journalists, and authors—who are all paid to speak—would receive diminished First Amendment protections because they engage in commercial speech. *See Hoover v. Morales*, 164 F.3d 221, 225 (5th Cir. 1998). That is simply not the law.

Second, Defendants place far too much weight on the fact that Florida labels 3PVROs "fiduciaries." If this Court were to accept Defendants' argument, the State could transform any group's speech into commercial speech by labeling that group a fiduciary. Thus, Defendants invite this Court to grant the State the power to diminish disfavored groups' First Amendment rights at will. *See Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2375 (2018) (*NIFLA*) ("States cannot choose the protection that speech receives under the First Amendment, as that would give them a powerful tool to impose 'invidious discrimination of disfavored subjects.'" (quoting *Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 423–424 n.19 (1993))); *see also Otto v. City of Boca Raton, Fla.*, 981 F.3d 854, 867 (11th Cir. 2020) ("The First Amendment's core speech protections could not very well withstand that sort of restriction-via-professionalization."). This Court declines that invitation. Plainly, Plaintiffs' speech is not commercial.

2

*Zauderer* does not supply the right test, but that invites the question—what test should this Court apply? All agree that *Anderson-Burdick* does not apply. Unlike

SB 90's other provisions, which regulate "the mechanics of the electoral process," the registration disclaimer requirement is "a regulation of pure speech." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 345 (1995). Accordingly, this Court agrees that *Anderson-Burdick* does not apply.

As to the proper test, however, the parties do not agree. Plaintiffs ask this Court to apply strict scrutiny because the disclaimer requirement compels them to speak. Defendants, on the other hand, analogize the registration disclaimer to campaign finance disclaimers, and ask this Court to apply exacting scrutiny.

Plaintiffs rely mainly on the Supreme Court's decision in *NIFLA*. There, the Court passed on the constitutionality of a California law requiring "clinics that primarily serve pregnant women" to "notify women that California provides free or low-cost services, including abortions, and give them a phone number to call." *NIFLA*, 138 S. Ct. at 2368. The California law targeted "crisis pregnancy centers," which are "largely Christian belief-based" centers that aim to discourage women from seeking abortions. *Id.*

First, the Court explained that the law was content based; "[b]y compelling individuals to speak a particular message," the law altered their speech's content. *Id.* at 2371. In *NIFLA*, the law required "clinics [to] provide a government-drafted script about the availability of state-sponsored services, as well as contact information for how to obtain them. One of those services [was] abortion—the very practice that

petitioners are devoted to opposing." *Id.* "[P]lainly," then, the law altered the plaintiffs' speech. *Id.* The Court then rejected the argument that the plaintiffs' speech was professional speech subject to a lower level of review. *Id.* at 2372–75. Without foreclosing "the possibility that some reason exist[ed]" for treating the law before it differently, the Court struck down the disclosure law because it did not pass even intermediate scrutiny. *Id.* at 2375.

Plaintiffs argue that the registration disclaimer and the California law at issue in *NIFLA* are doppelgangers. Like the California law, the registration disclaimer forces Plaintiffs to deliver a message—that Plaintiffs may not deliver an applicant's registration on time and that the registrant can register through other means. And in both cases, the government's message goes against the speaker's mission because it suggests that government-provided alternatives to the speaker's services are available.

Defendants, on the other hand, liken the registration disclaimer to campaign finance disclaimers. They argue that the registration disclaimer "may burden the ability to speak," but it does "not prevent anyone from speaking." *Citizens United*, 558 U.S. at 366. For this reason, Defendants say, the registration disclaimer is subject to "exacting scrutiny." *Id.* Defendants also claim that *NIFLA* does not apply because it "did not involve election-related speech." ECF No. 648 at 84.

This Court agrees with Plaintiffs. *NIFLA* controls.[63] The most fundamental problem with Defendants' argument is that nearly every case they cite addresses a law requiring groups to disclose their donors to the government. *See Buckley v. Valeo*, 424 U.S. 1, 64 (1976); *Citizens United*, 558 U.S. at 366; *Gaspee Project v. Mederos*, 13 F.4th 79, 82 (1st Cir. 2021); *Worley v. Fla. Sec'y of State*, 717 F.3d 1238, 1240 (11th Cir. 2013); *The Real Truth About Abortion, Inc. v. Fed. Election Comm'n*, 681 F.3d 544, 545 (4th Cir. 2012). And the only case Defendants cite that applied exacting scrutiny to a disclosure requirement outside the campaign finance context addressed a law that required speakers to disclose their identity. *See McIntyre*, 514 U.S. at 338 n.3.

Yet the registration disclaimer does not require Plaintiffs to disclose anything about themselves. For example, it does not require Plaintiffs to inform potential registrants that they are funded by outside groups—as many of the Plaintiff organizations are. Nor does it require canvassers to identify the organization they are affiliated with. Rather, the registration disclaimer requires Plaintiffs to deliver the

---

[63] Though not necessarily for the same reasons Plaintiffs argue. Plaintiffs suggest that exacting scrutiny applies only to laws that restrain freedom of association by compelling speakers to disclose their affiliation with groups engaged in advocacy. ECF No. 649 at 67. But the line between speech and association is not as clean as Plaintiffs suggest. For example, in *McIntyre v. Ohio Elections Commission*, the Court applied exacting scrutiny to a law requiring speakers to disclose their identity. 514 U.S. at 344–45; *see also id.* at 342 ("[A]n author's decision to remain anonymous, like other decisions concerning omissions or additions to the content of a publication, is an aspect of the *freedom of speech* protected by the First Amendment." (emphasis added)). So exacting scrutiny can apply to disclosures impinging either the right to speak *or* to associate.

government's message: that Plaintiffs may not return the application and that alternative government services are available. This is no mere statement of fact.

On the surface, of course, the statement is factually true. Sometimes 3PVROs turn in applications late. But the statement is also misleading. As Mr. Nordlund noted, "it makes it sound [like] organizations like ours habitually turn[] in voter registrations late or [do not] deliver them at all." Tr. at 1424. As explained above, the evidence before this Court shows that 3PVROs seldom submit applications late. Put differently, the registration disclaimer is like forcing 3PVROs to tell registrants that someone in their organization could steal their identity. Is it a factual statement? Sure, that *could* happen; but the risk is so small that forcing the 3PVRO to disclose it would mislead registrants into thinking it was likely.

Plus, in some ways, the disclaimer here is worse than the disclaimer at issue in *NIFLA*. Suppose the law in *NIFLA* required crisis pregnancy centers not only to inform clients that government sponsored services were available, but also that the center might give the client subpar services—that is what we have here. That Plaintiffs are compelled to deliver this government-imposed, self-effacing message is hardly comparable to a political committee being "forced to communicate that their message is not endorsed by a candidate or the candidate's committee." ECF No. 648 at 84.

In sum, when the government compels a speaker to deliver its message, strict scrutiny applies. *McClendon v. Long*, 22 F.4th 1330, 1337–38 (11th Cir. 2022). Thus, the disclaimer requirement is subject to strict scrutiny.

3

Because the registration disclaimer is a content-based restriction on speech, it is "presumptively unconstitutional" and subject to strict scrutiny. *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015). Under strict scrutiny, Defendants must show that the registration disclaimer is "narrowly tailored to serve compelling state interests." *Id.* That, Defendants cannot do.

a

Starting with the State's interest, under strict scrutiny, Defendants must identify the interest that actually motivated the Legislature, not provide *post hoc* rationalizations for the Legislature's actions. *See Shaw v. Hunt*, 517 U.S. 899, 908 n.4 (1996); *see also Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 633 (2d Cir. 2020) ("The government's justification 'must be genuine, not hypothesized or invented *post hoc* in response to litigation.'" (quoting *United States v. Virginia*, 518 U.S. 515, 533 (1996))). As explained below, this Court finds that the Legislature enacted the registration disclaimer with the intent to discriminate based on race— the polar opposite of a compelling state interest.

And even accepting Defendants' proffered justifications, "informing the public about the risks of entrusting 3PVROs with voter registration applications and of alternative means for registering," ECF No. 648 at 83, these interests do not justify the disclaimer.

First, as for the State's interest in providing voters with information about other ways to register, "[t]he simple interest in providing voters with additional relevant information does not justify a state requirement that a [speaker] make statements or disclosures she would otherwise omit." *McIntyre*, 514 U.S. at 348.

As for warning voters about the risks of entrusting 3PVROs with their registration applications, this Court accepts that the State's interest *could* be compelling, provided those risks were significant. Here, however, all evidence before this Court suggest that they are not. While the evidence shows, and this Court accepts, that 3PVROs do sometimes turn in registrations late, the evidence also shows that the chance that a 3PVRO will return any particular voter's registration late is vanishingly small.

For example, Ms. Scoon testified that, in the past ten years, the League had collected "[t]housands" of voter registration applications. Tr. at 47. Of those thousands, six were turned in late. *Id.* Two were late because of a hurricane, and four were late because a League member miscalculated the due date by one day. *Id.* That said, all six registrations were submitted before the book closing, and so all six voters

210

were eligible to vote. *Id.* Similarly, Poder Latinx collected roughly 33,000 registration applications in the run up to the 2020 election. *Id.* at 191. Of those registrations, Poder Latinx submitted 55 of them late. *See id.* at 201. That means that for any voter who registered through Poder Latinx in the run up to the 2020 election, there was roughly a 0.16% chance their registration would be submitted late. Put another way, that means there was a 99.8% chance that Poder Latinx *would* return the application on time. But even if you were one of the unlucky 55, Poder Latinx returned the applications before book closing, and so those applicants still got to vote. *Id.* at 202. True, some voters do not get to vote because their applications are late. Unidos has registered 300,000 voters since 2012. Of those 300,000, five applications were submitted late, 3 were too late to vote in the primary and 2 were too late to vote in the general election. *Id.* at 1419, 1501. That means there is roughly a 0.00016% chance that a voter who registered through Unidos would be unable to vote because Unidos submitted their application late. By contrast, there is roughly a 0.0065% chance that a person will be struck by lightning in their lifetime (a 1/15,300 chance). *How Dangerous is Lightning?* National Weather Service, https://www.weather.gov/safety/lightning-odds (last visited March 11, 2022). In other words, potential registrants are more likely to be stuck by lightning during their life than to have Unidos turn their application in late. In short, it is incredibly unlikely that the Plaintiff organizations would turn in an application late.

But wait, one might say, maybe other organizations do submit large numbers of registration applications late. Not according to the Supervisors, who overwhelmingly testified that they were unaware of widespread issues related to 3PVROs turning in applications late. For example, Supervisor White testified that she was unaware of any instance in which a voter was prevented from voting because a 3PVRO submitted a late registration. Tr. at 1343. Similarly, Supervisor Scott testified that he was unaware of any issues with 3PVROs. *Id.* at 1163. And Supervisor Hays also testified that he was unaware of 3PVROs turning in late applications. ECF No. 549-2 at 130.

Supervisor Latimer, on the other hand, recognized that there were some issues in 2020, but explained that they were "very minor." ECF No. 549-3 at 51. Indeed, no application was turned in so "late that the person didn't get registered to be able to vote in the election." *Id.* Similarly, while Supervisor Earley testified to some issues with 3PVROs, he explained that the "vast majority" of applications submitted by 3PVROs are submitted on time. Tr. at 2666. Indeed, when Supervisor Earley first heard about the registration disclaimer, he thought it was "a joke." *Id.*

The harshest testimony this Court heard was from Director Matthews, who testified that she received complaints about 3PVROs returning registrations late "[o]n a fairly regular basis." *Id.* at 3422. While this Court does not question—and the evidence reflects—that 3PVROs *do* turn in some registrations late, this Court

does not find Director Matthews's testimony credible on this point (and many others).

As this Court tells every jury, they can accept a witness's testimony "in whole or in part." Eleventh Circuit Pattern Jury Instructions, Civil P 1.1 (2013). On this point, this Court rejects Director Matthews's testimony. This Court asks jurors "did the witness impress you as one who was telling the truth?" *Id.* And Director Matthews did not. Although indiscernible from a cold record, this Court bore witness to Director Matthews's halting speech, evasive answers, and smirks in response to Plaintiffs' questions. Director Matthews also precisely parroted Defendants' arguments in her testimony—for example, likening the registration disclaimer to an informed consent requirement. *Compare* ECF No. 321-1 at 46 ("All three disclaimers empower the voters to make informed decisions."), *with* Tr. at 3417 ("I analogize it to informed consent by a doctor."). And Director Matthews failed to give specifics beyond her conclusory testimony that she receives complaints fairly regularly. While this Court acknowledges that it excluded a compendium of documents addressing complaints related to late voter registration submissions as hearsay, Tr. at 3421, nothing prevented Director Matthews from providing more details, such as an approximate number of complaints received. Plus, when Plaintiffs called her as their witness, Director Matthews struggled to recall much of anything. But like Saul on the road to Damascus, Director Matthews had an epiphany between

her testimony in Plaintiffs' case in chief and her testimony in Defendants' case in chief—suddenly remembering the answer to every question defense counsel posed.

This Court also tells jurors to ask whether witnesses have "any particular reason not to tell the truth," and whether the witness has "a personal interest in the outcome of the case?" Pattern Instructions, P 1.1. As the Director of the Division Elections, Director Matthews—who answers directly to Defendant Lee—has both.

And finally, this Court instructs jurors to ask, "whether the witness's testimony differ[ed] from other testimony or other evidence?" *Id.* Director Matthews's testimony that 3PVROs habitually submit registrations late is belied by every other witness's testimony—including the testimony of many co-defendants. Put simply, I find that Director Matthews's testimony on this point is simply not credible.

In sum, this Court finds, based on all the evidence before it, that 3PVROs very rarely turn in registrations late.[64] Based on the facts here, then, warning voters that 3PVROs *might* turn in registrations late is not a compelling interest.

---

[64] Indeed, registering though the State could be riskier. *See Namphy*, 493 F. Supp. 3d at 1144 (finding "that roughly 21,722 Floridians were potentially foreclosed from registering" in 2020 because Defendant Lee's "RegisterToVoteFlorida.gov" website crashed on the last day of registration).

b

Even if Florida's interests were compelling, the registration disclaimer is not narrowly tailored to serve those interests. By way of analogy, compelling Plaintiffs to speak to give potential voters relevant information about the registration process is the constitutional equivalent of using a flamethrower to dust cobwebs. There are many less drastic alternatives.

This Court begins, and ends, with the less restrictive alternative the State seems poised to adopt: communicating its message itself. *See Riley v. Nat'l Fed'n of the Blind of N.C. Inc.*, 487 U.S. 781, 800 (1988). Most 3PVROs use the voter registration form promulgated by Defendant Lee. Tr. at 2779. That form already contains instructions on "[w]here to register," the "[d]eadline to register, and ID requirements." ECF No. 464-13. It also warns voters that Florida is a closed primary state, that it is a felony to submit false information of the form, and that much of the information on the form will be public record. *Id.* If the State believes that it is important to "inform[] the public about the risks of entrusting 3PVROs with voter registration applications and of alternative means for registering," ECF No. 648 at 83, it could certainly do so on this form.

And that is *exactly* what Florida has done. SB 524 removes the registration disclaimer and adds that provision's language to Florida's uniform statewide voter registration application. Fla. CS for SB 524, § 5 (2022) (creating § 97.057(3)(g), Fla.

215

Stat.). Beyond any shadow of a doubt, the registration disclaimer is not narrowly tailored.

4

Even accepting that exacting scrutiny applies, the registration disclaimer would still fall short. Before turning to that test, this Court addresses two conceptual issues.

*First*, Defendants misstate exacting scrutiny's contours. Defendants try to contort exacting scrutiny into a two-track test, one that treats disclosure requirements in the election context more leniently. *See* ECF No. 648 at 81. Not so. "[E]xacting scrutiny is not unique to electoral disclosure regimes." *Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2383 (2021). Indeed, the test finds its genesis in "nonelection cases." *Id.* In short, " 'it is immaterial' to the level of scrutiny 'whether the beliefs sought to be advanced by association pertain to political, economical, religious or cultural matters' "—exacting scrutiny is exacting scrutiny. *Id.* (quoting *NAACP v. Alabama*, 357 U.S. 449, 460–61 (1958)).

*Second*, Defendants also mischaracterize Plaintiffs' interest, claiming that the disclosure requirement does not implicate "the kind of core political speech at issue in *Buckley* and *Citizens United*." ECF No. 648 at 83. Defendants could not be more wrong. "A discussion of whether or not a person should register to vote . . . inherently 'implicates political thought and expression.' " *League of Women Voters*

216

*v. Hargett*, 400 F. Supp. 3d 706, 724 (M.D. Tenn. 2019) (quoting *Buckley v. Am. Const. L. Found., Inc.*, 525 U.S. 182, 195 (1999)).

For example, as *Hargett* recognized, "[a] person seeking to register voters may, for example, find herself confronted with people who, based on their beliefs about politics and government, consider voting to be unimportant, a waste of time, or even a pernicious tool for lending legitimacy to an intolerable system." *Id.* That's exactly what we have here. For example, Ms. Scoon testified to registering a young man during a registration drive. Tr. at 38. At first, the man declined to register because he believed politicians "are all crooks." *Id.* Ms. Scoon then engaged the man in a conversation about how elected officials' decisions impact his children's lives and his parents' lives. *Id.* at 38–39. After over 20 minutes of conversation, Ms. Scoon convinced the man to register. *Id.* at 39–40. Similarly, Ms. McCoy testified that many people tell her that they do not want to register because they "don't trust the system and" because they believe that their "vote doesn't matter." *Id.* at 263. Ms. McCoy then engages skeptics in a conversation about how, for example, voting can affect housing, their children's future, jobs, and crime in their communities. *Id.* These conversations "bear on fundamental questions at the heart of the political system." *Hargett*, 400 F. Supp. 3d at 724. Thus, there is "no reason that the First Amendment would treat [Plaintiffs'] discussion[s] as somehow less deserving of protection than, for example, a discussion [as in *McIntyre*] about whether or not there should be a

ballot initiative about property taxes." *Id.* In sum, Plaintiffs' speech is core political speech.

With those caveats, this Court turns to the test for exacting scrutiny. "[E]xacting scrutiny requires that there be 'a substantial relation between the disclosure requirement and a sufficiently important governmental interest . . . .' " *Bonta*, 141 S. Ct. at 2385 (quoting *John Doe No. 1 v. Reed*, 561 U.S. 186, 196 (2010)). Exacting scrutiny also requires "that the disclosure requirement be narrowly tailored to the interest it promotes." *Id.* As explained above, the disclaimer requirement comes nowhere close to meeting this standard. Accordingly, it fails under exacting scrutiny as well.

In sum, whether this Court applies Plaintiffs' preferred test or Defendants' preferred test, the registration disclaimer violates Plaintiffs' First Amendment rights.[65] Accordingly, Defendants Lee and Moody are permanently enjoined from enforcing it.

## VII

Next, the *NAACP* Plaintiffs seek to enjoin Defendants' enforcement of sections 101.69 (the drop box provision), 101.62(1)(a) (the VBM request provision), and 102.031(4)(b) (the solicitation definition), under Title II of the Americans with

---

[65] Having concluded that the registration disclaimer unconstitutionally compels Plaintiffs to speak, this Court need not reach Plaintiffs' political speech and association theories. *See, e.g.*, ECF No. 59 ¶¶ 237-46, *in* Case No. 4:21cv201.

Disabilities Act ("ADA"). *See* ECF No. 402 at 5, 15; ECF No. 45 ¶¶ 152–66. Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Rules promulgated pursuant to Title II provide that "[a] public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7)(i). For the reasons stated below, Defendants are entitled to judgment as to this claim.

A

1

This Court begins with a discussion of the relevant background with respect to the VBM request provision and Plaintiffs' ADA claim as to that provision before addressing the drop box and solicitation definition provisions.

a

Susan Rogers, a constituent of DRF, is a registered voter in Pinellas County who intends to continue voting by mail in future elections. Tr. at 1088, 1090–91. Ms. Rogers votes by mail because she suffers from vision loss, which decreases her

mobility and makes it impossible to read her ballot unassisted. *Id*. at 1091–02. In 1986, Ms. Rogers was diagnosed with presumed ocular histoplasmosis, a fungal infection that attacked her central vision and retinal tissue. *Id*. at 1088–89. Since her diagnosis, she has lost all central vision in both eyes. *Id*. at 1089. To vote, Ms. Rogers relies on assistive devices such as a closed-circuit TV, a KNFB reader, or a magnifier on her Apple iPad to enlarge the image of the ballot. *Id*. at 1092.

In the past, Ms. Rogers has simply checked off a box on her ballot envelope indicating she would like to continue to vote by mail, a process which she says made her feel "gleeful" in its ease. *Id*. at 1095. Now, given the VBM request provision, she will no longer be able to request her VBM ballot in this fashion. Instead, every two years, Ms. Rogers must struggle to either apply online—a frustrating process that requires her to navigate an inaccessible SOE website with her assistive devices—or find the SOE phone number online and apply over the phone—a similarly difficult process with the added likelihood of calling at least one wrong number. *Id*. at 1096–1102. In addition to hurdles in the new request process, Ms. Rogers, whose vision loss has impacted both her memory and ability to use a calendar, fears she will forget to request her VBM ballot every two years. *Id*. at 1102–03.

b

Catherine Teti is a registered voter in Hillsborough County who intends to vote in future elections. Tr. at 1587-88. Ms. Teti votes by mail because she has mobility issues, making it hard to go in person. *Id*. at 15891. She either has to walk with a cane, a walker, or use a scooter, each method with its own advantages and disadvantages. *Id*. at 1589.

Just like Ms. Rogers, Ms. Teti had requested her VBM ballots by checking the box on her ballot that says, "Please send me a mail ballot for the next election." *Id*. at 1590. Now that the VBM request provision has prohibited SOEs from offering the check-box method, she is unsure how she will request a VBM ballot in the future. She also worries that she might forget to request her ballot, given how accustomed she has become to simply checking the box. *Id*. at 1591.

c

Naomi Slaughter is a fourth generation Floridian and a registered voter in Hillsborough County. Tr. at 2075, 2077. Her grandfather took her to the polling station when she was five years old and told her it was her duty as an American citizen to always cast her vote. *Id*. at 2077–78. Since then, she has never missed an election in which she was eligible to vote. *Id*. at 2078. She signed up to automatically receive a VBM ballot every year and plans on continuing to vote by mail in future elections, as she has in the past. *Id* at 2078-79.

Ms. Slaughter votes by mail because her disabilities make it nearly impossible to leave her home. She suffers from major depression, anxiety disorder, panic disorder, PTSD, and borderline personality disorder. *Id*. at 2079. Her mental illnesses culminate in severe agoraphobia, making it hard to even check her mailbox, and impossible to go to the polls to vote. *Id*. at 2080. Her illnesses also impact her cognitive abilities, making it difficult to comprehend what she is reading. As she describes it, "it's like all the words kind of melt in together." *Id*. Because she knew her disorders were not curable, and she would never be able to vote in person again, she signed up to automatically receive VBM ballots every election. *Id*. at 2079. She expressed relief at having had this option, because if she got her ballot every year, she did not have to go through the difficult process of requesting it all over again. *Id*. at 2082.

Now, due to the VBM Request provision, Ms. Slaughter must request a VBM ballot every two years. She fears her memory problems will make her forget to request her ballot. She also has difficulty navigating the SOE website, especially to deal with a new, complicated form. Tr. at 2083–84. Although VBM ballots can be requested over the phone, Ms. Slaughter explained that the anxiety she would face trying to call the Supervisor makes it incredibly difficult for her to communicate. *Id*. at 2083–84. This Court credits her testimony about the impact that anxiety has on her communication ability. Multiple times throughout her testimony, Ms. Slaughter

broke down into tears, shaking and struggling to find her words. Her distress was not feigned. When asked why she chose to participate in this case, Ms. Slaughter responded poignantly.

> Sometimes I wonder. I'm not the only mentally ill person in the state. You know, we didn't ask to be like this. We didn't ask to be part of an invisible illness. There's a lot of people, and I truly feel like oftentimes when the legislators and stuff make up laws, they don't think of disabled people, and they sure as hell don't think of mentally ill people. And just because they're mentally ill does not mean I'm stupid. It doesn't mean that I don't still want to be a contributing part of my society. You know, I just—I want to be treated fairly.

*Id*. at 2086–87.

2

Plaintiffs—DRF, Florida NAACP, and Common Cause—are each organizations proceeding under theories of associational standing or diversion of resources.[66] This Court begins with whether any Plaintiff has associational standing.

a

Starting with DRF, the interests at stake in Plaintiffs' ADA claim are germane to the organization's purpose. DRF seeks to enjoin SB 90's VBM request provision. As DRF's mission is to investigate and litigate to protect and advance the rights, dignity, equal opportunities, self-determination, and choices for all people with

---

[66] As only one Plaintiff needs standing in each case, *Rumsfeld*, 547 U.S. at 53, once it is established that either DRF, the Florida NAACP, or Common Cause has standing to challenge a given provision, this Court need not address standing for the remaining Plaintiffs as to that provision.

disabilities, the interests at stake here—accessible voting for people with disabilities—are germane to the organization's purpose. Tr. at 437.

Next, "when the relief sought is injunctive, individual participation of the organization's members is not normally necessary." *Browning*, 522 F.3d at 1160 (quotation marks omitted). Here, DRF seeks injunctive and declaratory relief, so the individual participation of any of DRF's constituents is unnecessary.

Here, standing comes down to whether DRF's constituents themselves "would otherwise have standing to sue in their own right" for injunctive relief as to the VBM provisions. *Glover*, 222 F.3d at 1330. First, DRF is a designated protection and advocacy system with constituents rather than members. This appears to be a distinction without a difference, as protection and advocacy systems "may sue on behalf of [their] constituents." *Stincer*, 175 F.3d at 884. Specifically, DRF need not establish that *all* of its constituents are at danger of suffering an injury, but rather that " 'at least one member faces a realistic danger' of suffering an injury." *Arcia*, 772 F.3d at 1342 (quoting *Browning*, 522 F.3d at 1163).

Susan Rogers, Catherine Teti, and Naomi Slaughter would all have standing to sue for a violation of Title II of the ADA, in their own right. Ms. Rogers, a blind woman, and Ms. Teti, a woman with impaired mobility, both have been checking a box each election to continue voting by mail. Now, because of the VBM request provision, they no longer have that option. Ms. Slaughter, who had been enrolled to

224

automatically receive a VBM ballot each election, now must request a ballot every two years. All three of these women plan to continue to vote by mail, so their injuries are imminent. And an injunction prohibiting the Hillsborough and Pinellas Counties' Supervisors of Elections from enforcing the VBM request provision would redress their injuries and allow these women to continue to receive VBM ballots without following the new request requirements. Accordingly, DRF has proved it has standing to challenge the VBM request provision.

b

In addition to associational standing, DRF has standing under a diversion-of-resources theory. DRF's Senior Policy Analyst, Ms. Babis, testified that because of SB 90, DRF has had to transition staff time and expenses from expanding supervised facility voting, implementing the new accessible vote-by-mail program, and creating equipment demonstration videos, as well as focusing on different topics at its election summit to be held this summer. Tr. at 2731–32. Ms. Babis, whose testimony I find credible, testified that DRF has been doing legislative work to expand the definition of "supervised facility voting" from just covering nursing homes and assisted living facilities to include congregate care facilities. *Id*. at 2732–33. It also planned on spending much of the next few years helping counties implement the new accessible vote-by-mail program. The program was appropriated for by the Legislature, but has yet to be implemented by 62 counties, and it is supposed to

expand to all 67 counties for the upcoming election. DRF would work to ensure people know the program exists, how to access it, and setting them up with local advocates to help implement a process that is accessible. DRF would also be offering technical assistance to the counties. *Id*. at 2734–35. And while it is working on these programs now, it is not working on them to the extent it would have had SB 90 not forced them to reassess their priorities. *Id*. at 2735. DRF also had plans to film videos demonstrating in-person voting machines and how to use them to be placed on DRF's website and the SOE websites. This would have cost $30,000 to produce, but because of SB 90, those plans have been stalled and the organization does not know when they will resume. *Id*. at 2735–36.

Instead, in the wake of SB 90, DRF is working on brochures and educational materials to inform constituents that they will need to request ballots more frequently. Educational materials will cost $10,000. *Id*. at 2731. DRF is also doing a website accessibility audit for all 67 Supervisor of Elections websites. The point is to analyze the websites to ensure that they are accessible to voters with disabilities, like those with hearing, visual, and cognitive impairments. DRF's concern is that websites must be accessible to voters with disabilities, so they may be able to complete the new VBM request process. This is a huge endeavor which will cost $80,000 in funds reallocated from other activities. *Id*.; *id*. at 2733–34.

Based on this diversion of time and resources from other identifiable projects and priorities, including assisting with the implementation of the new accessible vote-by-mail program and filming new educational videos to provide to SOEs, DRF has demonstrated that it has standing through a diversion-of-resources theory. Accordingly, having determined that one Plaintiff has standing to challenge the VBM request provision under Title II of the ADA, this Court need not determine whether the Florida NAACP or Common Cause have standing to challenge the VBM request provision and will turn now to the merits.

3

Plaintiffs argue that the VBM request provision violates the ADA because it makes it more difficult for disabled voters to request a VBM ballot. By requiring voters to request ballots every two years, as opposed to the previous limit of four years, voters are forced to request VBM ballots twice as often. ECF No. 652 ¶ 1092. Plaintiffs point to memory issues and mental impairments that may make it harder for voters with disabilities to remember to request a ballot twice as often. *Id.* ¶ 1095. Also, to request a VBM ballot, voters are required to provide to the Supervisor either the social security number or Florida ID number that they used on their voter registration. If they do not remember with which number they registered, or they did not register with one of those ID numbers, they must update their voter registration forms before requesting the VBM ballot. Plaintiffs point out that inaccessible

websites, difficulties phoning Supervisors, and other obstacles to requesting a VBM ballot through the revised request process burden visually impaired, hearing impaired, and mentally ill voters. *Id.* ¶¶ 1092–94.

To prevail on this claim, Plaintiffs must establish (1) that they—or their constituents—are qualified individuals with a disability; (2) that Plaintiffs' constituents were "excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or w[ere] otherwise discriminated against by the public entity; and (3) that the exclusion, denial of benefit, or discrimination was by reason of" their disability. *Bircoll v. Miami-Dade Cnty.*, 480 F.3d 1072, 1081 (11th Cir. 2007) (citing *Shotz v. Cates*, 256 F.3d 1077, 1079 (11th Cir. 2001)).

On the first prong, Plaintiffs must show that their constituents " 'meet[] the essential eligibility requirements' to participate in the program or services at issue 'with or without reasonable modifications.' " *People First of Ala. v. Merrill*, 491 F. Supp. 3d 1076, 1155 (N.D. Ala. 2020) (quoting *United States v. Georgia*, 546 U.S. 151, 153–54 (2006)). Here, there is no suggestion that disabled Floridians—including Ms. Rogers, Ms. Teti, and Ms. Slaughter—are not registered, eligible voters.

As for the second prong, there is no question that elections are a public program. *See, e.g.*, *Am. Ass'n of People with Disabilities v. Harris*, 647 F.3d 1093, 1107 (11th Cir. 2011) ("As a public program, disabled citizens must be able to

228

participate in the County's voting program."); *Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 507 (4th Cir. 2016) ("Voting is a quintessential public activity."). Additionally, the question is not whether Plaintiffs' constituents have been excluded from voting altogether, but whether any given modality of voting is not "readily accessible" to those with disabilities. *Merrill*, 491 F. Supp. 3d at 1159–60; *see also Lamone*, 813 F.3d at 504–05.

Plaintiffs have established that requesting a VBM ballot is not readily accessible to those with disabilities under the VBM request provision. Ms. Rogers's testimony, which this Court credits, illuminated how easy it was to request a ballot before SB 90, and how difficult it has become. Ms. Rogers, a woman who has access to at least three assistive devices and has some (albeit very little) vision left, must still run the gauntlet to (1) access the SOE website, (2) find and fill out the form, or (3) call the SOE to enroll over the phone. This Court can only imagine how difficult this would be for those voters who are completely blind, do not have assistive devices, or lack internet access. For those voters the VBM request provision is likely to make requesting a ballot not only burdensome, but completely inaccessible. All of this is held in sharp contrast to how Ms. Rogers and other voters used to request their ballots, by checking a box on their vote-by-mail envelope.

To satisfy the third prong, Plaintiffs must "establish a causal link between their disabilities and the exclusion, denial of benefits, or discrimination." *Merrill*, 491 F.

Supp. 3d at 1155. To establish this link, a Title II plaintiff may demonstrate "(1) intentional discrimination or disparate treatment; (2) disparate impact; [or] (3) failure to make reasonable accommodations." *Lamone*, 813 F.3d at 503 n.5. Here, Plaintiffs allege a failure to accommodate. *See* ECF No. 45 at 68.

Defendant-Intervenors, along with Defendant Supervisor White, argue that to establish standing under the ADA, Plaintiffs must put forward evidence that a qualified individual requested, and was denied, a reasonable modification. ECF No. 648 at 87; ECF No. 651 at 20. In employment cases, "[t]he plaintiff bears the burden of identifying an accommodation, and of demonstrating that the accommodation allows him to perform the job's essential functions." *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1255–56 (11th Cir. 2001). However, the Eleventh Circuit has not ruled whether a specific request for accommodation is required under Title II, or if a plaintiff may move forward so long as the accommodation necessary was "open and obvious." *Reeves v. Comm'r, Ala. Dept. of Corrs.*, 23 F.4th 1308, 1321 (11th Cir. 2022). As this challenge to the VBM request provision can be decided on other grounds, this Court need not address the issue at this time.

Even assuming *arguendo* that Plaintiffs had established a prima facie case of discrimination, the claim would still fail, because Plaintiffs' proposed

modification[67]—to enjoin the entirety of the VBM request provision, for all voters—is a fundamental alteration of SB 90.

If Plaintiffs make a prima facie case of discrimination, they must then propose a facially reasonable modification to the challenged provision. *People First of Ala. v. Merrill*, 467 F. Supp. 3d 1179, 1216 (N.D. Ala. 2020). But a defendant may then point to evidence that the request, although reasonable, would cause an "undue burden or a fundamental alteration of its policy or program." *Schaw v. Habitat for Human. of Citrus Cnty., Inc.*, 938 F.3d 1259, 1267 (11th Cir. 2019). In its analysis, this Court may consider whether the proposed modification "would eliminate an 'essential aspect' of the defendant's policy or program keeping in mind the 'basic purpose' of the policy or program at issue, and weighing the benefits to the plaintiff against the burdens on the defendant." *Id.*

In considering whether a proposed modification is a fundamental alteration of the policy, this Court may consider whether the proposed modification would eliminate an "essential aspect" of Defendants' policy, keeping in mind the basic purpose of the law, and weigh the benefits to Plaintiffs against the burdens on Defendants. *Schaw*, 938 F.3d at 1267. It is also helpful to look to other courts that

---

[67] To clarify, some courts use the terms "modification" and "accommodation" in this context interchangeably. *See Schaw*, 938 F.3d at 1267. However, as this Court understands the terms, "accommodation" typically applies to changes sought by an individual, and "modification" applies to changes when it is imposed by a court applying 28 C.F.R. § 35.130(b)(7)(i).

have considered injunctions to similar voting laws. In *Merrill*, the court enjoined a requirement of the state's VBM law which required voters to submit a photocopy of their ID with their ballot. *Merrill*, 467 F. Supp. 3d at 1213. In its analysis, the court considered that the plaintiffs only sought to expand an exception, already built into the law, and thereby enjoin the provision for a larger, yet still circumscribed, subset of older, disabled, and compromised voters. *Id.* at 1212–13.

Here, Plaintiffs are not seeking a limited injunction for a subset of disabled voters. Rather, Plaintiffs' counsel goes for broke and seeks to enjoin enforcement of the law as to all voters. But a proposed modification which seeks to enjoin an entire provision necessarily eliminates an "essential aspect" of it. Unlike the proposed modification in *Merrill*, which sought to extend an existing exemption to the photo ID requirement to a limited group of voters, Plaintiffs seek to enjoin the entire VBM Request provision for all voters in the whole state. Doing so undermines the basic purpose of the law, no matter what that purpose is.

This Court is moved by the testimony of Ms. Rogers, Ms. Slaughter, and Ms. Teti, and has grave concerns over the struggles they and countless others will have to overcome to engage in the sacred responsibility of voting. But Plaintiffs' counsel has not proposed a modification which this Court is entitled to adopt. The expansive scope of the proposed modification, both in applying to all voters and in seeking to

enjoin the entire provision, has the effect of fundamentally altering the law.[68] As such, Plaintiffs are entitled to no relief on this claim.

B

Plaintiffs argue that the drop box provision violates the ADA because it will decrease the number of drop boxes provided by the SOEs, particularly drive-through or outdoor drop boxes. ECF No. 652 at 389. Based on his review of SOE discovery responses, Plaintiffs' expert, Dr. Smith, whom this Court finds credible, testified that one-third of all counties plan to reduce the availability of outdoor drop boxes by moving them inside, or reduce their availability to normal business hours. Tr. at 2461, 2484–85. Plaintiffs argue this reduction will make it more difficult for voters with disabilities to vote. In particular, this change burdens those voters who have disabilities which make it harder for them to go inside to vote. ECF No. 652 at 390; Tr. at 2485.

Defendants respond by arguing that Plaintiffs' claims are "meritless" because no SOE plans to place drop boxes in non-ADA compliant buildings or refuse reasonable accommodations to those who request them. ECF No. 648 at 86. It is

---

[68] It is important to note that this Court has certain powers to issue an injunction less expansive in scope than that which is sought by Plaintiffs. *See Lee*, 915 F.3d at 1327 ("[A] district court 'need not grant the total relief sought by the applicant but may mold its decree to meet the exigencies of the particular case.' " (citation omitted)). However, here the scope of the proposed modification goes to the substantive question of whether the Plaintiffs have stated a valid claim under the ADA. By proposing a modification that is so expansive as to undermine the basic purpose of the law, Plaintiffs have failed to establish a claim under the ADA upon which any injunctive relief may be granted.

233

clear to this Court that the drop box provision will have the effect of decreasing the number of drop boxes. In addition to Dr. Smith's testimony, as a practical matter, the reduction of the number of drop boxes available is the logical conclusion. If the Florida Legislature makes something more risky or costly, people are less likely to do it. The drop box provision makes providing drop boxes more costly by requiring them to be staffed at all times by an SOE employee. The law also threatens Supervisors with $25,000 fines for noncompliance. The fear of a substantial fine is enough to make at least one Supervisor plan to double-staff each box, to avoid the possibility that they violate the law. Tr. at 3496. Supervisors, particularly those with stretched budgets, are likely to decrease the size of their drop box program in response to SB 90.[69]

1

This Court begins by addressing whether Plaintiffs have standing to challenge the drop box provision under the ADA.

a

DRF's constituents include all Floridians with disabilities. *Id*. at 440. One of those constituents is Dr. Brigham, whose testimony I find credible. Dr. Brigham has been a registered voter in Florida since 1958, and he has voted in every election since

---

[69] As this Court discussed above, two expert witnesses and many Supervisors testified that the drop box provision will lead to a drastic reduction in drop-box availability—especially 24/7 drop boxes and drop boxes offered outside of early voting hours.

then. *Id*. at 1597. While for years he voted in person, Dr. Brigham voted by mail for the first time in the 2020 primary election and voted using a drop box for the first time in the 2020 general election. *Id*. In the 2020 general election, Dr. Brigham and his wife used a drive-through ballot drop box—at a location across the street from the SOE office in Orange County—and voted without having to leave their car. *Id*. at 1599–1600.

Dr. Brigham chooses to vote by drop box due to his disability. As noted elsewhere in this Order, he is a colorectal cancer survivor, but the surgery to treat that cancer left him incontinent. Unfortunately, this means that Dr. Brigham may defecate with no warning or control. *Id*. at 1597–98. This problem is exacerbated by physical activity, such as getting out of his car and standing in line. *Id*. at 1602. If this happens while he is away from home, he tries not to be too embarrassed and returns home to clean himself up. *Id*. at 1598, 1602. If Dr. Brigham were to defecate while standing in line to drop off his ballot, he would be forced to decide whether to remain in soiled clothes and vote or leave hoping to try again later. He has no guarantee he would not face the same problem upon his return to the polls. *Id*. at 1607. The ability to stay in his car while dropping off his ballot makes it less likely that he will soil himself while voting. It also grants him privacy should that occur. Drop boxes are the best method of voting for Dr. Brigham because they allow him to vote with dignity.

Ms. Zukeran is a registered voter in Leon County who tries to vote in every election in which she is eligible. *Id*. at 2092, 2094. She suffers from anxiety, major depression, and PTSD, which make it difficult for her to leave her home or interact with other people. *Id*. at 2093–94. For these reasons, Ms. Zukeran struggles to vote in person. First, her depression makes it difficult to summon the will to leave her house in anticipation of being in a crowded place, so she is likely to procrastinate until election day. *Id*. at 2095. Then, once she is at the polling location in a crowd of strangers, she feels anxious and distracted, which makes it difficult to remember for whom and what she planned to vote. *Id*. at 2096. Once she has voted, Ms. Zukeran suffers from residual anxiety that can last the remainder of the day and may be triggered at a later date simply by recounting the experience. Tr. at 2096. Voting by mail through the Post Office triggers a similar sense of anxiety for Ms. Zukeran, because she fears her ballot might not be delivered. *Id*. at 2099–2100.

Ms. Zukeran voted using a drop box in the 2020 general election. *Id*. at 2097. When she drove into the parking lot to drop off her ballot, Ms. Zukeran was surprised to see that a person was standing there, watching the box. She drove around the parking lot, fearing social interaction, hoping the woman would leave. When she realized the woman was not leaving, Ms. Zukeran nearly drove home, but she overcame her tremendous anxiety, quickly parked, dropped off her ballot, and headed home. *Id*. at 2097–98. The minimal social interaction of saying "hello" to the

woman monitoring the drop box nearly prevented her from voting because of how much anxiety it caused her. *Id*. at 2098. Even an outdoor drop box is difficult for her to use, so if the drop boxes were moved indoors, the anxiety—similar to that of voting in person—would be prohibitive. *Id.* at 2099.

b

As addressed above, the interests at stake in this case are germane to DRF's purpose, and Plaintiffs seek only injunctive relief, so no individual constituent needs to participate in the lawsuit. Thus, standing comes down to whether DRF's constituents themselves would otherwise have standing to sue in their own right to seek an injunction as to the drop box provision. Unfortunately, because Plaintiffs did not introduce any evidence to prove that the Orange County or Leon County Supervisors plan on making any changes to the drop-box provisions which would injure Dr. Brigham or Ms. Zukeran, they have not established that DRF has associational standing to challenge the Drop Box Provision. In fact, Plaintiffs point out that only eight counties, none of which include Orange or Leon, have expressed a definite intent to reduce the availability of outdoor drop boxes. ECF No. 652 at 286.

As to Dr. Brigham, he testified that he voted by drop box in the 2020 general election, that it was a drive-through drop box, during business hours, not on the day before or on election day, and that he handed his ballot to a person manning the drop

237

box. Tr. at 1610–11. Additionally, Plaintiff submitted evidence to demonstrate that Orange County has no plan to change any of these procedures in response to SB 90. Dr. Smith explains in his report that the Orange County SOE plans to maintain the same number of drop boxes and hours of availability it had in 2020 for the 2022 elections. Because there is no evidence of an imminent change in policy which would impact Dr. Brigham's ability to vote using a drop box, any injury as a result of the drop box provision is highly speculative. As such, Dr. Brigham does not have standing to sue in his own right.

As to Ms. Zukeran, she testified that she dropped off her ballot at a manned, outdoor location in Leon County. But Supervisor Earley, whose testimony I credit, testified that the procedures his office uses to manage drop boxes are not impacted by SB 90. Except for one mailbox attached to the SOE office, Leon County already had staff watching drop boxes. Additionally, Leon County does not host 24/7 drop boxes at early voting locations, so the new provision which limits the hours which a drop box can be accessed at an early voting location would not impact that policy. Tr. at 3496–97. Because there is no evidence that Leon County intends to change drop box procedures in a way which would impact Ms. Zukeran's ability to vote by drop box, any injury as a result of the Drop Box Provision would be highly speculative. As such, Ms. Zukeran does not have standing to sue in her own right.

Accordingly, because DRF has not established that any one constituent would have standing to challenge the drop box provision, DRF has not proved associational standing to challenge that provision.

c

Because DRF does not have associational standing, this Court must address whether Florida NAACP has associational standing.[70] Florida NAACP's mission is to ensure the political, social, educational, and economic equality of all persons and to eliminate race-based discrimination. Tr. at 506. Their purpose of ensuring that all people, including those with disabilities, are politically equal is germane to the issues at stake in this case, namely voting access. Further, all that the Plaintiffs seek is injunctive relief, thus no individual member must participate.

Again, standing comes down to whether Florida NAACP's members themselves would otherwise have standing to sue. While Mr. Brown, the Third Vice President for Florida NAACP, testified that the drop box provision will impact its members, he only discussed the impact in terms of how changes will harm a specific migrant farm worker, and made no mention of voters with disabilities. *Id.* at 527. And Ms. Scoon, a member of Florida NAACP in Bay County, testified as to the personal convenience of drop boxes, but did not testify that any NAACP member

---

[70] Common Cause does not argue that it has associational standing to sue for an injunction of the Drop Box Provision. ECF Nos. 652 at 281 & 652-1 at 5–6.

with disabilities would suffer an injury in Bay County or elsewhere. *Id*. at 77–78. As such, Florida NAACP's counsel elicited no testimony from which this Court could find that any one of its qualified members with disabilities is injured by the drop box provision, and therefore the Florida NAACP does not have associational standing to sue for an injunction of that provision.

d

DRF also argues that it has organizational standing under the diversion-of-resources theory. As addressed above, while DRF has certainly diverted resources from other identifiable programs and priorities to establish standing to challenge the VBM request provision, none of the resources redistributed in the wake of SB 90 are the result of the drop-box provisions. DRF is funding educational materials to inform people about VBM changes, and the website accessibility audit is explicitly meant to assess and address the accessibility of SOE websites so voters can request VBM ballots. Tr. at 2736. But DRF's witnesses did not testify that the organization has transitioned any funds or staff time to educate voters about the accessibility of drop boxes, aid members who will be injured by the changes, or address the drop box provision in any other way.

An organization has standing to challenge illegal acts which impair its "ability to engage in its own projects by forcing it to divert resources in response." *Arcia*, 772 F.3d at 1341. But DRF is not diverting resources in response to the drop box

provision. If this Court were to issue an injunction prohibiting SOEs from enforcing the drop box provision, DRF would still need to redirect the exact same resources, because its diversion is only the result of the VBM request provision. As such, Plaintiff DRF lacks standing to challenge the drop box provision.

The same is true for Plaintiffs Florida NAACP and Common Cause. Mr. Brown testified that Florida NAACP has had to divert resources to educate its members and voters about the effects of SB 90. However, Plaintiffs' counsel only elicited testimony that the organization sought to inform members and voters how they can "matriculate through this process"—presumably referring to new VBM request requirements—and the risk that members could be "criminalized"—again presumably referring to the solicitation definition. Tr. at 532. Mr. Brown also testified that the organization would disseminate flyers to educate voters, but he makes no mention of the content of the flyers, leaving the Court to speculate whether they address the drop box provision. *Id*. at 532.

Plaintiff Common Cause similarly introduced generalized testimony that it will divert resources to educate voters, but counsel elicited no testimony to help this Court understand whether those materials or programs address changes to drop boxes. *Id*. at 544–45, 556–58. This Court is not empowered to speculate as to whether the diversion of resources these parties suffer will be redressed by an

injunction against the drop box provision. As such, no Plaintiff has established standing, under any theory, to challenge the provision.

C

Finally, Plaintiffs argue that the solicitation definition of SB 90 violates the ADA because it will make in-person voting less accessible for individuals with disabilities by prohibiting third-party organizations from providing line relief support. ECF No. 652 at 397–98. Plaintiffs point to the number of voters with disabilities limiting their mobility and who benefit from receiving chairs or water while waiting in line to vote. *Id.* 398. They further explain that the assistance provided by third-party organizations such as Florida NAACP is not as reliably supplied by SOEs. *Id.* Intervenor-Defendants respond by arguing that Plaintiffs have not shown that any SOE has refused reasonable accommodations to those who request them. ECF No. 648 at 87.

As addressed earlier in this Order, (1) Common Cause has abandoned its claims as to the solicitation definition, and (2) Disability Rights Florida failed to prove standing to challenge the Solicitation Definition. Additionally, the Florida NAACP has only proved that it has standing to challenge the solicitation definition under the First, Fourteenth, and Fifteenth Amendments and the VRA. However, Florida NAACP has not alleged that any of its members in Volusia County are

242

disabled voters who would be harmed by the solicitation definition. As such, no Plaintiff has standing to challenge the solicitation definition under the ADA.

But even assuming *arguendo* a First Amendment injury was sufficient to give the Florida NAACP standing to challenge the solicitation definition under the ADA, it has failed to state a claim under the first prong of the three part test, that it—or its members—are qualified individuals with a disability. Ms. Slater testified that her local branch has volunteers who are trained to do "line warming," but not that any of her members are disabled voters. Tr. at 1956–57. And Mr. Brown testified that his local branch has assisted voters with disabilities in line to vote, but he makes no mention that these voters are members of Florida NAACP. *Id*. at 515–16.  Therefore, Plaintiffs' counsel has not established a violation of the ADA.

*     *     *

At trial, this Court heard deeply troubling testimony from Floridians with disabilities about how much effort they must go through to vote, and I struggle to see how Secretary Lee and the Defendant Supervisors are not moved by the testimony of these citizens. And Ms. Slaughter is right, it is apparent the Legislature did not think about its disabled constituents when it passed SB 90, resulting in bad policy. However, this Court is not empowered to strike down every barrier to accessible voting. This is especially true given that Plaintiffs' counsel has not done the legwork necessary to prove that they either have standing under the ADA to

243

challenge the laws, or to propose reasonable modifications. Indeed, rather than propose a legally tenable modification that would actually help disabled Floridians, Plaintiffs' counsel appears to have treated this claim as an afterthought or as another tool to strike down SB 90 in toto. Consequently, this Court is left with no choice, and enters judgment in favor of Defendants, as to all provisions, on Count III in Case No. 4:21cv187.

## VIII

Next, this Court considers Plaintiffs' claims that several provisions under SB 90 unduly burden the right to vote and fail the Supreme Court's *Anderson-Burdick* test under the First and Fourteenth Amendments. Specifically, the *League* Plaintiffs challenge the drop box restrictions, the VBM request provision, and the solicitation definition. The *NAACP* Plaintiffs challenge the drop box restrictions, the VBM request provision, and the solicitation definition. And the *Florida Rising* Plaintiffs challenge the drop box restrictions, the VBM request identification provision, the registration delivery requirements, and the solicitation definition.

## A

Here, given the myriad constitutional infirmities discussed at length above with respect to the drop box restrictions, the solicitation definition, and the registration delivery requirements, this Court need not reach the constitutional question of whether these provisions also violate the Constitution under *Anderson-*

*Burdick. See, e.g.*, *Williamson*, 928 F.3d at 1316–17; *Green Party of Tenn.*, 791 F.3d at 695 ("Because we find that the ballot retention statute is facially unconstitutional under the Equal Protection Clause, we need not decide whether it also violates the First Amendment."); *Cates*, 535 F. Supp. 3d at 1231 ("The Court need not address the preemption question because Defendant is already entitled to summary judgment on alternative grounds.").

Accordingly, this Court turns to the remaining challenged provisions—the VBM request provisions—to determine if it survives constitutional scrutiny under the *Anderson-Burdick* test.

### B

#### 1

As with all claims, this Court first considers whether at least one Plaintiff from each of the relevant consolidated cases has standing to challenge the VBM provisions. *See CAMP*, 451 F.3d at 1273; *FAIR*, 547 U.S. at 53; *Hall*, 138 S. Ct. at 1127–29. As addressed above in the discussion of *Arlington Heights*, the *NAACP* Plaintiffs have standing to challenge the VBM request provision and the *Florida Rising* Plaintiffs both have standing to challenge the VBM request identification provision. This Court also found that Ms. Scoon—both a member of the Bay County NAACP and an individual *League* Plaintiff—has standing to challenge the VBM request provision. Additionally, in its discussion on the ADA, this Court found that

Ms. Rogers—also an individual *League* Plaintiff—has standing to challenge the VBM request provision. As such, the *League* Plaintiffs, too, have standing.

2

Next, this Court applies the *Anderson-Burdick* test to the VBM provisions. Challenges to election laws are evaluated using the sliding scale standard set out in *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and *Burdick v. Takushi*, 504 U.S. 428 (1992). The *Anderson-Burdick* test is designed to balance the fundamental right to vote against the reality that "there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Storer v. Brown*, 415 U.S. 724, 730 (1974). The test requires this Court to "weigh the character and magnitude of the asserted First and Fourteenth Amendment injury against the state's proffered justifications for the burdens imposed by the rule" while "taking into consideration the extent to which those justifications require the burden to plaintiffs' rights." *Lee*, 915 F.3d at 1318. The greater the burden the law imposes on the right to vote, the greater the scrutiny this Court must apply.

Laws that impose " 'severe' restrictions . . . must be 'narrowly drawn to advance a state interest of compelling importance.' " *Burdick*, 504 U.S. at 434 (quoting *Norman v. Reed*, 502 U.S. 279, 289 (1992)). Laws that impose "reasonable, nondiscriminatory restrictions," on the other hand, are subject to a more forgiving

review, under which the "state's important regulatory interests" will generally justify the restrictions. *Anderson*, 460 U.S. at 788. But no matter how slight the burden, "it must be justified by relevant and legitimate state interests 'sufficiently weighty to justify the limitation.' " *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 191 (2008) (controlling op.) (quoting *Norman*, 502 U.S. at 288–89). The *Anderson-Burdick* test "emphasizes the relevance of context and specific circumstances." *Cowen v. Ga. Sec'y of State*, 960 F.3d 1339, 1346 (11th Cir. 2020); *see also Duke v. Cleland*, 5 F.3d 1399, 1405 (11th Cir. 1993); *Bergland v. Harris*, 767 F.2d 1551, 1555 (11th Cir. 1985). "Given the fact that [Plaintiffs] have advanced a broad attack on the constitutionality of [SB 90], seeking relief that would invalidate the statute in all its applications, they bear a heavy burden of persuasion." *Crawford*, 553 U.S. at 200.

a

This Court begins its analysis by identifying the burden that Florida's VBM provisions impose on the right to vote. As addressed elsewhere, the VBM provisions have two main impacts: (1) the VBM request provision reduces the duration of a voter's VBM ballot request from two election cycles to one general election cycle, and (2) the VBM request identification provision requires any voter seeking to vote by mail to provide their Florida driver's license number, Florida identification card number, or the last four digits of their social security number. This means that voters

247

have to request ballots twice as often and eliminates VBM enrollment opportunities like the reenrollment check box on VBM ballots.

Here, the burden falls, not directly on the voter's ability to cast their vote, but rather on their ability to request a VBM ballot. However, it is important to keep in mind that while some voters are fortunate enough to be able to make use of all three methods of voting (election day, early in-person, and by mail), others, particularly the elderly or those with disabilities, rely on VBM ballots exclusively to exercise the fundamental right to vote. That means that for some voters, denial of the ability to request a VBM ballot may effectively prevent them from voting.

To assess the significance of the burden placed on voters by the VBM provisions, this Court first considers the severity of the impact on individual voters. The relevant burdens are those imposed on any person who would enroll to receive a VBM ballot. For most voters, the inconvenience of requesting a ballot every two years, rather than every four, and providing the SOE with a valid ID number is not likely to qualify as a severe burden on the right to vote. However, there are some populations which may be burdened more significantly than others.

b

The first group of people who may be disproportionately impacted by the VBM provisions are those who have no valid form of ID. The VBM request identification provision requires voters to both have a valid ID associated with their

voter registration and to provide that same ID when enrolling in VBM. According to Plaintiffs' expert, Dr. Smith, there are roughly 681,481 registered voters who do not currently have a valid ID associated with their voter registration. ECF No. 467-7. Director Matthews confirms that this number was accurate in early February 2021, but she currently estimates this number to be around 480,000 voters. ECF No. 571-10; Tr. at 2785. Whichever number is more accurate, there is evidence that hundreds of thousands of voters have no valid ID number on their voter record, and therefore will not be able to request a VBM ballot without going through steps in addition to those required by SB 90. Voters who possess a valid ID even though it is not on file with their voter registration will have to re-register to vote with their updated information. For those voters who do not already have a valid ID, they will need to acquire valid ID, then re-register to vote.

While Plaintiffs have provided a broad number of registered voters who do not currently have an ID on file with the Division of Elections, they have not (1) identified how many of those voters vote by mail, (2) identified how many of those voters do not possess a valid ID and would need to acquire one, nor have they (3) provided a witness who does not possess a valid ID to testify to the impact this provision would have on them. From this limited evidence, this Court cannot assess the magnitude of SB 90's impact on voters who do not have ID but would like to vote by mail.

Additionally, any burden on the ability to request a VBM ballot is mitigated by the fact that voters may vote in person. Even if voters do not have a valid ID, they may cast a provisional ballot, minimizing the burden on their ability to vote. *See Crawford*, 553 U.S. at 199–200. As such, this Court cannot conclude that the statute imposes a severe burden on voters who do not have a valid ID associated with their voter registration.

c

The second group of people who may be disproportionately impacted by the VBM enrollment provisions includes the disabled and elderly who are unable to vote in person. Multiple witnesses testified as to the individual burden the provisions would have on their ability to vote. For example, Susan Rogers testified how significantly the VBM provisions would burden her ability to vote. As discussed in the ADA section, Ms. Rogers is a blind woman who votes in Hillsborough County. She is unable to transport herself to vote in person, and she relies on assistive devices to fill out her ballot, so she has little choice but to vote by mail. Ms. Rogers testified that in the past she has been able to simply check a box on her VBM ballot to reenroll, the simplicity of which made her "gleeful." Because she also signed her VBM ballot, the SOE had a signature verification to verify the identity of Ms. Rogers's VBM request.

Now, because of SB 90, Ms. Rogers has to go through a trying process to request her VBM ballot every two years. It might not be difficult for a voter who is not disabled to locate their ID, download a form on a website, fill it out, and mail it to their local SOE, but it is like running a gauntlet for Ms. Rogers and other similarly disabled voters. It is easy to imagine how much more difficult requesting a VBM ballot will be for those who have disabilities but do not have internet access or accessibility tools.

However, Plaintiffs have not provided evidence to establish how many Floridians with disabilities will be impacted by the VBM provisions. According to statewide data provided by the Division of Elections, about 4.5 million people voted by mail in 2020, ECF No. 467-7 at tbl. 5, but this number does not account for how many people will struggle to request a VBM ballot under SB 90. Based on this record, this Court cannot conclude that the statute imposes a severe restriction on any class of voters. *See Crawford*, 553 U.S. at 202 (asking whether "the statute imposes 'excessively burdensome requirements' on any class of voters").[71]

d

Ultimately, then, this Court cannot conclude that the VBM provisions impose a severe burden on the right to vote. Contrast this case with other cases where this

---

[71] In *Greater Birmingham Ministries*, the Eleventh Circuit recognized Justice Stevens's opinion in *Crawford* as controlling. 992 F.3d at 1319 n.31.

Court found a severe burden. For example, in *Florida Democratic Party v. Scott*, this Court considered whether to enter an injunction extending the voter registration deadline in the wake of Hurricane Matthew. 215 F. Supp. 3d at 1254.[72] When it came to the burden on the right to vote under *Anderson-Burdick*, the state argued that "the right to vote is not severely burdened because other opportunities to vote are available. For example, voters instead could vote early, by mail, or on Election Day." *Id.* at 1257. "But that argument [was] a nonsequitur. Those options are available only if the voter has already registered. It does absolutely nothing for those aspiring eligible voters who have yet to register." *Id.* Thus, because Florida's action—or lack thereof—completely barred those unable to register from voting, the burden was severe.

Similarly, in *Florida Democratic Party v. Detzner*, this Court enjoined the enforcement of a statute that did not offer those whose signature on their vote-by-mail ballots did not match their signature on file any opportunity to cure the issue. 2016 WL 6090943, at *2. This Court recognized that the statute severely burdened the right to vote; those affected were completely disenfranchised.

---

[72] While, at first blush, *Florida Democratic Party v. Scott* may appear similar to *Namphy*, in which this Court declined to extend the registration deadline, the two cases are quite different. For one, in *Namphy*, the state took some, albeit imperfect, measures to remedy the burden on would-be registrants. *See* 493 F. Supp. 3d at 1135. In *Scott*, the state had taken no such measures. Plus, in *Scott*, the state ultimately did not oppose an injunction extending the registration deadline. 2016 WL 6080225, at *1.

Here, for the majority of Florida's electorate, the VBM provisions certainly impose a burden, but that burden is mitigated by the availability of other modalities of voting. *See New Ga. Project v. Raffensperger*, 976 F.3d 1278, 1281 (11th Cir. 2020).

That said, this Court recognizes that "[d]isparate impact matters under *Anderson-Burdick*." *League of Women Voters of Fla.*, 314 F. Supp. 3d at 1216. But as this Court explained above, based on the evidence before it, it cannot conclude that the statute imposes a severe restriction on any class of voters. In sum, then, the burden the VBM provision imposes on the right to vote is moderate.

3

Next this Court weighs the burden caused by the VBM provisions against Defendants' proffered justifications. Note that *Anderson-Burdick* is different from *Arlington Heights* in that this Court need not determine what the Legislature's underlying intent was when it passed the law. Rather, in most cases, this Court need only consider the state's "*proffered* justifications for the burdens imposed by the rule" while "taking into consideration the extent to which those justifications require the burden to plaintiffs' rights." *Lee*, 915 F.3d at 1318 (emphasis added). Thus, this Court's analysis is limited to the justifications furthered by Defendants' post-trial briefing, and whether they justify the burden placed on voters by the VBM provisions.

253

Defendants argue that the state's interest in helping SOEs have "more current information" on file justifies the VBM request provision. ECF No. 648 at 29. Defendants explain that, before SB 90, a VBM request could remain on file for four years, during which time voters may have changed their address. *Id.* at 30. Now, voters must request a VBM ballot every two years, and in doing so, must update or confirm their address information. In *Crawford*, the Supreme Court held that cleaning up a bloated voter registration file provides a "nondiscriminatory reason supporting the State's decision to require [identification]." *Crawford*, 553 U.S. at 196. Thus, the state has a valid interest in keeping VBM records up to date.

For the VBM request identification provision, Defendants proffer the justification of adding another layer of authentication to VBM requests. ECF No. 648 at 28. Again, the Supreme Court held in *Crawford* that "[t]here is no question about the legitimacy or importance of the State's interest in counting only the votes of eligible voters." 553 U.S. at 196. As such, requiring that voters provide an ID number with their VBM request, similar to the type of IDs a polling location would require to vote in person, serves a "legitimate and important" interest.

Given that access to other modalities of voting mitigates the burdens SB 90 imposes, and that the state has proffered legitimate interests, the VBM provisions are constitutional under *Anderson-Burdick*. Again, this Court is seriously troubled by Ms. Rogers's testimony, and by the impact SB 90 will have on voters with

disabilities. Plainly, the Legislature failed to even consider—or worse, failed to care—how this law would harm voters with disabilities. However, which methods the Legislature uses to achieve legitimate ends are a matter of policy, which is outside this Court's purview. Because this Court cannot say the burdens placed on voters generally are severe, and because Defendants have proffered legitimate interests justifying those burdens, this Court must enter judgement in favor of Defendants as to Plaintiff's challenge to the VBM provisions under the *Anderson-Burdick* test.[73]

## IX

The *Florida Rising* and *NAACP* Plaintiffs also bring discriminatory results claims under section 2 of the VRA against the VBM request provision, the VBM request identification provision, the drop-box provisions, the registration delivery provision, and the solicitation definition. *See* ECF No. 45 ¶¶ 125–41, *in* Case No. 4:21cv187; ECF No. 59 ¶¶ 165–72, *in* Case No. 4:21cv201.

---

[73] This Court previously noted, in another context in this case, that "the Eleventh Circuit has expressed a willingness to permit parties to change their focus from a facial to an as-applied challenge." *See* ECF No. 380 at 13. Here, although Plaintiffs labeled their claims as both "facial" and "as-applied" in their pretrial stipulation, ECF No. 402, they have not changed their focus from the facial nature of their *Anderson-Burdick* claims in their amended complaints to the written closing arguments filed at the conclusion of the bench trial. Plaintiffs have sought only facial relief with respect to this particular claim without developing any "as-applied" theory. *See John Doe No. 1.*, 561 U.S. at 194 ("The label is not what matters. The important point is that plaintiffs' claim and the relief that would follow . . . reach beyond the particular circumstances of these plaintiffs."). Accordingly, Plaintiffs have not established that they are entitled to any relief "as applied" to any individual Plaintiff.

Section 2 provides:

> (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 10303(f)(2) of this title, as provided in subsection (b).
>
> (b) A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided*, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

52 U.S.C. § 10301.

"Unlike discrimination claims brought pursuant to the Fourteenth and Fifteenth Amendments, which require proof of both discriminatory intent and actual discriminatory effect, the language of section 2(a) of the VRA requires only proof of discriminatory 'results,' not of discriminatory intent." *GBM*, 992 F.3d at 1328–29. Further, the Supreme Court, in *Brnovich v. Democratic National Committee*, 141 S. Ct. 2321 (2021), made plain that section 2 commands "consideration of 'the totality of circumstances' that have a bearing on whether a State makes voting 'equally open' to all and gives everyone an equal 'opportunity' to vote." *Id.* at 2341.

In light of the conclusions above, however, this Court need not conduct the full analysis enunciated in *Brnovich* and its forebears. First, this Court rejected Plaintiffs' intentional discrimination challenge to the VBM provisions partly because Plaintiffs failed to show a disparate impact under *Arlington Heights*, and a section 2 results claim requires an even greater showing of impact:

> Interpreting *Arlington Heights* to require a more onerous impact showing would eliminate the distinction between discriminatory results claims under section 2 of the Voting Rights Act and discriminatory intent claims under section 2 and the Constitution. When plaintiffs contend that a law has a discriminatory *result* under section 2, they need prove *only* impact. In that context, of course plaintiffs must make a greater showing of disproportionate impact. Otherwise, plaintiffs could prevail in any and every case in which they proved any impact.

*McCrory*, 831 F.3d at 231 n.8. Accordingly, because Plaintiffs could not make the lesser impact showing under *Arlington Heights* for the VBM provisions, they likewise cannot meet the higher threshold for their section 2 discriminatory results claims against those provisions. Plaintiffs have thus failed to demonstrate that the VBM request provision and the VBM request identification provision cause discriminatory results in violation of section 2 of the VRA.

Second, this Court has already determined that the drop-box provisions, the registration delivery provision, and the solicitation definition are intentionally discriminatory in violation of the VRA, Fourteenth Amendment, and Fifteenth Amendment. As such, this Court need not address Plaintiffs' remaining section 2 challenges to those provisions.

X

As to the remaining claims, the *Florida Rising* Plaintiffs claim the registration delivery provision violates the First Amendment as applied to their voter-registration activities. *See* ECF No. 59 ¶¶ 219–36, *in* Case No. 4:21cv201. In addition, the *HTFF* Plaintiffs claim the registration disclaimer provision is unconstitutionally vague with respect to specific penalties imposed for violating it. *See* ECF No. 44 ¶¶ 111–20, *in* Case No. 4:21cv242.

As to both claims, again, this Court need not reach the constitutional questions they raise given the myriad constitutional infirmities discussed at length above with respect to both the registration delivery provision and the registration disclaimer provision. *See, e.g.*, *Williamson*, 928 F.3d at 1316–17; *Green Party of Tenn.*, 791 F.3d at 695; *Cates*, 535 F. Supp. 3d at 1231. Moreover, as this Court noted above with respect to Plaintiffs' compelled speech claims, Plaintiffs' claims challenging the registration disclaimer provision appear likely to become moot if Governor DeSantis signs SB 524 into law. *See* ECF Nos. 661 & 662.

XI

A

All Plaintiffs request an injunction barring Defendants from enforcing SB 90's challenged provisions. *See generally* ECF No. 160; ECF No. 45, *in* Case No. 4:21cv187; ECF No. 59, *in* Case No. 4:21cv201; ECF No. 44, *in* Case No.

4:21cv242. To obtain a permanent injunction, Plaintiffs "must satisfy a four-factor test." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 159 (2010) (internal quotation marks omitted). Plaintiffs must show (1) that they have "suffered an irreparable injury; (2) remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) the public interest would not be disserved by a permanent injunction." *Ga. Advoc. Off. v. Jackson*, 4 F.4th 1200, 1208 (11th Cir. 2021).

Here Plaintiffs have suffered—and continue to suffer—irreparable injuries. "Courts routinely deem restrictions on fundamental voting rights irreparable injury" because "once the election occurs, there can be no do-over and no redress." *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014). And as it relates to the Plaintiff organizations, "conduct that limits an organization's ability to conduct voter registration activities constitutes an irreparable injury." *Project Vote, Inc. v. Kemp*, 208 F. Supp. 3d 1320, 1350 (N.D. Ga. 2016). Likewise, Plaintiffs have proved that they are suffering ongoing First Amendment injuries. *See FF Cosms. FL, Inc. v. City of Miami Beach*, 866 F.3d 1290, 1298 (11th Cir. 2017) ("An ongoing violation of the First Amendment constitutes an irreparable injury."). Plus, on the second factor, monetary damages are no substitute for the exercise of fundamental rights.

The final two factors likewise favor a permanent injunction. "The public has no interest in enforcing an unconstitutional" law—especially one that intentionally discriminates based on race. *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006). On the other side of the ledger sits the fundamental rights of Plaintiffs and their constituents. There is no comparison. Plaintiffs are entitled to an injunction.

Now, a brief remark on the scope of the injunction. Although this Court engaged in a county-by-county approach to standing with respect to the claims against the Defendant Supervisors of Elections—particularly as to Plaintiffs' vagueness and overbreadth claims regarding the solicitation definition—any remedy as to the intentionally discriminatory provisions in violation of the Fourteenth and Fifteenth Amendments and section 2 of the VRA shall run to all Defendants responsible for such provisions' enforcement. This is so, because when an official action is taken for racially discriminatory purposes, it "has no legitimacy *at all* under our Constitution." *City of Richmond, Va. v. United States*, 422 U.S. 358, 378 (1975) (emphasis added). Thus, those provisions found to be intentionally racially discriminatory are a nullity under the law and no Defendant shall enforce them.[74]

---

[74] To the extent a reviewing court disagrees with this scope of the injunction to follow, this Court finds, as set out at length above, that Plaintiffs proved specific injuries that are traceable to certain Supervisors of Elections and redressable by an injunction against them, including the following—namely, (a) with respect to the drop box provision, Supervisors of Elections for Orange, Osceola, Seminole, Lake, Polk, Lee, Palm Beach, and Volusia Counties, and (b) with

*See McCrory*, 831 F.3d at 239 ("[T]he proper remedy for a legal provision enacted with discriminatory intent is invalidation" (citing *City of Richmond*, 422 U.S. at 378-79)). Indeed, this Court is obligated in this instance "to grant a complete remedy," which "must reflect [the] finding that the challenged provisions were motivated by an impermissible discriminatory intent and must ensure that those provisions do not impose any lingering burden on African American voters." *Id*. at 240.

## B

Briefly, this Court pauses to address the so-called "*Purcell* principle." "In 2004, Arizona voters approved Proposition 200," which required voters to prove that they were US citizens when registering to vote and to present identification when casting their ballots. *Purcell v. Gonzalez*, 549 U.S. 1, 2 (2006). On September 11, 2006, a district court denied a motion to enjoin Proposition 200's enforcement but made no findings of fact or conclusions of law. *Id*. at 3. On October 5, and with an election scheduled on November 7, a motions panel of the Ninth Circuit enjoined Arizona from enforcing Proposition 200. *Id*. at 3. "The Court of Appeals offered no explanation or justification for its order." *Id*. Then, on October 12, the district court issued findings of fact and conclusion of law, explaining that "the balance of the harms and the public interest counseled in favor of denying the injunction." *Id*. at 4.

---

respect to the solicitation definition provision, Supervisors of Elections for Broward, Palm Beach, Duval, Orange, Osceola, Pinellas, Miami-Dade, Seminole, and Volusia Counties.

On October 20, in a five-page per curiam opinion, the Supreme Court reversed. *See id.* at 2. The Court explained that "[c]ourt orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls. As an election draws closer, that risk will increase." *Id.* at 4–5. The Court also held that the Ninth Circuit's failure to "give deference to the discretion of the District Court . . . was error." *Id.* at 5.

In the last election cycle, the Supreme Court took *Purcell*'s narrow ruling and recast it as an all-powerful "principle" that "lower federal courts should ordinarily not alter the election rules on the eve of an election." *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020). But this new "principle's" contours remain undefined. For example, what counts as the "eve" of an election? In *Purcell*, the Ninth Circuit enjoined an election law's enforcement 33 days before an election. On the other hand, the Supreme Court recently stayed an injunction issued roughly nine months before a general election and four months before the primary. *See Milligan*, 142 S. Ct. at 888 (2022) (Kagan, J., dissenting). And if courts "should not ordinarily alter election rules on the eve of an election," *Republican Nat'l Comm.*, 140 S. Ct. at 1207, what constitutes an *extraordinary* case? A poll tax? A literacy test? Even the Justices have struggled to consistently answer this question.

For example, in *Milligan*, the Court stayed an injunction entered by a three-judge district court panel after the panel found that Alabama's redistricting plan

262

"unlawfully diluted the votes of the State's Black population." 142 S. Ct. at 883 (Kagan, J., dissenting). The Court apparently relied on *Purcell*, even though the nearest election was four months away. *Id.* at 881 (Kavanaugh, J., concurring). Justice Alito joined Justice Kavanaugh's concurrence to that effect. Yet, only one month later, when the Court declined to enter an order "requiring North Carolina to change its existing congressional election districts for the upcoming 2022 primary and general elections" roughly two months before the next election, *Moore v. Harper*, 142 S. Ct. 1089, 1089 (2022) (Kavanaugh, J., concurring), Justice Alito dissented, arguing that roughly two months from a primary was not too close to change the legislative maps, *id.* at 1091–92 (2022) (Alito, J., dissenting). And even more recently, and roughly five months before the next election, the Supreme Court reversed the Wisconsin Supreme Court's adoption of a legislative map that "increased the number of majority-Black Assembly districts in Milwaukee" with nary a mention of *Purcell*. *Wis. Legislature v. Wis. Elections Comm'n*, No. 21A471, slip op. at 1 (U.S. Mar. 23, 2022) (Sotomayor, J., dissenting). How can this Court reconcile these competing applications of the "*Purcell* principle?"

Worse yet, the Court has often applied this so-called principle with little to no exposition. *See, e.g.*, *Merrill v. People First of Ala.*, 141 S. Ct. 25 (2020); *Democratic Nat'l Comm. v. Wis. State Legislature*, 141 S. Ct. 28 (2020). In short, without

explaining itself, the Court has allowed its wholly judge-made prudential rule to trump some of our most precious constitutional rights.

Not that this Court disagrees that sometimes, on the eve of an election, the balance of the equities weighs against injunctive relief. Last election cycle, this Court declined to grant a preliminary injunction for just that reason. Only weeks before the 2020 general election, and on the last day that Floridians could register to vote, Florida's voter registration website crashed. *Namphy*, 493 F. Supp. 3d at 1135. Several voting rights organizations sued, asking this Court to enter an injunction extending the registration deadline. *Id.* at 1136.

Though the plaintiffs did little to develop the record, the evidence before this Court suggested that up to 20,000 Floridians may have been deprived of their opportunity to register. *Id.* at 1144. On the other side of the ledger, however, were the significant collateral effects an injunction would have. All during a pandemic, thousands of voters could show up to vote, having registered but not yet on the rolls, and be forced to cast provisional ballots—leading to long lines and chaos at polling places. *Id.* at 1145. And processing new registrations after the book closing deadline would draw Supervisors' resources away from other pressing pre-election tasks, "such as processing vote-by-mail requests and ballots, and administering early voting." *Id.*

Ultimately, this Court ruled that "Florida's interest in preventing chaos in its already precarious—and perennially chaotic—election outweighs the substantial burden imposed on the right to vote" and declined to issue an injunction. *Id.* In other words, sometimes the cure is worse than the disease. That is the sensible rule *Purcell* used to stand for.

Still, this Court is duty bound to follow the Supreme Court's pronouncements, including its reworked *Purcell* principle. But the question remains, what *is* the *Purcell* principle? In his concurring opinion in *Milligan*, Justice Kavanaugh suggested a set of factors to consider in deciding both if an injunction comes too close to an election and if an injunction is warranted even when an election is imminent.

Under Justice Kavanaugh's rubric, what qualifies as "too close" to an election varies depending on "the nature of the election law at issue, and how easily the State could make the change without undue collateral effects." *Milligan*, 142 S. Ct. at 881 n.1 (Kavanaugh, J., concurring). "Changes that require complex or disruptive implementation must be ordered earlier than changes that are easy to implement." *Id.* Florida's primary election is set for August 23, 2022, and the general is set for November 8, 2022. Tr. at 3495. So the closest election is roughly five months away. Plaintiffs ask for an injunction *preventing* changes to Florida's election law from going into effect; namely, Plaintiffs ask this Court to enjoin Defendants from

enforcing *new* limitations on drop boxes, enforcing a *new* solicitation definition, enforcing *new* restrictions on 3PVROs.

Supervisor Earley put on evidence showing that an injunction would not have negative collateral effects. First, he testified that enjoining SB 90's requirement that drop boxes be continuously manned "would have little impact" on his office. *Id.* at 3496; *see also id.* at 3156 (testimony by Supervisor White that if this Court enjoined the drop-box provisions "tomorrow" nothing would change for her office). He added that enjoining the $25,000 fine "would be a help." *Id.* Indeed, he explained, "it would have a pretty significant impact in a positive way." *Id.* at 3499. This is because enjoining the fine would relieve staffing concerns and allow Supervisor Earley to keep a small drop box at his office that he would otherwise remove. *Id.* at 3496. He also testified that "[f]or the most part," enjoining the provision barring most drop boxes outside of early voting hours "would not" affect his operations. *Id.* at 3496–97.

For the solicitation definition, Supervisor Earley remarked that an injunction would not "have any impact." *Id.* at 3499. And for the registration return requirement, Supervisor Earley testified that it might "tend to impact us a little bit in an adverse way" but that 3PVROs are important and that "we value that partnership." *Id.* at 3501. Similarly, Supervisor White testified that it would be "just

. . . more burdensome" for her office if this Court enjoined the registration return requirement. *Id.* at 3168.

In short, then, Supervisors Earley and White explained that, on the whole, enjoining the challenged provisions would not have undue collateral effects on their preparation for the 2022 election. Rather, an injunction would improve election administration in Florida. This Court heard no testimony to the contrary. Thus, this Court's injunction—coming roughly five months before the next election—presents no *Purcell* issue.[75]

And even if five months were too close, this Court's injunction would still meet Justice Kavanaugh's second test. That test requires the plaintiff to show "(i) the underlying merits are entirely clear-cut in favor of the plaintiff; (ii) the plaintiff would suffer irreparable harm absent the injunction; (iii) the plaintiff has not unduly delayed bringing the complaint to court; and (iv) the changes in question are at least feasible before the election without significant cost, confusion, or hardship." *Milligan*, 142 S. Ct. at 881 (Kavanaugh, J., concurring).

On the first factor, Plaintiffs have *already* succeeded on the merits. On the second, as explained above, Plaintiffs will suffer irreparable harm absent an

---

[75] Contrast this Court's decision in *Namphy* discussed above. There, the changes the plaintiffs sought would be very disruptive, and thus must come at a greater distance from the election. *Milligan*, 142 S. Ct. at 881 n.1 (Kavanaugh, J., concurring).

injunction. On the third factor, Plaintiffs have not delayed, indeed, the *League* Plaintiffs sued the *same* day Governor DeSantis signed SB 90 into law—with the other Plaintiffs following soon after. *See, e.g.*, ECF No. 1. Finally, an injunction bars changes, it requires no one to do anything differently from what they did before SB 90 was enacted. Thus, it is feasible to implement an injunction before the next election without hardship.[76]

In short, under any set of equitable factors that might apply, Plaintiffs are entitled to a permanent injunction.

## XII

Having determined that a permanent injunction is warranted, this Court next addresses whether it will stay that injunction pending appeal. Stays pending appeal are governed by a four-part test: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest

---

[76] Again, contrast this case with *Namphy*. In *Namphy*, the plaintiffs introduced little evidence, and so their likelihood of success on the merits was not clear-cut. 493 F. Supp. 3d at 1145 (weighing the plaintiffs' scant evidence against that offered by the defendant, "which paint[ed] a disturbing picture of overworked elections staff, incomplete voter rolls, and election day mayhem"). On the other hand, the plaintiffs would suffer irreparable harm and had not unduly delayed. But the changes the plaintiffs requested were not "feasible before the election without significant cost, confusion, or hardship." *Milligan*, 142 S. Ct. at 881 (Kavanaugh, J., concurring). Thus, as this Court recognized, it faced an "incredibly close call." *Namphy*, 494 F. Supp. 3d at 1145. In end, however, the fourth factor proved decisive. *Id.*

lies." *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987); *see also Venues Lines Agency v. CVG Industria Venezolana De Aluminio, C.A.*, 210 F.3d 1309, 1313 (11th Cir. 2000) (applying the same test). Because these factors substantially overlap with the factors this Court applies in deciding whether to grant an injunction, stays pending appeal "are disfavored and granted only in exceptional circumstances." *Garcia–Mir v. Meese*, 781 F.2d 1450, 1453 (11th Cir. 1986). Here, this Court finds Defendants are not entitled to a stay of this Court's injunction. Accordingly, this Court will not entertain motions to stay. Defendants have every right to appeal, and this Court sees no reason to delay Defendants in seeking an appeal by requiring them to move to stay with this Court under Rule 62.

## XIII

On top of injunctive relief, the *NAACP* and *Florida Rising* Plaintiffs seek bail-in relief under section 3(c) of the VRA. ECF No. 45 ¶ 239, *in* Case No. 4:21cv187; ECF No. 59 ¶¶ 162–64, *in* Case No. 4:21cv201.

Titled "Retention of jurisdiction to prevent commencement of new devices to deny or abridge the right to vote," section 3(c) provides additional remedies for Plaintiffs who have successfully challenged voting restrictions under the Fourteenth or Fifteenth Amendments. Under section 3(c), if this Court finds that a "political subdivision" has committed intentional race discrimination in voting, it "shall retain jurisdiction for such period as it may deem appropriate." 52 U.S.C. § 10302(c).

During that period no voting regulations enacted by the guilty political subdivision will go into effect unless the subdivision preclears them with either this Court or the Attorney General. *Id.* After careful consideration, this Court determines that Plaintiffs are entitled to such relief.

The parties treat this issue as an afterthought. Defendants devote less than one page to it; Plaintiffs devote five. But this Court finds that a more expansive discussion is necessary. This is because preclearance is "strong medicine" and "a drastic departure from basic principles of federalism." *Shelby Cnty.*, 570 U.S. at 535. This Court begins its analysis with section 3(c)'s history, and its place in the VRA's broader preclearance scheme.

## A

### 1

The VRA is an extraordinary solution to an extraordinary problem. Congress passed the VRA because it "felt itself confronted by an insidious and pervasive evil which had been perpetuated in certain parts of our country through unremitting and ingenious defiance of the Constitution." *South Carolina v. Katzenbach*, 383 U.S. 301, 309 (1966). Congress also concluded that previous remedies for voting discrimination had fallen short and "would have to be replaced by sterner and more elaborate measures in order to satisfy the clear commands of the Fifteenth Amendment." *Id.*

Before the VRA, Congress fought racial discrimination in voting by facilitating "case-by-case litigation against voting discrimination." *Id.* at 313. But as the Supreme Court explained, that approach "proved ineffective for a number of reasons." *Id.* at 314. Drawing on the congressional record, *Katzenbach* identified four reasons why a case-by-case approach had failed to get the job done.

*First*, "[v]oting suits are unusually onerous to prepare, sometimes requiring as many as 6,000 man-hours spent combing through . . . records in preparation for trial." *Id. Second*, "[l]itigation ha[d] been exceedingly slow, in part because of the ample opportunities for delay afforded" defendants in such proceedings. *Id. Third*, "[e]ven when favorable decisions [were] finally . . . obtained," states merely switched their method of discrimination to evade the court's ruling. *Id.*; *see also* H.R. Rep. No. 89-439, at 10 (1965) ("Barring one contrivance too often has caused no change in result, only in methods."). And *fourth*, local officials refused to obey unfavorable court orders. *Katzenbach*, 383 U.S. at 314.

Congress's solution was preclearance. Section 4 of the VRA laid "down a formula for defining the States and political subdivisions to which" preclearance applied. *Id.* at 315. And section 5 set out preclearance itself: "the suspension of all new voting regulations pending review by federal authorities to determine whether their use would perpetuate voting discrimination." *Id.* at 315–16. Section 4 also permitted jurisdictions to seek relief from section 5 scrutiny by showing that they

had not discriminated in the past five years, a process known as "bail[ing] out" of preclearance. *Shelby Cnty.*, 570 U.S. at 537. These two provisions made up the preclearance scheme's backbone.

But Congress also included section 3(c) as a part of that scheme. Some have described section 3(c) as "[a] hybrid of sections 2 and 5" of the VRA. Travis Crum, *The Voting Rights Act's Secret Weapon: Pocket Trigger Litigation and Dynamic Preclearance*, 119 Yale. L. J. 1992, 2006 (2010). As explained above, "section 3 authorizes courts to impose preclearance in response to violations of the Fourteenth and Fifteenth Amendments." *Id.*; *see also* Pub. L. No. 89-110, § 3(c), 79 Stat. 437, 437–38 (1965).[77] Congress designed section 3(c) "to deal with denials or abridgments of the right to vote in so-called 'pockets of discrimination'—that is, areas outside the States and subdivisions to which the prohibitions of section 4(a) are in effect." H.R. Rep. No. 80-439, at 23 (1965). As Congress explained, section 3(c) was intended to supplement sections 4 and 5 "by providing for judicial scrutiny of new or changed voting requirements, [and] to insure against the erection of new and onerous discriminatory voting barriers by State or political subdivisions which had been found to have discriminated." *Id.* In other words, just as courts can "bail

---

[77] Section 3 does differ from section 5 in that it permits this Court—rather than a three-judge panel of District Court for the District of Columbia—to preclear election regulations. *See* Crum *supra*, at 2009.

out" states that have stopped discriminating, they can "bail in" states who have recently discriminated, but who were not already subject to preclearance.

2

Not all of the VRA's preclearance regime remains in effect. In *Katzenbach*, the Court found the VRA's preclearance scheme constitutional. But nearly 50 years later, the Court invalidated section 4 because, in reenacting section 4, Congress focused "on decades-old data relevant to decades-old problems, rather than current data reflecting current needs." *See Shelby Cnty.*, 570 U.S. at 553. That said, the Court explicitly declined to pass on the constitutionality of other VRA sections, including section 3(c). *Id.* at 557.

Section 3(c) allows preclearance; in that way, it resembles sections 4 and 5. But section 3(c) does not raise the same constitutional concerns that animated the Court in *Shelby County*. Unlike section 4, section 3(c) does not sort jurisdictions into categories based on their long-past history of discrimination. While "section 4's coverage formula . . . required[] preclearance in jurisdictions with histories of racial discrimination in voting dating back to the 1960s and 1970s," section 3(c) "requires a court to find—or a jurisdiction to admit—a constitutional violation." Crum *supra*, at 2009. Put another way, rather than rely "on decades-old data relevant to decades-old problems" section 3(c) relies on the most up-to-date data possible. *Shelby Cnty.*, 570 U.S. at 553.

273

In short, "any 'disparate geographic coverage' must be 'sufficiently related to the problem that it targets.' " *Id.* at 551 (quoting *Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 203 (2009)). Section 3(c) ensures that it is. Thus, *Shelby County* presents no bar to relief under section 3(c).

B

Courts have applied section 3(c) "sparingly." Crum, *supra* at 2010. Indeed, section 3(c) has been "invoked fewer than twenty times in forty-eight years." *See* Edward K. Olds, *More Than 'Rarely-Used: A Post-*Shelby *Judicial Standard For Section 3 Preclearance*, 117 Colum. L. Rev. 2185, 2188 (2017).[78] There is therefore a dearth of authority from the Supreme Court and the various circuit courts as to when relief under section 3(c) is appropriate. *See id.* ("Section 3 preclearance garnered little . . . judicial attention from the time it was enacted . . . until the Supreme Court's decision in *Shelby County v. Holder*."). Even those cases that have considered section 3(c) offer little guidance. In *McCrory*, for example, the Fourth Circuit remarked only that "[s]uch remedies "[are] rarely used" before summarily declining to grant relief under section 3(c). 831 F.3d at 241. Similarly, in *Patino v. City of Pasadena*, the court granted section 3(c) relief after an exhaustive analysis

---

[78] This Court, however, has granted section 3(c) relief at least once. *See NAACP v. Gadsden Cnty. Sch. Bd.*, 589 F. Supp. 953, 958 (N.D. Fla. 1984).

of the plaintiffs' claims but devoted no analysis to section 3(c) itself. 230 F. Supp. 3d 667, 730 (S.D. Tex. 2017).

The only case to devote substantial analysis to section 3(c), *Jeffers v. Clinton*, 740 F. Supp. 585 (E.D. Ark. 1990), remains the seminal case interpreting the section. There, a three-judge district court panel imposed a preclearance requirement on Arkansas after determining that it "ha[d] committed a number of constitutional violations of the voting rights of black citizens." *Id.* at 586. With a few caveats, this Court finds the *Jeffers* court's well-reasoned opinion persuasive, and thus applies the same analysis here.

Under *Jeffers*, courts first ask "whether violations of the Fourteenth or Fifteenth Amendments justifying equitable relief have occurred within the State." *Perez v. Abbott*, 390 F. Supp. 3d 803, 813 (W.D. Tex. 2019). On this point, *Jeffers* explained that "more than one violation must be shown." 740 F. Supp. at 600. But there are reasons to doubt this conclusion. For one, it "runs counter to statutorily mandated rules of construction." Crum *supra*, at 2007 n.88; 1 U.S.C. § 1 ("In determining the meaning of any Act of Congress, unless the context indicates otherwise . . . words importing the plural include the singular . . . ."). Plus, "any statute that violates the Fifteenth Amendment necessarily violates countless citizens' Fifteenth Amendment rights." Crum *supra*, at 2007 n.88. At any rate, because this Court already found that, over the past 20 years, Florida has repeatedly targeted

Black voters because of their affiliation with the Democratic party, this Court need not resolve this issue. The first *Jeffers* factor is met.

Next, under *Jeffers*, courts ask whether "the remedy of preclearance should be imposed." *Perez*, 390 F. Supp. 3d at 813. Recall that the statute says that this Court, upon finding a Fifteenth Amendment violation, "*shall* retain jurisdiction for such period as it may deem appropriate." 52 U.S.C. § 10302(c) (emphasis added). *Jeffers* reasoned that the word "shall" in section 3(c) does not strip courts of their discretion. 740 F. Supp. at 600 (stating that "[i]t is standard doctrine that statutes stating that courts 'shall' grant equitable relief upon the occurrence of a certain state of affairs are not literally construed"). This Court questions whether courts may so casually disregard an express directive from Congress. *See Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 171 (2016) ("Unlike the word 'may,' which implies discretion, the word 'shall' usually connotes a requirement."); *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998) ("The . . . instruction comes in terms of the mandatory 'shall,' which normally creates an obligation impervious to judicial discretion."). Still, because this Court finds that equity favors imposing preclearance, it need not decide whether "shall" really means shall.

Having determined that courts may exercise discretion in deciding whether to award 3(c) relief, *Jeffers* set out a series of non-exhaustive factors to guide that

discretion. 740 F. Supp. at 601. These factors include (1) whether "the violations [have] been persistent and repeated," (2) whether the violations are "recent or distant in time," (3) whether preclearance would prevent future violations, (4) whether the violations have "been remedied by judicial decree or otherwise," (5) whether the violations are likely to recur, and (6) whether "political developments, independent of this litigation, make recurrence more or less likely." *Id.*

On the first and second factors, as detailed above, Florida has repeatedly, recently, and persistently acted to deny Black Floridians access to the franchise. This Court also finds that preclearance would prevent future violations. The fourth factor, however, weighs against imposing preclearance requirements because this Order remedies the discrimination at issue before this Court. And on the fifth and sixth factors, this Court finds that violations are likely to recur, because political developments, if anything, make recurrence more likely. Both the Governor's Mansion and the Legislature are controlled by a party that, in the words of its own expert witness, stands to gain "if voting were to decrease among African-Americans." Tr. at 3362.

This Court also finds guidance in the Supreme Court's decision in *Katzenbach*. *See* Olds *supra*, at 2208–12 (arguing that *Katzenbach* should guide courts in applying section 3(c)). As explained above, Congress and the *Katzenbach* Court identified four problems with enforcing the Fifteenth Amendment on a case-

by-case basis: (1) litigation is expensive, (2) litigation takes time, (3) jurisdictions quickly change tactics in the face of unfavorable rulings, and (4) jurisdictions may disobey unfavorable rulings.

On the first point, Plaintiffs have challenged SB 90 at great cost—given the number of lawyers who have appeared here, and the amount of papers filed, this Court shudders to think how much.[79] And, on the second point, despite this Court's best efforts, it has taken a year to litigate this case. As to the third point, now that this case is on the cusp of resolution, Florida is poised to change tack, repealing some of SB 90's most obviously unconstitutional provisions and introducing new regulations on the franchise. SB 524, which is now awaiting Governor DeSantis's signature, deletes the registration disclaimer added by SB 90 and challenged in this case. *See* Fla. CS for SB 524, § 6 (2022) (proposed amendment to § 97.057(3)(a), Fla. Stat.). As explained above, the registration disclaimer that SB 524 proposes to repeal violates the First Amendment. Worse still, the Legislature enacted the registration disclaimer with the intent to discriminate against Black voters—who disproportionately rely on 3PVROs.

---

[79] In comparison to the great cost of challenging election laws—sometime millions of dollars—"[t]he average cost of preclearing a voting change is a few hundred dollars." Crum *supra*, at 2016.

Having determined that three of the four problems with case-by-case adjudication discussed in *Katzenbach* are present here, this Court need not address the more nuanced, but equally troubling, fourth problem.

In sum, without preclearance, Florida can pass unconstitutional restrictions like the registration disclaimer with impunity. Litigation takes time; here, it has taken a year. And so, before litigation can run its course, the Legislature can merely change the law—as it has done here. The result is that Floridians have been forced to live under a law that violates their rights on multiple fronts for over a year. Without preclearance, Florida could continue to enact such laws, replacing them every legislative session if courts view them with skepticism. Such a scheme makes a mockery of the rule of law.

Under any metric, preclearance is needed.

## C

Having determined that section 3(c) relief is warranted, a final word is in order about Defendants' argument—made in passing in a footnote—that section 3(c) "appears to" violate the Constitution. *See* ECF No. 648 at 65 n.18. Defendants claim that section 3(c) is "an improper delegation of authority under Article I, § 4 of the U.S. Constitution." *Id.*

On this point, this Court's analysis starts, and ends, with the text: "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be

prescribed in each State by the Legislature thereof; *but the Congress may at any time by Law make or alter such Regulations*, except as to the Places of chusing Senators." U.S. Const. art. I, § 4, cl. 1 (emphasis added).

The Constitution's text could not be clearer: Congress gets the final word. This principle is nearly old as the Union itself. *See Martin v. Hunter's Lessee*, 14 U.S. (1 Wheat) 304, 343 (1816) ("It is imperative upon the state legislatures to make laws prescribing the time, places, and manner of holding elections for senators and representatives, and for electors of president and vice-president. And in these, as well as some other cases, congress have a right to revise, amend, or supercede the laws which may be passed by state legislatures."). Article I, the Court recognized, places state legislatures, "in some respects, under the control of congress." *Id.* And Congress has determined that, at times, preclearance is necessary. *See* 52 U.S.C. § 10302(c). Defendants' argument lacks merit.

## D

So section 3(c) relief is warranted and constitutional. But the question remains: what does that relief look like? On the one hand, this Court confesses reticence to order preclearance at all, given the drastic nature of such relief and the great federalism costs it imposes. On the other hand, section 3(c) represents a direct command from Congress that Fifteenth Amendment violations warrant preclearance.

Ultimately, this Court is not at liberty to ignore duly enacted federal law based on its own discomfort with the outcome.

But section 3(c) does afford this Court some wiggle room. As many scholars have recognized, a key advantage of section 3(c) over sections 4 and 5 is that section 3(c) allows courts to order preclearance that is both targeted and limited in duration. *See* Olds *supra*, at 2214; Crum *supra*, at 2016. And though, based on the evidence above, a strong argument could be made in favor of requiring Florida to preclear all changes to its election code, this Court—recognizing that preclearance of any form is a drastic remedy—finds a more tailored remedy appropriate.

Pursuant to section 3(c) of the VRA, this Court retains jurisdiction for a period of ten years following the date this Order is entered. During that time, Florida may enact no law or regulation governing 3PVROs,[80] drop boxes, or "line warming" activities[81] without submitting such law or regulation for preclearance.

XIV

On August 28, 1963, Martin Luther King Jr. delivered his famous "I Have a Dream" speech on the steps of the Lincoln Memorial. In its most memorable passage, he said, "I have a dream that my four little children will one day live in a nation where they will not be judged by the color of their skin but by the content of

---

[80] As that term is defined in section 97.021(40), Florida Statutes.

[81] Meaning the non-partisan provision of aid to those waiting in line to vote.

their character." *Read Martin Luther King Jr.'s "I Have a Dream' Speech in its Entirety*, NPR (Jan. 14, 2022, 1:53 PM), https://tinyurl.com/5n7j5cuj.

Many know and celebrate Dr. King's speech—or at least its second half, given extemporaneously after Mahalia Jackson called on Dr. King to tell the crowd about his dream. But most do not know that, only three years later, Dr. King told NBC News "that dream that I had that day has in many points turned into a nightmare." Kirsten West Savali, *Martin Luther King Jr: "My Dream Has Turned Into a Nightmare,"* The Root (Jan. 16, 2017, 1:36 PM) https://tinyurl.com/2uxm94h9. As he explained, Dr. King had "come to see that we have many more difficulties ahead and some of the old optimism was a little superficial and now it must be tempered with a solid realism. And I think the realistic fact is that we still have a long, long way to go . . . ." *Id.*

Likewise, while this Court lauds the idealism of Dr. King's dream in 1963, this Court is not so naïve to believe that the Florida Legislature would not pass an intentionally discriminatory law in 2021. We do not live in a colorblind society— not that this was ever Dr. King's point. *See* Tanner Colby, *Politicians have Abused Martin Luther King Jr's Dream*, The Guardian (Aug. 23, 2013), https://tinyurl.com/ycksnvpj; Donna Murch, *Five Myths About Martin Luther King*, The Washington Post (Jan. 15, 2016); https://tinyurl.com/36shpaez.

The evidence bears that out. In Florida, White Floridians outpace Black Floridians in almost every socioeconomic metric. In Florida, since the end of the Civil War, politicians have attacked the political rights of Black citizens. In Florida, though we have come far, "the realistic fact is that we still have a long, long way to go." For the past 20 years, the majority in the Florida Legislature has attacked the voting rights of its Black constituents. They have done so not as, in the words of Dr. King, "vicious racists, with [the] governor having his lips dripping with the words of interposition and nullification," but as part of a cynical effort to suppress turnout among their opponents' supporters. That, the law does not permit.

Accordingly,

**IT IS ORDERED**:

1. This Court declares that § 101.69(2), Florida Statutes (2021), as amended by SB 90, is unconstitutional.

2. This Court declares that § 97.0575(3)(a), Florida Statutes (2021), as amended by SB 90, is unconstitutional.

3. This Court declares that the prohibition against "engaging in any activity with the intent to influence or effect of influencing a voter" under § 102.031(4)(a)–(b), Florida Statutes (2021), as amended by SB 90, is unconstitutional.

4. In Case No. 4:21cv187, Plaintiffs are entitled to no relief under the Americans with Disabilities Act on Count III of their amended complaint, ECF No. 45.

5. In Case No. 4:21cv186, the Clerk shall enter judgment stating:

This Court hereby **DECLARES** that the registration disclaimer provision described in section 97.0575(3)(a), Florida Statutes (2021), as amended by SB 90, violates Plaintiffs' rights under the First Amendment of the United States Constitution. This Court **GRANTS** Plaintiffs' request for a permanent injunction. Neither Defendant Lee nor Defendant Moody, nor their successors in office, deputies, officers, employees, agents, nor any person in active participation or concert with Defendants Lee and Moody shall enforce, nor permit enforcement of, the registration disclaimer provision described in section 97.0575(3)(a), Florida Statutes (2021), as amended by SB 90. Defendants Lee and Moody, and their successors in office, as well as their deputies, officers, employees, agents, and any other person in active participation and concert with Defendants Lee and Moody shall take all practicable measures within the scope of their official authority to ensure compliance with the terms of this Order. In addition, this Court **DECLARES** that the prohibition against "engaging in any activity with the intent to influence or effect of influencing a voter" under § 102.031(4)(a)–(b), Florida Statutes (2021), as amended by SB 90, violates Plaintiff Scoon and the League Entities' rights under the First and Fourteenth Amendments of the United States Constitution. This Court **GRANTS** Plaintiffs' request for a permanent injunction. Neither Defendant Supervisor of Elections for Bay County, nor his successors in office, deputies, officers, employees, agents, nor any person in active participation or concert with Defendant Supervisor of Elections for Bay County shall enforce, nor permit enforcement of, the prohibition against "engaging in any activity with the intent to influence or effect of influencing a voter" as described in section 102.031(4)(a)-(b), Florida Statutes (2021), as amended by SB 90. Defendant Supervisor of Elections for Bay County and his successors in office, as well as his deputies, officers, employees, agents, and any other person in active participation and concert with Defendant Supervisor of Elections for Bay County shall take all practicable measures within the scope of their official authority to ensure compliance with the terms of this Order.

6. In Case No. 4:21cv187, the Clerk shall enter judgment stating:

This Court hereby **DECLARES** that the drop box provision described in section 101.69(2)-(3), Florida Statutes (2021), as amended by SB 90, violates Plaintiffs' rights under the Fourteenth and Fifteenth Amendments of the United States Constitution and section 2 of the Voting Rights Act. This Court **GRANTS** Plaintiffs' request for a permanent injunction. Neither Defendant Lee nor the Defendant Supervisors of Elections, nor their successors in office, deputies, officers, employees, agents, nor any person in active participation or concert with Defendants Lee and the Supervisors of Elections shall enforce, nor permit enforcement of, the drop box provision described in section 101.69(2)-(3), Florida Statutes (2021), as amended by SB 90. Defendants Lee and the Supervisors of Elections, and their successors in office, as well as their deputies, officers, employees, agents, and any other person in active participation and concert with Defendants Lee and the Supervisors of Elections shall take all practicable measures within the scope of their official authority to ensure compliance with the terms of this Order. In addition, this Court **DECLARES** that the prohibition against "engaging in any activity with the intent to influence or effect of influencing a voter" under section 102.031(4)(a)–(b), Florida Statutes (2021), as amended by SB 90, violates Plaintiffs' rights under the First, Fourteenth, and Fifteenth Amendments of the United States Constitution and section 2 of the Voting Rights Act. This Court **GRANTS** Plaintiffs' request for a permanent injunction. Neither Defendant Supervisors of Elections, nor their successors in office, deputies, officers, employees, agents, nor any person in active participation or concert with Defendant Supervisors of Elections shall enforce, nor permit enforcement of, the prohibition against "engaging in any activity with the intent to influence or effect of influencing a voter" as described in section 102.031(4)(a)-(b), Florida Statutes (2021), as amended by SB 90. Defendant Supervisors of Elections and their successors in office, as well as their deputies, officers, employees, agents, and any other person in active participation and concert with Defendant Supervisors of Elections shall take all practicable measures within the scope of their official authority to ensure compliance with the terms of this Order.

7. In Case No. 4:21cv201, the Clerk shall enter judgment stating:

This Court hereby **DECLARES** that the drop box provision described in section 101.69(2)-(3), Florida Statutes (2021), as amended

by SB 90, violates Plaintiffs' rights under the Fourteenth and Fifteenth Amendments of the United States Constitution and section 2 of the Voting Rights Act. This Court **GRANTS** Plaintiffs' request for a permanent injunction. Neither Defendant Lee nor the Defendant Supervisors of Elections, nor their successors in office, deputies, officers, employees, agents, nor any person in active participation or concert with Defendants Lee and the Supervisors of Elections shall enforce, nor permit enforcement of, the drop box provision described in section 101.69(2)-(3), Florida Statutes (2021), as amended by SB 90. Defendants Lee and the Supervisors of Elections, and their successors in office, as well as their deputies, officers, employees, agents, and any other person in active participation and concert with Defendants Lee and the Supervisors of Elections shall take all practicable measures within the scope of their official authority to ensure compliance with the terms of this Order. In addition, this Court **DECLARES** that the prohibition against "engaging in any activity with the intent to influence or effect of influencing a voter" under section 102.031(4)(a)–(b), Florida Statutes (2021), as amended by SB 90, violates Plaintiffs' rights under the First, Fourteenth, and Fifteenth Amendments of the United States Constitution and section 2 of the Voting Rights Act. This Court **GRANTS** Plaintiffs' request for a permanent injunction. Neither Defendant Supervisors of Elections, nor their successors in office, deputies, officers, employees, agents, nor any person in active participation or concert with Defendant Supervisors of Elections shall enforce, nor permit enforcement of, the prohibition against "engaging in any activity with the intent to influence or effect of influencing a voter" as described in section 102.031(4)(a)-(b), Florida Statutes (2021), as amended by SB 90. Defendant Supervisors of Elections and their successors in office, as well as their deputies, officers, employees, agents, and any other person in active participation and concert with Defendant Supervisors of Elections shall take all practicable measures within the scope of their official authority to ensure compliance with the terms of this Order. In addition, this Court **DECLARES** that the registration delivery provision described in section 97.0575(3)(a), Fla. Stat. (2021), as amended by SB 90, violates Plaintiffs' rights under the Fourteenth, and Fifteenth Amendments of the United States Constitution and section 2 of the Voting Rights Act. This Court **GRANTS** Plaintiffs' request for a permanent injunction. Neither Defendant Lee nor Defendant Moody, nor their successors in office, deputies, officers, employees, agents, nor any person in active

participation or concert with Defendants Lee and Moody shall enforce, nor permit enforcement of, the registration delivery provision described in section 97.0575(3)(a), Florida Statutes (2021), as amended by SB 90. Defendants Lee and Moody, and their successors in office, as well as their deputies, officers, employees, agents, and any other person in active participation and concert with Defendants Lee and Moody shall take all practicable measures within the scope of their official authority to ensure compliance with the terms of this Order. Finally, this Court **DECLARES** that the registration disclaimer provision described in section 97.0575(3)(a), Fla. Stat. (2021), as amended by SB 90, violates Plaintiffs' rights under the First Amendment of the United States Constitution. This Court **GRANTS** Plaintiffs' request for a permanent injunction. Neither Defendant Lee nor Defendant Moody, nor their successors in office, deputies, officers, employees, agents, nor any person in active participation or concert with Defendants Lee and Moody shall enforce, nor permit enforcement of, the registration disclaimer provision described in section 97.0575(3)(a), Florida Statutes (2021), as amended by SB 90. Defendants Lee and Moody, and their successors in office, as well as their deputies, officers, employees, agents, and any other person in active participation and concert with Defendants Lee and Moody shall take all practicable measures within the scope of their official authority to ensure compliance with the terms of this Order.

8. In Case No. 4:21cv242, the Clerk shall enter judgment stating:

This Court hereby **DECLARES** that the registration disclaimer provision described in section 97.0575(3)(a), Florida Statutes (2021), as amended by SB 90, violates Plaintiffs' rights under the First Amendment of the United States Constitution. This Court **GRANTS** Plaintiffs' request for a permanent injunction. Neither Defendant Lee nor Defendant Moody, nor their successors in office, deputies, officers, employees, agents, nor any person in active participation or concert with Defendants Lee and Moody shall enforce, nor permit enforcement of, the registration disclaimer provision described in section 97.0575(3)(a), Florida Statutes (2021), as amended by SB 90. Defendants Lee and Moody, and their successors in office, as well as their deputies, officers, employees, agents, and any other person in active participation and concert with Defendants Lee and Moody shall

take all practicable measures within the scope of their official authority
to ensure compliance with the terms of this Order.

9. This Order incorporates all prior rulings in this case on motions to dismiss and

   motions for summary judgment.

10. Pursuant to 52 U.S.C. § 10302(c), this Court retains jurisdiction for a period

    of ten years following the date of this Order. During that time, Florida may

    enact no law or regulation governing 3PVROs, drop boxes, or "line warming"

    activities, as those terms are defined in this Order, without submitting such

    law or regulation for preclearance.

11. This Court also retains jurisdiction in these four cases for purposes of

    determining entitlement to and amount, if any, of attorneys' fees.

12. The Clerk shall close the file.

   **SO ORDERED on March 31, 2022.**

                        **s/Mark E. Walker**
                        **Chief United States District Judge**

# TAB 758

### IN THE UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF FLORIDA
### TALLAHASSEE DIVISION

**LEAGUE OF WOMEN VOTERS**
**OF FLORIDA, INC., et al.,**

       *Plaintiffs*,

**v.**                             **Case No.: 4:21cv186-MW/MAF**

**CORD BYRD, et al.,**

       *Defendants*.

_____/

### ORDER VACATING JUDGMENT AND
### DIRECTING CLERK TO ENTER PARTIAL JUDGMENT[1]

Pursuant to the Mandate issued in this consolidated case by the United States Court of Appeals for the Eleventh Circuit, *see* ECF No. 754, the Clerk shall annotate the docket to reflect that this Court's Order on the Merits, ECF No. 665, is **VACATED in part**, and the Clerk's Judgment, ECF No. 666, is **VACATED in part**.

Pursuant to Federal Rule of Civil Procedure 54(b), this Court finds there is no just reason for delay in entering final judgment on remand with respect to Plaintiffs'

---

[1] This Court recognizes that this is one of four consolidated cases that were tried together and resulted in a consolidated Order on the merits. For purposes of entering judgment, this Court treated each case separately. Accordingly, this Court will address the Eleventh Circuit's Mandate in separate Orders with respect to each individual case. This Order concerns only the judgment with respect to Plaintiffs' claims in Case No.: 4:21cv186-MW/MAF.

claims in Counts II, IV, V, and VI.[2] Accordingly, The Clerk shall enter an amended partial judgment in **Case No.: 4:21cv186-MW/MAF** stating, "Count II in Plaintiffs' amended complaint, ECF No. 160, is **DISMISSED without prejudice for lack of standing**. Counts V and VI of Plaintiff's amended complaint are **DISMISSED as moot**. Judgment is entered in favor of Plaintiffs with respect to Count IV. This Court **DECLARES** that the prohibition against "engaging in any activity with the . . . effect of influencing a voter" under section 102.031(4)(a)–(b), Florida Statutes (2021), as amended by SB 90, violates Plaintiff Scoon and the League Entities' rights under the Fourteenth Amendment of the United States Constitution. This Court **GRANTS in part** Plaintiffs' request for a permanent injunction. Neither Defendant Supervisor of Elections for Bay County, nor his successors in office, deputies, officers, employees, agents, nor any person in active participation or concert with Defendant Supervisor of Elections for Bay County shall enforce, nor permit enforcement of the prohibition against "engaging in any activity with the . . . effect of influencing a voter" as described in section 102.0131(4)(a)–(b), Florida Statutes (2021), as amended by SB 90. Defendant Supervisor of Elections for Bay County and his successors in office, as well as his deputies, officers, employees, agents, and any

---

[2] Given that the Eleventh Circuit affirmed, in part, this Court's decision concerning the vagueness of the solicitation definition, this Court need not reach Plaintiffs' undue burden or free speech claims in Counts I and III with respect to this provision. Moreover, this is consistent with the Eleventh Circuit's remand to address only "whether the drop-box and registration-delivery provisions unduly burden the right to vote under the First and Fourteenth Amendments." *See* ECF No. 739 at 9–10.

other person in active participation and concert with Defendant Supervisor of Elections for Bay County shall take all practicable measures within the scope of their official authority to ensure compliance with the terms of this Order." The Clerk shall reopen this case for this Court to address Plaintiffs' remaining undue burden claim under Count I.

**SO ORDERED on November 15, 2023.**

<u>s/Mark E. Walker</u>
**Chief United States District Judge**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was filed electronically on February 9, 2026 and will therefore be served electronically upon all counsel.

*/s/ John A. Freedman*

John A. Freedman

*Counsel for Florida Rising Together Appellees*

*/s/ Amia Trigg*

Amia Trigg

*Counsel for Disability Rights Florida Appellees*

*/s/ Christina Ford*

Christina Ford

*Counsel for Appellees League of Women Voters of Florida, Inc., et al.*